**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HAITIAN-AMERICANS UNITED INC.; VENEZUELAN ASSOCIATION OF MASSACHUSETTS; UNDOCUBLACK NETWORK, INC.; SYDNEY DOE; MARLENE DOE; GUSTAVO DOE; and NATALIA DOE,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security,<br><br>Defendants. | **COMPLAINT**<br><br>Civil Action No. 25-10498 |

**INTRODUCTION**

1.      Temporary Protected Status (TPS) is a humanitarian program that provides a critical lifeline in the United States for immigrants who have fled their home countries due to extreme violence, political upheaval, and natural disasters. Enacted in 1990, TPS was designed to bring an orderly and fact-driven process to what had previously been characterized by *ad hoc* decisions to defer immigration enforcement for those displaced by humanitarian or environmental crises. Accordingly, the TPS statute now sets forth specific criteria for when the Secretary of the Department of Homeland Security (DHS) may designate countries for TPS protection; timelines for when designations are to be reviewed and extended; and criteria governing when designations can be terminated.

2.      Haiti has been designated under TPS since 2010 and Venezuela since 2021. Both

1

nations are in collapse—beset by political violence and without functioning governments or basic infrastructure. For thousands of Haitian and Venezuelan nationals living in the United States, TPS is thus literally life-saving, allowing them to remain here instead of returning to the immense dangers of their home countries. With the work authorization that comes with TPS protection, Haitian and Venezuelan TPS holders hold jobs throughout the U.S. economy, have started and grown families in the United States, and are deeply involved in their communities.

3.      But having long denigrated Haitian and Venezuelan immigrants as savages and "animals," and undeterred by the structures of TPS law, Defendant Donald J. Trump swept into the Presidency in January 2025 and immediately began undermining TPS protections. His DHS Secretary, Defendant Kristi Noem, within days of her confirmation "vacated" TPS extensions that had already been granted to Haiti and Venezuela. These unprecedented "vacaturs" purport to advance the end-date for Venezuela's TPS designation from October 2, 2026 to as early as April 2, 2025, and Haiti's from February 3, 2026 to August 3, 2025. Then, based on the "vacatur" of Venezuela's extension, Defendant Noem proceeded swiftly to announce that TPS would be terminated for that country entirely, effective April 7, 2025.

4.      None of these actions are legal. The TPS statute does not authorize the Secretary to pull the rug out from under vulnerable TPS recipients and rescind an extension that has already been granted; she simply has no statutory authority to do so. *See Federal Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (an agency "literally has no power to act … unless and until Congress authorizes it to do so by statute.") (cleaned up). And because the subsequent termination of TPS for Venezuela is based on the improper vacatur, it is also contrary to law.

5.      Defendants' *ultra vires* conduct highlights an even more fundamental problem, which provides an independent ground for invalidating the challenged decisions: they are not

evidence-based determinations based on the criteria required under the TPS statute, but rather are pre-ordained conclusions motivated by racial bias and improper political influence. The timing alone—with the first of the decisions coming mere days after Defendant Noem's confirmation as DHS Secretary—demonstrates that the decisions are not the reasoned determinations required by law.

6.    The evidence that racial bias infected the decision-making is equally strong. The list of dehumanizing and disparaging statements that Defendant Trump has made against Haitian and Venezuelan immigrants is unfortunately long: ranging from racist tropes that Haitians "all have AIDS" and eat dogs and cats, to routinely describing Venezuelans and other Latino immigrants as sub-human "animals." *See infra* at pp. 31-38; *see also Centro Presente et al. v. United States Dep't of Homeland Security et al*., 332 F. Supp. 3d 393, 401-02 (D. Mass. 2018) (cataloguing extensive evidence of discriminatory intent from first Trump Administration). By contrast, Defendant Trump regularly praises immigrants from predominately white countries, expressly asking why the United States cannot have more immigrants from "nice countries, you know like Denmark, Switzerland…."[1]

7.    Moreover, this racial bias translates directly into policy, both through executive action that disfavors Black and Latino immigrants—such as the TPS decisions at issue here—and action that favors white immigrants instead. *See Addressing Egregious Actions of the Republic of South Africa,* Executive Order (EO) 14204, 90 Fed. Reg. 9497 (February 12, 2025) (directive requiring that white South African and their families be granted priority refugee status in the United States). The Constitution forbids this type of biased decision-making. *Vill. of*

---

[1] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977) (Equal Protection violation shown where racial bias is "a motivating factor" in governmental decision-making).

8.     Plaintiffs are three membership organizations representing Haitian and Venezuelan TPS holders—Haitian Americans United, Inc., Venezuelan Association of Massachusetts, and UndocuBlack Network, Inc.—and four individual TPS recipients. By this action, they challenge Defendants' actions, which would imminently remove critical TPS protection from thousands of vulnerable individuals, as unlawful under the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq*. and the U.S. Constitution.

9.     Plaintiffs ask that this Court declare that the "vacaturs" for Haiti and Venezuela, and the subsequent Venezuela termination, are void. Plaintiffs further ask that these actions be immediately enjoined and set aside under the APA as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…." 5 U.S.C. § 706(1), (2)(A)-(D).

## PARTIES

**Organizational Plaintiffs**

*Haitian-Americans United, Inc.*

10.     Haitian-Americans United (HAU) is a nonprofit membership organization comprised of seventeen organizations[2] that focus on improving the quality of life for Haitian

---

[2] The organizations under HAU's umbrella include: Everett Haitian Community Center; Haitian American Public Health Initiatives (HAPHI); Haitian Artists Assembly of Massachusetts (HAAM); Haitian Parents Association; Haitian Youth Connection; Immigrant family Services Institute, Inc. (IFSI-USA); Little Hearts Dream Foundation; Massachusetts Haitian Media; Organization Promotional Artist and Haitian Culture (OPAHC); The Association of Haitian Women in Boston (AFAB-KAFANM); True Alliance Center (TAC); U.S. Haitian Chamber of Commerce, Inc.; Youth and Family Enrichment Services, Inc. (YOFES); Haitian Community Partners (HCP); Haitian American Bar Association; Haitian Community in Worcester MA; and The Haitian American Business Expo.

immigrants and Haitian-Americans through education, community empowerment, and cultural development. Membership is free and requires that the potential member organization be aligned with HAU's mission of providing services to Haitian immigrants and Haitian-Americans. Members are distinguished by their active participation in HAU's activities and events, which provides access to a network of support and resources.

11.     As the leading Haitian organization in Greater Boston—home to the third-largest Haitian and Haitian-American population in the United States—HAU plays a vital role in supporting immigrants and refugees. HAU hosts widely attended in-person events, programs, and activities designed to empower the Haitian immigrant community. These events serve several key purposes: promoting civic education, advocating for the rights of Haitian immigrants and Haitian-Americans, and strengthening cultural, academic, and artistic initiatives. Additionally, HAU works to raise awareness of Haitian history, fostering a sense of pride and solidarity while providing practical resources and support for immigrants and refugees.

12.     Through HAU's member organizations, HAU has thousands of individual members in Massachusetts, including a significant number of TPS beneficiaries from Haiti.

13.     For example, "Christina Doe," is a 58-year-old Haitian immigrant and HAU member who arrived in the United States in 2022 with her two daughters, now 23 and 20 years old. Since 2023, all three have been TPS recipients. Christina's youngest daughter suffers from Kartagener syndrome, a rare pulmonary disease that requires ongoing medical care. She depends on multiple daily medications and two medical devices to manage her condition. Without TPS, she would lose access to this critical treatment in Haiti, where adequate care is unavailable—putting her life at serious risk.

14.     "Jean Doe" is a 27-year-old Haitian immigrant and HAU member who arrived in

5

the United States in 2023 and obtained TPS in 2024. With employment authorization secured through TPS, Jean works as a cashier at a large retail store, where she has been recognized as a reliable, hardworking team player. She is also the mother of a 15-month-old U.S.-born child. Jean fears that without TPS, she will be forced to leave the country without her child, who is a U.S. citizen; she cannot fathom taking her child to Haiti due to the extreme insecurity and violence there. Her family in Haiti is currently under constant threats of violence. If she is forced to return to Haiti, she fears facing horrific violence—even death. Losing TPS would put her life at risk and tear her family apart.

15.    Since the Trump Administration's campaign against immigrants and DHS's decision to shorten TPS protections for Haitians, HAU has experienced a significant drop in engagement with all its programming. Attendance at events has been lower, and fewer members and constituents have been seeking HAU's services, with many citing fear of attending or engaging due to the threat of immigration enforcement now that they or their family's status may change. This has not only hindered HAU's ability to provide education and other core services to its members and constituents, but it has also impaired HAU's ability to simply access and interact with members of the community it serves, which is fundamental to its ability to carry out its core activities.

*Venezuelan Association of Massachusetts*

16.    Venezuelan Association of Massachusetts (VAM) is a non-profit, membership-based organization, whose mission is to provide humanitarian aid to Venezuela, promote Venezuelan cultural values, and support its local Venezuelan community. VAM is dedicated to educating and informing the public on issues of relevance to Venezuelans, while also fostering connections and integration within the Venezuelan community across the nation. The

organization works to address immediate needs and create a positive impact, striving to be a key resource for the growth and development of the Venezuelan community, while extending its influence on other communities across the state.

17.    VAM's services range from informational sessions, assistance with employment, legal guidance on TPS, and assisting members with obtaining driver's licenses, adjustment of status, or asylum. VAM is also dedicated to providing support service for newly arrived Venezuelan immigrants in Massachusetts by providing assistance with basic necessities like clothing, food and assistance with paying rent.

18.    Over the past four years, VAM has partnered with pro bono immigration attorneys to host numerous legal clinics, assisting members with TPS applications and Employment Authorization Document (EAD) renewals. In 2021, they served 179 members; in 2023, they helped 271 members; and in 2024, they assisted 116 members.

19.    VAM has over 380 members across the nation, including in Massachusetts, Texas, Florida, and California. Of those members, a significant number are TPS beneficiaries from Venezuela.  To join, individuals complete a questionnaire identifying their interests and needs, such as humanitarian efforts for Venezuelans in Venezuela, immigration services, basic necessities, or social events. Based on their responses, members receive tailored communications and outreach for relevant services.

20.    For example, "Jaime Doe," a 35-year-old Venezuelan immigrant and VAM member, arrived in the United States in 2017 and obtained TPS status under the 2021 Venezuela Designation. Jaime was a doctor in Venezuela and now works as a caretaker at a hospice facility. He is worried that if he is stripped of his TPS protections, he will lose his employment and be at risk of deportation. As a healthcare professional, Jaime has contributed to improving the health

and wellbeing of his community, including during the devastating COVID-19 pandemic and hopes to be able to continue doing so.

21.    "Camila Doe," a 19-year-old Venezuelan immigrant and VAM member, arrived in the United States in 2020 and obtained TPS status under the 2023 Venezuela Designation. Camila is a high school student and is applying to colleges. Camila has applied to multiple academic scholarships and was told that without her TPS status, she will not be eligible for the programs. Camila is concerned that without renewing her TPS status, her educational opportunities will vanish.

22.    The Trump Administration's campaign against immigrants and DHS's decision to rescind and terminate TPS protections for Venezuelans have significantly impacted VAM's ability to reach members seeking their services. Many of VAM's recent events have seen a significant drop in attendance as members express fear of deportation and the increasingly hostile anti-immigrant climate. This has not only hindered VAM's ability to provide education and other core services to its members, but it has also impaired VAM's ability to simply access and interact with members of the community it serves, which is fundamental to its ability to carry out its core activities.

*UndocuBlack Network, Inc.*

23.    The UndocuBlack Network, Inc. (UBN) is a membership-based multigenerational organization of currently and formerly undocumented Black people that fosters community, facilitates access to resources, and contributes to transforming the realities of its members so they can thrive and live their fullest lives. UBN serves thousands of immigrants through organizational chapters with a national network across approximately thirty states, including Massachusetts. UBN has numerous members who are TPS beneficiaries from Haiti.

24.     To become a member of UBN, a potential member must complete a form, which is reviewed by UBN's community engagement team to ensure that the individual meets the requirements of membership (*e.g.*, identifies as Black and is or was formally undocumented).

25.     For example, "Fred Doe," a 31-year-old Haitian immigrant and UBN member, arrived in the United States in 2019. He obtained TPS and work authorization in 2024. Recently, he lost his job and fears that without TPS, securing new employment will be nearly impossible. TPS has been a lifeline for him and his family.

26.     Similarly, "Melissa Doe," a 40-year-old Haitian immigrant and UBN member arrived in the United States in 2001. She has held TPS since 2012, along with work authorization. For over two decades, she has worked as a nurse in New York City—the United States is her home. Melissa now faces the devastating prospect of losing her legal ability to work, her livelihood, and the stability she has built over the past 20 years.

27.     UBN stives to create a safe and supportive community for its members. UBN provides its members access to resources concerning legal issues, mental wellness, health services, housing, work, and education opportunities. This includes conducting legal clinics to complete TPS applications and corresponding work authorization applications.  UBN will sponsor their members' costs associated with filing TPS applications and related documents.

28.     UBN invested extensive resources to include funds and staff time to assist with TPS applications, many of which were steps away from being filed based on the most recent TPS extension that extended until February 3, 2026. As a result of the recission of this extension, UBN's ongoing TPS applications came to an abrupt halt and all the work has been shelved.

29.    Many UBN members are now confused about what will happen with their drivers' licenses, real identifications and work authorizations, which were all scheduled for renewal at the same time Haiti's TPS was legally scheduled for renewal.

30.    In the wake of Defendant Trump's unprecedented actions and the deviation from the normal process, UBN has been forced to divert their attention from their normal course of business to scramble to try to find answers for their members. Unfortunately, and counter to their purpose as an organization, UBN is unable to give their members the answers they need.

**Individual Plaintiffs**

31.    Sydney Doe, a Haitian immigrant and HAU member, arrived in the United States in 2018 along with his wife and son. He has been a TPS beneficiary since 2020, when he also received work authorization.

32.    Sydney and his family were forced to flee Haiti after receiving violent threats due to his government auditing work. Their safety became increasingly precarious, leaving them no choice but to seek refuge in the United States.

33.    Sydney earned a bachelor's degree in accounting while in Haiti. He used his educational background to advise both private and government contractors in Haiti. Since arriving in the United States, Sydney has earned a master's degree in business administration. He is currently a successful real estate broker, business owner, consultant, and trained accountant.

34.    As a licensed real estate broker, Sydney owns and operates his own real-estate firm. He also consults individuals and businesses on their homeownership, accounting, and tax needs.

35.    Together with his wife Marlene, Sydney owns a three-family home in the Greater Boston area, where he and his wife are raising their 17-year-old son and 6-year-old son. Their

eldest son was born in Haiti and is also a TPS recipient. He is currently a junior in high school earning exemplary grades. He is excited about entering his senior year in the Fall of 2025 and for the prospect of college beyond that. Sydney and Marlene's youngest son was born in the United States and is therefore a U.S. citizen. He recently started kindergarten in the fall of 2024.

36.     Sydney is also renting a portion of their property, providing stable housing to several tenants.

37.     Marlene Doe is a Haitian immigrant and HAU member.  With Sydney, she fled Haiti in 2018 because their family was receiving violent threats due to Sydney's government auditing work. She has been a TPS beneficiary since 2020, when she also received work authorization.

38.     Marlene obtained a bachelor's degree in nursing in Haiti. She is an experienced nurse and caregiver and since 2019 works as a Certified Nursing Assistant. Marlene was among the essential workers who provided continuous care to her elderly patients throughout the COVID-19 pandemic.

39.     Gustavo Doe, a 31-year-old Venezuelan immigrant and member of VAM, arrived in the United States in 2023 after facing threats due to his outspoken opposition to the government corruption. That same year, Gustavo obtained TPS and work authorization.

40.     In March 2023, Gustavo was severely injured in a devastating car accident, resulting in lasting medical complications that left him nearly deaf. He spent over six weeks in the hospital and underwent surgery, with another operation still required for his recovery.

41.     Due to his precarious medical condition, Gustavo is unable to work and depends entirely on financial support from his mother, Natalia. Without TPS, he would lose access to critical medical care. If forced to return to Venezuela, he fears the country's collapsed healthcare

system would leave him without the treatment he desperately needs.

42.     Natalia Doe, a 46-year-old Venezuelan immigrant and VAM member, arrived in the United States in May 2023 to care for her son, Gustavo, after his devastating accident. She obtained TPS and work authorization that same year.

43.     As the primary provider for their household, Natalia works at a supermarket while also serving as Gustavo's caretaker, ensuring he receives the ongoing medical support he needs.

44.     Without TPS, Natalia fears she will be unable to sustain their household, and Gustavo will lose access to critical medical care, putting his health and well-being at serious risk.

**Defendants**

45.     Defendant Donald J. Trump is President of the United States, a position he has held since January 20, 2025. As chief executive President Trump oversees all executive agencies and cabinet members including Defendants. He is sued in his official capacity.

46.     Defendant Department of Homeland Security ("DHS") is a Department of the Executive Branch of the United States government and an agency within the meaning and scope of 5 U.S.C. § 551. DHS and its component agencies, U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS") have the authority to administer and enforce U.S. immigration laws and policies including the TPS program at issue here.

47.     Defendant Kristi Noem is the Secretary of DHS since January 25, 2025, and is currently DHS' senior official. She was appointed to the position by President Trump. Secretary Noem is responsible for DHS oversight and for implementing and enforcing immigration laws and policies. Secretary Noem authorized the rescission of the Haiti and Venezuela TPS designations and the subsequent termination of TPS for Venezuela. She is sued in her official capacity.

## JURISDICTION AND VENUE

48.    This Court has proper jurisdiction over this matter under 28 U.S.C § 1331.

49.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because each defendant is an officer or agency of the United States, Plaintiffs HAU and VAM have their principal places of business in this district, and all of the individual Plaintiffs reside in this district.

## FACTS

**TPS Statutory Scheme**

50.    Prior to the enactment of TPS, the Executive Branch utilized what was known as Extended Voluntary Departure (EVD) to "permit one or more groups of otherwise deportable aliens to remain temporarily in the United States out of concern that the forced repatriation of these individuals could endanger their lives and safety."[3]

51.    Under the EVD policy, the Attorney General made determinations on a "situation by situation basis" as there were no specific criteria to make such determinations.[4]

52.    Former Acting Commissioner of the Immigration Naturalization Services (DHS's predecessor) Doris Meissner highlighted the inadequacies of EVD to Congress, stating, among many things, that EVD "is seriously flawed and in urgent need of reform. [as]… the conditions under which temporary protected status, may be granted, extended or terminated do not appear in any regulation. Moreover, Congress and the public learn of such decisions only through press releases."[5]

---

[3] *Chinese Temporary Protected Status Act of 1989*, H.R. Rep. No. 101-245, 101st Cong., 1st Sess., at 9 (1989).
[4] *Id.* at 10.
[5] *Id.* at 12. *See also* 136 Cong. Rec. H8629-92 (daily ed. Oct. 2, 1990) (statement of Rep. Mary R. Oakar) ("An orderly, systematic procedure for providing temporary protected status for nationals of countries undergoing war, civil war, or other extreme tragedy is needed to replace

53.    To address these deficiencies, Congress created TPS as a part of the Immigration Act of 1990, to establish a formal process for granting temporary legal status to groups of immigrants fleeing unsafe conditions in their home countries.[6] This landmark program acknowledged the urgent need for humanitarian relief and set a precedent for protecting vulnerable populations in the United States.

54.    TPS is promulgated under Section 244(c)(2) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1254(a). The program is designed to address unsafe conditions such as civil unrest, armed conflict, extreme violence, or natural disasters—conditions that compromise the ability of noncitizens in the United States to safely return to their native country.

55.    The TPS statute sets forth an orderly process for initially designating a foreign country for TPS, for extending the designation, and for terminating the designation.

56.    Under the statute, the Secretary of DHS[7] may designate a foreign country for TPS, "after consultation with appropriate agencies of the Government," if she finds that one of three conditions are met:

a.    an ongoing armed conflict in the foreign state poses a serious threat to the personal safety of returning nationals; [8]

b.    an earthquake, flood, drought, epidemic, or other environmental disaster in the

---

the current ad hoc haphazard procedure. The current procedure for [EVD] is so arbitrary and discretionary that [immigrants] are reluctant to come forward.").

[6] Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (codified in scattered sections of 8 U.S.C.).

[7] Under 8 U.S.C. § 1254a, the Attorney General was originally authorized to administer the TPS program. With the formation of the Department of Homeland Security the authority to designate countries and administer the TPS program was transferred from the Attorney General to the Secretary of Homeland Security in 2003. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).

[8] Id. §1254a(b)(1)(A).

foreign state resulting in a substantial, but temporary, disruption of living conditions in the affected area; the foreign state is unable, temporarily, to adequately handle the return to the state of aliens who are nationals of the state; and the foreign state officially has requested TPS designation;[9] or

c.   extraordinary, temporary conditions make their safe return impossible, unless doing so is against the national interest.[10]

57.     The designation of a country shall "take effect upon the date of publication of the designation" or "such later date as the [Secretary] may specify in the notice published under such paragraph."  Designations may be from 6 to 18 months in duration. The designation "shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)."

58.     Paragraph (3) establishes the process for periodic review, terminations, and extensions of designations.  Paragraph (3)(A) provides that at least 60 days prior to the end of the initial period of designation, or any extension, the Secretary shall consult with other agencies, review country conditions, and determine whether the conditions for designation continue to be met. The Secretary "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension) … in the Federal Register."

59.     In practice, this review of country conditions and consultation with other agencies is a multi-step process, involving the preparation of a Country Conditions Memo by a division of USCIS5; a Decision Memo with USCIS's recommendation; input from the State Department (which in turn relies on information from the local U.S. Embassy under the direction of the local

---

[9] *Id.*  §1254a(b)(1)(B) (i-iii).
[10] *Id.* §1254a(b)(1)(C).

ambassador, and regional and policy bureaus) and other government sources. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted*, 59 F.4th 1010 (2023), *appeal dismissed sub nom. Ramos v. Mayorkas*, 2023 WL4363667; *Saget v. Trump*, 375 F. Supp. 3d 280, 298-300 (E.D.N.Y. 2019).

60.    Paragraph (3)(B) sets forth the process for the termination of designation. If the Secretary "determines under subparagraph (A)" that a country no longer continues to meet the conditions for designation, the Secretary "shall terminate the designation by publishing notice in the Federal Register of the determination … (including the basis for the determination)." The termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C)."

61.    Subparagraph (C) provides for extension of designations. It states that if the Secretary does not determine that a designated country no longer meets the conditions for designation, then the period of designation is extended for an additional six (6) months (or, in the Secretary's discretion, a period of 12 or 18 months).

62.    When a country has been designated by the statute, foreign nationals from that country may then apply for TPS status and must meet rigorous qualifications, including having no serious criminal record.[11]

63.    If eligible, foreign nationals with TPS status are protected from removal from the United States and are granted work authorization.[12]

64.    As described above, the Secretary's decision to designate, extend, or terminate TPS

---

[11] *Id.* §1254a(c)(2)(B).
[12] *Id.* §1254a(a)(1)(A)-(B).

protection must be published in the Federal Register.[13] The timing of the Secretary's publication has important implications for TPS recipients, allowing them to order their lives based on their immigration status and the protections attached to TPS—such as employment authorization.

**Haiti's TPS Designation Prior To The Second Trump Administration**

65.     On January 21, 2010, then DHS Secretary, Janet Napolitano, designated Haiti for TPS ("2010 Haiti Designation").[14]

66.     Secretary Napolitano found that the requisite "extraordinary and temporary conditions" in Haiti warranted the TPS designation. This determination was based on the following findings:

    a.  "On January 12, 2010, Haiti was struck by a 7.0-magnitude earthquake . . . its strongest earthquake in 200 years."[15]

    b.  The earthquake devastated Port-au-Prince, reducing much of the capital to rubble.[16]

    c.  Reports estimated that the earthquake affected three million people—one-third of Haiti's population.[17]

    d.  Hospitals, schools, and critical government buildings collapsed or sustained severe damage. The country's infrastructure, including electricity, water, and telecommunications, was heavily impacted.[18]

67.     To be eligible, Haitian nationals had to demonstrate being "continuously

---

[13] *Id.* §1254a(b)(1)(C).
[14] Designation of Haiti for TPS, 75 Fed. Reg. 3476 (Jan. 21, 2010).
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

physically present" in the United States since January 21, 2010, and have "continuously resided in the United States since January 12, 2010."[19] This initial designation was set to run through July 22, 2011.[20]

68.    On May 19, 2011, Secretary Napolitano re-designated and extended TPS for Haiti ("2011 Haiti Extension"). Re-designation allows those who entered the country after the original designation to come under the statute's protection. The extension and new designation began on July 23, 2011, and continued until January 22, 2013.[21]

69.    Secretary Napolitano affirmed that Haiti continued to meet all necessary criteria under the TPS statute, particularly given the earthquake's devastating impact on an already impoverished nation. She noted that Haiti, among the poorest countries in the world, suffered widespread destruction across all levels of infrastructure, including housing, roads, hospitals, and schools. Citing the crisis's severity, she emphasized that 80% of Haiti's population lived below the poverty line, the earthquake claimed an estimated 230,000 lives, and over one million people were left homeless.[22]

70.    She also noted the 800,000 internally displaced children, the rise of gender-based violence, and the outbreak of a cholera epidemic in the country with nearly 200,000 reported cases at the time.[23]

71.    DHS Secretaries subsequently extended the TPS designation for Haiti, typically for 18 months, as the end of designation periods approached.  The extensions were based both on the aftermath and continuing effects of the 2010 earthquake, as well as on new natural disasters

---

[19] *Id.*
[20] *Id.*
[21] Extension and Redesignation of Haiti for TPS, 76 Fed. Reg. 29000 (May 19, 2011).
[22] *Id.*
[23] *Id.*

and political upheaval including:

      a.  Public health threats such as cholera outbreaks and food insecurity;[24]

      b.  Tropical Storm Isaac and Hurricane Sandy—which caused further devastation, displacement, and loss of life; [25]

      c.  Lack of "functioning legislative branch or duly elected local authorities;" [26] and

      d.  Hurricane Matthew and severe flooding.[27]

72.    On January 18, 2018, former Deputy DHS Secretary, Elaine C. Duke, announced a termination of Haiti's TPS designation on the basis that "Haiti has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation" ("2018 Haiti Termination").[28] The termination was set to take effect on July 22, 2019, to allow beneficiaries time to prepare for return.[29]

73.    Secretary Duke's decision to terminate TPS for Haiti was challenged in multiple court cases. On October 3, 2018, in *Ramos v. Wolf*, *supra*, the district court granted a preliminary injunction, enjoining the termination because plaintiffs had shown a likelihood of success on their APA claim that there had been an unexplained change in DHS practice in regard to TPS terminations and on their Equal Protection claim that the decisions were motivated by a discriminatory purpose, and the balance of equities tipped sharply in plaintiffs' favor.[30]

---

[24] Extension of the Designation of Haiti for TPS, 77 Fed. Reg. 59943 (Oct. 1, 2012).
[25] Extension of the Designation of Haiti for TPS, 79 Fed. Reg. 11808 (Mar. 3, 2014).
[26] Extension of the Designation of Haiti for TPS, 80 Fed. Reg. 51582 (Aug. 25, 2015).
[27] Extension of the Designation of Haiti for TPS, 82 Fed. Reg. 23830 (May 24, 2017).
[28] Termination of the Designation of Haiti for TPS, 83 Fed. Reg. 2648 (Jan. 18, 2018).
[29] *Id.*
[30] *Ramos v. Nielsen,* 336 F. Supp. 3d 1075, 1097-98, 1108 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023). The *Ramos* case involved termination of TPS for other

74.    Subsequently, on October 31, 2018, then Acting Deputy DHS Secretary, Claire M. Grady issued a notice in the Federal Register outlining the department's actions to comply with the *Ramos* preliminary injunction. The notice indicated that Haitian TPS beneficiaries would retain their TPS, and extended the validity of TPS-related documents, such as work permits, through April 2, 2019.[31]

75.    From March 2019 through November 2022, DHS Secretaries continued to issue notices confirming the Department's ongoing compliance with the *Ramos* preliminary injunction.[32]

76.    On August 3, 2021, former DHS Secretary Alejandro N. Mayorkas re-designated Haiti for TPS ("2021 Haiti Designation").[33] To be eligible, Haitian nationals had to demonstrate being "continuously physically present" in the United States since August 3, 2021, and have "continuously resided in the United States since July 29, 2021."[34] This designation was set to run through February 3, 2023.[35]

77.    Secretary Mayorkas noted that this re-designation enabled Haitian TPS beneficiaries—whose status had been extended through court-ordered extensions—to reapply for

---

countries as well. For ease of reference, this Complaint focuses on the impact of the *Ramos* decision on Haiti.

[31] Continuation of Documentation for Beneficiaries of TPS Designations for Sudan, Nicaragua, Haiti, and El Salvador, 83 FR 54764 (Oct. 31, 2018).

[32] Continuation of Documentation for Beneficiaries of TPS Designations for Various Countries, 84 FR 7103 (Mar. 01, 2019); 84 FR 59403 (Sep. 4, 2019); 85 FR 79208 (Dec. 9, 2020); 86 FR 50725 (Sep. 10, 2021); 86 FR 52694 (Sep. 22, 2021); 87 FR 68717 (Nov. 16, 2022). On April 11, 2019, a preliminary injunction enjoining the termination of TPS for Haiti was entered in *Saget et al. v. Trump, et al.*, 375 F. Supp.3d 280 (E.D.N.Y. 2019). DHS notices after that date referred to the *Saget* injunction as well.

[33] Designation of Haiti for TPS, 86 FR 41863 (Aug. 3, 2021).

[34] *Id.*

[35] *Id.*

TPS under the new designation, while also allowing new applicants to apply.[36]

78.    Secretary Mayorkas' TPS designation was based on Haiti's "extraordinary and temporary conditions," including a deteriorating political crisis, escalating gang violence, and widespread human rights abuses.[37] The ongoing instability, compounded by food insecurity, disease outbreaks, and economic collapse, made it unsafe for Haitian nationals to return at that time.[38]

79.    On January 26, 2023, Secretary Mayorkas extended TPS for Haiti from February 4, 2023, to August 3, 2024 ("2023 Haiti Extension").[39] He also re-designated Haiti for TPS, allowing new applicants who have been "continuously residing in the United States since November 6, 2022," and "continuously physically present in the United States since February 4, 2023," to apply.[40]

80.    Secretary Mayorkas extended and redesignated TPS for Haiti due to the country's ongoing economic, security, political, and humanitarian crises.[41] Widespread gang violence, government instability, and severe shortages of basic necessities, including food, water, and healthcare, made return to Haiti unsafe for nationals residing in the United States.[42]

81.    On December 14, 2023, Secretary Mayorkas extended the re-registration periods for the extension of TPS for Haiti from 60 days to the full 18-month designation extension period.[43] The period for individuals re-registering for Haiti was from January 26, 2023, through

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] Extension and Redesignation of Haiti for TPS, 88 FR 5022 (Jan. 26, 2023).
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] Extension of Re-Registration Periods for Extensions of the TPS Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan, 88 FR 86665 (Dec. 14, 2023).

August 3, 2024.[44]

82.    On July 01, 2024, Secretary Mayorkas issued a notice extending TPS for Haiti from August 4, 2024, to February 3, 2026 ("2024 Haiti Extension").[45] He also re-designated Haiti for TPS, allowing new applicants with a "continuous residence" date in the United States since June 3, 2024, and who have been "continuously physically present" in the United States since August 4, 2024.[46]

83.    Secretary Mayorkas extended and redesignated TPS for Haiti due to the country's ongoing security, political, and humanitarian crises.[47] Widespread gang violence, the absence of a functioning national government, and severe shortages of essential resources made return unsafe for Haitian nationals in the United States.[48]

**Venezuela's TPS Designation Prior To The Second Trump Administration**

84.    On March 9, 2021, Secretary Mayorkas, designated Venezuela for TPS ("2021 Venezuela Designation"). To be eligible, Venezuelan nationals had to demonstrate being "continuously physically present" in the United States since March 9, 2021, and have "continuously resided in the United States since March 8, 2021."[49] This initial designation was set to run through September 5, 2022.

85.    Secretary Mayorkas' TPS designation was based on a severe humanitarian crisis in Venezuela driven by economic collapse, political repression, and widespread human rights

---

[44] *Id.*
[45] Extension and Redesignation of Haiti for TPS, 89 FR 54484 (July 01, 2024).
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] Designation of Venezuela for TPS and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13574 (Mar. 9, 2021).

violations under Nicolás Maduro's regime, including:[50]

    a. Pro-government groups and high-level officials, including Maduro, committing crimes against humanity, with the judiciary enabling arbitrary arrests, impunity, and the denial of justice;[51]

    b. A collapsed health care system marked by severe shortages of medical supplies, medication, and regular interruptions of basic utilities at healthcare facilities;[52]

    c. Widespread and severe shortages of food;[53]and,

    d. Rampant homicide and crime victimization rates, with Venezuela experiencing "one of the highest number [sic] of violent deaths in the region and in the world."[54]

86. On September 8, 2022, Secretary Mayorkas extended Venezuela's TPS designation from September 10, 2022, to March 10, 2024 ("2022 Venezuela Extension").[55]

87. Secretary Mayorkas based the extension of TPS for Venezuela on the continued economic and political crises. Despite some stabilization, hyperinflation, poverty, and food insecurity persist, with 76.6% of the population living in extreme poverty—nearly a 10% increase from the previous year.[56] He also emphasized that Venezuela's healthcare system remains "run-down, overloaded, and crumbling," contributing to a resurgence of vaccine-preventable and infectious diseases.[57] Widespread human rights violations continue under Nicolás Maduro's

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] Extension of the Designation of Venezuela for TPS, 87 Fed. Reg. 55024 (Sep. 8, 2022).

[56] *Id.*

[57] *Id.*

regime, including arbitrary detentions, torture, and extrajudicial executions, disproportionately targeting dissidents, political activists, students, and human rights defenders.[58]

88.    On October 3, 2023, Secretary Mayorkas extended Venezuela's TPS designation from March 11, 2024, to September 10, 2025 ("2024 Venezuela Designation").[59] He also re-designated Venezuela for TPS, from October 3, 2023 to April 2, 2025.[60] The re-designation allowed additional Venezuelan nationals who had been "continuously physically present" in the United States since October 3, 2023, and "continuously residing" in the United States since July 31, 2023, to apply for TPS for the first time.[61] The 2023 Venezuela Designation provided protection for new registrants through April 2, 2025. Thus, moving forward there were two different registration periods, one for the 2021 Venezuela Designation, and another for the 2023 designation.

89.    Secretary Mayorkas' decision to re-designate was based upon the same factual circumstances and legal considerations as the initial designation.[62] Venezuela's ongoing political and economic crisis, compounded by human rights violations, high crime levels, and recent flooding and landslides had continued to exacerbate poverty and severely hinder access to essential resources such as food, medicine, healthcare, water, electricity, and fuel.[63]

90.    On January 17, 2025, Secretary Mayorkas extended Venezuela's TPS designation

---

[58] *Id.*
[59] Extension and Redesignation of Venezuela for TPS, 88 Fed. Reg. 68130 (Oct. 3, 2023).
[60] The notice cited other instances where the DHS Secretary chose to re-designate a country for TPS. *See, e.g.,* "Extension and Redesignation of Haiti for TPS," 76 FR 29000 (May 19, 2011); "Extension and Re-designation of TPS for Sudan," 69 FR 60168 (Oct. 7, 2004); "Extension of Designation and Redesignation of Liberia Under TPS Program," 62 FR 16608 (Apr. 7, 1997). *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*

24

from April 3, 2025, to October 2, 2026 ("2025 Venezuela Extension").[64]  The Secretary noted that existing TPS holders, whether under the 2021 or the 2023 designation, could re-register pursuant to this extension.[65]

91.     Secretary Mayorkas based this extension on a finding that Venezuela continued to meet all of the requirements that prompted its initial designation. He noted that Venezuela was experiencing "a complex, serious and multidimensional humanitarian crisis…disrupt[ing] every aspect of life in Venezuela."[66]

**Actions Since The Second Trump Administration Challenged By This Lawsuit**

92.     Thus, when Defendant Trump assumed the Presidency on January 20, 2025, Venezuela was designated for TPS through October 2, 2026, and Haiti was designated for TPS through February 3, 2026.

93.     Defendant Noem was sworn into office as Secretary of DHS on January 25, 2025.

Vacatur Of the 2025 Venezuela Extension

94.     Three days later, on January 28, 2025, Defendant Noem purported to reverse the 2025 Venezuela Extension.[67] She announced her action the following day on "Fox and Friends," characterizing Mayorkas' extension as allowing Venezuelan TPS recipients "to be able to stay

---

[64] Extension of the 2023 Designation of Venezuela for TPS, 90 Fed. Reg. 5961 (Jan. 17, 2025).
[65] The notice included a section discussing the rationale for combining the two re-registration processes. United States Citizenship and Immigration Services (USCIS) concluded that two separate filing processes created "operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations." *Id.* Therefore, in order "to decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements," USCIS consolidated the two designations' re-registration processes. *Id.*
[66] *Id.*
[67] *See* USCIS, TPS Designated Country: Venezuela, available at:
https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela (last visited Mar. 2, 2025).

here and violate our laws for another 18 months. And we stopped that."[68]

95.     On February 3, 2025, she published notice in the Federal Register of what she termed a "vacatur" of the 2025 Venezuela TPS extension ("2025 Venezuela Vacatur," attached hereto as Exhibit A).[69] As the notice concedes, there is no process in the TPS statute for a "vacatur" of a TPS extension. Secretary Noem instead asserted that she has "inherent authority" under the INA to reconsider any TPS-related decision and to "vacate or amend the determination."[70]

96.     Secretary Noem did not identify any error in Secretary Mayorkas' determination that Venezuela continues to meet the criteria for TPS designation. Rather, she asserted that the 2025 Extension was problematic because it consolidated the separate designations.[71] Consequently, she purported to invoke a "vacatur" to "untangle confusion…. [and] restore the status quo preceding [the 2025 Venezuela Extension]."[72] The effect is to advance the date when the 2021 designation ends to September 10, 2025, and to advance the date when the 2023 designation ends to April 2, 2025.

97.     Although TPS holders are all known to the U.S. government and have express authority to be in the country under the TPS statute, Defendant Noem also cited one of Defendant Trump's first-day Executive Orders as a rationale for the "vacatur"—an Executive Order that states that "[m]illions of illegal aliens" have been permitted to settle in the United States "in violation of longstanding Federal laws."

---

[68] Fox and Friends, *DHS Sec. Noem Announces End to TPS for Venezuelan Migrants*, Fox News (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112.
[69] Vacatur of 2025 TPS Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025).
[70] *Id.*
[71]*Id.*
[72]*Id.*

98.     In a section entitled "Effect of the Vacatur," Defendant Noem stated that because the 2023 Venezuela designation was now set to expire on April 2, 2025, she was required to decide whether to extend or terminate the designation at least 60 days prior to that date.  *See* 2025 Venezuela Vacatur, *supra* n. 69 (noting that, due to the vacatur, the Secretary "must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation….").

99.     The 2025 Venezuelan Vacatur was the first attempt to void a TPS extension in the history of the TPS statute.

2025 Venezuela Termination

100.     Subsequently, on February 5, 2025, DHS published notice in the Federal Register terminating Venezuela's 2023 Designation ("2025 Venezuela Termination," attached hereto as Exhibit B).[73]  Secretary Noem reiterated that because of the 2025 Venezuela Vacatur, she was required to make the determination by February 1, 2025.  *See* 2025 Venezuela Termination, *supra* n. 73 (noting 2025 Vacatur and stating "Accordingly, a determination whether to extend the 2023 Venezuela designation was due by February 1, 2025.").  Without the 2025 Venezuela Vacatur, the deadline for a determination as to whether Venezuela continued to meet the conditions for TPS designation would not have been necessary until August 3, 2026 (*i.e.*, 60 days prior to October 2, 2026).

101.     Under the heading "Reasons for the Secretary's Termination of the 2023 TPS Designation for Venezuela," the Secretary stated that "even assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan

---

[73] Termination of the October 3, 2023 Designation of Venezuela for TPS, 90 Fed. Reg. 9040 (Feb. 5, 2025).

nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States." *Id.*

102.    While the 2025 Venezuela Termination acknowledged that conditions justifying Venezuela's 2023 TPS designation persist, it asserted that "there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country." *Id.*

103.    There have not been notable improvements in Venezuela that allow for Venezuelan TPS holders to safely return. The falsity of the reasons cited by Defendant Noem, together with the haste with which the decision was made and the evidence of racial bias that has infected the process, demonstrate that the stated reasons are pretext and that the decision to terminate Venezuela's TPS designation was a foregone conclusion based on improper political considerations and racial bias.

104.    For example, while obtaining accurate crime data from Venezuela is challenging, as the government has not released official crime statistics in over a decade,[74] nongovernmental Venezuelan organizations continue to report that the country maintains one of the highest murder rates in the region.[75]

105.    Secretary Noem's assessment of Venezuela directly contradicted the federal government's own reports, including those released by the Department of State—reports that align much more closely with the dire conditions outlined in the Federal Register for the 2025 Venezuela

---

[74] Maria Ramirez Uribe, *PolitiFact FL: Trump Exaggerates Venezuelan Crime Drop and Misleads on Root Causes*, NPR (April 10, 2024), https://www.wuft.org/politifact-florida/2024-04-10/donald-trump-venezuelan-crime-drop.

[75] The Venezuelan Observatory of Violence reported that in 2023, Venezuela had a violent death rate of 26.8 per 100,000 people—more than double Mexico's homicide rate of 12 per 100,000 in the first half of 2023 and nearly four times the U.S. homicide rate of 6.8 per 100,000 in 2022. *Id.*

Extension. For example, in September 2024, the Department of State reported that "[v]iolent crimes, such as homicide, armed robbery, kidnapping, and carjacking, are common in Venezuela. Political rallies and demonstrations occur, often with little notice. Police and security forces have instituted a brutal crackdown on anti-Maduro demonstrations, including the use of tear gas, pepper spray, and rubber bullets against participants."[76]

106.    Consistent with previous administrations' determinations in extending TPS protections to Venezuela, the Department of State has repeatedly highlighted severe human rights violations in the country, including "unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces…. unlawful recruitment or use of children by illegal armed groups…. restrictions on freedom of movement and on the ability to leave the country; inability of citizens to change their government peacefully through free and fair elections."[77]

107.    Consistent with the TPS statutory mandate, prior DHS Secretaries have carefully reviewed conditions in Venezuela to assess whether the country continues to suffer from severe issues related to housing, food scarcity, deteriorating infrastructure, limited access to healthcare, education challenges, and rampant gang violence—problems that have long plagued Venezuela, particularly under the Maduro regime, and that justified its TPS designation.[78]

108.    In deciding to terminate TPS for Venezuela, Defendant Noem also purported to rely on a list of amorphous "national interest" factors that mark a stark departure from past agency

[76]Department of State Travel Advisory on Venezuela (Sep. 24, 2024), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html.

[77] Department of State, Venezuela 2023 Country Report on Human Rights Practices, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/venezuela/.

[78] 2021 Venezuela Designation, *supra* n. 49; 2022 Venezuela Extension, *supra* n. 55; 2023 Venezuela Designation, *supra* n. 59; 2025 Venezuela Extension, *supra* n. 64.

practices without explanation, underscoring that the decision was preordained and heavily influenced by the White House's improper political agenda to terminate TPS for Venezuela.[79] For example, Defendant Noem's justification, consistent with statements she has made publicly, indicate her belief that TPS recipients are "illegal" and equate Venezuelan TPS recipients with criminals—despite the fact that TPS is authorized by statute and TPS applicants are ineligible if they have more than one misdemeanor conviction.

2025 Haiti's Vacatur

109.    On February 20, 2025, the Trump Administration announced a "partial vacatur" of the 2024 Haiti Extension ("2025 Haiti Vacatur," attached hereto as Exhibit C), purporting to cut short the designation period by six months.[80]

110.    Secretary Noem made this decision within weeks of assuming her role as DHS Secretary. The rapid pace of this and other decisions, *see supra* pp. 25-27, provides further evidence that neither she nor the department conducted meaningful consultations with relevant government agencies, as required by the TPS statute.[81]

111.    Secretary Noem cited three reasons for her decision to cut short the designation window by six months:

        a. Secretary Mayorkas did not specify why an 18-month period was selected for

---

[79] Defendant Noem cites Defendant Trump's executive orders—*Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 FR 8439 (Jan. 20, 2025), and *America First Policy Directive to the Secretary of State,* 90 FR 8337 (Jan. 20, 2025) —as the basis for "reach[ing] a different conclusion" than Secretary Mayorkas in assessing TPS for Venezuela. 2025 Venezuela Termination, *supra* n. 73. *See Saget*, 375 F. Supp. 3d at 345-362.

[80] DHS, Press Release: Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS, Feb. 20, 2025, https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status.

[81] 8 U.S.C. §§ 1254a(b).

extension;[82]

    b. Secretary Mayorkas did not provide enough detail as to why an extension was not "contrary to the national interest";[83] and

    c. The country condition reports that Secretary Mayorkas cited included reports from 2022-2023 and earlier.[84]

112.    The TPS statute only grants the DHS Secretary discretion to designate, extend, and terminate TPS designations. *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A). There is no provision that permits a vacatur.

113.    Additionally, the statute explicitly grants the DHS Secretary discretion to set the designation period between 6 and 18 months.[85]

114.    Similar to her justifications for the 2025 Venezuela Termination, Secretary Noem also introduced a lengthy list of factors to determine whether a TPS designation is "contrary to national interest" and faulted Secretary Mayorkas for purportedly not giving these factors sufficient attention.  Contrary to Defendant Noem's objection, the TPS statute does not outline a specific analysis that must be conducted when considering whether a TPS designation is contrary to the "national interest." Instead, it requires the Secretary to consult with the appropriate agencies of government to determine whether the foreign nation meets one of the classifications under the statute before making a designation, extension, or termination.[86] Secretary Mayorkas did so, consistent with past agency practice.

115.    Defendants' decision to vacate the 2024 Haiti Designation thus lacks any legal basis

---

[82] Partial Vacatur of 2024 TPS Decision for Haiti, 90 FR 10511 (Feb. 24, 2025).
[83] *Id.*
[84] *Id.*
[85] 8 U.S.C. §§ 1254a(b)(2); (3)(C).
[86] 8 U.S.C. §§ 1254a(b).

and instead demonstrates that the decision was preordained and improperly influenced by a political agenda to terminate TPS for Haiti.

**The Challenged Decisions Were Motivated In Part By Impermissible Racial, Ethnic and/or National Origin Discrimination**

116.    Throughout Defendant Trump's political career, he has repeatedly made statements reflecting bias and prejudice against immigrants of color, particularly Latino and Haitian immigrants.[87] This pattern of rhetoric supports the inference that Defendants' vacaturs of TPS for Haiti and Venezuela, and the subsequent termination of TPS for Venezuela were motivated by racial, ethnic, and national origin discrimination.

117.    For example, during the first Trump Administration, Defendant Trump made the following statements:

a.    Upon learning that 15,000 Haitian people had received visas, Defendant Trump stated they "all have AIDS."[88]

b.    Defendant Trump referred to countries designated for TPS as "shithole countries" and is reported to have said "Why do we need more Haitians?" and asked officials to "[t]ake them out" of the TPS plan.[89]

---

[87] *Fact-checking Over 12,000 of Donald Trump's Statements About Immigration*, THE MARSHALL PROJECT (Oct. 21, 2024), https://www.themarshallproject.org/2024/10/21/fact-check-12000-trump-statements-immigrants?utm_source=chatgpt.com (fact-checking analysis of Defendant Trump's statements about immigration revealed that "[a]ll of them are untrue or deeply misleading").

[88] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. TIMES (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.

[89] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

    c.   In discussing immigration, Defendant Trump stated: "We pick out people. Then they turn out to be horrendous. And we don't understand why. They're not giving us their best people, folks."[90]

    d.   Defendant Trump equated Latino immigrants from Mexico with rapists, stating: "When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people . . . It's coming from more than Mexico. It's coming from all over South and Latin America."[91]

    e.   In October 2016, during a presidential debate, then-candidate Defendant Trump responded to a question about immigration policy by saying: "We have some bad hombres here and we're going to get them out."[92]

118.    Throughout the 2024 campaign, Defendant Trump continued to make racists remarks about Venezuelan and Haitian immigrants. For example, on December 16, 2023, at a rally



**Donald J. Trump** ✔
@realDonaldTrump · 22h

ILLEGAL  IMMIGRATION IS POISONING THE BLOOD OF OUR NATION. THEY'RE COMING FROM PRISONS, FROM MENTAL INSTITUTIONS — FROM ALL OVER THE WORLD. WITHOUT BORDERS & FAIR ELECTIONS, YOU DON'T HAVE A COUNTRY. MAKE AMERICA GREAT AGAIN!

💬 1.17k   🔁 4.88k   ♡ 17.2k   • • •

---

[90] Trip Gabriel, *Trump Escalates Anti-Immigrant Rhetoric With 'Poisoning the Blood' Comment*, N.Y. TIMES (Oct. 5, 2023), https://www.nytimes.com/2023/10/05/us/politics/trump-immigration-rhetoric.html.

[91] Washington Post Staff, *Full Text: Donald Trump announces a presidential bid* (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/.

[92] Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United States*, WASH. POST (Oct. 19, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/10/19/trump-on-immigration-there-are-bad-hombres-in-the-united-states/.

in Durham, New Hampshire, Defendant Trump declared that immigrants were "poisoning the blood of our country," echoing rhetoric historically associated with Adolf Hitler.[93]

119.    Later that day, he doubled down on his statement by stating on True Social, in all caps, "ILLEGAL IMMIGRATION IS POISONING THE BLOOD OF OUR NATION. THEYR'RE COMING FROM PRISIONS, FROM MENTAL INSTITUTIONS—FROM ALL OVER THE WORLD. WITHOUT BORDERS & FAIR ELECTIONS, YOU DON'T HAVE A COUNTRY. MAKE AMERICA GREAT AGAIN!"[94]

120.    Secretary Noem tweeted similar racist tropes and stereotypes on back-to-back days in February 2024:

> a.    "Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America. They are happy to let America's open border be the solution to their problem."[95]
>
> b.    "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America. Deportations need to start on DAY ONE of [Defendant

---

[93] "The term 'blood poisoning' was used by Hitler in his manifesto 'Mein Kampf,' in which he criticized immigration and the mixing of races." Ginger Gibson, *Trump Says Immigrants Are 'Poisoning the Blood of Our Country.' Biden Campaign Likens Comments to Hitler*, NBC NEWS (Dec. 17, 2023), https://www.nbcnews.com/politics/2024-election/trump-says-immigrants-are-poisoning-blood-country-biden-campaign-liken-rcna130141.

[94] This was not the first time Defendant Trump has used such grotesque language. In September 2023, in an interview with Raheem Kassam on the National Pulse, President Trump, in discussing immigration, stated: "[I]t is a very sad thing for our country… it's poisoning the blood of our country …it's so bad and people are coming in with disease people are coming in with every possible thing that you can have." *See* Raheem Kassam, *Raheem Kassam Interviews Donald Trump*, YOUTUBE (Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (starting at 1:34 to 1:45).

[95] Kristi Noem (@KristiNoem), X (Feb. 26, 2024, 2:19 PM), https://x.com/KristiNoem/status/1762195636491825295.

Trump's] term."[96]

121.    On February 29, 2024, at an event in Eagle Pass, Texas, Defendant Trump claimed: "They're (immigrants) coming from jails and they're coming from prisons and they're coming from mental institutions and they're coming from insane asylums….You look at the jails now – you look at the jails throughout the region but more importantly throughout the world, they're emptying out, because they're dumping them into the United States."[97]

122.    On March 4, 2024, Defendant Trump compared immigrants to Hannibal Lecter, stating "they're rough people, in many cases from jails, prisons, from mental institutions, insane asylums. You know, insane asylums, that's 'Silence of the Lambs' stuff . . . We don't want 'em in this country."

123.    In March 2024, Defendant Noem tweeted "Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America. The White House is facilitating this invasion. They're doing it on purpose."[98]

124.    By contrast, Defendant Trump describes European countries in a different light: "[N]ice countries, you know like Denmark, Switzerland" and "Norway."[99]

125.    During the September 10, 2024 presidential debate in Philadelphia, Defendant Trump recklessly spread misinformation about Haitian immigrants in Springfield, Ohio,

[96] Kristi Noem (@KristiNoem), X (Feb. 27, 2024, 8:26 PM), https://x.com/KristiNoem/status/1762650522920652828.

[97] Daniel Dale, *Fact Check: Trump Makes False and Unsubstantiated Claims in Border* Speech, CNN NEWS (Feb. 29, 2024), https://www.cnn.com/2024/02/29/politics/fact-check-trump-biden-border-speech/index.html.

[98] Kristi Noem (@KristiNoem), INSTAGRAM (Mar. 6, 2024), https://www.instagram.com/kristinoem/reel/C4ML17eRBYr/.

[99] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

infamously stating: "They're eating the dogs, the people that came in, they're eating the cats…They're eating the pets of the people that live there, and this is what's happening in our country, and it's a shame."[100] Following this inflammatory remark, Springfield received more than 33 bomb threats, forcing schools to evacuate.[101]

126.    In October 2024, during an interview with conservative radio host Hugh Hewitt, Defendant Trump further escalated his rhetoric: "How about allowing people to come to an open border… many of them murdered far more than one person, and they're now happily living in the United States. You know now a murder, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[102] The notion that a group of people—such as Venezuelans— have a "genetic" propensity for murderous behavior is another example of Defendant Trump's racial stereotyping and harmful generalizations that echo eugenicist ideas.

---

[100] Daniel Arkin & David Ingram, *Trump pushes baseless claim about immigrants 'eating the pets,'* NBC NEWS (Sept. 10, 2024), https://www.nbcnews.com/politics/2024-election/trump-pushes-baseless-claim-immigrants-eating-pets-rcna170537. *See also* Jasmine Garsd, *The Stereotype of Immigrants Eating Dogs and Cats is Storied—And Vitriolic As Ever*, NPR (Sep. 11, 2024), https://www.npr.org/2024/09/11/nx-s1-5108401/donald-trump-debate-eating-dogs-cats-immigrants-false-stereotype (discussing racist history of the stereotype of immigrants eating dogs and cats).
[101] Phil Helsel, *More Than 30 Bomb Threats Made in Springfield, Ohio, After False Pets Claims*, NBC NEWS (Sept. 16, 2024), https://www.nbcnews.com/news/us-news/30-bomb-threats-made-springfield-ohio-false-pets-claims-rcna171392.
[102] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trump-suggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271. *See also* Myah Ward, *We Watched 20 Trump Rallies. His Racist, Anti-immigrant Messaging is Getting Darker*, POLITICO (Oct. 12, 2024), https://www.politico.com/news/2024/10/12/trump-racist-rhetoric-immigrants-00183537 ("'What is so jarring to me is these are not just Nazi-like statements. These are actual Nazi sentiments,' said Robert Jones, founder of the Public Religion Research Institute, the author of 'The Hidden Roots of White Supremacy' and a vocal critic of Defendant Trump's rhetoric."); Patrick Svitek, *Trump Suggests 'Bad Genes' to Blame for Undocumented Immigrants Who Commit Murders*, WASH. POST (Oct. 7, 2024), https://www.washingtonpost.com/politics/2024/10/07/trump-undocumented-immigrants-bad-genes/.

127.    Again, such comments stand in stark contrast to the statements Defendant Trump has made to white audiences. For example, at a campaign rally in Minnesota, he told the predominantly white crowd that they have "good genes" and invoked the "racehorse theory" —which suggests that some people are born with inherently superior genetic traits.[103]

128.    On October 9, 2024, at a rally in Reading, PA, Defendant Trump made the following disparaging statements about Venezuelans:

    a.  "In Venezuela, many countries, they're emptying their prisons into our country."[104]

    b.  "They (Venezuelans) take the criminal gangs from Caracas off the streets, and they bus them into the United States and drop them."[105]

129.    Two days later, on October 11, 2024, at a rally in Aurora, Colorado, Defendant Trump delivered an inflammatory speech, doubling down on his previous remarks calling immigrants "rapists" and intensifying his attacks on Venezuelan migrants in Aurora. Standing between mugshots of undocumented individuals accused of crimes, he declared:

    a.  "Every day Americans…are living in fear all because Kamala decided to empty the slums and prison cells of Caracas… and they deposit them into the United States bus after bus…and we have to live with these animals… but we're not going to live with them for long…"[106]

---

[103] *Id.*
[104] Fox News, *Donald Trump Delivers Remarks at Rally in Reading, PA*, YOUTUBE (Oct. 9, 2024), https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (starting at 29:55).
[105] *Id.* (starting at 30:07).
[106] Fox 4, *Trump Rally in Aurora, Colorado: FULL SPEECH,* YOUTUBE (Oct. 12, 2024) https://www.youtube.com/watch?v=_xguaneoZ5A (Starting at 41:00 to 41:54).

     b.   "Venezuelan gangs and thugs and criminals and you know we're talking a lot about Venezuela because Aurora is really infected by Venezuela…"[107]

     c.   "We will send elite squads of ICE border patrol and federal law enforcement officers to hunt down arrest and deport every last illegal alien…"[108]

130.    In an interview in January 2025, referring specifically to Venezuelan migrants, Secretary Noem stated: "The people of this country want these dirtbags out."[109]

131.    Just days after Defendant Trump's inauguration, in a video post on X, Secretary Noem referred to ICE enforcement as "[g]etting the dirt bags off the streets."[110]

132.    In addition, both Defendant Trump and Noem have consistently expressed their view that Haitian and Venezuelan TPS holders are "illegal" due to their TPS protection. For example, in October 2024, when asked whether Haitian TPS holders in Springfield, Ohio were "legal or illegal," Defendant Trump responded "You have to remove the people; you cannot destroy our country . . . In my opinion, [TPS] is not legal. . . . Absolutely I would revoke [TPS]."[111]

133.    Similarly, in referring to Haitian migrants, Defendant Trump stated ""They are illegal immigrants as far as I'm concerned. They're destroying the towns. . . . [T]hey'll end up destroying the state!"[112]

---

[107] *Id.* (starting at 43:15 to 43:27).

[108] *Id.* (starting at 1:00:44 through 1:00:56).

[109] CBS Mornings, *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YOUTUBE (Jan. 29, 2025), https://www.youtube.com/watch?v=tODarHnNiNs.

[110] Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547.

[111] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed'*, NEWSNATION at 12:00 (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/.

[112] Edith Olmstead, *Trump Is Now Threatening All Immigrants, "Illegal" or Not,* THE NEW REPUBLIC (Oct. 9, 2024), https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie.

**Harms and Effects of Defendants' Discriminatorily Motivated Actions**

134.    If the challenged actions are allowed to go into effect, Plaintiffs and other TPS beneficiaries will suffer immediate and irreparable injuries to their rights under the United States Constitution and federal law, to their proprietary interests, and to their dignity.

135.    The Haiti and Venezuela vacaturs and subsequent Venezuela termination will deprive Plaintiffs of certainty in their legal rights and protections and burden them and their families with the resulting consequences.

136.    If the challenged actions are allowed to go into effect, Plaintiffs and other TPS beneficiaries who have lived, worked, and raised families in the United States will be put at immediate risk of deportation. They risk being uprooted from their lives and careers and face the prospect of return to countries where they have little or no ties. Many have U.S. citizen children and so face the choice between family separation or keeping their families together and exposing their children to the grave dangers of their home countries.

137.    If the challenged actions are allowed to go into effect, Plaintiffs and other TPS beneficiaries will be denied work, including workplace benefits and protections. Without TPS, most beneficiaries will not have access to employment authorization which gives these immigrants (and their employers) an assurance that they may put their talents to use—something that benefits Massachusetts and the country as a whole. TPS beneficiaries fill critical gaps in the economy, including in the healthcare sector and other sectors where their labor and expertise is needed. Without employment, many TPS beneficiaries will also lose health benefits.

138.    If the challenged actions are allowed to go into effect, Plaintiffs and other TPS beneficiaries will have little to no time to prepare for imminent removal. Plaintiffs will incur costs to ensure that their property rights, family relationships, and tax obligations are protected. These

financial burdens will decrease the overall resources available to TPS beneficiaries and their families.

139.    Because the Trump Administration's decision to vacate TPS extensions for Haiti and Venezuela and subsequently terminate TPS for Venezuela was infected by invidious discrimination, its implementation will stigmatize immigrants of color, as well as their children and families, and imposes a dignitary harm by denying them then dignity and respect they deserve under the United States Constitution and federal law.

140.    The challenged actions trigger and fuel social stigma, harassment, discrimination, and even violence against immigrants of color. Defendants' xenophobic and racist rhetoric vilifies immigrants of color, fuels hostility, spreads misinformation, and fosters an environment where violence against immigrant communities becomes more likely.[113]

141.    By labeling TPS beneficiaries from Haiti and Venezuela as undesirable and equating them to criminals predisposed to violence—particularly in contrast to white Americans— the federal government ratifies and legitimizes the notion that immigrants of color are worthy of lesser social stature. This compromises their well-being and encourages discrimination against immigrants of color. In this manner, the Trump Administration's decision to vacate TPS extensions for Haiti and Venezuela, and its subsequent termination of TPS for Venezuela, has caused, is causing, and will continue to cause dignitary harms and psychological injuries to families and

---

[113] Research following Defendant Trump's election in 2016 demonstrated that there is a clear correlation between Trump campaign events and incidents of prejudiced violence. For example, FBI data show that there was an anomalous spike in hate crimes concentrated in counties where Defendant Trump won by larger margins. Another study showed that counties that hosted a Trump campaign rally in 2016 saw hate crimes more than double compared to their counterparts. *See* Vanessa Williamson & Isabella Gelfand, *Trump and Racism: What do[es] the data say?*, BROOKINGS (Aug. 14, 2019), https://www.brookings.edu/articles/trump-and-racism-what-do-the-data-say/.

children.

## CLAIMS FOR RELIEF

### <u>COUNT ONE</u>

**Violation of the Administrative Procedure Act (APA), 5 U.S.C. § 551, et seq.**

**(Against all Defendants except Defendant Trump)**

**(2025 Venezuela Vacatur)**

142.    Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

143.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq., ensures that federal agencies are accountable to the public by providing a right of review to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.  Judicial review extends to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

144.    Among other things, the APA empowers the federal courts to "compel agency action unlawfully withheld" and "hold unlawful and set aside agency actions, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), (2)(A).

145.    Defendant DHS is an agency subject to the APA, 5 U.S.C. § 551(1), 703.

146.    The Administration's 2025 Venezuela Vacatur constitutes arbitrary and capricious acts that are an abuse of discretion and contrary to the Equal Protection Clause of the United States Constitution and the laws governing TPS.

147.    Plaintiffs will suffer irreparable injury from the unlawful vacatur.

## COUNT TWO

### Violation of the Administrative Procedure Act (APA), 5 U.S.C. § 551, et seq.

### (Against all Defendants except Defendant Trump)

### (2025 Haiti Vacatur)

148.    Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

149.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq., ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Judicial review extends to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

150.    Among other things, the APA empowers the federal courts to "compel agency action unlawfully withheld" and "hold unlawful and set aside agency actions, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), (2)(A).

151.    Defendant DHS is an agency subject to the APA, 5 U.S.C. § 551(1), 703.

152.    The Administration's 2025 Haiti Vacatur constitutes arbitrary and capricious acts that are an abuse of discretion and contrary to the Equal Protection Clause of the United States Constitution and the laws governing TPS.

153.    Plaintiffs will suffer irreparable injury from the unlawful vacatur.

## COUNT THREE

### *Ultra Vires* Action

### (Against All Defendants)

154.    Plaintiffs re-allege and incorporate each and every allegation made in the

preceding paragraphs as if fully set forth herein.

155.    The TPS statute grants the DHS Secretary the authority to designate, extend, or terminate a foreign nation's TPS status. 8 U.S.C. §1254a (b). The statute provides no authority to rescind a determination to designate or extend once it has already been granted. *Id.*

156.    Defendants' Haiti and Venezuela TPS vacaturs lacks any legal basis or justification and as such is *ultra vires* in violation of the Constitution and the laws of the United States.

157.    Plaintiffs have suffered harm as a direct and proximate result of Defendants' actions.

## COUNT FOUR

**Violation of the Administrative Procedure Act (APA), 5 U.S.C. § 551, et seq.**

**(Against all Defendants except Defendant Trump)**

**(2025 Venezuela Termination)**

158.    Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

159.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq., ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  Judicial review extends to "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

160.    Among other things, the APA empowers the federal courts to "compel agency action unlawfully withheld" and "hold unlawful and set aside agency actions, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(1), (2)(A).

161.    Defendant DHS is an agency subject to the APA, 5 U.S.C. § 551(1), 703.

162.    The Administration's 2025 Venezuela Termination constitutes arbitrary and capricious acts that are an abuse of discretion and contrary to the Equal Protection Clause of the United States Constitution and the laws governing TPS.

163.    Plaintiffs will suffer irreparable injury from the unlawful termination.

## COUNT FIVE

### Violation of Equal Protection – Fifth Amendment
### (Against All Defendants)

164.    Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

165.    The Due Process Clause of the Fifth Amendment incorporates the equal protection principles of the Fourteenth Amendment. *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) (gender discrimination in immigration context); *see also United States v. Windsor*, 133 S. Ct. 2675 (2013); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

166.    The Due Process Clause of the Fifth Amendment also prohibits irrational government action. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973).

167.    Defendants' decisions to promulgate the 2025 Haiti Vacatur, the 2025 Venezuela Vacatur, and the 2025 Venezuela Termination violate both aspects of the Fifth Amendment because the Trump Administration intended to discriminate against both groups on the basis of race, ethnicity and/or national origin.

168.    The inference of race, ethnicity, and/or national origin discrimination is supported by the Administration's departure from the normal decision-making process, including the haste with which decisions were made; the fact that the decision bears more heavily on one race than another; the sequence of events leading to the decision; the contemporaneous statements of

decision-makers; and the historical background of the decision. The Supreme Court has recognized these factors as probative of intentional discrimination. *See Vill. of Arlington Heights v. Metro. Hous. Development Corp.*, 429 U.S. 252 (1977).

169.    The inference of race, ethnicity, and/or national origin discrimination is supported by the departure Defendants' analysis from previous TPS determinations. The consistent practice of previous officials demonstrates the normal decision-making process for TPS decisions. Defendants sharply deviated from that normal decision-making process in deciding to take the challenged actions.

170.    The inference of race, ethnicity, and/or national origin discrimination is also supported by Defendants' deviation from INA § 244(b)(3)'s and 8 U.S.C. § 1254a's requirement that DHS undertake a genuine, good faith review of the conditions in a foreign country designated for TPS to determine whether the conditions for designation continue to be met.

171.    The inference of race, ethnicity, and/or national origin discrimination is also supported by Defendant Trump's comments as listed in paragraphs 116 through 133 and which informed practice in executive agencies.

172.    As a direct and proximate result of the TPS vacaturs and subsequent termination of TPS for Venezuela by Defendants and/or their agents, Plaintiffs have been deprived of their rights under the Fifth Amendment to the United States Constitution and will suffer irreparable injury.

<u>**COUNT SIX**</u>

**Declaratory Judgment 28 U.S.C. §§ 2201, 2202**

**(Against All Defendants)**

173.    Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

174.    For the reasons stated above, Defendants have violated the United States

Constitution and other laws.

175.    Plaintiffs seek a declaration to that effect.

176.    Defendants' illegal actions have injured, and will continue to injure, the Plaintiffs and those similarly situated in numerous ways as described herein.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

A.  A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that:

   a.  The 2025 Haiti Vacatur violates the Administrative Procedure Act and the Fifth Amendment of the Constitution and is *ultra vires* and is, therefore, void and without legal force or effect;

   b.  The 2025 Venezuela Vacatur violates the Administrative Procedure Act and the Fifth Amendment of the Constitution and is *ultra vires* and is, therefore, void and without legal force or effect;

   c.  The 2025 Venezuela Termination violates the Administrative Procedure Act and the Fifth Amendment of the United States Constitution and is, therefore, void and without legal force or effect;

B.  An order holding unlawful and setting aside, under the Administrative Procedure Act, the 2025 Haiti Vacatur, the 2025 Venezuela Vacatur, and the 2025 Venezuela Termination;

C.  A preliminary and permanent injunction enjoining Defendants, their agents, servants, employees, attorneys and all persons in active concert with them from implementing or enforcing: the 2025 Haiti Vacatur, the 2025 Venezuela Vacatur, and the 2025 Venezuela Termination;

D.  An order awarding Plaintiffs attorneys' fees, costs, and expenses; and

E.  All other necessary and appropriate that justice may require.

Dated:  March 3, 2025,                                Respectfully submitted,

                                                                        _/s/ Mirian Albert_____

                                                                        Mirian Albert (BBO #710093)
                                                                        Oren Sellstrom (BBO #569045)
                                                                        Victoria Miranda (BBO #695913)
                                                                        Lawyers for Civil Rights
                                                                        61 Batterymarch Street, 5th Floor
                                                                        Boston, MA 02110
                                                                        malbert@lawyersforcivilrights.org
                                                                        osellstrom@lawyersforcivilrights.org
                                                                        vmiranda@lawyersforcivilrights.org