# EXHIBIT B

| Heading/subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.22 .................. | Articles the product of China and Hong Kong that are informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

4. by inserting the following new heading 9903.01.23 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1—General", "Rates of Duty 1—Special" and "Rates of Duty 2", respectively:

| Heading/subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.23 .................. | Except for products described in headings 9903.01.21 and 9903.01.22, and other than products for personal use included in accompanied baggage of persons arriving in the United States, articles the product of China and Hong Kong that: (1) were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern standard time on February 1, 2025; and (2) are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

5. by inserting the following new U.S. note 2(s) to subchapter III of chapter 99 of the HTSUS in numerical sequence:

"2. (s) For the purposes of heading 9903.01.20, products of China and Hong Kong, other than products described in heading 9903.01.21, heading 9903.01.22, heading 9903.01.23, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 10% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of China and Hong Kong that are subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20 shall also be subject to the general rates of duty imposed on products of China and Hong Kong entered under subheadings in chapters 1 to 97 of the tariff schedule. Products of China and Hong Kong that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

The additional duties imposed by heading 9903.01.20 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in China and Hong Kong), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in China and Hong Kong), less the cost or value of such products of the United States, as described.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall not be eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—the so-called "de minimis" exemption.

(t) Heading 9903.01.21 covers only products of China and Hong Kong, that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances."

[FR Doc. 2025–02293 Filed 2–3–25; 1:15 pm]
**BILLING CODE 9111–14–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2804–25]

### Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** On October 3, 2023, Venezuela was newly designated for Temporary Protected Status (TPS) based on the determination that there were extraordinary and temporary conditions in that country that prevented the safe return of Venezuelan nationals, and that permitting such Venezuelan nationals to remain temporarily in the United States is not contrary to the U.S. national interest. The 2023 designation of Venezuela for TPS is set to expire on April 2, 2025. After reviewing country

conditions and considering whether permitting Venezuelan nationals covered by the 2023 designation is contrary to the national interest of the United States, in consultation with the appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that Venezuela no longer continues to meet the conditions for the 2023 designation. In particular, the Secretary has determined it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States. The Secretary therefore is terminating the 2023 TPS designation of Venezuela. This termination is effective April 7, 2025. After April 7, 2025, nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) who have been granted TPS under the 2023 Venezuela designation will no longer have TPS. This termination determination does not apply to the 2021 designation of Venezuela for TPS, which remains in effect until September 10, 2025, or to individuals who are registered for TPS under the 2021 designation.

**DATES:** The October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on April 7, 2025.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## What is Temporary Protected Status (TPS)?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1). The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state'' for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2). When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

## Designation of Venezuela for TPS

On March 9, 2021, then Secretary of Homeland Security Alejandro Mayorkas designated Venezuela for TPS based on his determination that there existed ''extraordinary and temporary conditions'' in Venezuela that prevented nationals of Venezuela from returning in safety and that permitting such aliens to remain temporarily in the United States is not contrary to the U.S. national interest (Venezuela 2021 designation). *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, then Secretary Mayorkas extended the Venezuela 2021 TPS designation for 18 months. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, Secretary Mayorkas extended the Venezuela 2021 TPS designation for another 18 months with an expiration date of September 10, 2025, and separately newly designated Venezuela for 18 months, a decision the former Secretary called a ''redesignation'' (Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate and concurrent Venezuela TPS designations. *See Extension and Redesignation of Venezuela for Temporary Protected Status,* 88 FR 68130 (Oct. 3, 2023).

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months. The notice was based on then Secretary Mayorkas's January 10, 2025 determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). In the January 2025 notice, Secretary Mayorkas did not expressly extend or terminate the 2021 Venezuela designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status,* 90 FR 5961 (Jan. 17, 2025).

On January 28, 2025, Secretary of Homeland Security Kristi Noem vacated former Secretary Mayorkas's January 10, 2025 decision, restoring the status quo that preceded that decision.[1] Accordingly, a determination whether to extend the 2023 Venezuela designation was due by February 1, 2025. The Department of Homeland Security (DHS or Department) estimates that approximately 348,202 aliens are eligible for TPS under the 2023 Venezuela designation.

## Secretary's Authority To Terminate the 2023 Designation of Venezuela for TPS

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after

---

[1] *See Vacatur of 2025 Temporary Protected Status Decision for Venezuela,* 88 FR 8805 (Feb. 3, 2025).

consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs. *See id.; see also* INA 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary ''option'' to allow for a certain ''orderly transition'' period if she determines it to be appropriate).

### Reasons for the Secretary's Termination of the 2023 TPS Designation for Venezuela

Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.[2]

The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both ''extraordinary'' and ''temporary,'' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States.[3]

In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that ''permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.'' INA 244(b)(1), 8 U.S.C. 1254a(b)(1). Accordingly, as the Department and the Attorney General have long recognized, such a ''national interest'' assessment is an essential element of a determination whether to extend or terminate the 2023 Venezuela designation, which was based on ''extraordinary and temporary conditions.''[4]

''National interest'' is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[5] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

President Trump in his recent, immigration and border-related executive orders and proclamations clearly articulated an array of policy imperatives bearing upon the national interest. First, the President directed the Secretary to terminate, as contrary to the policy of the United States, the parole program known as the ''Processes for Cubans, Haitians, Nicaraguans, and Venezuelans'' (CHNV). The parole process for Venezuelans had been in effect since October 19, 2022, allowing hundreds of thousands of inadmissible Venezuelans to enter the United States at interior ports of entry and remain in this country, generally for a period of two years, with employment authorization eligibility.[6] DHS estimates that 33,600 CHNV parolees from Venezuela availed themselves of TPS. Venezuelan CHNV parolees, along with Venezuelan nationals who crossed illegally into the United States, who had been continuously residing in the United States since July 31, 2023, and continuously present in the United States since October 3, 2023, were able to secure TPS and TPS-based employment authorization under the 2023 Venezuela designation.

TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua.[7] Tren de Agua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants. The United States has sanctioned the gang and placed it on a list of transnational criminal organizations.[8] In Executive Order 14157, *Designating Cartels and Other*

---

[2] *See also* E.O. 14159, *Protecting the American People Against Invasion,* sec. 16(b), 90 FR 8443, 8446 (Jan. 20, 2025) (directing that the Secretary should ''ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute'').

[3] *See INS* v. *Bagamasbad,* 429 U.S. 24, 25 (1976) (per curiam) (''As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.'').

[4] *Cf., e.g., Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension,* 63 FR 15437, 15438 (Mar. 31, 1998) (terminating Liberia TPS designation after ''consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States'').

[5] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, ''that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts'' (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J-,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is ''sound immigration policy'' and an ''important national security interest''); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in ''national interest'' assessments).

[6] *See Implementation of a Parole Process for Venezuelans,* 87 FR 63507 (Oct. 19, 2022); *see also Implementation of Changes to the Parole Process for Venezuelans,* 88 FR 1279 (Jan. 9, 2023).

[7] Joshua Goodman, Tren de Aragua gang started in Venezuela's prisons and now spreads fear in the US, Associated Press, Sept. 24, 2024, available at: *https://apnews.com/article/tren-de-aragua-gang-venezuela-us-a12c8fee9dc4a0ca73769ea893e09e53* (last accessed Jan. 28, 2025).

[8] Joshua Goodman, US sanctions a Venezuela gang for spreading criminal activity across Latin America, Associated Press, July 11, 2024, available at: *https://apnews.com/article/washington-venezuela-gang-sanctions-f742f6966d160ee80b703ed419dfdac3* (last accessed Jan. 30, 2025).

*Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists,* the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States.[9] The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including millions who crossed U.S. borders or were allowed to fly to a U.S. air port of entry and allowed to settle in American communities.[10] The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels."[11] For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025.[12] Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.[13]

The President underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[14] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[15] Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[16] The Department accordingly has reappraised the national interest factors and given strong consideration to the serious national security, border enforcement, public safety, immigration policy, and economic and public welfare concerns engendered by illegal immigration of Venezuelans, which the President, DHS, and other federal agencies are seeking to stem through other policy actions.

Third, President Trump declared a national emergency at the southern border.[17] As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation.[18] The same is true for Venezuela.[19] The anticipated designation or extension for TPS and resulting benefit to access EAD have been pull factors driving Venezuelan nationals to the United States.[20] In October 2023, DHS stated that there were approximately 243,000 Venezuela TPS beneficiaries, while also estimating that approximately *472,000 additional aliens* may be eligible under the October 3, 2023 designation.[21] Currently, DHS estimates that 348,202 aliens are registered under the 2023 designation.

Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[22] Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first. U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.[23]

In making this finding and determination regarding the national interest, the Secretary also has taken into account the national-interest-related factors that were presented to former Secretary Mayorkas for his consideration for purposes of his now-vacated January 10, 2025 decision. However, especially in view of President Trump's Executive Orders relating to immigration and after consulting with the Department of State, the Secretary has reached a different conclusion and has determined that permitting such Venezuelan nationals (and aliens with no nationality who last habitually resided in Venezuela) to remain in the United States is in fact contrary to the national interest, as is the Secretary's authority and prerogative under the statute.[24]

**Effective Date of Termination of 2023 Designation**

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the **Federal Register** notice is published or, if later, the expiration of the most recent previous extension. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). As noted, the expiration date of the 2023 Venezuela designation is 60 days from the date of publication of this notice.

The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.;* INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Given the Secretary's finding that continuing to permit such Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest, and considering the relative recency of the designation (Oct. 3, 2023), the Secretary has determined that it is not

---

[9] 90 FR 8439 (Jan. 20, 2025).

[10] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[11] *Id.*

[12] *The Cost of the Border Crisis,* Testimony before the House Budget Committee of Julie Kirchner the Executive Director, Federation for American Immigration Reform (May 8, 2024), available at: https://www.congress.gov/118/meeting/house/117257/witnesses/HHRG-118-BU00-Wstate-KirchnerJ-20240508.pdf (last accessed Jan. 30, 2025).

[13] Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis (last accessed Jan. 30, 2025).

[14] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[15] *Id.,* sec. 16, 90 FR 8446.

[16] *Id.,* sec. 16(b), 90 FR 8446.

[17] Proc. 10886, *Declaring a National Emergency at the Southern Border of the United States,* 90 FR 8327 (Jan. 20, 2025).

[18] *See Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program,* 62 FR 16608, 16609 (Apr. 7, 1997) ("One factor in determining whether redesignation is appropriate is whether it will create a 'magnet effect' for nationals of the country under consideration. In cases where the Attorney General contemplates redesignation, she may consider this possible magnet effect and any other factors weighing against redesignation, together with any discretionary factors in favor of redesignation.").

[19] *See, e.g.,* Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis (last accessed Jan. 30, 2025).

[20] *See id.*

[21] 88 FR 68134.

[22] *America First Policy Directive to the Secretary of State,* 90 FR 8337 (Jan. 20, 2025).

[23] *See* U.S. Dep't of State, *Priorities and Mission of the Second Trump Administration's Department of State* (Jan. 24, 2025), available at https://pa.usembassy.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.

[24] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.").

appropriate to allow for a further transition period. Accordingly, the termination of the October 3, 2023 Venezuela TPS designation will be effective 60 days from the date of publication of this notice.[25]

The Secretary has considered putative reliance interests in the 2023 Venezuela TPS designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status, TPS designations are time-limited and must be periodically reviewed, TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). Any putative reliance interests of registrants under the Venezuela 2023 designation therefore merit only diminished weight. Moreover, any such putative reliance interests are outweighed by the overriding, important national interest considerations described in this notice.[26]

---

[25] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

[26] DHS recognizes that certain previous TPS terminations allowed for an extended transition, especially in the case of TPS designations that had been extended numerous times over the course of many years. *See, e.g., Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018) (nearly 17 years, with 18-month transition period); *Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (20 years, with 12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (nearly 6 years, with 6-month orderly transition period); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status,* 81 FR 66059 (Sept. 26, 2016) (nearly 2 years, with 6-month orderly transition period). Those countries, however, generally had been designated for TPS for longer periods, and none of those terminations were based on a determination that allowing the aliens to remain temporarily in the United States is contrary to the U.S. national interest. At the same time, certain other TPS designations were terminated without allowing for an extended transition period. *See, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (nearly 3 years, no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (2 years, no extended transition period).

### Venezuelan Nationals Registered Under the 2021 Venezuela Designation

Although unorthodox, the prior Administration issued two separate designations of Venezuela. *See* 88 FR 68130 (Oct. 3, 2023); 86 FR 13574 (Mar. 9, 2021). In this notice, DHS is terminating only the October 3, 2023 Venezuela TPS designation. The 2021 Venezuela TPS designation remains in effect until September 10, 2025.

### Notice of Termination of the 2023 TPS Designation of Venezuela

By the authority vested in the Secretary of Homeland Security under section 244(b)(3) of the INA, 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with appropriate agencies of the U.S. Government, (a) conditions in Venezuela; and (b) whether permitting the nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States is contrary to the national interest of the United States. Based on my review, I have determined that Venezuela no longer continues to meet the conditions for the October 3, 2023 designation for Temporary Protected Status (TPS) under section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on April 7, 2025.

(2) This notice supersedes the January 17, 2025 notice at 90 FR 5961, the underlying decision for which was vacated on January 28, 2025.

(3) Information concerning the termination of TPS for nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) under the October 3, 2023 designation will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS website at *www.USCIS.gov.*

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–02294 Filed 2–3–25; 12:15 pm]
**BILLING CODE 9111–97–P**

---

### INTERNATIONAL TRADE COMMISSION

[Investigation Nos. 701–TA–453 and 731–TA–1136–1137 (Third Review)]

### Sodium Nitrite From China and Germany

#### Determinations

On the basis of the record [1] developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the antidumping and countervailing duty orders on sodium nitrite from China and the antidumping duty order on sodium nitrite from Germany would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[2]

#### Background

The Commission instituted these reviews on July 1, 2024 (89 FR 54536) and determined on October 4, 2024 that it would conduct expedited reviews (89 FR 85986, October 29, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 31, 2025. The views of the Commission are contained in USITC Publication 5582 (January 2025), entitled *Sodium Nitrite from China and Germany: Investigation Nos. 701–TA–453 and 731–TA–1136–1137 (Third Review).*

By order of the Commission.

Issued: January 31, 2025.

**Lisa Barton,**
*Secretary to the Commission.*
[FR Doc. 2025–02260 Filed 2–4–25; 8:45 am]
**BILLING CODE 7020–02–P**

---

### DEPARTMENT OF JUSTICE

### Notice of Cancellation of Task Force on Research on Violence Against American Indian and Alaska Native Women Meeting

**AGENCY:** Office on Violence Against Women, United States Department of Justice.

**ACTION:** Notice; cancellation of meeting.

---

The Office on Violence Against Women (OVW), U.S. Department of

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[2] Commissioner Rhonda K. Schmidtlein not participating.