**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

<table>
<tr>
<td>

HAITIAN-AMERICANS UNITED INC.;
VENEZUELAN ASSOCIATION OF
MASSACHUSETTS; UNDOCUBLACK
NETWORK, INC.; SYDNEY DOE; MARLENE
DOE; GUSTAVO DOE; and NATALIA DOE,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. DEPARTMENT
HOMELAND SECURITY; and KRISTI NOEM, in
her official capacity as Secretary of the Department
of Homeland Security,

Defendants.

</td>
<td>

Civil Action No. 25-cv-10498

</td>
</tr>
</table>

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION UNDER 5 U.S.C.
§ 705 TO STAY THE EFFECTIVE DATE OF DHS' VENEZUELA AND HAITI
TEMPORARY PROTECTED STATUS (TPS) VACATURS AND 2025 VENEZUELA
TERMINATION**</u>

# Table of Contents

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 3

    I.     TPS Statutory Scheme ............................................................................... 3

    II.    TPS Designation Prior To The Second Trump Administration. ...................... 4

    III.   The Challenged Conduct. ........................................................................... 6

ARGUMENT ...................................................................................................................... 7

    I.     UNDER THE APA, THE COURT MAY STAY THE VENEZUELA
         AND HAITI VACATURS AND 2025 VENEZUELA
         TERMINATION PENDING FURTHER PROCEEDINGS............................. 7

    II.    PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS. ............... 9

         A.     Plaintiffs Are Likely To Succeed On Their APA Claims. ..................... 9

         B.     Plaintiffs Are Likely To Succeed On Their Equal Protection
              Claim. ................................................................................... 13

    III.   IN THE ABSENCE OF PRELIMINARY RELIEF, PLAINTIFFS
         WILL SUFFER IRREPARABLE HARM. ................................................. 17

    IV.   THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR
         DELAYING THE EFFECTIVE DATE OF THE TPS VACATURS
         AND THE VENEZUELA TERMINATION. ............................................. 18

    V.     THE COURT SHOULD ENTER A UNIVERSAL STAY UNDER 5
         U.S.C. § 705. ........................................................................................ 20

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)..................................................... 13

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3rd Cir. 1996)........................................... 14

*American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984) .................................................. 11

*Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016).............................. 14

*Bankamerica Corp. v. United States*, 462 U.S. 122 (1983) ........................................................ 12

*Biden v. Nebraska*, 600 U.S. 477 (2023) .................................................................................... 13

*Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220.  (5th Cir. 2024)
.................................................................................................................................................... 20

*CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325-26 (2018)  ................................. 16

*Centro Presente v. Dep't of Homeland Security*, 332 F.Supp.3d 393 (D. Mass. 2018) .............. 16

*D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d  (D.D.C. 2020)....................................................... 8

*Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358 (1978)............................................................ 20

*Dep't of ED. v. Career Colleges & Sch. of TX*, 2025 WL 65914 (U.S. Jan. 10, 2025) ............... 20

*Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520 (S.D.N.Y. 2006) ........................................... 17

*Dorce v. Wolf*, 506 F. Supp. 3d 142(D. Mass. 2020)................................................................... 19

*FDA v. Brown & Williamson*, 529 U.S. 120 (2000) .................................................................... 11

*Federal Election Comm'n v. Cruz*, 596 U.S. 289 (2022) .............................................................. 2

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010).................................... 13

*Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F3d 244 (1st Cir. 2012) ........................... 13

*Guimaraes v. SuperValu, Inc.,* 674 F.3d 962(8th Cir.2012).......................................................... 14

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) .............................................................. 20

*Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. 2020)................................... 8

*Ivy Sports Medicine v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014)............................................... 10, 11

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..................... 19

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ....................................................... 7

*Macktal v. Chao*, 286 F.3d 822 (5th Cir. 2002)........................................................................... 12

*Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600
(D. Mass. 2020)...................................................................................................................... 8, 20

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ..................................... 8

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2015) ........................................ 16

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) .................................................................................................................................... 9

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 18

*Norris on Behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12 (1st Cir. 2020) ................... 8

*NRDC v. Regan*, 67 F.4th 397 (D.C. Cir. 2023) ................................................................. 10, 11

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................................................. 18

*Ramos v. Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018) ..................................................... 4,5

*Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) .............................................................................. 4

*Ramos v. Mayorkas,* 2023 WL4363667 ....................................................................................... 4

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996). ............................ 9

*Saget v. Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................... 4

*Savino v. Souza*, 459 F. Supp. 3d 317 (D. Mass. 2020) .............................................................. 20

*Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012) ......................................................... 8

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ............................................................................... 8

*The Last Best Beef v. Dudas,* 506 F.3d 333 (4th Cir. 2007). ...................................................... 12

*United States v. Riverside Bayview Homes*, 474 U.S. 121(1985) ................................................. 12

*University of Texas v. Camenisch*, 451 U.S. 390 (1981) .............................................................. 8

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) .................................................................... 9

*Victim Rts. L. Ctr. v. Cardona*, 2021 WL 3516475 (D. Mass Aug. 10, 2021) ........................... 20

*Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ........................................................................................................................... 2, 14, 17

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ........................................................... 11

*Washington v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191 (E.D. Wash. 2019) . ......................................................................................................................................... 8

## Statutes

5 U.S.C. § 705 .......................................................................................... 1, 3, 8, 20, 21

5 U.S.C. § 706 ................................................................................................................. 7

8 U.S.C. §1254a ....................................................................................................... passim

**Regulations**

75 Fed. Reg. 3476 ................................................................................................ 5

76 Fed. Reg. 29000 .............................................................................................. 4

77 Fed. Reg. 59943 .............................................................................................. 4

79 Fed. Reg. 11808 .............................................................................................. 4

80 Fed. Reg. 51582 .............................................................................................. 4

82 Fed. Reg. 23830 .............................................................................................. 4

83 Fed. Reg. 2648 ................................................................................................ 4

86 Fed. Reg. 13574 .............................................................................................. 5

86 Fed. Reg. 41863 .............................................................................................. 5

87 Fed. Reg. 55024 .............................................................................................. 5

88 Fed. Reg. 68130 .............................................................................................. 5

88 Fed. Reg.5022 ................................................................................................. 5

88 Fed. Reg.86665 ............................................................................................... 5

89 Fed. Reg. 54484 ............................................................................................ 17

89 Fed. Reg.54484 ............................................................................................... 5

90 Fed. Reg. 10511 .............................................................................................. 1

90 Fed. Reg. 5961 ....................................................................................... 5, 6, 17

90 Fed. Reg. 8805 ............................................................................................ 1, 6

90 Fed. Reg. 9040 ............................................................................................ 1, 6

90 Fed. Reg. 9497 .............................................................................................. 16

90 Fed. Reg.10511 .............................................................................................. 7

**Constitutional Provisions**

U.S. Const. art. I, § 1 .......................................................................................... 9

## INTRODUCTION

Plaintiffs Haitian Americans United, Inc. ("HAU"), Venezuelan Association of Massachusetts ("VAM"), UndocuBlack Network Inc. ("UBN"), and four individual recipients of Temporary Protected Status ("TPS") respectfully ask this Court to exercise its authority under the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, to postpone the effective date of three challenged actions taken by Defendant Department of Homeland Security ("DHS") and its Secretary, Defendant Kristi Noem, pending the Court's review:

- Vacatur of 2025 TPS Decision for Venezuela ("2025 Venezuela Vacatur")[1]

- Termination of the October 3, 2023 Designation of Venezuela for TPS ("2025 Venezuela Termination")[2]

- Partial Vacatur of 2024 TPS Decision for Haiti ("2025 Haiti Vacatur")[3]

Absent a postponement from this Court, hundreds of thousands of Venezuelan and Haitian TPS holders will imminently lose humanitarian protection to which they are entitled. The 2025 Venezuela Vacatur is scheduled to take effect on **April 2, 2025**; the 2025 Venezuela Termination on **April 7, 2025**; and the 2025 Haiti Vacatur on **August 3, 2025**. Those stripped of TPS protection will face irreparable harm, including deportation to countries in collapse, separation from their U.S. citizen children, loss of health and even life.

TPS provides refuge for immigrants fleeing extreme violence, political upheaval, and natural disasters. When Defendant Trump took office for his second term, TPS protections were in place until February 3, 2026 for Haiti and October 2, 2026 for Venezuela. Yet, within days of the inauguration, Defendant Noem moved to slash these protections, unlawfully accelerating the

---

[1] 90 Fed. Reg. 8805 (Feb. 3, 2025) (ECF Doc. 1-3 (Exhibit A to Complaint)).
[2] 90 Fed. Reg. 9040 (Feb. 5, 2025) (ECF Doc. 1-4 (Exhibit B to Complaint)).
[3] 90 Fed. Reg. 10511 (Feb. 24, 2025) (ECF Doc. 1-5 (Exhibit C to Complaint)).

expiration dates of the most recent extensions to April 2, 2025 (Venezuela) and August 3, 2025 (Haiti). Shortly after, she announced the complete termination of TPS for Venezuela, now slated to occur on April 7, 2025.

Without judicial intervention, the challenged conduct will inflict devastating harm on TPS holders and their families. Congress designed TPS to replace *ad hoc*, discretionary deferrals of immigration enforcement with a structured, fact-based process. The TPS statute sets forth a clear process and timelines for DHS to review, extend, or terminate a country's TPS designation. However, Defendants have disregarded these procedures, attempting to strip vulnerable TPS recipients of protections by rescinding already granted extensions. This is flatly unlawful. The Secretary of DHS has no statutory authority to retroactively rescind an extension that has already been granted. *See Federal Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (an agency "literally has no power to act … unless and until Congress authorizes it to do so by statute.") (cleaned up).

The challenged conduct is also unlawful because it is not based on the statutory criteria required for TPS, but rather represents predetermined conclusions fueled by racial bias, as evidenced by an extraordinary volume of dehumanizing and biased remarks made by Defendants Trump and Noem about Black and Latino immigrants, and Haitian and Venezuelan immigrants in particular. Such discriminatory decision-making violates core constitutional principles of Equal Protection. *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977).[4]

---

[4] The challenged actions suffer from other infirmities as well, including that Defendant Noem did not undertake the evidence-driven analysis required by law. For purposes of this preliminary Motion, Plaintiffs focus on her lack of authority to issue the Vacaturs and Termination, and on their Equal Protection claim.

Plaintiffs—individual TPS holders and organizations with affected members across the country—a have raised grave doubts about the legality of Defendants' actions and are likely to succeed on the merits. To prevent irreparable harm, this Court should exercise its discretion under 5 U.S.C. § 705 to stay the effective dates of the three challenged actions, pending further review.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    TPS Statutory Scheme

Before the enactment of TPS, the Executive Branch relied on a discretionary policy known as Extended Voluntary Departure (EVD) to allow certain groups of otherwise deportable individuals to remain in the United States. This policy was implemented on a case-by-case basis by the Attorney General without clear statutory guidelines. Recognizing these deficiencies, Congress established TPS as part of the Immigration Act of 1990. 8 U.S.C. § 1254a. TPS now provides a structured process for designating countries whose nationals face unsafe conditions.  It authorizes the DHS Secretary to extend TPS to foreign nationals who cannot return to their country of origin because of war, civil unrest or a natural disaster. *Id.* TPS recipients who meet eligibility criteria, including having no serious criminal record, receive protection from removal and work authorization, enabling them to sustain their livelihoods while conditions in their home countries remain unsafe. *Id.* §1254a(c)(2)(B).

The DHS Secretary may designate a country for TPS—after  consulting with appropriate government agencies—if one of the following conditions is met: (1) an ongoing armed conflict poses a serious threat to returning nationals; (2) a natural disaster, such as an earthquake or epidemic, has temporarily disrupted living conditions, making it unsafe for nationals to return and prompting an official request for TPS; or (3) extraordinary and temporary conditions prevent safe return unless doing so is against U.S. interests. *Id.* §1254a(b)(1)(A)-(C).

Once a country is designated, TPS takes effect upon publication in the Federal Register

and lasts between six to eighteen months. *Id.* §1254a(b)(2). Each designation has a fixed end-point: it "shall remain in effect until the effective date of the termination of the designation." *Id.* At least 60 days before a designation expires, DHS must review country conditions, consult with other agencies, and determine whether TPS should be extended or terminated. *Id.* In practice, this process includes a multi-step review, incorporating a Country Conditions Memo from USCIS, a Decision Memo with USCIS's recommendation, and input from the State Department and other agencies.[5]

If the DHS Secretary determines that conditions no longer justify TPS, she must publish a termination notice in the Federal Register. *Id.* §1254a(b)(3). The termination cannot take effect sooner than 60 days after publication, nor before the end of the most recent extension granted. *Id.* (termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension…."). If the Secretary does not find grounds for termination, the designation is extended for at least six months, with the option for 12- or 18-month extensions at the Secretary's discretion. *Id.*

## II.    TPS Designation Prior To The Second Trump Administration.

Both Haiti and Venezuela have experienced prolonged periods of instability that have necessitated TPS designations. These designations have been extended and re-designated multiple times due to ongoing humanitarian crises, political repression, and economic collapse in both countries.[6]

---

[5] *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted*, 59 F.4th 1010 (2023), *appeal dismissed sub nom. Ramos v. Mayorkas*, 2023 WL4363667; *Saget v. Trump*, 375 F. Supp. 3d 280, 298-300 (E.D.N.Y. 2019).

[6] Designations and Extensions of Haiti for TPS, 75 Fed. Reg. 3476 (Jan. 21, 2010); 76 Fed. Reg. 29000 (May 19, 2011); 77 Fed. Reg. 59943 (Oct. 1, 2012); 79 Fed. Reg. 11808 (Mar. 3, 2014); 80 Fed. Reg. 51582 (Aug. 25, 2015); 82 Fed. Reg. 23830 (May 24, 2017); 83 Fed. Reg. 2648 (Jan.

Haiti received its initial TPS designation on January 21, 2010, following a catastrophic earthquake that devastated Port-au-Prince, leaving over a million homeless. 75 Fed. Reg. 3476 (Jan. 21, 2010). The designation was subsequently extended due to persistent instability, including political turmoil, natural disasters, and health crises like the cholera outbreak. *See supra* n.6. In 2018, during the first Trump Administration, the DHS Secretary attempted to terminate Haiti's TPS; however, the termination was enjoined.[7] On August 3, 2021, former DHS Secretary Mayorkas re-designated Haiti for TPS due to escalating violence, political instability following President Moïse's assassination, and worsening humanitarian conditions. 86 Fed. Reg. 41863 (Aug. 3, 2021). The most recent extension on July 1, 2024 ensured protection through February 3, 2026, acknowledging Haiti's ongoing crisis. 89 Fed. Reg. 54484 (July 01, 2024) ("The 18-month designation of Haiti for TPS … will remain in effect for 18 months, ending on February 3, 2026. The extension allows existing TPS beneficiaries to retain TPS through February 3, 2026, if they otherwise continue to meet the eligibility requirements for TPS.").

Secretary Mayorkas first designated Venezuela for TPS on March 9, 2021. 6 Fed. Reg. 13574 (Mar. 9, 2021). The designation was based on overwhelming evidence of economic collapse, political repression, and human rights violations under Nicolás Maduro's regime. Arbitrary arrests, extrajudicial killings, food shortages, and a crumbling healthcare system left millions in dire conditions. *Id.* Recognizing the persistent instability, DHS extended TPS in September 2022 and again in October 2023, allowing additional Venezuelans to apply. *Supra* n.6. By 2025, the crisis showed no signs of abating. On January 17, 2025, Secretary Mayorkas extended

---

18, 2018); 86 Fed. Reg. 41863 (Aug. 3, 2021); 88 Fed. Reg. 5022 (Jan. 26, 2023); 88 Fed. Reg. 86665 (Dec. 14, 2023); 89 Fed. Reg. 54484 (July 01, 2024). Designations and Extensions of Venezuela for TPS, 86 Fed. Reg. 13574 (Mar. 9, 2021); 87 Fed. Reg. 55024 (Sep. 8, 2022); 88 Fed. Reg. 68130 (Oct. 3, 2023); 90 Fed. Reg. 5961 (Jan. 17, 2025).
[7] *Ramos v. Nielsen*, *supra* n.5.

protections through October 2, 2026, reaffirming that Venezuela's severe conditions made safe return impossible. 90 Fed. Reg. 5961 (Jan. 17, 2025) ("2025 Venezuela Extension") ("The 18-month extension of Venezuela's … will remain in effect for 18 months, ending on October 2, 2026. The extension allows existing TPS beneficiaries to retain TPS through October 2, 2026, if they otherwise continue to meet the eligibility requirements for TPS.").

### III.    The Challenged Conduct.

Thus, when Defendant Trump assumed the presidency on January 20, 2025, Venezuela's TPS designation extended through October 2, 2026, and Haiti's TPS designation extended through February 3, 2026. On January 25, 2025, Defendant Noem was sworn in as Secretary of the DHS. Three days later, Defendant Noem announced the reversal of the 2025 Venezuela TPS extension, publicly characterizing it as a way to prevent Venezuelan TPS holders from "violating our laws for another 18 months." *See* Declaration of Mirian Albert ("Albert Dec."), Ex. 23. On February 3, 2025, she published notice in the Federal Register of what she termed a "vacatur" of the 2025 Venezuela TPS extension—though the TPS statute contains no provision for such an action. 90 Fed. Reg. 8805 (Feb. 3, 2025) ("2025 Venezuela Vacatur"). Nonetheless, Defendant Noem claimed "inherent authority" under the Immigration and Nationality Act ("INA") to vacate TPS determinations. No Secretary in the TPS statute's 35-year history had ever before "vacated" an already-granted extension.

This paved the way to end the TPS designation for Venezuela altogether. On February 5, 2025, DHS announced the termination of Venezuela's 2023 TPS designation in the Federal Register, with an end date of April 7, 2025. 90 Fed. Reg. 9040 (Feb. 5, 2025) ("2025 Venezuela Termination"). This accelerated termination date depended on the vacatur, because a TPS termination cannot occur before the end date of the last-granted extension (which prior to the

vacatur was October 2, 2026). Despite acknowledging ongoing issues in Venezuela, the Secretary claimed that improvements in conditions made it possible for Venezuelan nationals to safely return.

In parallel, on February 20, 2025, Secretary Noem announced a partial vacatur of Haiti's most recent TPS extension, cutting the designation period short by six months. 90 Fed. Reg. 10511 (Feb. 24, 2025) ("2025 Haiti Vacatur"). This decision, made swiftly after Defendant Noem's confirmation, mirrored her reasoning for the Venezuela termination, citing "national interest" factors and questioning the thoroughness of Secretary Mayorkas' extension analysis, but citing no statutory provision granting her authority to vacate. *Id.*

## ARGUMENT

### I.  UNDER THE APA, THE COURT MAY STAY THE VENEZUELA AND HAITI VACATURS AND 2025 VENEZUELA TERMINATION PENDING FURTHER PROCEEDINGS.

Under the APA, a reviewing court "shall…hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; …(B) contrary to constitutional right, power, privilege, or immunity; … [or] (C) in excess of statutory jurisdiction, authority, or limitations…." 5 U.S.C. § 706. As the Supreme Court has recently explained:

> Congress in 1946 enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices. It was the culmination of a comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers.

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quotations and internal citations omitted); *see also id*. at 392 ("agency interpretations of statutes…are *not* entitled to deference.") (emphasis in original).

A court reviewing final agency action under the APA may issue a "postpone[ment]" or stay of the effective date of an agency action.  Under 5 U.S.C. § 705, a reviewing court may "on such conditions as may be required and to the extent necessary to prevent irreparable injury … issue all necessary and appropriate process to postpone the effective date of an agency action ... pending conclusion of the review proceeding." *See also Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020) (staying HUD rule that weakened disparate impact liability under Fair Housing Act); *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (staying EPA final rule "in its entirety").[8]

A stay under § 705 preserves the *status quo* pending a decision on the merits.  *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 28 (D.D.C. 2012). In determining whether to issue a stay, courts apply the same standards as apply to grants of preliminary injunctions.  *See Mass. Fair Hous. Ctr.,* 496 F. Supp. 3d at 609; *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020).  Courts consider "(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Norris on Behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (citations and quotations omitted). The First Circuit has described likelihood of success on the

---

[8] *See also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) ("Section 705 of the APA authorizes courts to stay agency rules pending judicial review without any time limit on the duration of the stay."); *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 46 (D.D.C. 2020) (granting stay under § 705 and nationwide preliminary injunction); *Washington v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191. 1211-1212 (E.D. Wash. 2019) (same regarding DHS rules changing visa application rules).

merits as "the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). In this case, all factors favor a stay.

## II.    PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS.

### A.  Plaintiffs Are Likely To Succeed On Their APA Claims.

Plaintiffs have established a strong likelihood of success on the merits of their APA claims because Defendant Noem has no authority to "vacate" TPS extensions that have already been granted. And once the original date of Venezuela's most recent extension is restored to October 2, 2026, the 2025 Venezuela Termination is automatically improper because it terminates Venezuela's designation prior to the end of that extension period.

As the Supreme Court has repeatedly emphasized, "[a]dministrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). Legislative power lies with Congress, *see* U.S. Const. art. I, § 1, and it is "[a] core administrative-law principle … that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Here, Congress has legislated explicitly about how TPS extensions and terminations must occur—and has included no process for "vacaturs." As described *supra* at 3-4, Congress set forth in the TPS statute an orderly process for designating, extending, and terminating TPS protections. The process is clear and defined, with dates by which decisions must be made, formal notice published in the Federal Register, and work authorizations that run concurrently with the designation—all of which allow TPS beneficiaries to order their lives. This framework also provides time and a process for the DHS Secretary to periodically review TPS designations to determine whether to extend or terminate them.  Underpinning the entire scheme is the certainty that comes from a designation period of a fixed duration: a designation "*shall remain in effect* until

the effective date of the termination of the designation...." 8 U.S.C. §1254a(b)(2)(B). ) (emphasis

supplied).

Nowhere in this detailed statutory scheme is there any provision that allows the DHS

Secretary to revoke an extension that has already been granted—*i.e.*, to remove protections that

have been officially afforded to TPS recipients. In the TPS Vacatur notices, Defendant Noem

concedes that Congress has not explicitly granted her the power to do so. She does not cite to any

statutory provision for this supposed authority, because there is none. She claims instead that she

has "inherent (that is, statutorily implicit) authority" to vacate prior extensions.[9]

But the cases that she cites for the proposition that agencies have "statutorily implicit"

authority to reconsider their decisions support Plaintiffs' position here. For example, in *Ivy Sports

Medicine v. Burwell*, the Court *rejected* the FDA's claim of inherent authority to re-classify a

medical device, after public allegations of undue political pressure in the classification process

arose. 767 F.3d 81, 89 (D.C. Cir. 2014). Then-Judge Kavanaugh reviewed the detailed statutory

scheme that Congress had set forth to reclassify such devices and held that "FDA may not short-

circuit that process through what it calls its inherent authority[.]" *Id*. at 87. The FDA may have

wanted "to take action more promptly" and avoid the "procedural hoops" created by the statutory

framework, but "inherent reconsideration authority does not apply in cases where Congress has

spoken." *Id*. at 86-87. Permitting the FDA to rescind the classification "would render the [statutory

---

[9] *See* ECF Doc. 1-3 at 3; ECF Doc. 1-5 at 5. As the Secretary's phrasing appears to recognize, agencies do not in fact have *any* "inherent" power. Any grant of power to an agency must come from Congress—or it does not exist at all. *NRDC v. Regan*, 67 F.4th 397 (D.C. Cir. 2023) ("While we have often referred to agencies' inherent authority, the term "inherent" is misleading because it is axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress.") (citations and internal quotations omitted).

reclassification process] a dead letter" as it would permit the FDA to "reclassify a device without complying with the procedural requirements" that Congress had set forth. *Id.* at 87.

So here, there is a carefully prescribed statutory process for deciding—and publicly announcing—TPS extensions and terminations. Congress has specifically spoken: a designation "shall remain in effect until the effective date of the termination of the designation…." 8 U.S.C. §1254a(b)(2)(B). It would be unreasonable to presume that Defendant Noem can nonetheless short-circuit those procedures by revoking an extension that has already been granted. As the Supreme Court has repeatedly cautioned, enabling legislation "is generally not an open book to which the agency may add pages and change the plot line." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (cleaned up). It would make no sense to think that Congress would explicitly set forth a precise statutory scheme, only to then impliedly give the Secretary authority to ignore it at any time. *NRDC*, 67 F.4th at 404 ("Congress did not create a process for EPA to withdraw a regulatory determination because it seemingly did not want EPA to have power to do so.").[10]

As another of the Secretary's cases highlights, immense uncertainty would arise from implying a free-ranging agency power to revoke prior determinations: "Like the sword suspended by a hair above the courtier Damocles, the Administration's claimed revocation authority would pose an ever-present threat…fostering great uncertainty." *American Methyl Corp. v. EPA*, 749 F.2d 826, 840 (D.C. Cir. 1984). Particularly in the context of the TPS statute, where human lives are at stake, this type of uncertainty is untenable—and is precisely what the law was enacted to

---

[10] *See also FDA v. Brown & Williamson*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted").

avoid. *See supra* at 3; *United States v. Riverside Bayview Homes*, 474 U.S. 121, 132-33 (1985) (underlying purpose of law is relevant to discerning limits on agency power).[11]

The other cases cited by Defendant Noem are also readily distinguishable. In *Macktal v. Chao*, the Fifth Circuit held that the Administrative Review Board of the Labor Department could reconsider its earlier decision awarding an employee attorneys' fees, but it emphasized that this was not the case where a statutory scheme otherwise provided a mechanism for review. 286 F.3d 822, 826 (5th Cir. 2002). Similarly, *The Last Best Beef v. Dudas* focused on instances where federal agencies can correct themselves if they "take erroneous or unlawful action…." 506 F.3d 333, 340 (4th Cir. 2007). But here, Defendant Noem did not claim any "error" in Secretary Mayorkas' extensions for Venezuela or Haiti. She cited only his "novel approach" to consolidating the two Venezuela designations, and what she considered his "inadequately developed" explanation for it. ECF Doc. 1-3 at 4.[12]

Finally, the fact that DHS has never before in the 35-year history of the TPS statute rescinded a TPS extension bolsters the conclusion that DHS has no such authority. *See Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) (lack of assertion of power is

---

[11] This purpose in fact permeates the statutory scheme. *See*, *e.g*., 8 U.S.C. 1254a(a)(1)(A) (assuring that a TPS holder will not be removable "during the period in which such status is in effect"); 1254a(a)(2) (assuring work authorization which "shall be effective throughout the period the alien is in [TPS] under this section"); 1254a(d) (documentation of protected status given to individual TPS holder "shall be valid during the initial period of designation of the foreign state (or part thereof) involved and any extension of such period."); 1254a(d) (ensuring "orderly renewal of documentation" and "orderly transition" in the case of a termination).
[12] As explained below, there is substantial evidence that it was not Secretary Mayorkas' approach to consolidating designations that motivated Defendant Noem's actions, but rather improper political influence and bias. *See infra* at 14-16; Compl. at ¶¶ 116-133.

significant in determining whether power was actually conferred); *Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (same).[13]

There is therefore a strong likelihood that Plaintiffs will prevail on the merits—*i.e.*, that both the Venezuela and the Haiti Vacaturs are unauthorized by law and must be set aside. Defendant Noem simply had no authority to issue them. The 2025 Venezuela Termination, which purports to terminate Venezuela's TPS protection by April 7, 2025, is similarly unlawful: once the illegal Venezuela Vacatur is set aside, then the Termination stands in direct conflict with the requirements of the TPS statute. Absent the Vacatur, Venezuela's TPS designation extends to October 2, 2026. And by law, the Secretary may not terminate TPS protection until that period expires. 8 U.S.C. 1254a(b)(3)(B) (any termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension…."). Her 2025 Venezuela Termination, however, purports to terminate TPS protection for Venezuela by April 7, 2025. Plaintiffs are likely to prevail on their claim that this is unlawful.

### B. Plaintiffs Are Likely To Succeed On Their Equal Protection Claim.

Plaintiffs are also likely to succeed on their Equal Protection Claim. "[T]he Due Process Clause of the Fifth Amendment is treated as containing an equal protection component that binds the federal government in the same way that the Equal Protection Clause binds the states." *Gonzalez-Maldonado v. MMM Healthcare, Inc*., 693 F3d 244, 247 n.2 (1st Cir. 2012) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995)). To prevail on this claim, Plaintiffs

---

[13] The Vacatur Notices cite to Secretary Mayorkas' recission of a decision to terminate TPS for El Salvador and other countries. *See* ECF Doc. 1-5 at 3-4. However, that action was taken to resolve years of litigation, *see supra* n.5, and was not challenged in court. In any event, given the hundreds of designations, extensions, and terminations that DHS has acted upon over the years, Defendant Noem's actions here indisputably lack precedent. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (finding "lack of historical precedent" where parties cite "only a handful of isolated" examples).

need only show that discriminatory purpose was one "motivating factor" for the challenged action. *Arlington Heights*, 429 U.S. at 265–66. This analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Relevant factors include contemporaneous statements of decision-makers, the historical background of the decision, the sequence of events leading up to it, departures from normal processes, and the disparate impact of the decision. *Id.* at 266-68.

Here, the sheer volume of statements from both Defendant Trump and Defendant Noem that evince racial bias is overwhelming. As numerous courts have held, "[t]here are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3rd Cir. 1996). Racist tropes, code words, stereotypes: all are "relevant for what they reveal—the intent of the speaker." *Id.*; *see also Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 505-06 (9th Cir. 2016) ("use of 'code words' may demonstrate discriminatory intent"); *Guimaraes v. SuperValu, Inc.,* 674 F.3d 962, 974 (8th Cir.2012) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications."). Defendants' biased statements include:

1. *Advancing Racist Tropes:*

- During Defendant Trump's first Administration, he disparaged Haitians, saying they "all have AIDS." Albert Dec., Ex. 3.
- During the September 2024 presidential debate, he baselessly claimed Haitian immigrants were "eating the dogs" and "eating the cats" of Springfield, Ohio residents. *Id.*, Ex. 15.

2. *Equating Black and Brown Immigrants with Criminals:*

- Defendant Trump declared, "When Mexico sends its people…They're bringing drugs. They're bringing crime. They're rapists." *Id.*, Ex. 6. A few

months later, he added: "We have some bad hombres here and we're going to get them out." *Id.*, Ex. 7.

- He has repeatedly claimed immigrants are from "jails, prisons, mental institutions, and insane asylums," stating, "They're dumping them into the United States." *Id.*, Ex.12. "You know, insane asylums, that's 'Silence of the Lambs' stuff . . ." *Id.*, Ex. 30.
- He has described immigrants as having "bad genes" propelling them to "murder." *Id.*, Ex. 21.
- He singled out Venezuelans, asserting:
  - o "In Venezuela, many countries, they're emptying their prisons into our country." *Id.*, Ex. 21.
  - o "Every day Americans…are living in fear all because Kamala decided to empty the slums and prison cells of Caracas… and we have to live with these animals…" *Id.*, Ex. 22.
  - o "Venezuelan gangs and thugs and criminals and you know we're talking a lot about Venezuela because Aurora is really infected by Venezuela…" *Id.*
- He has said in an interview: "'[I]t is a very sad thing for our country… it's poisoning the blood of our country … it's so bad and people are coming in with disease people are coming in with every possible thing that you can have." *Id.*, Ex. 9.
- Defendant Noem has frequently followed suit on X:
  - o "Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America." *Id.*, Ex. 10.
  - o "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America." *Id.*, Ex. 11.
  - o "Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America." *Id.*, Ex. 13.

3. *Other Xenophobic Comments:*

- Defendant Trump referred to TPS countries as "shithole countries" and reportedly asked, "Why do we need more Haitians? …[t]ake them out" of TPS during his first Administration. *Id.*, Ex. 7.
- He warned that immigrants were "poisoning the blood of our country," invoking Nazi-era eugenics. *Id.,* Ex. 8.
- Defendant Noem has repeatedly referred to Venezuelan immigrants as "dirtbags." *Id.*, Ex. 23 ("The people of this country want these dirtbags

out"); *id*., Ex. 27 (video posted of "[g]etting the dirt bags off the streets.").[14]

In stark contrast, when Defendant Trump speaks of white immigrants, he praises their "good genes" and questions why the U.S. cannot have more immigrants from "nice countries, you know like Denmark, [and] Switzerland." *See* Albert Dec., Ex. 17 & 18. And as his Administration is attempting to revoke protections for Plaintiffs, he has issued an executive order prioritizing white South Africans for refugee status. *Addressing Egregious Actions of the Republic of South Africa*, Executive Order (EO) 14204, 90 Fed. Reg. 9497 (February 12, 2025).

Defendants' challenged conduct also represents a clear departure from long-established practices under the TPS statute. In contrast to past practice of engaging in lengthy consultations with other governmental agencies to determine whether to extend a TPS designation, *see supra*, n.4, Defendant Noem began the process of vacating and terminating TPS designations within days of her confirmation. Her subsequent Vacaturs marked the first time in the TPS statute's history that a Secretary had ever attempted to roll back extensions that had already been granted. These irregularities in the process for Venezuelan and Haitian TPS holders are strong indicators of bias. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 227 (4th Cir. 2015) (procedural irregularities, including rushed decision making, truncated debate, and timing of enactment are evidence of discriminatory intent); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 548 (S.D.N.Y. 2006) (procedural irregularities are evidence of racial animus).

---

[14] Numerous courts during the first Trump Administration catalogued his discriminatory statements and found evidence of bias. *See*, *e.g.*, *Centro Presente v. Dep't of Homeland Security*, 332 F.Supp.3d 393, 413–16 (D. Mass. 2018) ((TPS plaintiffs plausibly stated claim that terminations were motivated by racial animus); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325-26 (2018) (same).

Finally, the challenged conduct unquestionably "bears more heavily on" Black and Latino TPS holders. *See Arlington Heights*, 429 U.S. at 266-68. Over a million TPS holders from Venezuela and Haiti would be impacted and imminently at risk for detention and removal.[15] As noted above, predominately white and European countries receive much more favored treatment.

Given this overwhelming evidence, Plaintiffs have a substantial likelihood of success in proving that discriminatory intent, namely racial and ethnic animus, was one motivating factor behind the challenged actions. *Id.* at 265–66.

### III.    IN THE ABSENCE OF PRELIMINARY RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM.

If the challenged actions go into effect as currently scheduled, hundreds of thousands of TPS holders across the country will face irreparable harm: they will immediately become deportable, faced with the prospect of returning to home countries beset by violence, political instability, and chaos. Haiti's government has collapsed, with gangs controlling vast regions and thousands of people killed in escalating violence. Lawrence Dec. ¶ 13. Last year alone, over 5,000 people were killed due to gang violence. *Id.* Venezuela remains in the grip of economic collapse, food shortages, and widespread human rights abuses. Velasquez Dec. ¶ 17; Natalia Dec. ¶ 11. Individuals like Plaintiff Sydney Doe, who fled gang violence in Haiti, and Plaintiff Gustavo Doe, a former government attorney in Venezuela, would face near-certain persecution or death if forced to return. Sydney Dec. ¶¶ 6, 9; Gustavo Dec. ¶ 13.

Without a stay, families will also be torn apart. Many TPS beneficiaries live in mixed-status families, where some members are U.S. citizens while others rely on TPS for legal protection. *See* Marlene Dec. ¶ 8 (household with all TPS recipients and one 6-year-old U.S.

---

[15] *See* 90 Fed. Reg. 5961 (607,000 Venezuelans affected); 89 Fed. Reg. 54484 (estimating over 500,000 Haitians affected).

citizen); Fleurissaint Dec. ¶¶ 11-12; Velasquez Dec. ¶ 12. If the challenged actions are allowed to go into effect, these families will face the unimaginable choice of either taking their children back to the perilous conditions in their countries of origin or leaving them behind in the United States, possibly never seeing them again. *See Padilla v. Kentucky*, 559 U.S. 356, 357 (2010) (recognizing the "seriousness of deportation" and "the concomitant impact of deportation on families…").

Economic consequences would be dire as well. TPS holders, many of whom are essential workers, would be stripped of their right to work. Plaintiff Natalia Doe, a single mother, would lose the ability to provide for her son, who requires ongoing medical care after a life-altering accident. Natalia Dec. ¶ 7; Gustavo Dec. ¶ 8. Without income or access to health insurance, his very survival would be in jeopardy. Natalia Dec. ¶¶ 9-10; Gustavo Dec. ¶¶ 9-12. Thousands of TPS holders and their families would be thrust into hunger, medical crises, and extreme poverty, with no means of support.

These humanitarian consequences are not hypothetical—they are an imminent and devastating reality for Plaintiffs and the hundreds of thousands like them throughout the country.

### IV.    THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR DELAYING THE EFFECTIVE DATE OF THE TPS VACATURS AND THE VENEZUELA TERMINATION.

The third and fourth factors considered by the Court—the balance of harms and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotations and citations omitted). The public interest weighs in favor of allowing relief because it is "always in the public interest to prevent the

violation of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (internal citations and quotations omitted).

Here, the public interest would be severely harmed by the chaos caused by the TPS Vacaturs and the Venezuela Termination. Over a million individuals with TPS protections would be forced to uproot their lives, creating widespread disruption across social and economic sectors. TPS beneficiaries live and work throughout the United States, as healthcare workers, small business owners, landlords, teachers, and more. In Massachusetts alone, many frontline healthcare staff are Haitian immigrants. *See* Fleurissaint Dec. at ¶ 10.[16] Other TPS holders are entrepreneurs whose small businesses fuel local economies. *See*, *e.g.*, Velasquez Dec. ¶ 13 (Somerville restaurant serving 3,000 people per weekend would close without its TPS holder owner). The economic damage from mass deportations would not only devastate individual families but also shutter businesses and disrupt entire communities that rely on these enterprises.

On the opposite side of the balance, there is no injury to the government at all in preserving the *status quo*. *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978) ("the maintenance of the *status quo* is an important consideration in granting a stay."); *Savino v. Souza*, 459 F. Supp. 3d 317, 332 (D. Mass. 2020) (maintaining *status quo* where it "cause[d] minimal hardship to the government or injury to the public"). It is not in the public interest to

---

[16] The U.S. Department of Labor reported that in 2023, 40% of home health aides and 27% of personal care aides were foreign born, higher than the average of 19% for workers overall. *See* TED: The Economic Daily, U.S. Bureau of Labor Statistics (Nov. 13, 2024), https://www.bls.gov/opub/ted/2024/in-2023-the-majority-of-home-health-aides-and-personal-care-aides-were-women.htm#:~:text=%E2%80%8B%20Source%3A%20U.S.%20Bureau%20of,End%20of%20interactive%20chart.&text=Note%3A%20Workers%20of%20Hispanic%20or,workers%20overall%20(13%20percent).

tear families apart or force hardworking, law-abiding residents to uproot their lives and leave their communities.

## V.    THE COURT SHOULD ENTER A UNIVERSAL STAY UNDER 5 U.S.C. § 705.

The ultimate relief that Plaintiffs request in this action is for the Court to "set aside" the three challenged actions under the APA—relief that by its nature applies universally.  *See Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *Victim Rts. L. Ctr. v. Cardona*, No. 20-11104, 2021 WL 3516475 at *1 (D. Mass Aug. 10, 2021) (same and citing cases). In the same manner, a stay under § 705, which would preserve the *status quo* pending final adjudication, should also apply nationwide. *Mass. Fair Housing Center et al.*, 496 F. Supp. 3d at 611-12.[17]

### CONCLUSION

For all of these reasons, the Court should exercise its authority under 5 U.S.C. § 705 to stay the effective date of the three challenged actions pending conclusion of this review proceeding.

---

[17] *See also Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), ("the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action"), *cert. granted in part on other grounds sub nom. Dep't of ED. v. Career Colleges & Sch. of TX*, No. 24-413, 2025 WL 65914 (U.S. Jan. 10, 2025).

Dated:  March 6, 2025

Respectfully submitted,

*/s/ Mirian Albert*_____
Mirian Albert (BBO #710093)
Oren Sellstrom (BBO #569045)
Iván Espinoza-Madrigal (BBO # 708080)
Victoria Miranda (BBO #695913)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
malbert@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
iespinoza@lawyersforcivilrights.org
vmiranda@lawyersforcivilrights.org

**LOCAL RULE 7.1 CERTIFICATE**

I certify that on March 6, 2025, I emailed Anne L. Dichter, attorney for Defendants, in order to meet and confer regarding this matter. We were unable to resolve or narrow the issue.

/s/*Mirian Albert*
Mirian Albert (BBO #710093)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2025, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

/s/*Mirian Albert*
Mirian Albert (BBO #710093)