# EXHIBIT 29

United States General Accounting Office

# GAO

# Congressional Record, 101st Congress, House

| Bill | Date | Page(s) |
|------|------|---------|
| S.358 | Oct 27, 1990 (150) | H12320-21 |
| **Action:** | | H 12358-69 |

Family Unity and Employment Opportunity Immigration: By a yea-and-nay vote of 264 yeas to 118 nays, Roll No. 530, the House agreed to the conference report on S. 328, to amend the Immigration and Nationality Act to change the level, and preference system for admission, of immigrants to the United States, and to provide for administrative naturalization—clearing the measure for Senate action.

**Page H12368**

H. Res. 538, waiving certain points of order against consideration of the conference report on S. 358, to amend the Immigration and Nationality Act to change the level, and preference system for admission, of immigrants to the United States, and to provide for administrative naturalization, was agreed to earlier by a voice vote.

**Page H12320**

Pursuant to the rule, H. Con. Res 394, directing the Secretary of the Senate to make corrections in the enrollment of S. 358, was considered to have been adopted.

**Page H12321**

---

□ 1510

WAIVING CERTAIN POINTS OF ORDER AGAINST CONSIDER-ATION OF CONFERENCE REPORT ON S. 358, IMMIGRA-TION ACT OF 1990

Mr. MOAKLEY. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 538 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

H. RES. 538

*Resolved,* That upon adoption of this resolution the House shall be considered to have adopted House Concurrent Resolution 394.

SEC. 2. Upon receipt of a message from the Senate informing the House of the adoption of House Concurrent Resolution 394, it shall be in order to consider the conference report on the bill (S. 358) to amend the Immigration and Nationality Act to change the level, and preference system for admission, of immigrants to the United States, and to provide for administrative naturalization, and for other purposes, and all points of order against the conference report and against its consideration are hereby waived. The conference report shall be considered as having been read when called up for consideration.

The SPEAKER pro tempore (Mr. MURTHA). The gentleman from Massachusetts [Mr. MOAKLEY] is recognized for 1 hour.

Mr. MOAKLEY. Mr. Speaker, for purposes of debate only, I yield the customary 30 minutes to the gentleman from California [Mr. PASHAYAN],

pending which I yield myself such time as I may consume.

(Mr. MOAKLEY asked and was given permission to revise and extend his remarks.)

Mr. MOAKLEY. Mr. Speaker, House Resolution 538 provides for a correcting mechanism that would delete a provision from the conference report on S. 358 The Immigration Act of 1989 that some members objected to when the rule was last considered. The rule provides upon adoption, the House is deemed to have passed House Concurrent Resolution 394.

In addition, Mr. Speaker the rule provides that upon the receipt of a message from the Senate informing the House of the adoption of the concurrent resolution, it shall be in order to consider the conference report on the bill S. 358, the Immigration Act of 1989.

Mr. Speaker, the rule waives all points of order against the conference report and against its consideration. The rule further provides that the conference report shall be considered as having been read with called up consideration.

Mr. Speaker, this rule allows the House a second opportunity to pass important and much needed immigration legislation before we adjourn the 101st Congress.

I am sure that Members are aware of the circumstances concerning this legislation so I will not spend too much time going over the provisions in the conference report. However, I would like to briefly explain to my colleagues the procedures that this rule would make in order.

Mr. Speaker, if this rule is adopted the House shall be considered to have adopted House Concurrent Resolution 394. It will then be sent to the Senate, if they adopt the concurrent resolution without amendment, the House will then bring up and hopefully pass, the conference report on S. 358, the Immigration Act of 1989.

Mr. Speaker, I want to stress to my colleagues that this will be the last opportunity to pass this landmark immigration bill during the last hours of the Congress.

Last night I warned my colleagues that a vote against the rule would kill this important immigration bill. And, believe me, it almost did.

But, thanks to the generous cooperation and understanding of the distinguished Senator from Wyoming, ALAN SIMPSON and the senior Senator from Massachusetts, TED KENNEDY—and thanks to the persistence of BRUCE MORRISON, JACK BROOKS, BARNEY FRANK, CHUCK SCHUMER, HAMILTON FISH and HOWARD BERMAN, we were able to work out this compromise.

And it is a compromise that is supported by everyone from the White House to the ACLU.

Mr. Speaker, this immigration bill helps literally thousands upon thousands of people. It helps the Irish; it

helps the Polish; it eliminates discriminatory statutes and it helps thousands of refugees fleeing war whose lives are literally in the balance.

This is a good bill. It is the best we can get.

So, I do not want to sound like the boy who cried wolf, but this is really it. There will be no other opportunities to consider this measure.

I urge my colleagues to support the rule and support the bill. Let us do the right thing.

Mr. PASHAYAN. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I should first like to thank the chairman of my committee, the gentleman from Massachusetts [Mr. MOAKLEY]. I know he himself has worked very hard on not only the procedural aspects of this bill, which of course come within the jurisdiction of our committee, but also on the substantive aspects.

I know he has taken a very keen interest in it for reasons of his own and for the reasons of the region from which he comes.

I know, Mr. Speaker, that where I come from, with this bill we look forward to settling a lot of the problems about families being split up.

In my part of California, the agricultural worker provides a vital portion of the agricultural system we have there, and for too long many of the people have been placed in a situation where they simply come into the United States wanting to work, and willing to work hard may I add, and yet being in the situation where they sometimes for long, long periods have got to be separated from their families.

So it is my hope, Mr. Speaker, that this bill will bring some stabilization to the agricultural process. It will not only be fairer to the families involved, but it will also provide some economic stability to the farmers who are sorely dependent on the kind of labor that the people provide.

So I think it is good not only from the point of view of families and the home, but it is also very good from the point of view of the economics, not only for the farmers but of course for the agricultural workers themselves.

Mr. Speaker, this rule does waive all points of order. The conference report is to be considered as having been read.

Both sides have worked together. This is not a controversial rule.

We on this side certainly support this rule.

Mr. Speaker, I yield 4 minutes to the gentleman from Texas [Mr. SMITH].

Mr. SMITH of Texas. I thank the gentleman for yielding.

Mr. Speaker, I would like to encourage my colleagues to support this rule. This rules does contain a concurrent resolution which eliminates the provision that was of so much concern to so many colleagues last night, that being the pilot program involving drivers li-

censes. That controversial item has been eliminated.

Also, Mr. Speaker, I would like to point out, if we are going to have a legal-immigration bill this year, we are going to have to support this rule and then support the conference report as well.

Early this morning we received a letter from the administration addressed to the Republican leader, Mr. MICHEL, from Roger B. Porter, assistant to the President for economic and domestic policy.

I would·like to read that letter now for the benefit of my colleagues:

THE WHITE HOUSE,
*Washington, DC, October 27, 1990.*
Hon. ROBERT H. MICHEL,
*Minority Leader, House of Representatives, Washington, DC.*

DEAR MR. MICHEL: The Administration strongly supports passage of the Immigration Act of 1990. This bill represents a careful balancing of pro-growth and pro-family immigration goals. Its enactment not only will benefit the American economy but also will help preserve the bonds so vital to ensuring a successful family. This bill would:

Increase employment-based immigration from 54,000 to 140,000. New criteria will ensure most of these immigrants are highly skilled. These additional workers will help relieve labor shortages in key technical areas, allow more professional services in rural areas, and improve the competitiveness of our workforce.

Raise levels of family-based immigration for all major categories. This increase will help reunite many families.

The legislation cleared the Senate last night by an overwhelming bipartisan vote of 89-8. After weeks of discussion and compromise, this legislation represents a significant and welcome reform of our legal immigration system.

It is my understanding that the pilot drivers' license program, included as part of the Senate-passed bill, is the primary concern of House members who voted against the rule on this bill. It is also my understanding that the Senate will remove this provision before the House vote today.

We urge the House to support this important legislation.

Sincerely,
ROGER B. PORTER,
*Assistant to the President
for Economic and Domestic Policy.*

Mr. Speaker, I thank the gentleman for yielding.

Mr. PASHAYAN. Mr.ˑSpeaker, I yield 2 minutes to the gentleman from New York [Mr. GREEN].

Mr. GREEN of New York. I thank the gentleman for yielding.

Mr. Speaker, I rise in support of this rule, and I also rise to thank the distinguished chairman of the Committee on Rules, his colleagues on the Committee on Rules, the members of the Committee on the Judiciary, and their counterparts in the Senate, who have labored so hard to give us a second crack at this legislation.

Mr. Speaker, I understand the concerns of those who voted against the rule last night, although I supported it. But I do want to emphasize the important of this legislation to so many people.

In my district, for example, there are provisions in the bill of tremendous important to those of Chinese origin, those of Irish origin, and others in my constituency.

☐ 1520

So, Mr. Speaker, I think it is very important that we have this second shot. I appreciate all those who took the extra effort in order to give it us, and I urge my colleagues to vote yes on the rule.

Mr. PASHAYAN. Mr. Speaker, I have no further requests for time, and I yield back the balance of my time.

Mr. MOAKLEY. Mr. Speaker, I have no further requests for time, and I move the previous question on the resolution.

The previous question was ordered.

The resolution was agreed to.

A motion to reconsider was laid on the table.

The SPEAKER pro tempore (Mr. MURTHA). Pursuant to House Resolution 538, House Concurrent Resolution 394 is considered as having been adopted.

The text of House Concurrent Resolution 394 is as follows:

H. CON. RES. 394

*Resolved by the House of Representatives (the Senate concurring),* That in the enrollment of the bill (S. 358) to amend the Immigration and Nationality Act to change the level, and preference system for admission, of immigrants to the United States, and to provide for administrative naturalization, and for other purposes, the Secretary of the Senate shall make the following corrections:

(1) Strike section 522 and strike the item relating to that section in the table of contents in section 1(c).

(2) At the end of section 212(a)(3)(B)(i) of the Immigration and Nationality Act, as amended by section 601(a) of the bill, add the following: "An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this Act, to be engaged in a terrorist activity.".

ference report is considered as having been read.

(For conference report and statement, see proceedings of the House of yesterday, Friday, October 26, 1990.)

The SPEAKER pro tempore. The gentleman from Texas [Mr. BROOKS] will be recognized for 30 minutes, and the gentleman from Texas [Mr. SMITH] will be recognized for 30 minutes.

PARLIAMENTARY INQUIRY

Mr. BRYANT. Mr. Speaker, I have a parliamentary inquiry.

The SPEAKER pro tempore (Mr. MURTHA). The gentleman will state it.

Mr. BRYANT. Mr. Speaker, I would like to inquire if the gentleman from Texas has been granted the other half hour as opposed to the bill.

The SPEAKER pro tempore. Is the gentleman from Texas [Mr. SMITH] opposed to the conference report?

Mr. SMITH of Texas. Mr. Speaker, to answer the gentleman from Texas [Mr. BRYANT], I am not opposed to the bill.

Mr. BRYANT. In that case, Mr. Speaker, being opposed, I would seek 20 minutes of the time that has been allocated under the rule.

The SPEAKER pro tempore. The time will be allocated as follows: 20 minutes to the gentleman from Texas [Mr. SMITH], 20 minutes to the gentleman from Texas [Mr. BROOKS], and 20 minutes to the gentleman from Texas [Mr. BRYANT].

The Chair recognizes the gentleman from Texas [Mr. BROOKS].

Mr. BROOKS. Mr. Speaker, I yield myself such time as I may consume.

(Mr. BROOKS asked and was given permission to revise and extend his remarks.)

Mr. BROOKS. Mr. Speaker, I rise in support of the conference report on S. 358, the legal immigration bill. The bill, which was the subject of several days of meetings among members of both the Senate and House Judiciary Committee and others, reforms America's legal immigration quota system. It expands the annual immigration numbers from the current level of 530,000 to roughly 700,000 per year.

I believe that the current proposal on these major issues is a good resolution of the differences between the two Houses and should be approved because it represents a reasonable compromise. Those supporting family reunification should applaud our efforts because we have proposed additional visas over the current allotment. We have also proposed to increase visas for those immigrants who can contribute to improving American competitiveness in world market by attracting highly skilled individuals to our country. Last but not least, additional visas are to be granted to citizens of those countries that traditionally were sources of immigration in the past. These citizens were foreclosed from immigrating due to the vagaries of the 1965 law.

CONFERENCE REPORT ON S. 358, IMMIGRATION ACT OF 1990

Mr. BROOKS. Mr. Speaker, pursuant to House Resolution 538, I call up the conference report on the Senate bill (S. 358) to amend the Immigration and Nationality Act to change the level, and preference system for admission, of immigrants to the United States and to provide for administrative naturalization and for other purposes.

The Clerk read the title of the Senate bill.

The SPEAKER pro tempore. Pursuant to House Resolution 538, the con-

The legislation also provides for temporary safe haven to Salvadorans, as proposed by Chairman Moakley.

Mr. Speaker, I ask that the Members approved this conference report.

□ 1740

Mr. SMITH of Texas. Mr. Speaker, I yield such time as he may consume to the gentleman from New York [Mr. FISH], the ranking minority member on the Committee on the Judiciary.

Mr. FISH. Mr. Speaker, I rise in strong support of the conference report on immigration. I appreciate the work of the ranking minority member of the Immigration Subcommittee who has diligintly addressed the issue of rules and laws how many should come to the United States.

This country thrives on the new blood and vitality brought by immigrants. I believe that the conference report continues America's longstanding commitment to immigration.

Ten years ago I served on the Select Commission on Immigration and Refugee Policy. Which in 1980 made recommendations for changes in both legal and illegal immigration law and policy. Based upon the findings of the Commission, we tried in several Congresses to pass a bill on illegal migration. Finally, in 1986, we were successful and passed the Immigration Reform and Control Act.

We then turned to the issue of legal migration, also studied by the Select Commission. As Father Hesburgh, the chairman of the Commission, said, "Once we closed the back door to illegal immigration, we can open the front door a little wider."

The Senate has passed a legal migration bill in these Congresses, only to have it die in the House. It is now time to complete that process by passing the legal immigration conference report.

The conference committee worked hard to come to agreement on legal immigration. The House and Senate bills were very different. There are many compromises. The result in my judgement is a very good bill which enjoys broad bipartism support.

The conference report addresses three areas of legal migration: family unification, diversity and employment-based immigration.

The conference report enhances the unification of families who have been separated by their own unfortunate circumstances and by our immigration laws. We have been faithful in returning family unification as the cornerstone of American immigration law and policy.

The conference agreement also addresses America's business needs in order to compete in a global economy. At a time when the United States needs highly skilled workers—scientists, engineers computer experts, and other professionals—the conference agreement responds to that need. By increasing the number of employment-

based visas from current law, the conference agreement allows business to obtain the necessary skills to help it remain competitive in the international economy.

The conference report also creates opportunities to immigrate for natives of countries who are virtually shut out of the immigration system. The diversity program will allow these people to find their way back into the immigration flow which they been excluded from for 25 or more years.

This conference report is a true compromise and upholds the basic principles upon which U.S. Immigration laws rest.

I urge my colleagues to join me in supporting the legal immigration conference report.

Chairman MORRISON and all members of the subcommittee should take pride in forming one of the truly first rate legislative efforts of this Congress.

Mr. BRYANT. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I would like to begin in my opposition to this conference report by first singling out the gentleman from Connecticut [Mr. MORRISON] and the gentleman from California [Mr. BERMAN] for well-deserved praise for a lengthy battle in favor of this bill and for acting very much in what their view is of the public interest and the interest of people that need many of the protections that have been brought forward by this bill, including the family unity provision. I simply want to say though I disagree with them, I have enormous admiration for the job they have done, and would like to make that plain prior to the beginning of this debate.

Mr. Speaker, my opposition to this conference report is rooted in the simple fact that today in the United States of America we admit 530,000 legal immigrants into this country every year, more than all the other nations of the world combined admit to their countries, at a time in which we are unable to meet the basic needs of our own citizens and unable to even pay the bills of our country.

Today a bill is on the floor that would increase by one-third the number of legal immigrants that will be able to enter this country on an annual basis beginning next year, and the figure would not include those that enter the country as refugees or legal aliens.

Mr. Speaker, American immigration law should be based upon a desire for pursuing the time-honored American traditiuon of encouraging family unity, as well as the admission of refugees into this country, as well as the willingness to assist persons fleeing from persecution who are in need of asylum.

There is another legitimate purpose of immigration law, and that is to pursue any policy that pursues our national interest. But the bill before us today does not meet that criteria. The

bill goes far beyond these purposes. The bill cuts back dramatically on the level of family unity provisions which were in the bill when it passed the House and drew the attention of many Members and their support of it.

Instead, it begins to launch us into a new era in which suddenly we see dramtic increases in the number of persons who come into this country for purposes which in the past have not, I think, met with public approval.

What am I talking about? I am talking about a provision of the bill now that provides for employment-based immigration. This bill will allow 140,000 permanent workers to enter the country every year based on the allegation that somehow we have a labor shortage in the United States, an allegation which I believe we could easily show to be totally frivolous.

Mr. Speaker, we do not have a labor shortage in America today. What we have in America today is a job shortage and a training shortage. Indeed, we have a 6 percent unemployment rate.

The fact of the matter is that while this bill would admit 140,000 new permanent workers every year, we today have people in our country who cannot work, who are able to work, and are willing to work, but cannot find jobs.

The effect of this bill is simply going to be to drive down the value of their labor, which they are going to have a difficult time marketing even under the present circumstances.

We have Americans today who work at a wage rate low enough, that even those that have jobs are not able to get by. We have millions of untrained Americans. Basically what this bill is saying to them is, "Goodbye, there is not going to be training for you. We are not going to pay any attention to your situation. We are going to address the problems of this country by inviting an extra 140,000 permanent workers into the country, along with their families, to take the places that we might have trained you to take, had we been willing to follow that path."

Mr. Speaker, I submit to Members this is not the direction the American people want to take. This is not in the interest of the American people. This bill has lost its purpose.

Mr. Speaker, for those reasons I oppose this bill, and will expand further on my reasons for opposition in the subsequent comments.

Mr. Speaker, I reserve the balance of my time.

Mr. BROOKS. Mr. Speaker, I yield 1 minute to the gentleman from Washington [Mrs. UNSOELD].

(Mrs. UNSOELD asked and was given permission to revise and extend her remarks.)

Mrs. UNSOELD. Mr. Speaker, I wish to enter into a colloquy with the gentleman from Texas [Mr. BROOKS].

Mr. Speaker, I understand that section 203 of this bill would not author-

ize the Attorney General or the Secretary of State to take any action in the name of international reciprocity which would abrogate a U.S. collective bargaining agreement covering U.S. workers. That is, if, a U.S. union has a collective bargaining agreement with a stevedore employer, providing that specified longshore work will be done by the union's longshore workers, who will be American citizens, that collective bargaining agreement would continue to prevent alien crewmen from doing the work the contract protects for those U.S. longshoremen. This would be true even if under this legislation the Secretary of State finds that another country allows U.S. crewmen to perform particular longshore work in its ports and is entitled to reciprocity here for the purposes of this immigration law. Is this the case?

Mr. BROOKS. Mr. Speaker, if the gentlewoman will yield the gentlewoman is correct. This section only has the effect of defining what immigration law, by itself, permits and prohibits. It does not extend into the area of labor law, and it would not disturb any U.S. longshore collective bargaining agreements that reserve work for U.S. workers.

Mrs. UNSOELD. Mr. Speaker, I thank the committee chairman, and with this clarification, this immigration reform package goes one step further in providing protection for American workers.

While other workers who are qaualified and available have been given priority over aliens in other professions, the longshoremen have not been given the same protection. Current law has deprived U.S. longshoremen of desperately needed work. The ports, stevedore companies and coastal communities of the Pacific Northwest need our help. By adopting this conference report, they will get it.

With this, longshoremen can trust that their hard-won contracts will be honored. They can trust that immigration policy will not interfere with or abrogate labor and transportation policy. They can trust that the Attorney General and the Secretary of State will be on the side of the American worker.

I am hopeful that they can also trust that the limited exceptions, which define the longshore work aliens are allowed to perform, will continue to stay limited. The three exceptions are for tanker vessels, for cases in which the use of alien crewmen to perform particular longshore functions has been established and generally accepted in individual ports, and for reciprocal treatment between the U.S. and maritime countries that do not prohibit U.S. crewmen from performing longshore activities in their respective ports. These exceptions should remain the only exceptions.

Mr. Speaker, I urge my colleagues to support this conference report on immigration reform.

CONGRESSIONAL RECORD — HOUSE

Mr. BROOKS. Mr. Speaker, I yield such time as he may consume to the gentleman from Washington [Mr. SWIFT].

(Mr. SWIFT asked and was given permission to revise and extend his remarks.)

Mr. SWIFT. Mr. Speaker, I rise in support of the legislation.

I am pleased that the conferees have agreed to include language in section 311 of this conference report which will clarify the statutory definition of the "normal operation and service aborad a vessel" by alien crewmen.

The reason we have had to more clearly define what constitutes "normal operation" is that the Immigration and Naturalization Service has given a very open-ended interpretation to this definition so that they have allowed alien crewmembers on ships to perform loading and unloading functions that have traditionally been performed by longshoremen. What we have done here is clarify the original intent of the Immigration Reform and Control Act of 1986.

I want to commend the chairman of the Judiciary Committee, Mr. BROOKS for addressing this problem, and I am pleased to support the conference report.

Mr. BROOKS. Mr. Speaker, I yield 3 minutes to the gentleman from Connecticut [Mr. MORRISON], the distinguished chairman of the subcommittee, who has done outstanding work on this immigration bill. If it were not for Mr. BRUCE MORRISON, we would have no immigration bill before us on the floor, and when he leaves this Congress to be Governor of Connecticut, we will probably not have any more immigration bills on the floor.

Mr. MORRISON of Connecticut. Mr. Speaker, I thank the chairman for his gracious comments, and even more, thank the chairman for his diligent support and leadership in the process that brought this House to this point.

This legislation is historic legislation. It reforms our legal immigration system in ways more extensive and more broad than any legislation this Congress has ever considered before.

There are a number of important aspects of this legislation we should emphasize, First, it is strong on the improvement of family unification. This is pro-family legislation. It brings families together. In particular, it emphasizes the minor children and spouses of families, and the more immediate unification of such families.

Second, this legislation protects American jobs. Those who suggest that the admission of skilled workers for positions which go unfilled is contrary to the interests of American economy and American workers are mistaken, because we provide for filling jobs that otherwise would not be filled. Americans retain their jobs. American businesses expand in order to hire more Americans.

This legislation takes a balanced approach, a careful approach, and sees to it that those who are admitted to work in the United States are needed, and would not be here unless they were needed because of the lack of American workers.

Third, this legislation reopens the door of immigration to countries which have had that door closed since 1965, countries such as Ireland, Italy, Poland, countries that have been part of the basic source of immigration to this Nation.

Beyond those changes in legal immigration, this law perfects the rules regarding the temporary admission of workers to this country, an area that is subject to abuse, and the rules and standards are tightened for the benefit of American workers.

We also in this legislation, streamline the process by which people become citizens, implementing a long recommended provision regarding administrative naturalization, so there will not be the long waits there are today for those who seek to become citizens.

In addition, thanks to the work of the chairman of the Rules Committee, the gentleman from Massachusetts, [Mr. MOAKLEY], a battle that he has fought since the early 1980's has been won. Those who fled the violence and death in El Salvador will not be sent home because of temporary protected status that they are given, and beyond that the rules are put in place for temporary protected status for other nationals such as the Chinese and the Liberians and the Kuwaitis and the Lebanese who might need this protection now, and other nationalities who might need that protection in the future. This is broad, comprehensive reform. It deserves the support of this House, and the signature of the President, which I believe has been committed to us by the support of the administration.

Mr. SMITH of Texas. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, John F. Kennedy spoke of a nation of immigrants. Walt Whitman wrote of a teeming nation of nations, and Neil Diamond sings of coming to America.

America is known as a melting pot, but fortunately its contents are anything but bland. It contains variety, color and spice.

America continues to be blessed by those who come from foreign countries and who are attracted to the opportunities that only a free society can offer. I met one such person last week in the House Members' dining room. He is from Argentina and has been in this country about 3 years, and he is working as a waiter so that he can earn enough money to complete his college education. His obvious enthusiasm for the future can only make for a better America.

Mr. Speaker, individuals like the waiter in the House dining room will appreciate the legal immigration bill we consider today. It rightly further's America's reputation for generosity. In fact, we are a country that will continue to accept as many newcomers as the rest of the world combined.

Although not without flaws, this bill is far superior to the bill considered earlier by the House. The bill the House considered rewarded those who broke our immigration laws by granting amnesty to illegal aliens from certain adversely affected countries, while others who abided by the law waited for visas. The conference had the good sense to remove that provision.

Although many proponents of immigration reform wanted to help U.S. competitiveness, the bill the House considered contained provisions strongly opposed by such groups as the Chamber of Commerce. The bill would have imposed confusing and inefficient new labor certification procedures on companies who applied for employment-based immigrant visas.

It would have placed an unreasonably low limit of 25,000 on an annual basis as the number of temporary visas for highly skilled workers. Both of these provisions were improved by the conference committee.

The labor attestation changes are now a pilot program that will be studied after 3 years, and the limit on temporary visas for skilled workers is now 65,000.

The conference committee bill, while maintaining family reunification as the cornerstone of U.S. immigration policy, places a greater emphasis on skilled immigrants. This improvement puts America's interests first by recognizing the talents skilled immigrants have to offer.

The House bill, although it dealt with many issues, failed to address a few key problems in immigration policy. The deportation system in the United States has been full of loopholes and inefficient procedures that have allowed criminal aliens to circumvent the law and remain in this country.

The Immigration and Naturalization Service estimates that at least 30,000 aliens are arrested for deportable offenses every year, yet in 1989 only 7,000 such aliens were deported.

The General Accounting Office reported that of aliens who were convicted of felonies, 77 percent were arrested on felony charges at least one more time. This bill makes much needed reforms in the deportation process. Criminal aliens will no longer be able to stay in this country while immigration judges are operating with few rules and waiting for trial transcipts.

The reforms in this conference report, which include reforms from my criminal aliens legislation, H.R. 5284, will make deportations more closely conform to the Federal Rules of Civil Procedure. They will establish deadlines for filing appeals and help immigration judges hold in absentia hearings when aliens fail to appear.

Another provision to help expedite deportation of criminal aliens now in-

cluded in the bill is a provision introduced in the House as an amendment to the crime bill that authorizes 20 additional immigration judges to hear deportation cases of aggravated felonies. After a few years of declining arrests through the borders, apprehension of illegal aliens topped 1 million once again in fiscal year 1990. This discouraging news was largely unaddressed by the House bill, but the conference committee added a vital provision to help reverse this trend.

There are increased penalties for the Coyotes along the border who prey on scared aliens and reduce people to cargo.

□ 1800

There is improved border maintenance, to reduce the flow of illegal aliens.

Since last year, I have worked to give Immigration and Naturalization Service officers the statutory authority to perform the job we have asked them to do. These INS officers often have had to perform citizen's arrests to detain criminals smuggling drugs across the border. Granting INS officers general arrest authority will protect them from civil liability for performing their job, and it will prove to drug smugglers that Congress is serious about combating crime along the border.

Another indication of our resolve to combat illegal immigration is the authorization in the bill for an additional 1,000 Border Patrol personnel. I hope this additional authorization will result in the actual hiring of more Border Patrol officers.

I urge my colleagues to approve additional appropriations to ensure we can enforce our immigration laws.

The gentleman who deserves much of the credit for these improvements is the junior Senator from Wyoming, AL SIMPSON, whose persistence, expertise, and good humor enabled him in conference committee discussions to turn a special-interest bill into one that will largely serve America's interests.

I join with our colleagues in the Senate and my colleagues in the House in recommending this bill to the Members.

Mr. Speaker, I reserve the balance of my time.

Mr. BRYANT. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, many Members of the House last night voted against the rule on this bill because they learned late in the proceedings that this bill included not only the I.D. provision, which was later dropped, but also included a curious provision for the first time to allow 10,000 people to enter this country every year for one reason and one reason only: because they are millionaires. They have a million dollars. They are not qualified in any particular way, but they have a million dollars, and they are willing to come into the country and invest it here and create 10 jobs for the first couple of

years they are here, or in a rural area invest $500,000 and be qualified to become American citizens.

It is the sale of American citizenship. It is still in the conference report, Mr. Speaker, and I will talk about it more in a moment, but I want to make it very clear to Members who are paying attention to the consideration of this conference report that the problem has not been cured.

A vote for this conference report is a vote for the sale of American citizenship to anyone with $1 million.

Mr. BROOKS. Mr. Speaker, I yield 2 minutes to the distinguished gentleman from New York [Mr. SCHUMER], chairman of the Subcommittee on Criminal Justice.

(Mr. SCHUMER asked and was given permission to revise and extend his remarks.)

Mr. SCHUMER. Mr. Speaker, I thank the distinguished chairman of the full Committee on the Judiciary for yielding to this subcommittee chairman.

Mr. Speaker, let me say to my colleagues that this bill is, indeed, a turning point. It says that our immigration policy is in need of revision, given the new world we are in and that we have stepped up to the plate and met the challenge.

The bill says that immigrants are good for America as they have been for 200 years, adding their vitality, their skills, their energy, and their plain ordinary desire to be Americans and be free and participate in our system to our wealth and to our strength.

Every study has shown that immigrants give far more to America than they take. Every study has shown that areas of our country that have many immigrants are vital and strong and important.

This bill adds immigrants in three ways. First, it increases the number. We are a growing country, and we need more immigrants in general. Second, it says for the first time that immigrants should be admitted in large numbers because we need their skills. There are many companies in this country which, try as they might, who are stymied and stifled because they cannot find aeronautical engineers, hospitals that cannot find nurses, companies that cannot find specific kinds of skills whether they be low, medium, or high, and they need them.

Third, what this says is that there are parts of the world that should be able to contribute to American immigration, places like Ireland and Italy and Poland and Nigeria who have been denied simply because the people from those areas came to America not 30 years ago but 50 and 100 and 200 years ago.

This bill, under the diversity provision that I have authored, allows those people to come into this country.

Overall, Mr. Speaker, this is a bill that meets the needs of this country in the 21st century. We are not doing this for the immigrants. We are doing this for America.

The limmigration Nursing Relief Act of 1989 amended the INA section 101(a)(15)(H)(i) by establishing a new nonimmigrant classification for registered nurses who meet certain qualifications. To obtain a nurse pursuant to the new (H)(i)(a) program, a facility for which the alien nurse will perform services must file an attestation. The purpose of the attestation is, in part, to assure that the employment of the foreign nurse is critical to the facility's delivery of health services, that it would not adversely affect the employment of U.S. citizen and permanent resident alien nurses, and that steps would be taken by the facility to reduce its reliance on foreign nurses.

Since the passage of the Immigration Nursing Relief Act, questions have arisen about the meaning of the term "facility." Specifically, the 1989 act did not clearly address the attestation responsibilities of firms or agencies in the business of hiring nurses and contracting out their services, as well as the hospitals or nursing homes that contract for these nurses. This legislation specifically places the responsibility for filing an attestation both on the employer; namely, the employing agency, and its customer, the independent hospital or nursing home worksite.

The clarification of the responsibilities does not compel the filing for each worksite where the employer is the worksite or controls the worksite, such as in the case of a municipal hospital system that employs the nurses in its constituent hospital worksites that are under the control of the system. In such cases, the filing of a single attestation by the organization or municipal agency is sufficient.

In appropriate cases where multiple filings would otherwise be required, flexibility is afforded by giving the Secretary of Labor the authority to waive certain provisions otherwise required for the attestation.

Mr. SMITH of Texas. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, first of all, I would like to respond to the remarks by my friend, the gentleman from Texas, in regard to the investor visas mentioned just a minute ago.

I would like for my colleagues to know that this particular provision of the immigration bill is actually the only provision of the immigration bill that is absolutely guaranteed to create jobs and produce revenue for the U.S. Government. In fact, if these 10,000 investor visas are taken advantage of, it will create a minimum of 100,000 jobs in the United States, and it will generate a revenue of up to $10 billion for the Government.

Mr. BRYANT. Mr. Speaker, will the gentleman yield?

Mr. SMITH of Texas. I am happy to yield to the gentleman from Texas.

Mr. BRYANT. The gentleman observed it would create 100,000 jobs. In fact, this bill admits 140,000 new employees, does it not?

Mr. SMITH of Texas. Reclaiming my time, let me point out where I get

the figures that I am talking about, which I gather the gentleman does not dispute.

This provision, of course, says that 10,000 investors may come into the country if they are going to start a business that will employ at least a minimum of 10 employees. That is where the figure comes from of 100,000 guaranteed jobs.

In addition to that, I would like to say that this immigration bill gives perference to any number of individuals. It gives preference to individuals with skills. It gives preference to individuals with education. It also gives preference to individuals simply because of their right of birth, that they happened to be immediate family members.

So if we are going to give preference to individuals on the basis of those various qualifications, why not give preference to individuals on the basis of the skill and the talent and the business expertise that they are going to bring to America?

Lastly, Mr. Speaker, let me point out that our chief rivals for skilled immigrants—that is, the countries of Canada and Australia—have programs of this type, investor visas, that are far in excess of the kind of program that is a part of this bill today.

I think by any standard that this is a good provision. We need to continue the investor visa provision.

Mr. Speaker, I yield 3 minutes to my colleague, the gentleman from Florida [Mr. McCollum].

(Mr. McCOLLUM asked and was given permission to revise and extend his remarks.)

Mr. McCOLLUM. Mr. Speaker, I thank the gentleman for yielding me this time.

Mr. Speaker, I opposed this bill when it left the House. I did not think it was a good bill.

But I am very, very pleased with the product that came out of the conference committee, and I support this bill today, this conference report. I think it is a major advance in the reform of legal immigration, and I urge my colleagues to vote for it.

I have been one of the leading proponents of legal immigration reform for a long time. I was very much opposed to some of the illegal immigration provisions that were in the 1986 law which were amnesty- and legislation-oriented, but when we came to this bill and got to the conference committee, those provisions that were true amnesty were reduced to only those who are the children, minor children, and spouses of those who were legalized in 1986 and who were here on or before May 5, 1988, so that does not concern me in the scope of things nearly as much as the good things that are in this bill.

The good things, and the really good things, center on two or three areas. One of them is we now have a provision under this new law that will provide for a whole lot of new seed immi-

grants, people who do not have those family connections.

We still protect the family unification principles, but for a long time that family unification squeezed out all of the possibility of seed immigrants.

Under what is being adopted here tonight, we will be able to have 55,000 seed immigrants in the diversity category who have not been able to come here before who will have educational skills, and so forth, that do not have family connections, and we will be able to have 140,000 new skilled workers able to come here who do not have the family connections. I think it is very important that we have these skilled immigrants.

In addition, this bill does reform the areas of laws that have been long overdue to allow the Justice Department to deport those who are here illegally and who are criminals and who have been in our jails for years in many cases. I think the improvement of the deportation provisions alone might well justify the passage of this law.

Then, in addition to all of that, we have in this bill major reforms that go to the heart of the visa system and the way that that is conducted for the ordinary events of bringing people here on a temporary basis that I approve of.

So all in all, I must say this is an extraordinary accomplishment. I disagree with the temporary stay provisions that are incorporated here under the title of extended voluntary departure, but that was reduced and minimized in the conference considerably from what left the floor, and overall the positive things about this bill far outweigh the negatives considering what we are doing to have a major reform in legal immigration that will pass with this conference report tonight.

I urge my colleagues to vote "aye" on the conference report, vote "aye" for some very positive reform of immigration laws and be thankful that we have a conference ability here that puts two opposites together and can come out with a very fine product like we did in this case.

□ 1810

The SPEAKER pro tempore (Mr. McNulty). The Chair wishes to state that the gentleman from Texas [Mr. Bryant] has 13 minutes remaining.

Mr. BRYANT. Mr. Speaker, I am pleased to yield 3 minutes to my colleague, the gentleman from California [Mr. Campbell].

(Mr. CAMPBELL of California asked and was given permission to revise and extend his remarks.)

Mr. CAMPBELL of California. Mr. Speaker, I cannot vote for the immigration bill because of a provision that was added in the final minutes of the final day of this Congress. The provision that was added had been deleted from the bill in the House Judiciary Committee where I serve. That provi-

sion allowed individuals with sufficient wealth to invest that wealth in the United States and thereby obtain a visa and eventually citizenship.

Some argue that this is good for America's economy because we would invite the kind of investiment that stimulates jobs. Other countries, we are told, have similar programs. But this is intolerable for me. However beneficial the investment may be, the fact remains that the investment is possible only by those capable of investing. It remains inescapable that America would, for the first time in its history, be granting a statutory preference for citizenship based on wealth.

I have fought hard for this legislation. I voted in favor of it in committee. I debated opponents of this measure in the Republican conference, authored numerous letters to all the other Members of Congress urging their support for it, tried to persuade my colleagues in countless personal meetings to support it.

I have done everything in my power to pass an immigration bill because of the importance of its provisions for reuniting families, and for keeping in America those skilled individuals whose abilities are particularly in need.

But a truly offensive provision was forced into this bill, at time of great crisis as we were striving to finish the bill relative to the budget.

Many have urged me to vote for the bill and try to remove the provision next year. But it is highly unlikely that the Congress will revisit the immigration question next year. If, however, we defeat this bill, we can report an identical bill save for the offensive provision as soon as January.

The President has already indicated he would sign such a bill; his approval was not contingent upon including this offensive provision. The provision was added at the request of three Senators who, by reason of the desperately late hour of this Congress, were in a position to insist on their way. They will lack that power at the start of a new 2-year congressional session.

There is a sense of urgency in our present deliberations that is conducive to error. The wiser course is to bring this matter up again in January. Standing alone, a provision in immigration law that favors those with wealth would fail because the overwhelming majority of the people's representatives would oppose such a stark departure from what we think of America. We must not let shortness of time stampede us into a fundamental breach of faith.

Mr. BROOKS. Mr. Speaker, I yield 2 minutes to the distinguished gentleman from California [Mr. Berman], a very active and resourceful member of the subcommittee who did much to formulate this legislation.

Mr. BERMAN. Mr. Speaker, I thank the chairman of committee for yielding me this time, and, more important-

ly, I thank the gentleman from showing such tremendous skill and patience in helping us to move this measure in our first and final opportunity to pass a major comprehensive reform of legal immigration.

In that vein, I turn to my friend, the gentleman from California [Mr. CAMPBELL], a member who is sincerely concerned about the investor provisions, and say that if he thinks defeating this bill will cause the Committee on the Judiciary and the chairman of the Committee on the Judiciary to turn their attention to this legislation next year, I suggest a personal conversation with our distinguished chairman, the gentleman from Texas, on that subject, and the gentleman might reevaluate his position.

This bill, which came within a last gasp of disappearing from the scene last night, does very many things that I do not think anyone might have imagined we could have accomplished when the 101st Congress started. We have increased the visas for the second preference spouses and children from 70,000 to 148,200. We have provided that 75 percent of those second preference visas for spouses and minor children are not subject to country limits. This is an issue my colleague, the gentleman from Los Angeles, California [Mr. ROYBAL], has been working on for years. He has been working to remove the country limit on Mexico and some of the other over-subscribed countries. We have now accomplished that in this legislation.

We have permanently increased family-based immigration in the face of an initial effort on the other side to replace family-based immigration with skilled immigration. We have managed to find a way to deal with both.

Mr. Speaker, we have increased country ceilings effectively from 20,000 to approximately 25,000. We have included a provision in this bill which we were neglectful of including when we passed the Immigration Reform and Control Act, which finally provides codified stays of deportation and work authorization for spouses and minor children of newly legalized aliens, not to mention the 8-year effort of the chairman of the Rules Committee to provide EVD status, temporary protected status for the Salvadorans, and a massive reform of the horrible McCarran-Walter immigration legislation many years ago. This is something that the gentleman from Massachussetts [Mr. FRANK] organized.

Mr. Speaker, this is a good bill. I only want to pay in closing my tremendous respects to the chairman of the full committee and the subcommittee, as well as my colleagues on the subcommittee, for their work, and to the ranking Republican member of the subcommittee, the gentleman from Texas [Mr. SMITH], who had strong feelings about this legislation and who has seen from his point of view the kind of compromises that have caused him to support the legislation.

This means, I believe, that our effort will be successful, and I think I can say that we are on the verge of doing something very historic here.

The SPEAKER pro tempore. The Chair will state that the gentleman from Texas [Mr. SMITH] has 6½ minutes remaining.

Mr. SMITH of Texas. Mr. Speaker, I yield 3 minutes to my colleague, the gentleman from Illinois [Mr. PORTER].

(Mr. PORTER asked and was given permission to revise and extend his remarks.)

Mr. PORTER. Mr. Speaker, I thank the gentleman from Texas [Mr. SMITH] for yielding this time to me.

Mr. Speaker, I want to commend the gentleman from Texas [Mr. BROOKS] and the gentleman from New York [Mr. FISH] for their leadership in bringing this important legislation to the floor, and I commend also the gentleman from Connecticut [Mr. MORRISON] and the gentleman from Texas [Mr. SMITH] for their hard work in making it come about.

The legislation contains many important provisions, and three of them are on immigration from the Crown Colony of Hong Kong. Hong Kong, as the Members are well aware, is one of the world's great economic miracles, representing, perhaps, the most vibrant economy in the world, which will come under the control of Communist China in 1997. With Tiananmen Square and the ongoing abuses of human rights by the People's Republic of China, understandably the people of Hong Kong are extremely nervous about their future, and, Mr. Speaker, they are voting with their feet and leaving Hong Kong in record numbers. This year alone 62,000 are immigrating. They are going to Singapore and to Canada, they are going to Australia, they are going to many other places in the world. These are entrepreneurs who know how to create jobs and make another economy equally vibrant.

U.S. business has great interests in Hong Kong, as well with $16 billion invested and with many thousands of Hong Kong citizens as their employees. These businesses are also suffering because of this tremendous emigration.

The bill contains three provisions that are of great help. First, it raises the quota from 5,000 to 10,000. Second, it creates a special quota for Hong Kong employees of U.S. businesses of 12,000 a year. Third, it creates an unprecedented type of visa, one that is exercisable at the holder's discretion over a long period of time, 5 years past the 1997 date, and it will provide the kind of insurance to Hong Kong people that will allow them to stay in Hong Kong and continue to work and make Hong Kong an ongoing example of successful free enterprise that can influence the future economic policies of Beijing post-1997.

This special visa is the work of our colleague, the gentleman from Massachusetts [Mr. FRANK], who ought to be commended for his great creativity and his vision in seeing that this safety net is provided for the people of Hong Kong which will encourage them to stay and work and, at the same time, allow them to leave, if they must, in the face of possible future abuses of Hong Kong citizens by the People's Republic of China.

□ 1820

So I commend all these gentlemen for their good work. Hong Kong will be the better for it. The United States will be the better for it. Their economy, our economy, and ultimately, all the people of China will be the benficiaries.

Mr. BRYANT. Mr. Speaker, I yield 2 minutes to the gentleman from Florida [Mr. LEWIS].

Mr. LEWIS of Florida. Mr. Speaker, I thank the gentleman for yielding this time to me.

Well, Mr. Speaker, here we are again, increasing the numbers. I would like my colleagues who live in the States who are not affected by this type of immigration in southern California and Texas, on the Rio Grande and in southern Florida, to go back and explain to their people that we did you a favor, that we let the people of southern California, we let the people of southern Texas, and we let the people in southern Florida foot the bill for this particular amendment to the Immigration Act. I think this is wrong.

The people of Florida have not been compensated all the way back from the Mariel boatlift, and we continue and continue and continue to open the quotas and let the people come in, and open the floodgates.

Now, I do not think anyone in this body is opposed to letting these people come into this country, but we certainly, some of us, are in objection to continually having to pay and pay and pay. The Florida taxpayers are sick and tired of the irresponsible actions of this body in the Immigration Act that continues to allow amnesty and continues to open up the floodgates.

Search your souls. We want to help these people, but we certainly do not want to continue to open up the roads and allow these people to come into south Florida or southern California or southern Texas.

Mr. BROOKS. Mr. Speaker, I yield 2 minutes to the distinguished chairman of the Committee on Rules [Mr. MOAKLEY].

Mr. MOAKLEY. Mr. Speaker, I think this bill should be known as the Reincarnation Act of 1990. If anything was deader than this bill last night around midnight, I do not know what it was. If it was not for the outstanding action of the chairman, the gentleman from Texas [Mr. BROOKS], the gentleman from Connecticut [Mr.

MORRISON], and the gentleman from Massachusetts [Mr: FRANK], so many people scurrying back and forth between. the House and the Senate trying to work out some kind of last-minute arrangement so that this bill could come to the floor and be enacted into law. I think it really says something about the desire to have a bill such as this before the House today.

Mr. Speaker, this bill creates greater opportunity for all people. It reunites families. It contributes to the overall economic growth of our country. It provides fairer immigration standards for nationals from countries like Ireland and Poland. It provides a mechanism to offer safe haven to refugees who flee war. It is a good bill that deserves bipartisan support.

Mr. Speaker, as many of my colleagues know, I have a special interest in the bill. Specifically, I am very delighted that the conferees saw fit to maintain my position to offer temporary protection to the refugees from El Salvador.

It is no secret, Mr. Speaker, that El Salvador is currently engulfed in a very brutal civil war that has claimed over 70,000 lives. The violence perpetrated by both the left and the right continues to take a very high toll. And like it or not, we in the United States must bear some of the responsibility for what happens in that very small country.

Mr. Speaker, the modest protections in this bill to help these refugees is the right thing to do. It maintains the high traditions and standards that have become a hallmark for U.S. immigration policy.

Mr. Speaker, this bill is long overdue, and let me again thank my colleagues, the chairman of the committee, the gentleman from Texas [Mr. BROOKS] and the gentleman from Connecticut [Mr. MORRISON] for doing outstanding work, and I hope we can pass this and send it forward so that it can be enacted into law so we can settle a lot of problems that have happened over a number of years that need correcting at this time.

Mr. SMITH of Texas. Mr. Speaker, I yield 2 minutes to the gentlewoman from Maryland [Mrs. MORELLA].

Mrs. MORELLA. Mr. Speaker, I thank the gentleman for yielding this time to me.

Mr. Speaker, I would like to express my support for the conference report on S. 358, the Family Unity and Employment Opportunity Immigration Act of 1990.

S. 358 represents the most significant effort since 1965 to reform our Nation's current legal immigration laws. I believe that the existence of huge backlogs in family reunification visa cases, a continued shortage of workers with highly specialized skills, and systemic problems that have disadvantaged 19th century sending countries demonstrate the need for revision of our immigration system. S. 358 addresses these problems—reunit-

ing divided families, improving economic competitiveness by facilitating the immigration of those with scarce skills, and addressing the anti-European bias in the 1965 law.

Like most immigration bills, S. 358 is not perfect. I am particularly concerned about the limitation of the numbers for low-skilled workers to 10,000 per year; this is far below the demonstrated need for these visas. This limit on employer-sponsored immigration of low-skilled workers will prevent many American workers, especially women, from, pursuing careers while also caring adequately for their families. Thus, children, the elderly, and the disabled will be seriously and adversely affected.

The most recent publication of the Committee for Economic Development, a panel of leading business figures, presents a comprehensive summary of our future work force needs. The report, which I recommend to Members, demonstrates that this category of low-skilled immigrant workers needs at least 19,000 visas, plus family members. The conference report provides for a review of immigration policy, and I hope that this issue will be reconsidered as soon as the facts demonstrate that this legislation has exacerbated already existing shortages of child care, home care, elder care, and other basic skilled workers.

Mr. BROOKS. Mr. Speaker, I yield 30 seconds to the gentleman from California [Mr. EDWARDS], the chairman of the Committee on Public Works and Transportation.

Mr. EDWARDS of California. Mr. Speaker, I thank the gentleman for yielding me this time.

Mr. Speaker, I was one of the Members last night who spoke and voted against the rule, but I would like to make it very clear-that the odious provision that caused a number of us to vote against the rule last night has been removed. It is not a part of this bill. What is left is a remarkably creative decent piece of legislation that I support with great enthusiasm.

I compliment all those who have been involved in the creation of this bill, and especially the subcommittee chairman, the gentleman from Connecticut [Mr. MORRISON] who did a remarkable job, as well as the gentleman from Texas [Mr. SMITH] and my colleague, the gentleman from California [Mr. BERMAN].

Mr. Speaker, I urge enactment of the bill.

Mr. BROOKS. Mr. Speaker, I yield 1 minute to the gentlewoman from California [Ms. PELOSI].

Ms. PELOSI. Mr. Speaker, I thank the gentleman for yielding me this time.

Mr. Speaker, I want to join our colleagues in thanking the chairman, the gentleman from Texas [Mr. BROOKS], the gentleman from New York [Mr. FISH], and the other members of the committee for their hard work in bringing this bill to the floor.

I particularly want to commend the gentleman from Connecticut [Mr. MORRISON] for his leadership on issues of concern to my community.

It is with a degree of State pride in California that I commend the gentleman from California [Mr. BERMAN] for representing our interests on the committee and giving us a bill that is good for our State, good for the community, and most of all, good for our country.

Mr. Speaker, as one who believes that immigration is good for our country because it is a source of invigoration and refreshment to us, I am particularly pleased with the provisions of this bill which streamlined operations for people coming here, especially in terms of family reunification.

People bringing the academic and work ethic, people bringing family and religious values to our communities to enrich us in that way.

I am particularly pleased that the bill include the initiative that the gentleman from New York [Mr. FISH] took about extending registration in stage 2 of the legalization process, according to the IRCA bill and, of course, I want to commend the gentleman from Massachusetts [Mr. MOAKLEY] for the legislation that was included in the bill as well, which will go a long way to help not only the Salvadorans, but those in our country who minister to their needs.

Mr. Speaker, I commend the leadership of the committee again, and urge an aye vote.

□ 1830

Mr. BRYANT. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I would like to point out that the gentleman from California [Mr. EDWARDS], a moment ago made the comment that the problem which caused many Members to vote against the rule last night was solved. I think that is not completely accurate.

One problem which caused a few Members to vote against it, the ID card problem, was solved. One other which caused, I think, more Members to vote against it, was not solved and that is the fact that the bill continues to contain a provision as aptly described by the gentleman from California [Mr. CAMPBELL] just a moment ago that was forced upon us due to the late hour of the session by Members of the Senate, which would provide that 10,000 persons can come into this country because they are millionaires and for no other reason. That problem remains in this conference report.

Mr. Speaker, a moment ago one of the speakers made reference to the fact that this bill serves well the needs of Ireland, Italy, Poland, Nigeria, and mentioned a number of other countries as well. All are fine parts of the world. In fact, all of us are from those parts of the world at some point in our background, there is no question about that.

But I think it is fair for us to ask, in view of the state of affairs in our country today: What about the United States of America? Who is asking us to increase legal immigration in 1990 from the world high of 530,000 a year, which is more than all the rest of the countries of the world allow into their countries, who is asking us to allow the importation of 140,000 workers a year into a country that has a 6 percent unemployment rate? Who is asking us to allow 10,000 people to come into the country just because they are millionaries?

The American people are not asking for it, my constituents are not asking for it, your constituents are not asking for it. If this bill was only a family unity bill. I would be asking for it as I have asked for it in the past, and I think it would be warmly embraced. But it goes much farther, much farther than that, and that is the root of the objections raised by me and by others.

We are a Nation that cannot adequately educate our people. We do not adequately train our unemployed. We cannot protect our population from crime. We cannot even find homes for the homeless.

Yet, Members come to the floor and ask us to vote for a bill that increases legal immigration by one-third beginning next year.

I submit to you that the average American would be aghast if he thought that his Congress was busy in the waning hours of this prolonged session dealing with a matter which is so contrary to the viewpoint of the American people at this stage in our history.

Mr. Speaker, I reserve the balance of my time.

Mr. SMITH of Texas. Mr. Speaker, I yield 1 minute to the gentleman from New York [Mr. FISH].

(Mr. FISH asked and was given permission to revise and extend his remarks.)

Mr. FISH. Mr. Speaker, section 601 of the conference bill reforms our outmoded system of immigration exclusions.

It would modernize the health grounds of exclusion which have at times led to embarrassing incidents at U.S. ports of entry. The health exclusions language has been provided by the Department of Health and Human Services, and approval of it has been received by the Department of Justice.

The bill removes some of the antiquated and unused exclusions that have been in our law since the early 1900's, such as the exclusions based on illiteracy, and the exclusions for aliens who are "paupers, professional beggars, or vagrants." These relics have been replaced by one generic standard which exclude aliens who are "likely to become a public charge."

There is also a new exclusion based on foreign policy grounds which is modeled after the current section 901 statute.

It would allow the Secretary of State to exclude persons who would have a "serious adverse foreign policy effect" on the United States, but it contains some important first amendment exceptions.

The first exception would not allow the exclusion of a foreign government official "solely because of the person's beliefs, statements, or associations * * *"

The second exception would not allow the exclusion of any other alien because of that alien's beliefs, statements, or associations "unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest."

The bill would also expand the current waiver available to permanent immigrants who are members of the Communist Party. This new waiver for Communist Party members will become increasingly important as Eastern Europeans begin to immigrate to the United States.

However, we would retain the authority to exclude former Eastern European Communists if they continue to pose a security threat to the United States. We are simply diluting the current presumption that former Communist Party membership in a country that is no longer Communist dominated implies that a person is a security threat.

Finally, there are many other important changes that the entire exclusions package would bring about—including the elimiantion of the homosexual exclusion, and the opportunity for the administration to change its policy on the exclusion of HIV-positive aliens.

Let me emphasize, however, that these changes do not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or when they have previously violated U.S. immigration laws.

This is a comprehensive reform of exclusions laws which is a rational accommodation of the concerns of everyone—from those of the administration to those of civil libertarians. I strongly support it.

Mr. SMITH of Texas. Mr. Speaker, I yield myself the balance of my time.

Mr. Speaker, I would like to express my personal appreciation to the ranking minority member of the Committee on the Judiciary, the gentleman from New York [Mr. FISH], for his leadership.

Mr. Speaker, I join the gentleman from New York in urging our colleagues to support this piece of legislation.

Mr. Speaker, I have no further requests for time, and I yield back the balance of my time.

Mr. BROOKS. Mr. Speaker, I yield 1 minute to the gentleman from New York [Mr. MANTON].

(Mr. MANTON asked and was given permission to revise and extend his remarks.)

Mr. MANTON. Mr. Speaker, I rise in strong support of the conference report. At this point I would like to engage in a brief colloquy with my colleague Mr. MORRISON, the author of this legislation, for the purposes of clarifying the language in section 515(b) of the conference report.

It is my understanding that an alien who has filed an application for political asylum or withholding of deportation at any time prior to the effective date of this legislation, even when that application has been withdrawn and a motion to reopen the request has been granted, will not be subject to the provisions in section 515(a) of this measure. Is this correct?

Mr. MORRISON of Connecticut. Mr. Speaker, will the gentleman yield?

Mr. MANTON. I yield to the gentleman from Connecticut.

Mr. MORRISON of Connecticut. I thank the gentleman for yielding.

Mr. Speaker, the gentleman's interpretation of that provision is correct.

Mr. MANTON. Mr. Speaker, I thank my colleague and congratulate him on his fine work in shepherding this important legislation through the Congress.

The SPEAKER pro tempore (Mr. McNULTY). The Chair would advise: The gentleman from Texas [Mr. BRYANT] has 6 minutes remaining; the gentleman from Texas [Mr. BROOKS] has 4½ minutes remaining; and the gentleman from Texas [Mr. BROOKS] has the right to close debate.

AUTHORIZING THE SPEAKER TO REDUCE TIME FOR VOTE ON S. 845 FOLLOWING VOTE ON S. 358

Mr. BROOKS. Mr. Speaker, I ask unanimous consent that the Speaker be authorized to reduce to not less than 5 minutes the period of time within which a recorded vote, if ordered, may be taken on the motion to suspend the rules and pass the bill S. 845 immediately following to vote on this conference report.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. BROOKS. Mr. Speaker, I yield 1 minute to the gentleman from Texas [Mr. DE LA GARZA], the distinguished chairman of the Committee on Agriculture, a longtime defender of better immigration policies.

Mr. DE LA GARZA. I thank the chairman for yielding.

Mr. Speaker, I rise in support of this legislation. There was one particular point that we were concerned with. That was very graphically demonstrated last night.

I now think we have positive legislation, not that those of us who have and are sensitive to immigration and what it can do and not do, but the fact

is that those who have worked in good faith and in good conscience have now given us something that we can support.

I now ask them in the kindness that they have shown us, to continue working with us, and that the enforcement of this legislation be in the spirit in which we have passed it and that we continue working in that endeavor so that the enforcers have the sensitivity and the humanity necessary to see that immigration law is not a vindictive law, is not a law that prejudices anyone, but rather have an orderly ingression of people into our country.

Mr. BRYANT. Mr. Speaker, I yield myself the balance of my time.

(Mr. BRYANT asked and was given permission to revise and extend his remarks.)

Mr. BRYANT. Mr. Speaker, I will close my role in this debate with these remarks.

I would again like to pay a great compliment to the gentleman from Connecticut [Mr. MORRISON] for his leadership in this area, and to the gentleman from California [Mr. BERMAN].

Though we disagree on this bill today, they have been dogged in their pursuit of the matter that I think is extremely important and extremely worthy and that is, family unity.

I do not agree that this bill addresses that in a proportionate fashion, but I do want to say that they have done an excellent job and I will miss working with Mr. MORRISON, though I will be happy to see him as Governor of Connecticut in the upcoming year.

Mr. Speaker, I begin speaking on this matter by pointing out that I think the American people would welcome a bill that would address the problem of family unity. I know that I would, and I have spoken in this very spot for that kind of legislation, and for legislation that would address the problem of the El Salvadorans, which Mr. MOAKLEY has pursued with such vigor. I think they would agree with all of us that those are part of our heritage of an immigration policy which is focused on family unity, on refugees, on persons fleeing persecution and on policies that pursue the national interest.

But this bill goes far, far beyond that. In fact, in this bill, which was crafted in the waning hours of the session, the conference committee has imposed upon us the burden of considering legislation today that takes up matters that I think are offensive to the American people and should be offensive to us if we analyze the bill in light of the needs of our country today.

The bill increases employment-based immigration to 140,000 people, people who are going to come into this country for the purpose of taking skilled jobs. That is based on the premise that somehow we have a labor shortage in a country with a 6-percent unemployment rate that we know does not really count all the unemployed,

and in a country that does not do an adequate job of training its unemployed.

In fact, what we are doing today, if this bill passes, is saying the unemployment policy is going to be—the job shortage policy is going to be—to import people to take the jobs, not to train the Americans who are here already who are well able to do this work if we could simply give them access to that kind of training.

Second, the bill now includes a provision which this House rejected in committee and which I think the vote on the rule last night also rejected; and that is, the highly offensive provision which says that we are now going to say that we will set aside 10,000 visas for people who come into this country who qualify for those visas on the sole basis that they are millionaires. The bill now says if you have a million dollars to invest in this country and create 10 jobs, come on in. Or, if you have $500,000 that you will invest in a rural area to create 10 jobs, come on in. No other qualifications are necessary.

□ 1840

Mr. Speaker, if you're a teacher, if you're a preacher, or a minister, or a rabbi, if you're a nurse or social worker, if you're somebody who has spent your life in public service, you can't get in under this provision. But if you have dedicated your life to the accumulation of wealth, come on in, buy your citizenship in the United States of America.

Mr. Speaker, I think the other side will say, "Well, there's an obscure provision in the immigration law now called the seventh preference that at one time a long time ago allowed a few people to get in as investors." They will say there is precedent for this.

But what this bill does is unprecedented. Never before have we set aside 10,000 visas specifically for those who have money in their pocket so that they can come into the country ahead of those who do not.

I think, Mr. Speaker, that this bill is a culmination of the excesses of the 1980's, a period in which we tripled our national debt, a period in which we became the biggest debter nation in the world, a period in which we became a country that no longer pay its bills anymore without borrowing staggering sums of money, a period in which we sold off our most precious assets to the point that foreign ownership in our country has tripled in the last 7 years, and now we are selling our last and most precious possession, citizenship. For $500,000 one can have it if they live in the country; for $1 million they can have it if they live in the city.

I ask my colleagues, "Have we lost all of our self-respect? Are we willing to sell our most prized possession just to get money? What kind of a precedent is this that we are going to set if

we adopt this conference report today?"

I submit to my colleagues that it is fatally flawed. I submit to my colleagues that, if we can knock it down today, we can come back next year and take up another immigration bill, and then we can focus on the legitimate purposes of immigration legislation: family unity. This bill goes far, far beyond family unity and takes us into an area and sets precedents which I believe are not in the interest of the United States of America.

Mr. Speaker, we cannot educate our own people. We cannot train our own unemployed. We cannot protect our own population from crime. We cannot find homes for the homeless. And yet the Congress is busy changing the immigration law to allow an additional 170,000 people to come into the country over and above the 530,000 that already come in every year under the current law, more than all the rest of the nations of the world combined.

Mr. Speaker, I urge our membership to vote no on the conference report.

Mr. Speaker, I yield back the balance of my time.

Mr. BROOKS. Mr. Speaker, I yield such time as he may consume to the gentleman from New York [Mr. WEISS].

(Mr. WEISS asked and was given permission to revise and extend his remarks.)

Mr. WEISS. Mr. Speaker, I rise in support of the conference report.

Mr. Speaker, I want to salute the distinguished chairman from Texas, Mr. BROOKS, the gentleman from Connecticut Mr. [MORRISON], and members of the Rules Committee for their diligent efforts late last night to return this measures to the floor today. Thanks to your work and commitment, major immigration reform will become a reality in the 101st Congress.

I rise in strong support of the conference report on S. 358, an agreement which marks the most comprehensive revision of immigration law in 66 years. Under the new law, the number of visas granted each year will increase to 700,000 between 1992 and 1994, before dropping to 675,000 annually beginning in 1995.

The measure's most significant increase comes in the number of visas for family reunification, the cornerstone of immigration to the United States. The present policy runs contrary to our most deeply held values by prolonging the separation of spouses from each other and from their children. Under the agreement, more than half the visas, 465,000 for the first 3 years and 480,000 thereafter, would be set aside for the close relatives of U.S. citizens and permanent residents. This is sound public policy that provides for the swift reunification of close family members.

The bill also increases, from 54,000 to 140,000, the number of immigrants allowed entry on the basis of their occupational skills, a provision designed to supplement the threatening labor shortage and provide a needed shot in the arm to our national economy.

*October 27, 1990*                    CONGRESSIONAL RECORD — HOUSE                    H 12367

The measure breaks new ground by setting aside 40,000 visas for persons from over 30 countries that have been virtually shut out by current law. In 1995, the figure will rise to 55,000 and the list will extend to more nations.

The agreement also eliminates onerous and discriminatory aspects of the McCarren-Walter Act of 1954 which banned entry to the United States on the basis of homosexuality and ideology. In response to the dispute over AIDS and immigration, the measure gives the Department of Health and Human Services the power to remove AIDS from the list of diseases for which a visitor maybe excluded. The Bush administration now must act expeditiously on this newly granted power.

The agreement includes some very important provisions affecting illegal aliens. Under the measure, immigrants from El Salvador would have deportation and detention orders suspended for 18 months. The agreement also provides for a temporary stay of deportation and provides for a work authorization for spouses and children of individuals who were legalized under IRCA in 1986.

The measure addresses the employer sanctions imposed under IRCA by repealing these provisions for recruiters and job referral agencies. This is a step in the right direction, but the only way to truly eliminate the pernicious discrimination caused by these sanctions is to repeal them completely.

Mr. Speaker, let's spread democracy and freedom the best way this nation can: By opening our shores and allowing others to experience the American dream. I urge my colleagues to join me in supporting the Immigration Act before us.

Mr. BROOKS. Mr. Speaker, I yield 1 minute to the gentleman from California [Mr. ROYBAL].

Mr. ROYBAL. Mr. Speaker, I rise in support of the conference report. I wish to take this opportunity to thank the Black Caucus, the Hispanic Caucus, and Members of the House on both sides of the aisle who made possible the deletion from the immigration bill of a pilot project leading to a repugnant national identification system. When I presented my arguments against the biometric national identification system, I said that I would support the bill if it was taken out. The Senate has agreed to delete that section from the bill, and we now have before us a clean immigration bill. I must admit, however, that it is not as good as the original bill passed by this House, but it is much better, and I believe a great improvement over existing law.

Mr. Speaker, in its present version it is supported by some of the most important organizations in the country, and I join with them in favor of the conference report before us.

Mr. Speaker, I urge those who voted against the rule to vote in favor of final passage of this very much improved piece of legislation.

Mr. BROOKS. Mr. Speaker, I yield such time as he may consume to the gentleman from Texas [Mr. ORTIZ].

(Mr. ORTIZ asked and was given permission to revise and extend his remarks.)

Mr. ORTIZ. Mr. Speaker, I strongly support this piece of legislation and command those who worked so hard to get this legislation.

Mr. Speaker, I rise in support of the conference report on S. 358, the Immigration Act, and ask unanimous consent to revise and extend my remarks.

I would like to thank the distinguished members of the Judiciary Committee, and my dear Chairman BROOKS, Chairman MORRISON, Representative BERMAN, and Representative FRANK for their outstanding work on this bill.

I would also like to thank Chairman ROYBAL for his many years of leadership on this issue and for his work on defeating the inclusion of the national identification provision formerly in the bill.

I am in favor of provisions in this agreement that increase the number of visas for family reunification and would like to urge my colleagues to join me in supporting this conference report and final passage of this important legislation.

Mr. BROOKS. Mr. Speaker, I yield such time as he may consume to the gentleman from California [Mr. TORRES].

(Mr. TORRES asked and was given permission to revise and extend his remarks.)

Mr. TORRES. Mr. Speaker, I stand in support of the conference report.

Mr. BROOKS. Mr. Speaker, I yield such time as he may consume to the gentleman from New Mexico [Mr. RICHARDSON].

(Mr. RICHARDSON asked and was given permission to revise and extend his remarks.)

Mr. RICHARDSON. Mr. Speaker, I rise in support of the conference report.

Mr. Speaker, the new rule in House Concurrent Resolution 394 which deletes the Drivers License Pilot Program from the conference report.

The conference report preserves and expands the opportunities for families to be reunited.

Immigration based on occupational skills is more than doubled.

New visa categories are created to enhance the diversity of countries whose nationals can immigrate to the United States.

For these reasons, the new rule and the conference report are strongly supported by:

National Council of La Raza. Mexican American Legal Defense and Education Fund.
Organization of Chinese Americans.
Japanese American Citizens League.
Irish Immigration Reform Movement.
American Civil Liberties Union.
American Jewish Committee.
U.S. Catholic Conference.
Lutheran Immigration and Refugee Service.
American Bar Association.
American Immigration Lawyers Association.
U.S. Chamber of Commerce.
National Association of Manufacturers.
National Foreign Trade Council.
Industrial Biotechnology Association.
Semiconductor Industry Association.

American Council for International Personnel.
AFL–CIO.
International Ladies Garment Workers Union.

Mr. Speaker, Mr. BROOKS could have killed this bill after the rule went down last night, but he did not because he was a statesman—and knew that this bill was important. We are grateful to him.

The message in the rule defeat last night is that congressional Hispanic caucus members need to be consulted on vital issues affecting immigration. When that doesn't happen, problems like those that surfaced last night happen.

Mr. BROOKS. Mr. Speaker, I yield such time as he may consume to the gentleman from Texas [Mr. COLEMAN].

(Mr. COLEMAN of Texas asked and was given permission to revise and extend his remarks.)

Mr. COLEMAN of Texas. Mr. Speaker, I rise in strong support of this conference report.

Mr. SYNAR. Mr. Speaker, today I voted to approve the conference report on the first major reform of legal immigration in this country in 25 years. Our country was based on immigration and continues to benefit from the admission of immigrants who choose to come to the United States. This bill represents an attempt to strike a balance between the need to reunite families separated by unfair admission policies and the needs of our business and economic communities.

While I support the majority of the provisions contained in this measure, I believe that one particular provision is contrary to our immigration tradition. We have had many questionable exclusion policies applied over the years, our country has never permitted visas to a special class of immigrants based on wealth. One section of this bill calls for permitting the admission of 10,000 individuals on the basis of their ability to create jobs. This creates a separate category of visas that decreases the number available for skilled workers and those with exceptional or extraordinary abilities or advanced degrees. The individual simply has to have money to invest.

I support efforts to create and keep jobs in the United States, however, this section is so contrary to our immigration tradition that it is perilously close to a "selling" of our citizenship. I am hopeful this policy will be reconsidered and not made a permanent part of immigration policy.

Mr. MATSUI. Mr. Speaker, I would like to offer my reluctant support for the rule to the immigration conference report.

In watching the progress of the immigration reform in the House I have seen a mountain turn into a molehill. The conference report we have here before us which we must either approve or disapprove is a mere shadow of its former self. We have seen a bill which began as an ambitious attempt to expand immigration to the benefit of America and Americans chipped away bit by bit at every stage of the legislative process.

H.R. 4300 was sponsored by my good friend from Connecticut, the chairman of the Judiciary Committee, Mr. MORRISON, was fought for valiantly by my colleague from California, Mr. BERMAN, and received positive input and support from a range of minority or-

ganizations and immigration advocates. That bill, as passed by the House earlier this month, sought to reunite families, promote employment opportunities, and relieve the enormous backlogs currently being experienced by prospective immigrants from certain countries. The bill that has come out of the conference committee not only weakens the House's will for family reunification, but has been amended to encroach upon the civil liberties of all Americans.

The sudden appearance of a pilot program for national identification cards is reason for great concern, particularly when that program that could result in the sharing of Federal data banks. Also disturbing to me is the way in which this provision was thrown into the legislation by the conference committee. It was not in the House bill, nor was it in the Senate legislation, yet somehow it found its way into the conference report.

As much as I resent the establishment of a pilot program to explore the idea of national identification cards, however, I feel even stronger that we must not let this session of Congress expire without making some improvement to our immigration laws. If this proposed identification pilot program does become law, the Congress must be diligent in its oversight of the program and unrelenting in exposing it as dangerous and unjust.

In the final analysis, however, there is simply too much to be lost by fumbling the opportunity to effect some positive change in the immigration laws. Make no mistake about it: the conference report before us is not the improvement to immigration law that I had hoped the Congress would pass this year. It is an improvement, however, one which we should accept and build upon.

I urge my colleagues to approve the rule as a means of striking an initial blow toward the eventual goal of meaningful immigration reform.

Mr. MINETA. Mr. Speaker, I rise today in support of the conference report on S. 358, the Immigration Act of 1990.

Immigration is an important part of our national heritage. Immigrants have played a key role in the expansion and development of this Nation and our economy.

I would like to take this opportunity to commend the chairman of the Judiciary Committee, Mr. BROOKS, the ranking minority member, Mr. FISH, and the Immigration Subcommittee chairman, Mr. MORRISON. I would also like to commend my colleague from California, Mr. BERMAN. He has been an outstanding advocate for fair immigration policy.

I support this legislation because it provides critically needed family reunification measures which continue to be the cornerstone of our immigration law and policy. This conference report continues the process of reforming our immigration laws by attempting to reduce some of the serious immigration backlogs U.S. citizens and permanent residents face when trying to unite their families.

This reform legislation emphasizes the importance that immigration and diversity play in the Nation's culture and economy. As the United States tries to increase our competitiveness by training and building within our borders, we can find an excellent resource in potential immigrants.

The conference report includes several important provisions including one I authored to increase the immigration quota for Hong Kong.

I am also very supportive of the deletion of the pilot program for a national identification card system. As American of Japanese ancestry who was interned during World War II, I have serious reservations about the sharing of confidential information between Federal agencies.

Mr. Speaker, it is essential that we implement immigration laws which are fair and equitable for all of us.

Mrs. ROUKEMA. Mr. Speaker, I want to draw my colleagues attention to an amendment to the conference report on S. 358/H.R. 4300, the immigration reform bill considered by the House today, which at long last curtails the ability of U.S. airline and shipping industries to hire foreign nations to take the place of striking American crewmembers during labor disputes. Finally, with the addition of this compromise language, these industries will be encouraged to hire American replacement workers.

After considerable study and attention by the Congress, this legislation, which I originally introduced as H.R. 285, was modified to meet the concerns of affected industries. This amendment has a long history of support by the Congress. In the 99th Congress, I offered an amendment to the Immigration and Nationality Act to close this glaring loophole in our immigration laws, which permits our domestic airlines and shipping companies to hire foreign workers to take the jobs of striking Americans on international routes. In no other domestic industry is this permitted to occur. If these industries want to hire replacement workers, I certainly have no argument with their doing so. However, I believe these replacement workers should be Americans.

My amendment to IRCA which created an outright prohibition on admitting aliens who took the places of striking American crewmembers was passed with a 1-year sunset to allow Congress time to study and investigate the issue before permanent enactment. Indeed, the issue has been studied by the Education and Labor Committee through hearings, and the full House passed the measure in the 100th Congress on March 22, 1988 by a vote of 302 to 114.

Thereafter, I have worked to reach an accommodation with the Senate to ensure its acceptance by that body. The compromise language included in this conference report provides that aliens will not be permitted entry to the United States to take the place of striking American workers unless the alien has been an employee of such carrier for a period of not less than 1 year preceding the date that a lawful strike or lockout commenced, has served as a qualified crewman for the same employer at least once in each of 3 months during the year preceding that date, and will continue to provide the same services the alien provided as such a crewman. The alien's employer must provide documentation that satisfies the Attorney General that the circumstances governing the employment of the alien seeking entry to the United States meet these criteria.

In essence, this amendment prevents U.S. airlines and shipping companies from hiring a contingent of foreign workers in anticipation of a strike. As a matter of fundamental Federal neutrality in the free exercise of the legitimate labor rights of American workers in these in-

dustries, the Federal Government must not permit foreign workers to take the place of striking Americans. This amendment allows domestic industries to put in place those foreign workers who are suitably trained and experienced to take the place of pilots and flight attendants, and discourages the practice of hiring unqualified foreign workers during strikes, as was experienced during the TWA strike in 1986.

As I have often stated in the fight to pass this legislation, if these industries want to hire replacement workers during strikes, they are free to do so. However, they should hire Americans. At long last, this loophole in our immigration laws will be closed in a manner that leave affected industries some flexibility. It is a balanced approach that will work for all concerned.

Thank you, Mr. Speaker.

Mr. BROOKS. Mr. Speaker, I yield back the balance of my time, and I move the previous question on the conference report.

The previous question was ordered.

The SPEAKER pro tempore. The question is on the conference report.

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

Mr. BRYANT. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 264, nays 118, not voting 50, as follows:

[Roll No. 530]

YEAS—264

| | | |
|---|---|---|
| Ackerman | Conyers | Gephardt |
| Alexander | Costello | Gibbons |
| Anderson | Coughlin | Gillmor |
| Annunzio | Courter | Gilman |
| Anthony | Coyne | Gonzalez |
| Armey | Darden | Gradison |
| Atkins | de la Garza | Grandy |
| AuCoin | DeFazio | Grant |
| Baker | DeLay | Gray |
| Ballenger | Dellums | Green |
| Bartlett | DeWine | Guarini |
| Barton | Dickinson | Gunderson |
| Bateman | Dicks | Hall (OH) |
| Bereuter | Dixon | Hamilton |
| Berman | Donnelly | Hatcher |
| Bilbray | Dorgan (ND) | Hayes (IL) |
| Bliley | Douglas | Hefner |
| Boehlert | Downey | Henry |
| Boggs | Durbin | Hiler |
| Bonior | Dwyer | Hochbrueckner |
| Borski | Dymally | Horton |
| Bosco | Early | Houghton |
| Brooks | Edwards (CA) | Hoyer |
| Broomfield | Engel | Hughes |
| Brown (CA) | Espy | Hunter |
| Bruce | Evans | Hyde |
| Buechner | Fascell | Ireland |
| Bustamante | Fawell | Jacobs |
| Campbell (CO) | Fazio | Johnson (CT) |
| Cardin | Feighan | Johnson (SD) |
| Carper | Fish | Jones (GA) |
| Carr | Flake | Jones (NC) |
| Chandler | Foglietta | Jontz |
| Clarke | Ford (MI) | Kanjorski |
| Clay | Ford (TN) | Kaptur |
| Clinger | Frank | Kasich |
| Coble | Frenzel | Kastenmeier |
| Coleman (MO) | Frost | Kennedy |
| Coleman (TX) | Gallo | Kennelly |
| Collins | Gaydos | Kildee |
| Condit | Gejdenson | Kolbe |
| Conte | Oekas | Kolter |

Kostmayer
Kyl
Lantos
Leach (IA)
Lehman (CA)
Lehman (FL)
Lent
Levin (MI)
Levine (CA)
Lewis (GA)
Lightfoot
Livingston
Lowey (NY)
Machtley
Madigan
Manton
Markey
Martin (NY)
Martinez
Matsui
Mavroules
Mazzoli
McCloskey
McCollum
McCrery
McDade
McDermott
McEwen
McHugh
McMillan (NC)
McMillen (MD)
McNulty
Mfume
Michel
Miller (CA)
Miller (WA)
Mineta
Mink
Moakley
Molinari
Mollohan
Moody
Morella
Morrison (CT)
Morrison (WA)
Mrazek

Murtha
Nagle
Neal (MA)
Nielson
Oakar
Oberstar
Obey
Ortiz
Owens (NY)
Owens (UT)
Oxley
Pallone
Panetta
Pashayan
Paxon
Payne (NJ)
Pease
Pelosi
Penny
Pickett
Pickle
Porter
Poshard
Price
Rahall
Rangel
Ravenel
Rhodes
Richardson
Rinaldo
Ritter
Roe
Rohrabacher
Ros-Lehtinen
Roybal
Sabo
Sawyer
Saxton
Scheuer
Schiff
Schroeder
Schulze
Schumer
Serrano
Shays
Shumway

Sisisky
Skaggs
Skeen
Slattery
Slaughter (NY)
Smith (FL)
Smith (IA)
Smith (NJ)
Smith (TX)
Snowe
Solarz
Solomon
Spratt
Stangeland
Stark
Stokes
Studds
Swift
Synar
Tallon
Tauke
Thomas (WY)
Torres
Torricelli
Towns
Udall
Unsoeld
Upton
Vento
Visclosky
Vucanovich
Walker
Washington
Waxman
Weiss
Weldon
Wheat
Whittaker
Whitten
Williams
Wilson
Wolf
Wolpe
Wyden
Wylie
Yates

Pursell
Quillen
Robinson
Rose
Rostenkowski
Roukema
Rowland (CT)
Russo

Saiki
Sangmeister
Schneider
Schuette
Sharp
Sikorski
Skelton
Smith (VT)

Smith, Denny
(OR)
Thomas (GA)
Traxler
Walgren
Walsh
Watkins
Weber

□ 1904

The Clerk announced the following pair:

On this vote:

Mrs. Saiki for, with Mrs. Roukema against.

Messrs. BEVILL, VOLKMER, and NATCHER changed their vote from "yea" to "nay."

So the conference report was agreed to.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

## NAYS—118

Andrews
Applegate
Archer
Barnard
Beilenson
Bennett
Bentley
Bevill
Bilirakis
Browder
Brown (CO)
Bryant
Bunning
Byron
Campbell (CA)
Chapman
Clement
Combest
Cooper
Cox
Craig
Crane
Dannemeyer
Davis
Dornan (CA)
Dreier
Duncan
Dyson
Eckart
Edwards (OK)
Emerson
English
Erdreich
Fields
Gallegly
Geren
Goodling
Gordon
Goss
Hall (TX)

Hammerschmidt
Hancock
Hansen
Harris
Hastert
Hayes (LA)
Hefley
Herger
Hertel
Hoagland
Hopkins
Hubbard
Huckaby
Hutto
Inhofe
James
Lagomarsino
Lancaster
Laughlin
Lewis (CA)
Lewis (FL)
Lloyd
Long
Lowery (CA)
Marlenee
McCandless
McCurdy
Meyers
Miller (OH)
Montgomery
Moorhead
Myers
Natcher
Neal (NC)
Olin
Packard
Parker
Parris
Patterson
Payne (VA)

Perkins
Petri
Ray
Regula
Ridge
Roberts
Rogers
Roth
Rowland (GA)
Sarpalius
Savage
Schaefer
Sensenbrenner
Shaw
Shuster
Slaughter (VA)
Smith (NE)
Smith, Robert
(NH)
Smith, Robert
(OR)
Spence
Staggers
Stallings
Stearns
Stenholm
Stump
Sundquist
Tanner
Tauzin
Taylor
Thomas (CA)
Traficant
Valentine
Vander Jagt
Volkmer
Wise
Yatron
Young (AK)
Young (FL)

## NOT VOTING—50

Aspin
Bates
Boucher
Boxer
Brennan
Burton
Callahan
Crockett
Derrick

Dingell
Flippo
Gingrich
Glickman
Hawkins
Holloway
Jenkins
Johnston
Kleczka

LaFalce
Leath (TX)
Lipinski
Luken, Thomas
Martin (IL)
McGrath
Murphy
Nelson
Nowak