YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division
SARAH L. VUONG
Assistant Director
WILLIAM H. WEILAND
Senior Litigation Counsel
ERIC SNYDERMAN
JEFFREY HARTMAN
ANNA DICHTER
LAUREN BRYANT
CATHERINE ROSS
LUZ MARIA RESTREPO
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendants

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HAITIAN-AMERICANS UNITED INC., *et al.*,<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                    *Defendants*. | Case No. 25-cv-10498 |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO STAY THE EFFECTIVE DATE OF DHS' VENEZUELA AND HAITI TEMPORARY PROTECTED STATUS VACATURS AND 2025 VENEZUELA TERMINATION

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

BACKGROUND .......................................................................................................4

    I.    Statutory Background ...............................................................................4

    II.   Factual Background .................................................................................5

           A.    Haiti ...............................................................................................5

           B.    Venezuela ......................................................................................7

STANDARD OF REVIEW ......................................................................................9

ARGUMENT ............................................................................................................9

    I.    This Court Lacks Jurisdiction to Grant Plaintiffs the Relief They Seek ....................9

           A.    Section 1252(f) Precludes Plaintiffs' Requested Relief ....................9

           B.    The TPS Statute Bars Plaintiffs' Claims ........................................14

    II.   Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits .........17

           A.    The Secretary of Homeland Security has the Inherent Authority to Vacate a Prior Extension of a Country's TPS Designation ...........................................17

           B.    The Secretary's Determinations did not Violate the Fifth Amendment ...........21

    III.   Any Harm Plaintiffs May Suffer is Based on the Inherent Nature of the Statute ......26

    IV.   The Balance of the Equities and Public Interest Weigh Against Preliminary Injunctive Relief .......................................................................................................28

    V.   Plaintiffs' Requested Relief is Overbroad ..............................................29

CONCLUSION .......................................................................................................29

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Albertson v. FCC*,
   182 F.2d 397 (D.C. Cir. 1950) ...................................................................... 17

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) ................................................................................. 15

*Amgen, Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004) ................................................................... 14

*Arizona v. United States*,
   567 U.S. 387 (2012) .......................................................................... 18, 29

*Babb v. Wilkie*,
   589 U. S. 399 (2020) ............................................................................... 15

*Biden v. Texas*,
   597 U.S. 785 (2022) ................................................................................. 11

*Cal. Tow Truck Ass'n v. City & County of San Francisco*,
   807 F.3d 1008 (9th Cir. 2015) .................................................................. 15

*California v. Texas*,
   593 U.S. 659 (2021) ................................................................................. 29

*California v. Yamasaki*,
   442 U.S. 682 (1979). .................................................................................. 3

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
   332 F. Supp. 3d 393 (D. Mass. 2018).................................................. 16, 21

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004)..................................................................... 26

*Ctr. for Biological Diversity v. Regan*,
   597 F. Supp. 3d 173 (D.D.C. 2022).......................................................... 12

*Dan's City Used Cars, Inc. v. Pelkey*,
   569 U.S. 251 (2013) ................................................................................. 15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) .................................................................................... 24

*DHS v. New York*,
140 S. Ct. 599 (2020)..................................................................................29

*DHX Inc. v. Allianz AGF MAT, Ltd.*,
425 F.3d 1169 (9th Cir. 2005).....................................................................14

*Doe v. Trump*,
2025 WL 485070 (D. Mass. Feb. 13, 2025) ................................................29

*Durning v. Citibank, N.A.*,
950 F.2d 1419 (9th Cir. 1991).....................................................................14

*Fiallo v. Bell*,
430 U.S. 787 (1977) ...............................................................................22, 23

*Florida v. Mayorkas*,
No. 3:23-cv-09962-TKW-ZCB, 2023 WL 3567851 (N.D. Fla. May 16, 2023)......................13

*Galvan v. Press*,
347 U.S. 522 (1954) ....................................................................................22

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir. 2022) .......................................................................10

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) ...............................................................................11, 12

*Gill v. Whitford*,
138 S. Ct. 1916 (2018).................................................................................29

*Gun South, Inc. v. Brady*,
877 F.2d 858 (11th Cir. 1989)......................................................................17

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ...............................................................................18, 22

*Huffington v. T.C. Group, LLC*,
637 F.3d 18 (1st Cir. 2011)..........................................................................15

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993) ..................................................................................28

*Ivy Sports Medicine v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014) ......................................................................19

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ....................................................................................22

*Lamar, Archer & Cofrin, Llp v. Appling*,
    584 U.S. 709 (2018) ...................................................................15

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...................................................................29

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ...................................................................16

*Macktal v. Chao*,
    286 F.3d 822 (5th Cir. 2002)......................................................17

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ...............................................................21, 22

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) .....................................................................9

*McNary v. Haitian Refugee Center, Inc.*,
    498 U.S. 479 (1991) ...................................................................15

*Mulero-Carillo v. Roman-Hernandez*,
    790 F.3d 99 (1st Cir. 2015)........................................................21

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006)......................................................14

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ...................................................................25

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................28

*NRDC v. U.S. Dep't of Energy*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) .......................................12

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
    473 U.S. 1301 (1985) .................................................................14

*Patel v. Garland*,
    596 U.S. 328 (2022) .............................................................15, 16

*Poursina v. USCIS*,
    936 F.3d 868 (9th Cir. 2019)......................................................18

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020)............................................14, *passim*

*Reno v. Catholic Soc. Servs., Inc.*,
　509 U.S. 43 (1993) ...............................................................................................15

*S. Yuba River Citizens League*,
　804 F. Supp. 2d ...................................................................................................27

*Safety-Kleen Corp. v. EPA*,
　Nos. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ...................12

*Sampson v. Murray*,
　415 U.S. 61 (1974) ...........................................................................................9, 12

*Sanchez v. Mayorkas*,
　593 U.S. 409 (2021) ...............................................................................................5

*Scripps-Howard Radio v. FCC*,
　316 U.S. 4 (1942) ...........................................................................................11, 12

*Sorenson v. Sec'y of Treasury*,
　475 U.S. 851 (1986) .............................................................................................13

*State v. U.S. Bureau of Land Mgmt.*,
　277 F. Supp. 3d 1106 (N.D. Cal. 2017) ...............................................................12

*Stephan v. United States*,
　318 U.S. 423 (1943) (per curiam) ........................................................................10

*Trump v. Hawaii*,
　585 U.S. 667 (2018) ...............................................................................3, *passim*

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
　508 U.S. 439 (1993) .............................................................................................10

*U.S. R.R. Retirement Bd. v. Fritz*,
　449 U.S. 166 (1980) .............................................................................................23

*United States v. Carroll*,
　105 F.3d 740 (1st Cir. 1997) ...............................................................................10

*United States v. Nixon*,
　418 U.S. 683 (1974) .............................................................................................25

*United States v. Texas*,
　599 U.S. 670 (2023) .............................................................................................11

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
　429 U.S. 252 (1977) ...................................................................................3, 21, 23

*Webster v. Doe,*
    486 U.S. 592 (1988) ....................................................................................... 16, 21

*Winter v. NRDC,*
    555 U.S. 7 (2008) ............................................................................................. 9, 26

*Youngstown Sheet and Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................................................... 18

*Zhu v. Gonzales,*
    411 F.3d 292 (D.C. Cir. 2005) .............................................................................. 16

## <u>STATUTES</u>

1 U.S.C. § 112 ......................................................................................................... 10

1 U.S.C. § 204(A) ................................................................................................... 10

5 U.S.C. § 553 ......................................................................................................... 18

5 U.S.C. § 554 ......................................................................................................... 18

5 U.S.C. § 701(a)(1) ................................................................................................ 14

5 U.S.C. § 701(a)(2) ................................................................................................ 16

5 U.S.C. § 705 ................................................................................................ 1, *passim*

6 U.S.C. § 202(1)-(5) ............................................................................................... 19

6 U.S.C. § 557 ........................................................................................................... 4

8 U.S.C. § 1103 .......................................................................................................... 4

8 U.S.C. § 1103(a)(1) ............................................................................................... 19

8 U.S.C. § 1103(a)(3) ............................................................................................... 19

8 U.S.C. § 1252(f) ................................................................................................ 2, 12

8 U.S.C. § 1252(f)(1) ......................................................................................... 3, *passim*

8 U.S.C. § 1254a .................................................................................... 9, 10, 12, 28

8 U.S.C. § 1254a(a) ................................................................................................... 5

8 U.S.C. § 1254a(b) ................................................................................................... 1

8 U.S.C. § 1254a(b)(1) .................................................................................................. 1, 4

8 U.S.C. § 1254a(b)(1)(B)(i) ............................................................................................ 27

8 U.S.C. § 1254a(b)(1)(C) ..................................................................................... 5, *passim*

8 U.S.C. § 1254a(b)(2) ....................................................................................................... 5

8 U.S.C. § 1254a(b)(2)(B) ............................................................................................... 27

8 U.S.C. § 1254a(b)(3) .................................................................................................. 8, 20

8 U.S.C. § 1254a(b)(3)(A) ................................................................................ 5, 17, 18, 19

8 U.S.C. § 1254a(b)(3)(B) ...................................................................................... 1, 5, 18

8 U.S.C. § 1254a(b)(3)(C) ...................................................................................... 1, 5, 18

8 U.S.C. § 1254a(b)(5)(A) ..................................................................................... 2, *passim*

8 U.S.C. § 1254a(c) ............................................................................................................ 5

## Immigration Act of 1990:

Pub. L. No. 101-649, 104 Stat. 4978 ................................................................................. 4

## Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA):
### Pub. L. No. 104-208, 110 Stat. 3009-546

Section 306 ..................................................................................................................... 10

Section 308 ..................................................................................................................... 10

## <u>OTHER AUTHORITIES</u>

*Designation of Haiti for Temporary Protected Status,*
    75 Fed. Reg. 3,476, 3477 (Jan. 21, 2010) .................................................................. 5

*Designation of Haiti for Temporary Protected Status,*
    86 Fed. Reg. 41,863 (Aug. 3, 2021) ........................................................................... 6

*Designation of Venez. for Temporary Protected Status and Implementation of Emp.*
    *Authorization for Venezuelans Covered by Deferred Enforced Departure,*
    86 Fed. Reg. 13,574 (Mar. 9, 2021) ........................................................................... 7

*Extension of the Designation of Venez. for Temporary Protected Status,*
    87 Fed. Reg. 55,024 (Sept. 8, 2022) ........................................................................... 7

*Extension and Redesignation of Haiti for Temporary Protected Status*,
    88 Fed. Reg. 5,022 (Jan. 26, 2023) ................................................................6

*Extension and Redesignation of Venez. For Temporary Protected Status*,
    88 Fed. Reg. 68,130 (Oct. 3, 2023) ..............................................................7

*Extension and Redesignation of Haiti for Temporary Protected Status*,
    89 Fed. Reg. 54,484 (July 1, 2024) ...............................................................6

*Extension and Redesignation of Haiti for Temporary Protected Status*,
    76 Fed. Reg. 29,000 (May 19, 2011) .............................................................6

*Extension of the Designation of Haiti for Temporary Protected Status*,
    77 Fed. Reg. 59,943 (Oct. 1, 2012) ...............................................................6

*Extension of the Designation of Haiti for Temporary Protected Status*,
    79 Fed. Reg. 11,808 (Mar. 3, 2014) ..............................................................6

*Extension of the Designation of Haiti for Temporary Protected Status*,
    80 Fed. Reg. 51,582 (Aug. 25, 2015) ............................................................6

*Extension of the Designation of Haiti for Temporary Protected Status*,
    82 Fed. Reg. 23,830 (May 24, 2017) .............................................................6

*Extension of the 2023 Designation of Venez. for Temporary Protected Status*,
    90 Fed. Reg. 5,961 (Jan. 17, 2025) ...............................................................8

*Foreign Affairs Functions of the United States*,
    90 Fed. Reg. 12,200 (Mar. 14, 2025) ...........................................................18

*Partial Vacatur of 2024 [TPS] Decision for Haiti*,
    90 Fed. Reg. 10,511 (Feb. 24, 2025) ................................................... 2, 13, 20

*Protecting the American People Against Invasion*, § 16(b),
    90 Fed. Reg. 8443 (Jan. 20, 2025) ...................................................... 20, 22, 28

*Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary
    Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,
    88 Fed. Reg. 40,282, 40,285 (June 21, 2023)* ...............................................2

*Termination of the October 3, 2023 Designation of Venez. for Temporary Protected Status*,
    90 Fed. Reg. 9,040 (Feb. 5, 2025) ........................................................ 2, 8, 23

*Termination of the Designation of Haiti for Temporary Protected Status*,
    83 Fed. Reg. 2,648 (Jan. 18, 2018) ...............................................................6

*Vacatur of 2025 Temporary Protected Status Decision for Venez.*,
  90 Fed. Reg. 8,805 (Feb. 3, 2025) ............................................................................ 2, 8, 13, 20

## INTRODUCTION

Defendants Donald J. Trump, in his official capacity as President of the United States; the U.S. Department of Homeland Security (DHS); and Kristi Noem, in her official capacity as Secretary of Homeland Security, respectfully submit this response in opposition to Plaintiffs' Motion to Stay the Effective Date of DHS' Venezuela and Haiti Temporary Protected Status (TPS) Vacaturs and 2025 Venezuela Termination of TPS.[1] (PI Mot.), ECF 9.

In 1990, Congress created the TPS program to provide, on a discretionary basis, temporary status to aliens who cannot safely return in the short-term to their home nation because of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible aliens from that country who are present in the United States on the effective date of the designation and register with the Federal Government are temporarily protected from removal and receive authorization to work in the United States. Consistent with the temporary nature of TPS, Congress dictated that the Secretary must regularly review a country's TPS designation and must extend that designation for six months or, in the Secretary's discretion, twelve or eighteen months, if she determines that the conditions giving rise to the designation continue to be met. 8 U.S.C. § 1254a(b)(3)(C). If, however, the Secretary determines that the conditions giving rise to the designation are no longer met, she must terminate that country's designation. *Id.* § 1254a(b)(3)(B); 1254a(b)(1). Congress further provided, "determinations" concerning TPS "with respect to the designation, or termination or extension of a designation, of

---

[1] Plaintiffs style their Motion as one arising under 5 U.S.C. § 705 of the Administrative Procedure Act (APA), calling it a Motion to Stay. Yet Plaintiffs cite to the preliminary injunction standard throughout their Motion and effectively ask this Court for injunctive relief. Defendants will refer to Plaintiffs' Motion as a Preliminary Injunction Motion (PI Mot.).

a foreign state under this subsection" are not subject to "judicial review." *Id.* § 1254a(b)(5)(A). Indeed, as recognized by the prior administration, "the TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."[2]

Notwithstanding the Secretary's clear authority and Congress's decision to commit TPS determinations to her discretion alone, Plaintiffs, the Haitian Americans United, Inc., Venezuela Association of Massachusetts, UndocuBlack Network Inc., and four individual TPS beneficiaries, bring this suit challenging the Venezuela and Haiti TPS Vacaturs and Venezuela TPS Termination and assert claims under the APA and the Equal Protection Clause. Plaintiffs ask this court to postpone the effective date of Secretary Noem's 2025 Venezuela Vacatur,[3] 2025 Haiti Partial Vacatur,[4] and 2025 Termination of the 2023 Venezuela TPS Designation.[5]  PI Mot 1. The Court should reject those extraordinary requests.

To start, the Court lacks jurisdiction to issue the requested relief. Although Plaintiffs style their request as a motion to stay the effective date of the Secretary's determinations under 5 U.S.C. § 705, what they actually seek is an injunction enjoining the exercise of her authority. But 8 U.S.C. § 1252(f) prohibits any court, "other than the Supreme Court," from exercising "jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom

---

[2] *Reconsideration and Rescission of Termination of the Designation of El Salvador for [TPS]; Extension of the [TPS] Designation for El Salvador,* 88 Fed. Reg. 40,282, 40,285 (June 21, 2023) ("*2023 El Salvador Reconsideration, Rescission and Extension*").

[3] *Vacatur of 2025 [TPS] Decision for Venez.*, 90 Fed. Reg. 8,805 (Feb. 3, 2025) ("*2025 Venez. Vacatur*").

[4] *Partial Vacatur of 2024 [TPS] Decision for Haiti*, 90 Fed. Reg. 10,511 (Feb. 24, 2025) ("*2025 Haiti Partial Vacatur*").

[5] *Termination of the October 3, 2023 Designation of Venez. for [TPS]*, 90 Fed. Reg. 9,040 (Feb. 5, 2025) ("*2025 Venez. Termination*").

proceedings … have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Section 1254a is a covered provision, and a stay enjoining or restraining the Secretary's decisions from having any legal effect is the sort of coercive order § 1252(f) prohibits.

Additionally, the TPS statute broadly prohibits judicial review of "any determination of the Secretary with respect to" designations, terminations, or extensions. 8 U.S.C. § 1254a(b)(5)(A). Each of the Secretary's decisions is precisely such a "determination" concerning "extension" or "termination" of a designation under § 1254a. *Id.* Plaintiffs' claims challenging the basis for Secretary Noem's Vacatur and Termination decisions and request to set those decisions aside fit squarely within the statute's bar on judicial review.

Plaintiffs' claims lack merit too. Plaintiffs' APA claims fail because Congress granted the Secretary broad authority to review TPS decisions consistent with the mandate that she ensure the continued designation of a country does not adversely affect the national interest. Plaintiffs' equal protection claim is equally unavailing where they fail to identify any evidence indicating that the Secretary was motivated by discriminatory animus. To the contrary, the evidence demonstrates that Secretary Noem's Vacatur and Termination decisions are immigration policies rationally related to government objectives of national security and are not motivated by racially discriminatory intent. And that is true, regardless of whether the Court applies the deferential standard recognized in *Trump v. Hawaii*, 585 U.S. 667 (2018), as applicable to such claims in the immigration context, or the balancing sometimes applied in other contexts set forth in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

Finally, in seeking a nationwide injunction, the scope of Plaintiffs' requested relief is vastly overbroad. Plaintiffs' excessive request contravenes equitable principles that require relief to be no more burdensome to the defendant than is necessary to provide plaintiff relief. *California v. Yamasaki*, 442 U.S. 682, 702 (1979). Should the Court grant Plaintiffs' requested injunction-like

"stay", it should be limited to the individual Plaintiffs.

## BACKGROUND

### I.    Statutory Background

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent the aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to handle adequately the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the Secretary of Homeland Security,[6] "after consultation with appropriate agencies of the Government," to designate countries for "Temporary [P]rotected [S]tatus," if she finds:

> (A) … that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
> (B) … that—
>> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
>> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
>> (iii) the foreign state officially has requested designation under this subparagraph; or
> (C)  … there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

---

[6] The statute originally vested the Attorney General with the power to make TPS designation, extension and termination decisions. Congress transferred these powers to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103; 6 U.S.C. § 557.

When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be removed from the United States and are authorized to work for the duration of the country's TPS designation, so long as they remain in valid TPS. 8 U.S.C. § 1254a(a), (c); *see Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations may not exceed eighteen months. *Id.* § 1254a(b)(2). The Secretary must consult with appropriate agencies and review each designation before it ends to determine whether the conditions for the country's designation continue to be met. *Id.* § 1254a(b)(3)(A). If the Secretary finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal Register of the determination and the basis for the termination. *Id.* § 1254a(b)(3)(B). If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C). Finally, the statute makes the Secretary's TPS determinations unreviewable. Section 1254a(b)(5)(A) states: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."

## II.    Factual Background

### A.  Haiti

On January 21, 2010, former Secretary Janet Napolitano designated Haiti for TPS for a period of 18 months based on "extraordinary and temporary conditions" that prevented Haitian nationals from safely returning to Haiti due to the "conditions in Haiti following the [7.0 magnitude] earthquake" that struck Haiti in January 2010.[7] Various Secretaries extended and

---

[7] *Designation of Haiti for [TPS]*, 75 Fed. Reg. 3,476, 3477 (Jan. 21, 2010) (citing 8 U.S.C. § 1254a(b)(1)(C)).

redesignated TPS for Haiti through 2018.[8] On January 18, 2018, then-Acting Secretary Elaine Duke found that "the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met" and terminated the TPS designation of Haiti.[9] On August 3, 2021, former Secretary Alejandro Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions effective through February 4, 2023.[10] Thereafter, he extended and redesignated TPS for Haiti for a period of 18 months, ending on August 3, 2024.[11] On July 1, 2024, former Secretary Mayorkas again extended and redesignated TPS for Haiti for 18 months, ending on February 3, 2026.[12]

On February 24, 2025, Secretary Noem partially vacated the 2024 Haiti Extension and reduced the designation period from 18 months to 12 months. *See 2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,511. Secretary Noem explained that the 2024 Haiti Extension "failed to evaluate" whether permitting Haitian nationals to remain temporarily is not "contrary to the national interest of the United States." *Id.* at 10,512; *see* 8 U.S.C. § 1254a(b)(1)(C). Secretary Noem also noted that "there is no discussion in the [2024 Haiti Extension] of why the 18-month period was selected in lieu of a [six] or [twelve] month period." *Id.* at 10,513. She further relied on indications from the Department of State and DHS of "significant developments" that "might result in improvement in

---

[8]*Extension and Redesignation of Haiti for [TPS]*, 76 Fed. Reg. 29,000 (May 19, 2011); *Extension of the Designation of Haiti for [TPS]*, 77 Fed. Reg. 59,943 (Oct. 1, 2012); *Extension of the Designation of Haiti for [TPS]*, 79 Fed. Reg. 11,808 (Mar. 3, 2014); *Extension of the Designation of Haiti for [TPS]*, 80 Fed. Reg. 51,582 (Aug. 25, 2015); *Extension of the Designation of Haiti for [TPS]*, 82 Fed. Reg. 23,830 (May 24, 2017).

[9] *Termination of the Designation of Haiti for [TPS]*, 83 Fed. Reg. 2,648 (Jan. 18, 2018).

[10] *Designation of Haiti for [TPS]*, 86 Fed. Reg. 41,863 (Aug. 3, 2021).

[11] *Extension and Redesignation of Haiti for [TPS]*, 88 Fed. Reg. 5,022 (Jan. 26, 2023).

[12] *See Extension and Redesignation of Haiti for [TPS]*, 89 Fed. Reg. 54,484 (July 1, 2024) ("*2024 Haiti Extension*").

conditions," including the "deployment of the United Nations Multinational Security Support (MSS) mission" to "support the Haitian National Police in capacity building, combatting gang violence and provid[ing] security for critical infrastructure." *Id.* The Secretary considered the putative reliance interests of those impacted by the 2025 Haiti Vacatur but found that they were outweighed by the overriding interests and concerns articulated in the notice. *Id.*

## B. Venezuela

On March 9, 2021, former Secretary of Homeland Security Alejandro Mayorkas designated Venezuela for TPS based on extraordinary and temporary conditions that prevented nationals of Venezuela from returning in safety.[13] The former Secretary extended Venezuela's TPS designation twice.[14] On October 3, 2023, in addition to extending the 2021 Venezuela TPS designation through September 2025, the former Secretary redesignated Venezuela for TPS, effective from October 3, 2023, through April 2, 2025. *2023 Venez. Designation*, 88 Fed. Reg. 68,130. This notice not only provided procedures for initial applicants registering for TPS under the 2023 Venezuela Designation but also allowed Venezuelan nationals who had previously registered for TPS under the 2021 Venezuela Designation to re-register for TPS and apply to renew their Employment Authorization Document (EAD) with USCIS. *Id.* On January 10, 2025, former Secretary Mayorkas issued a notice extending the 2023 Venezuela Designation for 18 months, allowing a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or

---

[13] *Designation of Venez. for [TPS] and Implementation of Emp. Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed. Reg. 13,574 (Mar. 9, 2021) (citing 8 U.S.C. § 1254a(b)(1)(C) ("*2021 Venez. Designation*").

[14] *See Extension of the Designation of Venez. for [TPS]*, 87 Fed. Reg. 55,024 (Sept. 8, 2022); *see also Extension and Redesignation of Venez. For [TPS]*, 88 Fed. Reg. 68,130 (Oct. 3, 2023) ("*2023 Venez. Designation*").

2023 designations) could obtain TPS through October 2, 2026.[15]

On January 28, 2025, Secretary Noem vacated the 2025 Venezuela Extension and restored the status quo that preceded that decision. *See 2025 Venez. Vacatur*, 90 Fed. Reg. at 8,805. She explained that the 2025 Venezuela Extension "did not acknowledge the novelty of its approach" or "explain how it is consistent with the TPS statute." *Id*. at 8,807; *see* 8 U.S.C. § 1254a(b)(3). The Secretary determined that the "lack of clarity" warranted a vacatur to "untangle the confusion and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *Id*.

After reviewing the Venezuelan country conditions and consulting with the appropriate U.S. Government agencies, on February 1, 2025, Secretary Noem determined that Venezuela no longer continued to meet the conditions for the 2023 Venezuela Designation and that it was "contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States." *2025 Venez. Termination*, 90 Fed. Reg. at 9,040-41. Accordingly, Secretary Noem terminated the 2023 Designation of Venezuela, effective April 7, 2025. *Id*. In making this determination she highlighted the "notable improvements in several areas, such as the economy, public health, and crime," that allow for Venezuelan nationals to be "safely returned to their home country." *Id*. at 9042. However, even assuming extraordinary and temporary conditions remained, the Secretary explained that that the termination of the 2023 Venezuela TPS designation is necessary because it is contrary to the national interest to permit the Venezuelan nationals to remain temporarily in the United States. *Id*. The national interest is "an expansive standard that may encompass an array of broad considerations" which "calls upon the Secretary's expertise and discretionary judgment." *Id*. Secretary Noem explained that the significant population of TPS

---

[15] *Extension of the 2023 Designation of Venez. for [TPS]*, 90 Fed. Reg. 5,961 (Jan. 17, 2025) ("*2025 Venez. Extension*").

holders has resulted in "associated difficulties in local communities where local resources have

been inadequate to meet the demands cause by increased numbers," and further underscored that,

across the United States, "city shelters, police stations and aid services are at maximum capacity."

*Id*. In considering national interests, she found that this population includes members of Tren de

Aragua, a transnational criminal organization recently determined to "pos[e] threats to the United

States." *Id*. at 9,042-43. Secretary Noem also observed that "U.S. foreign policy interests,

particularly in the Western Hemisphere, are best served and protected by curtailing policies that

facilitate or encourage illegal and destabilizing migration." *Id*. at 9,043.

## STANDARD OF REVIEW

The standards of review for relief under 5 U.S.C. § 705 and for preliminary injunctions

are the same. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). A preliminary injunction is "an

extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear

showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

(quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he

is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that the injunction is in the

public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.  This Court Lacks Jurisdiction to Grant Plaintiffs the Relief They Seek

#### A.  Section 1252(f) Precludes Plaintiffs' Requested Relief

Here, the relief Plaintiffs seek would enjoin or restrain DHS's implementation of the TPS

provisions in 8 U.S.C. § 1254a. But 8 U.S.C. § 1252(f)(1) explicitly bars such relief, providing:

"Regardless of the nature of the action or claim or of the identity of the party or parties bringing

the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin*

9

*or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings … have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Section 1254a is one of the statutory provisions § 1252(f)(1) covers. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), div. C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-546. Although Section 1254a appears in Part V of the U.S. Code, the U.S. Code is inconsistent with the INA, wherein the TPS provisions in Section 244 appear in Chapter 4. *Id*. When there is a conflict, the INA prevails. *See Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) ("[T]he text of the United States Code 'cannot prevail over the Statutes at Large when the two are inconsistent.'") (quoting *Stephan v. United States*, 318 U.S. 423, 426 (1943) (per curiam)); *see also U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("Though the United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112...."); *United States v. Carroll*, 105 F.3d 740, 744 (1st Cir. 1997) ("Conflicts between the text of a statute as it appears in the Statutes at Large, on one hand, and in usually reliable but unofficial sources such as the United States Code Annotated, on the other hand, are rare, but, when they occur, the rendition of the law contained in the Statutes at Large controls.").  INA § 244 lies within chapter 4 of title II of the INA, as amended. Section 1252(f)(1) thus eliminates any court's (other than the Supreme Court's) authority to issue coercive orders enjoining or restraining implementation of 8 U.S.C. § 1254a.

By invoking 5 U.S.C. § 705 and asking this Court to "postpone the effective date of three challenged actions[,]" Plaintiffs seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1). PI Mot. 1. Regardless of how Plaintiffs frame the relief sought, an order pursuant to 5 U.S.C. § 705 prevents—i.e. "enjoin[s] or restrain[s]"—DHS from implementing the Secretary's 2025 determinations vacating, in whole or in part, the decisions to extend the  TPS

designations for Venezuela and Haiti and is thus jurisdictionally barred under § 1252(f)(1). The Supreme Court has held that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)) (emphasis added); *see* Black's Law Dictionary (12th ed. 2024) (An injunction is "[a] court order commanding or preventing an action"). To "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Aleman Gonzalez*, 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). An order postponing the effective date of implementation of the Secretary's determinations would be an order "restraining" federal officials. *Id.* at 550.

Plaintiffs' likely rejoinder is that stays differ from injunctions. But that argument relies on the incorrect assumption that § 705 creates a new form of remedy—a district court stay of agency action that is distinct from an injunction. *Cf. United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring) (questioning the validity of the district court's finding that § 1252(f)(1) does not bar vacatur orders and that § 706(2) authorizes courts to issue them). Section 705 creates no new remedy beyond the traditional equitable relief that existed at the time of the APA's passage. *See Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16–17 (1942). There is no evidence that Congress intended to create a wholly new, never-before-seen species of remedy when it adopted § 705. Instead, Congress simply codified existing equitable remedies. Section 705 allows a court to issue only that "process" that is "necessary and appropriate." And the Supreme Court long ago concluded "[t]he relevant legislative history of that section … indicates that it was primarily intended to reflect existing law" permitting courts of appeals to stay certain agency actions pending direct review authorized by statute in the same manner that appellate courts can in certain

circumstances stay a district court decision pending appeal. *Sampson*, 415 U.S. at 68 n.15; *see Scripps-Howard Radio*, 316 U.S. at 9-10 ("a federal court can stay the *enforcement of a judgment pending the outcome of an appeal*" (emphasis added)). Section 705 was not intended "to fashion new rules of intervention for District Courts." *Id*. Thus, the text, context, legislative history, sources contemporary to the APA's passage, and relevant case law all show § 705 does nothing more than preserve traditional equitable relief—relief that 8 U.S.C. § 1252(f)(1) bars.

Plaintiffs do not seek an order that would operate on the individual removal proceedings or some other agency adjudication pending judicial review. Plaintiffs instead ask this Court to "prevent" the government from implementing its chosen "course of action" with respect to 8 U.S.C. § 1254a. *See Aleman Gonzalez*, 596 U.S. at 549, 551 (orders requiring government to "refrain from actions that (again in the Government's view) are allowed" by covered provisions are barred by § 1252(f)). Such an order, even if labeled a stay, is injunctive in effect and barred by 8 U.S.C. § 1252(f)(1). Thus, Plaintiffs' stay request is no different from an injunction – a similarity underscored by the preliminary-injunction standard applying to it.

Even if 8 U.S.C. § 1252(f)(1) did not apply, 5 U.S.C. § 705 by its own terms does not authorize relief here because the Vacaturs have already taken effect. Courts construing 5 U.S.C. § 705 have concluded that the phrase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review"— but not suspension of a policy that is *already in effect*. *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (quoting *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996)) (emphasis added); *accord, e.g.*, *NRDC v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) (same); *State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017) (same). While these cases address an agency decision to "postpone the effective date," 5 U.S.C. § 705 uses identical

language when referring to "the reviewing court ... postpon[ing] the effective date of an agency action." The use of an identical phrase in the first and second sentences of § 705 must be presumed to be intentional. *See, e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."). Given its plain meaning, the language in 5 U.S.C. § 705 allowing a court or agency to "postpone the effective date" can only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay" the "operative" date of the agency action. *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/effective (last visited Mar. 2, 2025); *see also* Black's Law Dictionary Online (2d ed.), https://thelawdictionary.org/?s=postpone (last visited Mar. 3, 2025) (defining "postpone" as "to put off; defer; delay; continue"). One cannot "defer" or "put off" an action that has already occurred; thus, the issuance of a stay after the effective date of the challenged policy has already passed is beyond what § 705 permits. *See Florida v. Mayorkas*, No. 3:23-cv-09962-TKW-ZCB, 2023 WL 3567851, at *4 (N.D. Fla. May 16, 2023) (Section 705 stay unavailable because the policy was in effect at time of filing).

The Vacatur determinations Plaintiffs seek to stay were published in February 2025 with immediate effective dates. *2025 Venez. Vacatur*, 90 Fed. Reg. at 8,805 (published Feb. 3, 2025); *2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,511 (published Feb. 24, 2025). Thus, the determinations are already in effect. *See 2025 Venez. Vacatur*, 90 Fed. Reg at 8,806 ("The vacatur is effective immediately"); *2025 Haiti Partial Vacatur*, 90. Fed. Reg. at 10,511 (The "decision is effective immediately"). That 5 U.S.C. § 705 is disjunctive, permitting reviewing courts to "postpone the effective date of an agency action *or to preserve status or rights* pending conclusion of the review proceedings" (emphases added), does not change this result. An order staying a policy after it has already gone into effect thus does not preserve the status quo, but rather, *alters*

13

it. *See, e.g.*, *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (had the district court issued an order stopping rule from taking effect that would alter the "status quo"); *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations" would "disturb[]" rather than preserve "the status quo").

### B. The TPS Statute Bars Plaintiff's Claims

Additionally, the TPS statute itself unambiguously provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). The statute makes clear that TPS designation, extension, and termination determinations are committed to the unreviewable authority of the Secretary and APA challenges to such determinations are prohibited. *See* 5 U.S.C. § 701(a)(1) (Review is not available, however, "to the extent that" a relevant statute precludes it); *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004).

Plaintiffs allege that because the statute does not contain the word vacatur, then any such decision falls outside the scope of the statutory language. ECF 1 ¶ 155-156. Not only is this argument incorrect, *see infra*, § II.a, but this Court lacks jurisdiction to review the analysis of any such vacatur. This Court is prohibited from reviewing "*any determination … with respect to* the designation, or termination or extension of a designation" of TPS. 8 U.S.C. § 1254a(b)(5)(A). In its now vacated decision, the Ninth Circuit reviewed the exact statute at issue here. *See Ramos v. Wolf*, 975 F.3d 872, 889 (9th Cir. 2020), *vacated by Ramos v. Wolf*, 59 F.4th 1010, 1011 (9th Cir. 2023).[16] Comparing the term "determination" in § 1254a(b)(5)(A) with similar uses of the word

---

[16] This decision has been vacated and therefore has no precedential effect. *See, e.g.*, *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991). A vacated decision, however, "still carries informational and perhaps even persuasive precedential value." *DHX Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005).

in provisions analyzed by the Supreme Court in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 486 n.6 (1991), and *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 53 (1993), the Ninth Circuit stated that the reference to a determination "generally precludes direct review of the secretary's country-specific TPS determinations." *Ramos*, 975 F.3d at 891. The inquiry does not end here, but rather this Court must look to the surrounding text to understand what types of determinations are restricted from review. The word "any," modifying "determination" in § 1254a(b)(5)(A), indicates a broad sweep. *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)). The phrase "with respect to" in § 1254a(b)(5)(A) is likewise broad in scope, as that phrase "is generally understood to be synonymous with the phrase 'relating to'" or "'related to.'" *Cal. Tow Truck Ass'n v. City & County of San Francisco*, 807 F.3d 1008, 1021 (9th Cir. 2015); *accord Huffington v. T.C. Group, LLC*, 637 F.3d 18, 22 (1st Cir. 2011). And the Supreme Court has underscored that the ordinary meaning of "related to" is "a broad one," meaning "having a connection with or reference to . . ., whether directly or indirectly." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

The Supreme Court recently undertook a similar review of the phrase "any judgment regarding the granting of relief" under enumerated provisions. *Patel v. Garland*, 596 U.S. 328 (2022). There, the Supreme Court pointed out that it "has repeatedly explained, the word 'any' has an expansive meaning." *Id.* at 338 (quotations omitted) (citing *Babb v. Wilkie*, 589 U. S. 399, 405, n.2 (2020); Webster's Third New Int'l Dictionary, at 97 (defining "any" as "one or some indiscriminately of whatever kind")). The phrase "with respect to" is the equivalent of "regarding" or "concerning." *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 717 (2018); *see also Patel*, 596 U.S. at 339. The use of these phrases "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating

15

to that subject." *Patel*, 596 U.S. at 339.

Within this framework, Secretary Noem's Vacatur determinations fall well within the statute's "any determination" language and are country-specific TPS determinations relating to prior extensions. Judge Casper's 2018 decision finding jurisdiction is unpersuasive as it did not benefit from the more recent Supreme Court caselaw reaffirming the expansive use of the phrases "any" and "related to." *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 406 (D. Mass. 2018) (finding similarity between "a determination" and "any determination"); *see* PI Mot.16 n.14. For this reason, § 1254a(b)(5)(A) eliminates this Court's jurisdiction to review any APA claim regarding the Vacatur determinations, including those raised by Plaintiffs regarding the substance of the Federal Register Notice and facts that the Secretary considered. *See* PI Mot. 8-11. Likewise, this Court lacks jurisdiction to review the Termination, as it falls firmly within the statutes jurisdictional bar. *See* 8 U.S.C. § 1254a(b)(5)(A).

The APA also precludes review where the agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). While "rare," this section of the APA is used "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). A determination as to what constitutes the national interest is one of these rare circumstances. *See Trump*, 585 U.S. at 684-86 (explaining that where the President has statutory discretion to determine if an alien's entry "would be detrimental to the interests of the United States," federal courts should not inquire "into the persuasiveness of the President's justifications"). The determination of "national interest" is one that calls upon the Secretary's "expertise and judgment" and is not a manageable legal standard. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *see also Webster v. Doe*, 486 U.S. 592, 600 (1988). Because there is no manageable standard by which this Court can judge the Secretary's finding that permitting TPS holders from Venezuela and Haiti is contrary to the

national interest, this Court lacks jurisdiction to review any determination based upon that finding. *See* 2025 Venez. Termination, 2025 Haiti Vacatur.

## II.      Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits

### A. The Secretary of Homeland Security has the Inherent Authority to Vacate a Prior Extension of a Country's TPS Designation

Congress granted the Secretary "undoubtedly broad" authority to "make TPS determinations" and ensure the continued designation of a country complies with the law. *Ramos*, 975 F.3d at 890 (finding statutory constraints "on the Secretary's discretion, [are] in favor of limiting unwarranted designations or extensions…") (cleaned up). Even if this Court had jurisdiction to review the Secretary's determinations, Plaintiffs have not shown a likelihood of success on the merits that the Vacatur or Termination determinations are contrary to law.

When Congress authorized the Secretary to designate foreign countries for TPS, it committed several underlying policy questions to her discretion by statute and explicitly barred judicial review of sensitive foreign relations determinations. The Secretary's continuing border and national security responsibilities require her to evaluate any potential threats to the safety and security of the United States and permit her to change position, including reconsideration of a TPS determination. *See* 8 U.S.C. § 1254a(b)(3)(A) (The Secretary "… shall determine whether the conditions for such designation under this subsection *continue to be met*.") (emphasis added); *see also Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide.").[17] The statute requires the Secretary to review conditions within foreign

---

[17] "It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decision. *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (collecting cases); *see also Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) ("[T]he Supreme Court and other courts have recognized an implied authority in other agencies to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration.").

states designated for TPS, but any subsequent action turns on the Secretary's findings about whether the conditions for such designation continue to exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). Indeed, the statute inevitably requires the Secretary to make determinations affecting the conduct of United States foreign policy. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). When the Executive Branch acts in the field of foreign policy "… pursuant to an express or implied authorization of Congress, [its] authority is at its maximum, for it includes all that [it] possesses in [its] own right plus all that Congress can delegate." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (cleaned up).

Plaintiffs' analysis fails to acknowledge that the Secretary's determinations are rooted in foreign policy considerations. *See Arizona v. United States*, 567 U.S. 387, 409 (2012) (holding the federal government must speak "with one voice" in determining "whether it is appropriate to allow a foreign national to continue living in the United States").[18] Congress requires the Secretary to determine whether "permitting aliens to remain temporarily in the United States is contrary to the national interest of the United States[,]" and, as the Secretary determined in her Vacatur determinations, the vacated extension decisions lacked any meaningful discussion or justification in relation to that requirement. 8 U.S.C. § 1254a(b)(1)(C). *Cf. Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are

---

[18] *Cf. Determination: Foreign Affairs Functions of the United States*, 90 Fed. Reg. 12,200 (Mar. 14, 2025) ("[A]ll efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States under the [APA], 5 U.S.C. § 553, 554.").

firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Hawaii*, 585 U.S. at 684-86)). The Secretary's Venezuela Termination determination exercised that authority as intended.[19] Plaintiffs rely on *Ivy Sports Medicine v. Burwell*, 767 F.3d 81, 89 (D.C. Cir. 2014), asserting that because Congress established a statutory framework to reconsider a decision, there is no inherent authority. PI Mot. 10. But in *Ivy Sports*, the court held that inherent reconsideration authority *does* exist where there is no statutory mechanism to correct errors. *See Ivy Sports*, 767 F.3d at 86. Here, the TPS statute requires the Secretary to determine whether permitting the class of aliens from a designated country to remain temporarily in the United States is contrary to the national interest, but the statute contains no procedural requirement for how to remedy a recently-issued TPS decision that failed to meaningfully justify the national interest determination. 8 U.S.C. § 1254a(b)(1)(C).

Employing Plaintiffs' logic that the Venezuela and Haiti extensions of TPS were irrevocably binding, no Secretary of Homeland Security could ever vacate a designation or extension of a designation, no matter the type of national security threat posed or the seriousness of the error or legal defect in the prior determination. But the TPS statute itself does not mandate such a severe and unworkable limitation of the Secretary's ability to fulfill her border and national security responsibilities and exercise her broad authority to administer and enforce the immigration laws, *see, e.g.*, 6 U.S.C. § 202(1)-(5), 8 U.S.C. § 1103(a)(1), (a)(3), and to do so consistent with the President's Executive Orders. Indeed, even former Secretary Mayorkas agreed he had the inherent authority to revisit a prior TPS decision when he vacated his predecessor's termination of

---

[19] Plaintiffs do not dispute that the Secretary is authorized by statute to terminate a designation if she "determine[s]" that a foreign state "*no longer continues* to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added); *see* PI Mot. 9. Instead, Plaintiffs assert that "the 2025 Venezuela Termination is automatically improper because it terminates Venezuela's designation prior to the end of that extension period." *Id*

the TPS designation of El Salvador. *2023 El Salvador Reconsideration, Recission, and Extension*, 88 Fed. Reg. 40,282. As Secretary Mayorkas explained, "[t]he TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination." *Id.* at 40,285 (citing 8 U.S.C. § 1254a(b)(3), (b)(5)(A)). While Plaintiffs seek to distinguish the rescission of the termination of TPS for El Salvador as occurring due to "years of litigation," PI Mot. 13 n. 13, former Secretary Mayorkas's own analysis belies that contention, instead taking a sweeping view of the statutory authority provided by Congress to the Secretary. *See id*. And here, Secretary Noem has done the exact same thing—she has exercised her clear and unreviewable statutory authority to revisit previous TPS-related determinations and, upon reconsideration, vacated the prior determination to restore the status quo preceding that decision.

Plaintiffs' argument that the Vacaturs are impermissible because Secretary Noem's actions merely "short-circuit" statutory termination procedures also fails. PI Mot. 11. In issuing both the Venezuela and Haiti Vacaturs, Secretary Noem indicated that her decisions provided an opportunity to make informed determinations and to clarify procedures. *2025 Venez. Vacatur*, 90 Fed. Reg. at 8,807 (citing Exec. Order No. 14159, *Protecting the American People Against Invasion*, § 16(b), 90 Fed. Reg. 8443 (Jan. 20, 2025)); *2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,514 ("The Secretary intends to conduct a review of current conditions in Haiti and make a new determination in due course."). In both cases, vacatur is a statutorily permissible exercise of the Secretary's authority to reconsider a prior decision and make a reasoned decision of her own. The Secretary's Vacatur determinations complied with the statute and were consistent with her continuing obligation to safeguard the border and national security of the United States and to administer and enforce the immigration laws.

**B. The Secretary's Determinations did not Violate the Fifth Amendment**

Plaintiffs cannot bypass the explicit bar on judicial review by framing their claim as a constitutional challenge.[20] *See* 8 U.S.C. § 1254a(b)(5)(A); *supra* § I.B. Even if this Court determines it has jurisdiction to consider Plaintiffs' constitutional claim here, the Secretary's determinations to vacate the extensions of TPS for Venezuela and Haiti and terminate the 2023 Venezuela Designation did not violate the equal protection component of the Fifth Amendment Due Process Clause. Plaintiffs erroneously contend that "racial and ethnic animus" was at least "one motivating factor" behind the challenged actions and that a "sensitive inquiry" under *Vill. of Arlington Heights*, 429 U.S. at 265, should apply. PI Mot. 14-17. The appropriate standard for any such review, however, is set forth in *Hawaii*, 585 U.S. at 703-05. There, in determining that a rational basis standard should be applied, the Supreme Court explained that " '[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [the Court's] inquiry into matters of entry and national security is highly constrained." *Id*. at 704 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976)); *see Centro Presente*, 332 F. Supp. 3d at 411, 416 (Determinations concerning national security warrant deferential review, particularly when they are "rationally related to a legitimate government purpose." (citing *Mulero-Carillo v. Roman-Hernandez*, 790 F.3d 99, 107 (1st Cir. 2015)).

Here, Secretary Noem's Vacatur and Termination determinations are immigration policies related to Government objectives of border and national security and foreign policy.[21] *See supra*

---

[20] Section 1254a(b)(5)(A) provides a far clearer bar on review than the statutory provision at issue in *Webster v. Doe*, 486 U.S. 592, 603-04 (1988).

[21] Again, this Court should not be persuaded by the decision in *Centro Presente* where Judge Casper found that because the determinations at issue did "not concern national security," the heightened scrutiny set forth in *Arlington Heights* applies. 332 F. Supp. 3d at 411, 416. The same cannot be said in this case.

n.18. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Because decisions in these matters implicate "relations with foreign powers" and involve "classifications … defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews*, 426 U.S. at 81; *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government."). Decisions by the political branches about which classes of aliens to exclude or expel will generally be upheld against constitutional challenges so long they satisfy deferential rational-basis review. *Hawaii*, 585 U.S. at 704-05; *see also Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and bona fide" reason for its action); *Mathews*, 426 U.S. at 82 (a "narrow standard of review" applies to "decisions made by Congress or the President in the area of immigration and naturalization"); *Shaughnessy*, 342 U.S. at 588–89.

Although cases such as *Hawaii*, *Mandel*, and *Fiallo* involved policies directed at aliens seeking to enter the country, those decisions equally support applying rational-basis review in the specific context of these TPS determinations where the Secretary's basis for the Vacatur of the 2025 Venezuela Extension was to "provide an opportunity for informed determinations regarding the TPS designations and clear guidance" *2025 Vacatur*, 90 Fed. Reg. at 8807 (citing Exec. Order No. 14159, *Protecting the American People Against Invasion*, § 16(b), 90 Fed. Reg. 8443 (Jan. 20, 2025)), and for Haiti, the Partial Vacatur allowed her to analyze "whether permitting a class of aliens to remain temporarily in the United States is contrary to the national interest," *2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,513. Likewise, after consulting with the Department of State,

Secretary Noem issued the 2025 Venezuelan Termination, reasoning that permitting Venezuelan nationals to remain temporarily in the United States is contrary to the national interest. *See 2025 Venez. Termination*, 90 Fed. Reg. at 9,040, 9,042-43 (considering various national interest factors, including impact on U.S. communities, public safety, border security and immigration policy, and foreign policy); *see also Hawaii*, 585 U.S. at 706 (If "there is persuasive evidence that the [policy] has a legitimate grounding in national security concerns … we must accept that independent justification").

TPS decisions involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *Hawaii*, 585 U.S. at 702, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. *See id.*; *Fiallo*, 430 U.S. at 799. Each of Secretary Noem's determinations are fully consistent with Congress's goal of providing TPS to eligible aliens until the Secretary determines that the conditions for the country's TPS designation no longer continue to exist, including in this case that permitting such aliens to remain in the United States is contrary to the U.S. national interest. *Hawaii*, 585 U.S. at 704-05; *see also U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). Thus, under the rational basis test, Plaintiffs' equal protection claim fails.

Even under the heightened standard in *Arlington Heights*, Plaintiffs' equal protection claim is likely to fail because they cannot establish racially discriminatory intent. Under the *Arlington Heights* standard, Plaintiffs must prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision" to show a violation of the Equal Protection Clause. 429 U.S. at 265-266. In 2020, the Ninth Circuit analyzed an almost identical claim as presented here and held that under the *Arlington Heights* standard, plaintiffs failed to present "even serious questions on the merits of their claim that the Secretaries' TPS terminations were

improperly influenced by the President's" alleged racial animus. *Ramos*, 975 F.3d at 897 (internal quotations omitted); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal*., 591 U.S. 1, 34-35 (2020) (rejecting a similar equal protection claim where plaintiffs did not show racial animus or disparate impact). Although the 2020 *Ramos* decision has since been vacated on other grounds, the analysis is instructive.

In *Ramos*, the Ninth Circuit held that the plaintiffs' equal protection claim failed "due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations—such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by" racial animus. *Ramos*, 975 F.3d at 897. The Ninth Circuit reasoned that while there was record evidence that the President "expressed racial animus against 'non-white, non-European immigrants'" and "the White House influenced the TPS termination decisions," there was "no evidence linking the President's animus to the TPS terminations." *Id*. Moreover, the panel explained, "[i]t is expected—perhaps even critical to the functioning of the government—for executive officials to conform their decisions to the administration's policies" and the "mere fact that the White House exerted pressure on the Secretaries' TPS decisions does not itself support the conclusion that the President's alleged racial animus was a motivating factor in the TPS decisions." *Id*. at 898.

Here, Plaintiffs raise similar arguments before this Court as those rejected in *Ramos*. Secretary Noem provided reasoned explanations for her decision to vacate the extensions of TPS for Venezuela and Haiti and terminate Venezuela's 2023 TPS Designation, and Plaintiffs have not demonstrated that she harbored racial animus in making the determinations at issue. Plaintiffs cite a multitude of exhibits, arguing that "the sheer volume of statements from both Defendant Trump and Defendant Noem that evince racial bias is overwhelming." PI Mot. 14. But Plaintiffs fail to

24

establish any direct link between the provided evidence and Secretary Noem's determinations. For example, much of the evidence provided focuses on President Trump's first administration and statements made during his two presidential campaigns.[22] *See, e.g.*, ECF No. 11-3 (article regarding immigration policy in 2017); ECF No. 11-5 (article discussing a 2023 interview on immigration); ECF Nos. 11-1, 11-2,11-3, 11-4, 11-6, 11-9, 11-15, 11-16 (interview transcripts and articles discussing President Trump's immigration policy generally during his presidential campaigns). Plaintiffs also cite social media posts by Secretary Noem about "[n]ations like Venezuela." ECF No. 11-10. But these posts were made nearly a year before the determinations were published and focus on the nations themselves, not the race of its people. *See also* ECF Nos. 11-11, 11-13 (social media posts from 2024). Furthermore, Plaintiffs references to "xenophobic comments" were taken out of context. PI Mot. 15. Statements made about terrorism or criminal activity in major cities are not, by themselves, enough to show racial animus. *See, e.g.*, ECF Nos. 11-23, 11-24 (referencing crime in New York City).

National origin is inherently part of TPS. The statements that Plaintiffs rely on to show racial animus were made long before the determinations at issue and taken out of context. Most importantly, none of the statements pertain to race; rather, they concern the country itself. *See Ramos*, 975 F.3d at 898 ("[W]e find it instructive that these statements occurred primarily in

---

[22] To the extent Plaintiffs argue that Secretary Noem's determinations are unconstitutional because the President's animus directly influenced her decisions, the Ninth Circuit previously rejected that theory. *Ramos*, 975 F.3d at 897 (plaintiffs failed to "provide any case where such a theory of liability has been extended to governmental decisions in the foreign policy and national security realm"). Plaintiffs' approach would invite judicial second-guessing of an agency official's actions based on mere allegations of discriminatory motive by a different government official who may have played some role in the decision-making process. *See Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982); *United States v. Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.").

contexts removed from and unrelated to TPS policy or decisions."). The Secretary's various statements reflect an emphasis on immigration policy that focuses on America's economic and security interests, not racial or ethnic animus. An immigration policy that seeks to further American strategic and foreign policy interests cannot be the basis of an equal protection claim and is in fact contemplated by the TPS statute. *See* 8 U.S.C. § 1254a(b)(1)(C).

Plaintiffs' conjecture that the "irregularities in the process for Venezuelan and Haitian TPS holders are strong indicators of bias" is equally unpersuasive and does not show racial animus. PI Mot. 16. Plaintiffs speculate that the speed of Secretary Noem's determinations are further evidence of her alleged improper discriminatory purpose. *Id*. The timing of Secretary Noem's Vacatur and Termination determinations, however, are not—without more—evidence of an "overarching goal [] motivated by racial animus." *Ramos*, 975 F.3d 899. Plaintiffs incorrectly posit that the Secretary must have acted with animus because she issued both Vacaturs and the Termination determinations within days of her confirmation. PI Mot.  16. The Secretary's efficiency is hardly a basis for invalidating her action. And while Plaintiffs argue that a vacatur of an extension has not previously occurred, they minimize the fact that former-Secretary Mayorkas reached the same conclusion that the TPS statute grants authority to revisit a prior administration's determination and reconsider it. *See supra* II.A. Thus, Secretary Noem's Vacaturs are not tainted by the procedural irregularity alleged by Plaintiffs and, under any review standard, Plaintiffs are unlikely to succeed on the merits of their equal protection claim.

### III.    Any Harm Plaintiffs May Suffer is Based on the Inherent Nature of the Statute

A key requirement for obtaining a preliminary injunction is demonstrating irreparable harm. *Winter*, 555 U.S. at 20. "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Plaintiffs

have failed to make the requisite showing here.

First, Plaintiffs contend that their allegations of APA and Fifth Amendment violations *per se* constitute irreparable harm. Pl. Mot. 18-20. However, the alleged harms only occur if it is determined that Defendants have violated Plaintiffs' constitutional or statutory rights. Plaintiffs have not established a likelihood of success on the merits of those claims. *See* § II. Second, Plaintiffs allege numerous injuries resulting from the Vacatur and Termination determinations that are inherent in the temporary nature of TPS. For example, Plaintiffs allege that if they lose their TPS, "individuals … would be forced to uproot their lives, creating widespread disruption across social and economic sectors," and the "economic damage from mass deportations would not only devastate individual families but also shutter businesses and disrupt entire communities that rely on these enterprises." Pl. Mot. 19. While Plaintiffs focus on the burden that TPS beneficiaries will face should the Vacaturs and Termination go into effect, the underlying cause of this harm flows from the statute ("temporary" protected status) itself. *See* 8 U.S.C. § 1254a(b)(1)(B)(i) ("substantial, but temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C) ("extraordinary and temporary"), (g) ("remain in the United States temporarily"). The alleged harms would exist with or without the Vacaturs or Termination at issue, as there is never a guarantee of indefinite TPS. *Id.* § 1254a(b)(2)(B).

Even where Plaintiffs' declarations have identified concrete harms, those harms will not be remedied by the requested injunction. The assurances that Plaintiffs seek can only be truly safeguarded through legislative action. Plaintiffs have failed to show a likelihood of irreparable harm that could be remedied by this Court, and their request for a preliminary injunction should be denied. *See S. Yuba River Citizens League*, 804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure that will provide no benefit . . . in the interim period.").

27

IV.    **The Balance of the Equities and Public Interest Weigh Against Preliminary Injunctive Relief**

Plaintiffs also fail to show that the remaining equitable factors tip the balance in their favor. As the Supreme Court has explained in the immigration context, the questions of harm to the defendant and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government and the public share an interest in ensuring that the process established by Congress—under which the Secretary of Homeland Security has unreviewable authority to weigh the statutory factors governing TPS designations—is followed as Congress intended. The government has an "obligation to prioritize the safety, security, and financial and economic well-being of Americans." *Protecting the American People Against Invasion*, Exec. Order No. 14159, § 1, 90 Fed. Reg. at 8443. In this vein, "[e]nforcing [the n]ation's immigration laws is critically important to the national security and public safety of the United States." Id. The vacaturs allowed the government to take necessary steps to "ensur[e] that designations of [TPS] are consistent with the provisions of […] 8 U.S.C. § 1254a[], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." Exec. Order No. 14159, § 16(b), 90 Fed. Reg. at 8,446.

Ultimately, the injunctive relief Plaintiffs seek would frustrate Secretary Noem's substantive judgment as to how to implement the TPS statute in line with the government's established interests. *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of Government"). Congress has given the Secretary, in consultation with the appropriate agencies, the broad and unique authority to assess conditions in foreign countries and reach determinations regarding TPS. Where the Secretary follows the statutory requirements, it is

in the public interest for the Court to deny the extraordinary remedy of preliminary injunctive relief and allow this matter to proceed along the ordinary course.

## V.    Plaintiffs' Requested Relief is Overbroad

Even if a preliminary injunction (or "stay" accomplishing the same effect) were warranted here, Plaintiffs have no basis to request universal relief benefitting non-parties. Under settled constitutional and equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996) ("[S]tanding is not dispensed in gross[.]"). A valid remedy "operate[s] with respect to specific parties," not with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021) (quotation marks omitted). In this case, where sensitive foreign policy decisions of the Executive Branch are implicated, an injunction should go no further than redressing any cognizable injuries to individual named plaintiffs. *See Arizona*, 567 U.S. at 409 (2012). Universal injunctive relief here circumvents the requirement to limit relief to the Parties. Plaintiffs have not filed a putative class action have made no effort to explain why they should be entitled to such sweeping relief. Granting universal relief in this situation further encourages forum shopping and effectively nullifies the decisions of other district or circuit courts nationwide. *See  DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring); *see also Ramos*, 975 F.3d. at 902–06 (Nelson, J., concurring); *Doe v. Trump*, 2025 WL 485070, at *15 (D. Mass. Feb. 13, 2025) ("injunctive relief should be tailored to the parties before it.").

## CONCLUSION

This Court lacks jurisdiction to review the determinations by Secretary Noem relating to the TPS of Venezuela and Haiti and to grant Plaintiffs' requested relief. Even if this Court were to find that neither of the two clear jurisdictional bars applies, Plaintiffs' claims fail on the merits and the remaining factors do not support issuance of equitable relief.

Dated: March 20, 2025                                Respectfully submitted,

                                                     YAAKOV M. ROTH
                                                     Acting Assistant Attorney General
                                                     Civil Division

                                                     SARAH L. VUONG
                                                     Assistant Director

                                                     WILLIAM H. WEILAND
                                                     Senior Litigation Counsel

                                                     ERIC SNYDERMAN
                                                     JEFFREY HARTMAN
                                                     LAUREN BRYANT
                                                     CATHERINE ROSS
                                                     LUZ MARIA RESTREPO
                                                     Trial Attorneys

                                                     /s/ *Anna L. Dichter*
                                                     ANNA L. DICHTER
                                                     Trial Attorney
                                                     U.S. Department of Justice, Civil Division
                                                     Office of Immigration Litigation
                                                     General Litigation and Appeals Section
                                                     P.O. Box 868, Ben Franklin Station
                                                     Washington, DC 20044
                                                     Tel: (202) 353-2405
                                                     Anna.l.dichter@usdoj.gov

                                                     *Attorneys for the Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

Dated: March 20, 2025

/s/ *Anna L. Dichter*
ANNA L. DICHTER
Trial Attorney