**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HAITIAN-AMERICANS UNITED INC.; VENEZUELAN ASSOCIATION OF MASSACHUSETTS; UNDOCUBLACK NETWORK, INC.; SYDNEY DOE; MARLENE DOE; GUSTAVO DOE; and NATALIA DOE, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, <br><br> Defendants. | Civil Action No. 25-cv-10498 |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION UNDER 5 U.S.C. § 705 TO POSTPONE THE EFFECTIVE DATE OF DHS' HAITI AND VENEZUELA TPS VACATURS AND 2025 VENEZUELA TERMINATION**

**Table of Contents**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 2

    I.    THIS COURT HAS JURISDICTION TO GRANT THE REQUESTED
        RELIEF. ........................................................................................................ 2

        A.  8 U.S.C. § 1252(f)(1) Does Not Preclude This Court From Granting
           The Requested Relief. .......................................................................... 2

        B.  8 U.S.C. § 1254a(b)(5)(A) Does Not Preclude This Court's Review.............. 8

    II.   PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON
        THE MERITS. ............................................................................................. 11

        A.  Secretary Noem Lacks Authority to "Vacate" A Prior TPS
           Designation. ....................................................................................... 11

        B.  Plaintiffs Are Likely To Succeed On Their Equal Protection Claim.............. 14

    III.  THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS'
        FAVOR AND THE PUBLIC INTEREST WOULD BE SERVED BY A
        STAY. ......................................................................................................... 18

    IV.  THE APPROPRIATE RELIEF IS A UNIVERSAL STAY UNDER 5
        U.S.C. § 705. ............................................................................................. 19

CONCLUSION ......................................................................................................... 20

## Table of Authorities

**CASES**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)......................................................... 6

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ........................................................................... 11

*Am. Trucking Ass'ns v. Frisco Transp. Co*., 358 U.S. 133 (1958)...................................... 13

*American Baptist Churches v Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991)................. 11

*American Meat Institute v. U.S. Dep't of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014)........... 5

*ANA Int'l, Inc. v. Way*, 393 F.3d 886 (9th Cir. 2004). ...................................................... 6, 7

*Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) .......................... 5

*Biden v. Texas*, 597 U.S. 785 (2022). .................................................................................. 5

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)....................................... 7

*Brito v. Barr*, 22 F.4th 240 (1st Cir. 2021) ......................................................................... 4

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604
(5th Cir. 2021)................................................................................................................... 8

*Casa de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018)....................... 9, 15

*Centro Presente v. United States Dep't of Homeland Sec*., 332 F. Supp. 3d 393 (D. Mass. 2018)
........................................................................................................... 9, 11, 15, 18

*Chehazeh v. Att'y Gen. of U.S.*, 666 F.3d 118 (3d Cir. 2012)........................................... 11

*Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880 (D.C. Cir. 2021)......... 7

*Coteau Props. Co. v. Dep't of Interior*, 53 F.3d 1466 (8th Cir. 1995)............................... 14

*Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022)........................ 8

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ............. 6, 15

*Dig. Realty Tr., Inc. v. Somers*, 583 U.S. 149 (2018) ....................................................... 10

*Espinoza v. Farah Manufacturing Co., Inc.*, 414 U.S. 86 (1973)..................................... 17

*FDA v. Brown & Williamson*, 529 U.S. 120 (2000) .......................................................... 13

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023) ................................... 5

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) .......................................................... 10

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ......................................................... 4

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)................................................................... 4

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ................................................. 21

*Immigrant Assistance Project of AFL CIO v. I.N.S.*, 306 F.3d 842 (9th Cir. 2002 ............... 9

*INS v. St. Cyr*, 533 U.S. 289 (2001) ............................................................................ 7

*Int'l Paper Co. v. FERC*, 737 F.2d 1159 (D.C. Cir. 1984) ........................................ 13

*Ivy Sports Medicine v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014).................................. 12

*Jennings v. Rodriguez,* 583 U.S. 281 (2018). ........................................................... 3, 4

*Johnson v. Robison*, 415 U.S. 361 (1974)................................................................... 7

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ................................................ 10

*Kidd v. Mayorkas*, 734 F. Supp. 3d 967 (C.D. Cal. 2024)......................................... 5

*Landon v. Plasencia*, 459 U.S. 21 (1982) ................................................................ 15

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................. 20

*Leiva–Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ................................................ 19

*Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986) .................................. 12

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................................ 11

*McAllister v. United States*, 3 Cl. Ct. 394 (1983) .................................................... 14

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) ............................... 9, 10, 11

*Monsanto Co. v. Geertson Seed Farms, Inc.*, 561 U.S. 139 (2010).......................... 4, 5

*Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99 (1st Cir. 2015)........................... 16

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2015) ..................... 18

*NAACP v. United States Dep't of Homeland Sec.*, 364 F. Supp. 3d 568 (D. Md. 2019)............. 15

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549 (N.D. Cal. 2020) ..... 20

*National TPS Alliance et al. v, Noem et al.*, 25-cv-01766 (N.D. Cal. 2025)........................... 8, 13

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 7

*NRDC v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126 (S.D.N.Y. 2019) ......................... 8

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)................................................... 6

*Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018) ................................... 11, 15

*Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023). ......................................................... 12

*Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) ....................................................... 12, 16

*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43 (1993) ................................................ 6, 9

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ........................... 6

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012) ........................... 5

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) .................................................. 4

*Sackett v. E.P.A.*, 566 U.S. 120 (2012) .................................................................... 10

*Saget v. Trump*, 375 F. Supp. 3d 290 (E.D.N.Y. 2019) ............................................... 9, 18

*Scripps Howard Radio v. FCC*, 316 U.S. 4 (1942) ......................................................... 5

*Solar v. Pension Benefit Guar. Corp.*, 504 F.Supp. 1116 (S.D.N.Y. 1981) ................... 14

*State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017) ................ 8

*Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) .................................................. 5

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) ..................................................... 5

*Trump v. Hawaii*, 585 U.S. 667 (2018), ................................................................. 15, 16

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ................................................. 16

*United States v. Texas,* 599 U.S. 670 (2023) ................................................................ 5

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) .......... 21

*Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)

..................................................................................................................... 15, 18

*Webster v. Doe*, 486 U.S. 592 (1988) ...................................................................... 7, 10

*Weinberger v. Salfi*, 422 U.S. 749 (1975) ..................................................................... 7

*West Virginia v. EPA*, 577 U.S. 1126 (2016) ................................................................ 8

## STATUTES

28 U.S.C. § 1342 .......................................................................................................... 6

28 U.S.C. §1341 ........................................................................................................... 6

5 U.S.C. § 559 .............................................................................................................. 6

5 U.S.C. § 705 ................................................................................................... 2, 8, 21

5 U.S.C. § 706 ...................................................................................................... 4, 20

8 U.S.C. § 1252(b)(9) ................................................................................................. 10

8 U.S.C. § 1252(e) ....................................................................................................... 6

8 U.S.C. § 1252(f)(1) ........................................................................................... passim

8 U.S.C. §1160(e)(1) .................................................................................................... 9

8 U.S.C. §1254a ................................................................................................... passim

## REGULATIONS

29 C.F.R. § 1606.1 ...................................................................................................... 17

88 Fed. Reg. 40282 ................................................................................................. 14

89 Fed. Reg. 54484 ................................................................................................... 1

90 Fed. Reg. 5961 ..................................................................................................... 1

90 Fed. Reg. 8805 ................................................................................................... 12

90 Fed. Reg. 9040 ................................................................................................... 12

90 Fed. Reg. 10511 ................................................................................................. 12

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. 1, § 8 ............................................................................................. 21

## INTRODUCTION

Defendants do not dispute the basic facts that give rise to this lawsuit: in 2024 and 2025, the U.S. Government extended Temporary Protected Status ("TPS") protections through October 2, 2026 to approximately 607,000 Venezuelans who had fled a country beset by violence and instability, and through February 3, 2026 to over 500,000 Haitians fleeing similar conditions in their home country. As required by the TPS statute, official notices of the extensions were published in the Federal Register, assuring beneficiaries that TPS protections "will remain in effect" until the published end dates, and that work authorization documents is automatically extended for that period. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 5961 (Jan. 17, 2025); *Extension and Redesignation of Haiti for Temporary Protected Status*, 89 Fed. Reg. 54484 (July 1, 2024). By law, TPS protections cannot be terminated before the expiration of these extensions. 8 U.S.C. §1254a(b)(3)(B).

Yet Defendants are now attempting to pull the rug out from under the highly vulnerable population of TPS holders and strip them of the lawful right to live and work in this country. Without any statutory authority—and indeed, directly contrary to the TPS statute—Defendants have simply said that the TPS extensions that the Government formally granted and published in the Federal Register have been "vacated." Never before has the Government revoked an already-granted TPS protection—and for good reason. Such action is completely contrary to both the plain language of the TPS statute and its underlying purpose. *See infra* at pp.12-14.

To avoid facing the merits—and the manifest harm that springs from their unlawful about-face—Defendants assert a variety of unavailing arguments. They start with claims that this Court cannot review their conduct. But the jurisdiction-stripping statutes they rely on are inapplicable here, where Plaintiffs are seeking not to enjoin the lawful operation of the TPS statute, but rather to challenge agency action outside its bounds. And the remedies that Plaintiffs seek under the

1

Administrative Procedure Act ("APA")—to preliminarily stay and to "set aside" the unlawful agency conduct—are not injunctions covered by the jurisdiction-stripping statutes. *See infra* at pp. 2-12.

Plaintiffs have also demonstrated a likelihood of success on the merits—not only on their claim that Defendants are acting outside the bounds of the TPS statute, but that their conduct is impermissibly tainted by racial animus. Though Defendants' try to minimize their racially charged rhetoric targeting Black and Latino immigrants by calling it "remote" and "out of context," in fact it is both longstanding and direct, making clear that Defendants' actions are driven at least in part by discriminatory intent rather than legitimate policy considerations. *See infra* at pp. 16-19.

The balance of harms could not tip more sharply in Plaintiffs' favor. The ability to live and work lawfully in the United States is a critically important right, and Defendants' attempts to prematurely strip that right from Plaintiffs and thousands like them would cause grievous harm to individuals, families, and communities across the country. Accordingly, Plaintiffs respectfully request that this Court exercise its authority under 5 U.S.C. §705 to stay the effective date of the TPS Vacaturs and the Venezuela Termination, pending conclusion of this review proceeding.

**ARGUMENT**

**I.    THIS COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF.**

> **A. 8 U.S.C. §1252(f)(1) Does Not Preclude This Court From Granting The Requested Relief.**

Contrary to Defendants' assertions, 8 U.S.C. §1252(f)(1) does not bar this Court from granting Plaintiffs the relief they seek. That provision states that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter" except in individual removal hearings. *Id.* Defendants contend that this statute bars certain relief requested by Plaintiffs: namely, that the Court set aside the Vacaturs and

2

Venezuela Termination and that the Court preliminarily stay those actions pending final determination.  Defendants are wrong for several reasons.

First, Plaintiffs are not seeking to "enjoin or restrain the operations" of the TPS statute— but rather to have the Government *follow* the provisions of the law.  The TPS statute sets forth an orderly process for initiating, extending, and terminating a TPS designation. *See* Plaintiffs' Opening Brief ("Pls. Br."), ECF No. 10, at 3-4.  There is no statutory process for vacating a decision that has already been made—in the TPS statute or anywhere else. Therefore, what Plaintiffs challenge is agency action outside the bounds of the law.

In considering the jurisdictional statute that Defendants now cite, the Supreme Court has specifically noted this distinction between enjoining the operation of a law and challenging agency action that operates *outside* the law.  In *Jennings v. Rodriguez*, the Court reviewed a Ninth Circuit decision concerning the availability of periodic bond hearings for immigrants in detention. 583 U.S. 281, 313 (2018). While reversing on statutory interpretation grounds and remanding for consideration of constitutional claims, the Court cited approvingly to the Ninth Circuit's holding that Section 1252(f)(1) does not apply where a plaintiff challenges conduct as unauthorized by statute:

> The Court of Appeals held that [8 U.S.C. 1252(f)(1)] did not affect its jurisdiction over respondents' statutory claims because those claims did not "seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct ... not authorized by the statutes."… This reasoning does not seem to apply to an order granting relief on constitutional grounds, and therefore the Court of Appeals should consider on remand whether it may issue classwide injunctive relief based on respondents' constitutional claims.

*Id.* (emphasis omitted);[1] *see also Brito v. Barr*, 22 F.4th 240, 249 (1st Cir. 2021) (noting that the Supreme Court "seemed to accept this distinction" between enjoining operation of a statute and

---

[1] The Ninth Circuit put it this way in the ruling under review: "[Section] 1252(f)(1) limits the district court's authority to enjoin the INS from carrying out legitimate removal orders. Where, however, a

challenging *ultra vires* agency action); *Grace v. Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020) (holding that §1252(f)(1) "refers only to 'the operation of the provisions'—*i.e.*, the statutory provisions themselves, and thus places no restriction on the district court's authority to enjoin *agency action* found to be unlawful."). Indeed, if Section 1252(f)(1) reached as far as Defendants now contend— to claims that an agency has acted outside its delegated powers—the Supreme Court in *Jennings* would have disposed of the Ninth Circuit's ruling on those grounds, rather than reaching the merits. *See also Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (Section 1252(f)(1) prohibits injunctions ordering federal officials to take or refrain from action to carry out "specified statutory provisions.").

Second, even if Section 1252(f)(1) reached challenges to *ultra vires* action—which it does not—it still would not limit the power of this Court to "hold unlawful and set aside agency action" under the APA. 5 U.S.C. §706(2). Contrary to Defendants' arguments, the Supreme Court has specifically distinguished vacating agency action from an injunction, describing vacatur as a "less drastic remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Among other differences, the Court has noted that an injunction operates as a direct command to an agency official to act or refrain from acting. *See*, *e.g.*, *Aleman Gonzales*, 596 U.S. at 550 ("§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions.…"). By contrast, "setting aside" agency action under the APA simply removes an agency's authority to act but is not a direct order that runs against agency officials. *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1222 (D.C. Cir. 2012), *overruled on other*

---

petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of part IV of subchapter II, and § 1252(f)(1) therefore is not implicated." *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010) ) (quoting *Ali v. Ashcroft*, 346 F.3d 873, 886 (9th Cir. 2003).

*grounds by American Meat Institute v. U.S. Dep't of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014).[2] Indeed, because the two remedies are distinct, courts have noted that an injunction is often "anomalous" when a court sets aside agency action under the APA. *R.J. Reynolds*, 696 F.3d at 1222; *see also Monsanto*, 561 U.S. at 165-66 (upholding vacatur of agency rule, but reversing grants of injunctive relief). While the Supreme Court has never ruled on this issue in the context of Section 1252(f)(1), its precedents draw a clear distinction between injunctions and the "less drastic remedy" of setting aside agency action.[3] And every court to consider the issue has rejected the argument Defendants raise here. *See Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (holding Section 1252(f)(1) does not apply to vacatur); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (same); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D. Fla. 2023) (same); *Texas v. Biden*, 646 F. Supp. 3d 753, 768-69 (N.D. Tex. 2022) (same).[4]

There are numerous other indicators that an order setting aside illegal agency action under the APA is not limited by Section 1252(f)(1). Where Congress desires to strip jurisdiction more broadly, it uses broader language. *See*, *e.g.*, 8 U.S.C. § 1252(e) (barring not just "enjoining or restrain[ing]" as in §1252(f)(1), but "declaratory, injunctive, or other equitable relief," as well as class certification); 28 U.S.C. §§ 1341, 1342 (in Tax Injunction and Johnson Acts, providing that

---

[2] *Cf. Armstrong v. Exec. Office of the President, Office of Admin.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (an order that declares that agency action violates the APA is not punishable by contempt because it is not an injunction directed at any federal official).

[3] In a recent case, the Court requested briefing from the parties on whether Section 1252(f)(1) extends to relief under Section 706 of the APA, but ultimately "express[ed] no views" on the question. *Biden v. Texas*, 597 U.S. 785, 801 n.4 (2022).

[4] Defendants lean heavily on *Scripps Howard Radio v. FCC*, 316 U.S. 4 (1942) and claim it supports their view that vacating agency action is the same as an injunction. *See* Defendants' Opposition Brief (Defs. Br.), ECF No. 28, at 11. But *Scripps Howard* pre-dates the APA case, and Defendants do not explain why they believe it to be relevant here. Similarly, Justice Gorsuch's concurrence in *United States v. Texas*, also cited by Defendants, is inapt—not only because it is not a controlling opinion, but also because of the very different factual context, where vacatur of agency action would not have redressed the plaintiffs' grievances in any event. *See* 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring).

districts courts may not "enjoin, suspend, or restrain" the assessment or collection of state taxes or rate-making orders). By contrast, as the Supreme Court has held, "[b]y its plain terms, and even by its title, [§ 1252(f)] is nothing more or less than a limit on injunctive relief." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 481 (1999).[5]

This inquiry as to the scope of Section 1252(f) also operates against the backdrop of the longstanding presumption in favor of APA review. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 63–64 (1993) ("[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence.") (citations omitted); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).[6] The APA is designed to reach broadly, and explicitly states that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly." 5 U.S.C. § 559; *see also Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880, 889 (D.C. Cir. 2021) ("[Federal Election Campaign Act] cannot alter the APA's limitation on judicial review unless it does so expressly.").

Interpreting Section 1252(f)(1) to preclude judicial review of Plaintiffs' *constitutional* claims would be particularly problematic, since that "would, of course, raise serious questions

---

[5] Section 1252(f)'s title is "Limit on injunctive relief," in contrast, *e.g.*, to the broader title of Section 1252(e)(1): "Limitations on relief."

[6] "Even where the ultimate result [of a statute] is to limit judicial review, ... as a matter of the interpretive enterprise itself, the narrower construction of a jurisdiction-stripping provision is favored over the broader one." *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004).

concerning the constitutionality" of the statute. *Johnson v. Robison*, 415 U.S. 361, 366 (1974). Thus, the Supreme Court instructs courts "to avoid [that] 'serious constitutional question'" by accepting any fairly possible construction that permits review. *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)); *see also Weinberger v. Salfi*, 422 U.S. 749, 762 (1975); *INS v. St. Cyr*, 533 U.S. 289, 314 (2001).

Third, a stay pending ultimate decision, which is what Plaintiffs request in this Motion, is even further removed from an injunction against a governmental official to stop the operation of provisions of the TPS statute. The Supreme Court has made clear that the two remedies—a stay and an injunction—are distinct and "have typically been understood to serve different purposes." *Nken v. Holder*, 556 U.S. 418, 428-29 (2009). Whereas an injunction "is a means by which a court tells someone what to do or not to do," a stay simply suspends on a temporary basis the source of authority to act.[7]

Finally, Defendants argue that no relief is possible because the challenged vacaturs "have already taken effect." Defs. Br. at 12. As a practical matter, that is incorrect—the facts on the ground will not change until April 2nd (for Venezuela) and August 3rd (for Haiti), which are the end dates for the last uncontested extensions and when work authorizations will end if relief is not granted. Regardless, the only cases that Defendants cite for their proposition that an already effective action cannot be stayed concern *agencies* attempting to postpone their own regulations under 5 U.S.C. §705 (allowing an agency to "postpone the effective date of action taken by it").[8]

---

[7] *Id.* at 430 ("Whether such a stay might technically be called an injunction is beside the point: that is not the label by which it is generally known. The sun may be a star, but 'starry sky' does not refer to a bright summer day.").

[8] *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (analyzing agency authority to stay rule); *NRDC v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) (same); *State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017) (same).

But the APA's provision for judicial review is phrased much more expansively—and disjunctively—reflecting the fundamentally different role of courts, which have Article III power to preserve the *status quo*.[9]  And in fact the Supreme Court and lower courts have often stayed agency action past its effective date.  *See, e.g., West Virginia v. EPA*, 577 U.S. 1126 (2016) ; *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604, 609 (5th Cir. 2021).

### B.  8 U.S.C. § 1254a(b)(5)(A) Does Not Preclude This Court's Review.

Defendants next turn to the jurisdictional provisions of the TPS statute itself: 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of any determination of the [Secretary] with respect to designation, or termination or extension of a designation, of a foreign state under this subsection.").  But nothing in that provision can credibly be read to bar judicial review of Plaintiffs' claims either.[10]

Examining the words of the statute, it bars challenges to a "determination"—*i.e.*, a TPS designation, extension, or termination. But the Vacaturs are none of these things: they are unauthorized under the statute and do not fall into any of these categories. Moreover, even if the Vacaturs could be considered "determinations"—which they cannot—the Supreme Court has held that Section 1254a(b)(5)(A) does not preclude judicial review of agency action that is collateral to

---

[9] 5 U.S.C. §705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve the status or rights pending conclusion of the review proceedings.") (emphasis added).

[10] In related proceedings in the Northern District of California, Defendants conceded that Section 1254a(b)(5)(A) does not bar judicial review of the threshold question of whether the TPS statute authorizes vacatur.  *See* Supplemental Declaration of Mirian Albert ("2nd Albert Dec."), Ex. A (*National TPS Alliance et al. v, Noem et al*., 25-cv-01766 (N.D. Cal. 2025), Transcript of Proceedings) at 50:4-51:10.  Defendants' claim is apparently only that—if the Court finds the Secretary is authorized to vacate extensions—the jurisdiction-stripping provision bars judicial review of the reasons given for the Vacaturs.  As explained below, even as to that limited question Defendants are incorrect.

determinations themselves.  In *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491 (1991),

the Court upheld a class action challenge to the manner in which a special agricultural worker

amnesty program was being implemented, in the face of a jurisdiction-stripping provision that

barred actions seeking "judicial review of a determination respecting an application for adjustment

of status…."  *Id*. at 491 (citing 8 U.S.C. §1160(e)(1)). The Court held that this language does not

reach "general collateral challenges to unconstitutional practices and policies used by the agency

in processing applications." *Id*.; *see also Cath. Soc. Servs., Inc*., 509 U.S. at  63–64 (district court

may  properly  exercise  jurisdiction  over  challenge  to  regulations  concerning  legalization  of

undocumented  immigrants,  despite  jurisdiction-stripping  statute  that  precludes  review  of

"determination[s] respecting an application for adjustment of status"); *Immigrant Assistance

Project of AFL CIO v. I.N.S*., 306 F.3d 842, 862–63 (9th Cir. 2002).  Numerous courts have reached

this same conclusion in TPS challenges specifically.[11]

     As these cases make clear, plaintiffs do not challenge a "determination" where the relief

they seek does not impinge on the substantive outcome of the ultimate agency decision.  Here,

Plaintiffs do not dispute that DHS Secretaries may terminate TPS protections, but they must follow

the statutory process for doing so. As with Defendant's other jurisdiction-stripping argument, *see

supra*, the contrast to other jurisdiction-stripping laws is instructive.  Where Congress has intended

to  preclude  review  of  all  claims,  it  has  done  so  explicitly.  *See, e.g*.,  8  U.S.C.  §  1252(b)(9)

---

[11] *See*, *e.g*., *Saget v. Trump*, 375 F. Supp. 3d 290, 330-333 (E.D.N.Y. 2019) ("The construction of the
TPS statute does not evince an intent to bar all judicial review"); *Centro Presente v. United States
Dep't of Homeland Sec*., 332 F. Supp. 3d 393, 405–09 (D. Mass. 2018) (no jurisdiction-stripping
where plaintiffs bring "challenges to Defendants' process of adjudication rather than the content of
any particular adjudication" and "there would be no meaningful opportunity for review of Plaintiffs'
constitutional and statutory claims in removal proceedings"); *Casa de Maryland, Inc. v. Trump*, 355
F. Supp. 3d 307, 317-20 (D. Md. 2018) (finding jurisdiction where "the text does not use the
unambiguous and comprehensive language used in statutes courts have interpreted as broadly
precluding judicial review" and "the alternative methods of review of Plaintiffs' claims offered by the
Department do not constitute meaningful review.").

(precluding "[j]udicial review of all questions of law and fact, *including interpretation and application of constitutional and statutory provisions . . .*") (emphasis added).  "Where Congress includes particular language in one section of a statute but omits it in another," courts presume the omission is intentional.  *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (internal quotations omitted); *accord Dig. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161-62 (2018).[12]

Moreover, in these circumstances, there is no meaningful alternative avenue for review, further undercutting Defendants' arguments.  *See McNary*, 498 U.S. at 496-97.  To raise the claims that Plaintiffs raise here in the removal context, individual TPS holders would have to remain in this country (in violation of the law) and either be arrested and placed in removal proceedings, or turn themselves in to the Government and request removal proceedings.  The law does not require plaintiffs to undertake such burdens to enforce the law and to "bet the farm . . . by taking the violative action" before bringing a legal challenge."  *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490-91 (2010) (explaining that there was no "meaningful avenue of relief" if plaintiff were required to incur a sanction in order to test a law's validity) (internal citation omitted).  Indeed, in *McNary*, the Supreme Court allowed undocumented immigrants to raise a due-process challenge to immigration proceedings in district court, rather than pursue eventual review in a court of appeals after removal, in part because most of the immigrants could "ensure themselves review in courts of appeals only if they voluntarily surrender[ed] themselves for deportation," a "price . . . tantamount to a complete denial of judicial review for most undocumented aliens."  498 U.S. at 496-97; *see also Mathews v. Eldridge*, 424 U.S. 319, 331 (1976) (declining to require actual denial of benefits to bring due process challenge in part because recipient "raised at least a colorable

---

[12] *See also Sackett v. E.P.A.*, 566 U.S. 120, 128 (2012) ("[t]he APA ... creates a presumption favoring judicial review of administrative action"); *Webster*, 486 U.S. at 603 ("where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.").

claim" that full post-deprivation relief could not be obtained); *American Baptist Churches v Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (certifying class action brought by Salvadorans and Guatemalans challenging the federal government's discriminatory adjudication of asylum claims). Where, as here, "'by reason of the nature of the right asserted, [it] cannot be raised efficaciously within the administrative proceedings delineated by the INA,'" those proceedings are not a meaningful forum to bring that claim. *Chehazeh v. Att'y Gen. of U.S.*, 666 F.3d 118, 133 n.19 (3d Cir. 2012) (quoting *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007)); *Centro Presente,* 332 F. Supp. 3d at 406. Defendants' attempt to avoid judicial review is, therefore, unavailing.

## II.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.  <u>Secretary Noem Lacks Authority to "Vacate" A Prior TPS Designation.</u>

Plaintiffs are likely to succeed on their claim that the Vacaturs are not authorized by law. In their Opposition, Defendants do not attempt to argue that there is any explicit authorization for a vacatur in the TPS statute, nor do they disagree that, as head of an administrative agency, the Secretary cannot act unless statutorily authorized to do so. Instead, they argue that the authority for vacatur is "implicit" in the statute.

But this argument ignores the very purpose of the TPS statute—which was deliberately enacted to replace the *ad hoc* Extended Voluntary Departure (EVD) process. *See* Pls. Br. at 3; *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872, 879 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).[13]  Accepting Defendants' argument—that TPS status can always be reconsidered and revoked—would completely undermine the statute, allow terminations at any

---

[13] This starkly contrasts with the national-interest waiver in *Poursina v. United States Citizenship & Immigr. Servs.*, which Defendants cite, as that waiver is explicitly defined by statute as "entirely discretionary." 936 F.3d 868, 872 (9th Cir. 2019); Defs. Br. at 18.

time, and return to the days of *ad hoc* decision-making that Congress specifically sought to move away from in enacting the TPS statute. Where the statutory scheme's purpose and design is fundamentally incompatible with an agency's attempt to invoke "implicit" authority to act, courts have not hesitated to rule such action illegal. *See Ivy Sports Medicine v. Burwell*, 767 F.3d 81, 86-87 (D.C. Cir. 2014) ("inherent reconsideration authority does not apply in cases where Congress has spoken"); *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do.").

Defendants hinge their argument on the provision that the Secretary must "determine whether the conditions for … designation under this subsection continue to be met." *See* Defs. Br. at 17 (citing 8 U.S.C. §1254a(b)(3)(A)). But this is not a free-floating license to make the determination at any time; to the contrary, it is a part of the provision for "Periodic review," in which Congress specified exactly when such determinations must be made. *Id*. Defendants attempt to avoid this conclusion by cloaking themselves in "national security" and "foreign policy" interests, but this is unavailing for numerous reasons. First, it is a *post hoc* rationalization that is nowhere to be found in the Vacaturs themselves, which focus instead on bureaucratic "confusion" purportedly caused by overlapping designations.[14] Moreover, this argument overlooks that the TPS statute specifically allows consideration of the national interest—but that it is to be analyzed at the

---

[14] *See* 90 Fed. Reg. 8805 (Feb. 3, 2025); 90 Fed. Reg. 10511 (Feb. 24, 2025). Notably, Defendants do not claim that the supposedly confusing overlapping designations are legally improper—indeed they are commonplace. *See* Supplemental Albert Decl., Ex. A (Transcript of Proceedings, *National TPS Alliance v. Noem*) at 69:24-70:2 ("Plaintiffs are correct that these overlapping registrations can take place, but that's within the discretion of the Secretary on how that registration should take place."). Indeed, the TPS statute explicitly grants the Secretary broad discretion over the registration process. *See* 8 U.S.C. § 1254a(c)(1)(A)(iv) (TPS registration is "to the extent and in a manner which the [Secretary] establishes").

regular and defined intervals set forth by law.[15]  And even if the asserted basis for the Vacaturs was more than supposed bureaucratic confusion, "[r]egardless of how serious the problem an administrative agency seeks to address, … it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tabacco Corp.*, 529 U.S. 120, 125 (2000).

Simply asserting that the Secretary has inherent authority to correct errors—such as the supposed need to clear up "confusion" about overlapping designations—is insufficient. Courts routinely reject such unsubstantiated claims when they are pretext for otherwise unlawful agency action. *See, e.g., Int'l Paper Co. v. FERC*, 737 F.2d 1159, 1164-66 (D.C. Cir. 1984) (rejecting a claim by the Federal Energy Regulatory Commission ("FERC") of alleged error on the grounds that the agency did not fully explain how the error occurred, and because the parties had little knowledge that a mistake had been made); *Am. Trucking Ass'ns v. Frisco Transp. Co*., 358 U.S. 133, 146 (1958) ("Of course, the power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies."); *Coteau Props. Co. v. Dep't of Interior*, 53 F.3d 1466, 1469-70 (8th Cir. 1995) (disallowing reconsideration made soon after a change in presidential administration); *Solar v. Pension Benefit Guar. Corp*., 504 F.Supp. 1116, 1123 (S.D.N.Y. 1981) (disallowing reconsideration made soon after a change in agency personnel); *McAllister v. United States*, 3 Cl. Ct. 394, 402 (1983) (rejecting reconsideration where "the sole basis for the reversal of the [initial] determination... was that the agency decided to change its official mind").

---

[15] Defendants frequently stray from the actual language used by Congress ("national interest"), variously re-phrasing it as "national security" or "foreign policy" interest and citing cases in those contexts instead. *See* Defs. Br. at 18-19.  They also overlook provisions of the TPS statute that allow DHS to deny or revoke status at any time from any *individuals* found not to meet TPS eligibility standards such as through criminal activity, *see* 8 U.S.C. § 1254a(c)(2).

Defendants also do not dispute the longstanding agency practice of following the defined timelines set forth in the TPS statute. They acknowledge that this is the first time in the 35-year history of the TPS statute—out of hundreds of designations and extensions—that a formal extension of protected status has ever been summarily taken away from beneficiaries, as Defendants are attempting to do here. In response to this unbroken chain of agency practice, Defendants point only to former Secretary Mayorkas' revocation of a *termination* decision.[16] But this does not help Defendants, for numerous reasons. First, no one ever challenged Secretary Mayorkas' action, so no court ever ruled on it. Second, it did not practically change the status of TPS beneficiaries because various injunctions had already preserved the *status quo* for years until Secretary Mayorkas issued new TPS designations.[17] And finally, it was taken to resolve a legal morass: designations that were terminated in 2018, enjoined by a district court in California, overturned by the Ninth Circuit in 2020, but then essentially held in limbo for three years after the case went *en banc*, thus vacating the panel opinion. By contrast, Defendants' Vacaturs and subsequent Termination will have unprecedented consequences, stripping TPS protections from over 900,000 Venezuelan and Haitian holders whose status was lawfully extended by Secretary Mayorkas.

**B.    Plaintiffs Are Likely To Succeed On Their Equal Protection Claim.**

a.    *Arlington Heights* is the Controlling Standard of Review.

Contrary to Defendants' argument, courts have repeatedly addressed the appropriate standard for evaluating Equal Protection claims alleging racial discrimination in TPS cases and

---

[16] Defs. Br. at 19-20 (citing Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador, 88 Fed. Reg. 40282 (June 21, 2023).

[17] *See Ramos*, 336 F. Supp. 3d at 1082 (maintaining status quo after the first Trump Administration attempted to end TPS protections for several countries, including Haiti); *Saget v. Trump*, 375 F. Supp. 3d 280, 298-300 (E.D.N.Y. 2019) (same).

have consistently applied the heightened standard set forth in *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  *See e.g.*, *Centro Presente*, 332 F. Supp. 3d at 409–13; *CASA de Maryland., Inc. v. Trump*, 355 F. Supp. 3d 307, 322-23 (D. Md. 2018); *NAACP v. United States Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 576 (D. Md. 2019).[18] Defendants' argument that the Court should apply the rational basis standard under *Trump v. Hawaii*, 585 U.S. 667 (2018), is contrary to the weight of authority and should be rejected. *See* Defs. Br. at 21-22.

As the many other courts that have considered this issue have recognized, *Hawaii* concerned a very different factual context: regulation of foreign nationals seeking to enter the country in the face of national security concerns. By contrast, TPS beneficiaries have long-established ties to the United States and are entitled to a "higher level of due process than foreign nationals seeking admission to the country." *Centro Presente*, 332 F. Supp. 3d at 411 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982))*; see also DHS v. Regents*, 591 U.S. at 34 (plurality) (applying *Arlington Heights* standard to case challenging recission of Deferred Action for Childhood Arrivals (DACA)); Fleurissaint Dec. ¶¶ 9, 12 (HAU members who have been in the United States for over 10 years); Lawrence Dec. ¶13. Moreover, the Executive Order in *Hawaii* was issued pursuant to a statute that "exudes deference to the President in every clause," *Hawaii*, 585 U.S. at 684, whereas the TPS statute sets forth a clear process and criteria to be followed. Therefore, the *Arlington Heights* standard applies.[19]

---

[18] *See also Ramos,* 336 F. Supp. 3d 1082 (N.D. Cal. 2018).  The district court's ruling in *Ramos* was reversed by the Ninth Circuit, but the case was subsequently taken *en banc*, which vacated the panel opinion. While *en banc* proceedings were pending, the case was mooted out. For this reason, neither the district court ruling nor the Ninth Circuit opinion are precedent.  Notably, however, both the district court and the Ninth Circuit panel agreed that the *Arlington Heights* standard applied.

[19] Plaintiffs would prevail even under rational basis review because the challenged conduct is "not rationally related to a legitimate government purpose." *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107 (1st Cir. 2015). The Court may consider extrinsic evidence in this assessment. *See Hawaii*,

b.  Racial Animus Was A Motivating Factor In The Challenged Actions.

The evidence that discriminatory animus was a motivating factor behind the challenged actions here is abundant.  Defendants appear to concede that the President has "expressed racial animus against 'nonwhite, non-European immigrants'" but claim this is unproblematic from an Equal Protection perspective because there is an insufficient link to the TPS decisions. Defs. Br. at 24 (citing *Ramos*, 975 F.3d at 897).

But statements laced with racial stereotypes by both Defendant Trump and Defendant Noem have not been isolated or incidental—they were made for months leading up to Defendant Noem's decision to vacate TPS for Venezuela. *See* Exhibit B to 2nd Albert Dec. (Demonstrative Timeline).  As catalogued in Plaintiffs' opening brief, Defendants Trump and Noem have promoted racist tropes, such as the false claim that Haitians eat pets, Ex. 16 of Albert Dec., ECF No. 11-16; equated Black and Latino immigrants with criminals, including labeling Venezuelans as "gangs," "thugs," and "criminals," Pls. Br.at 14-16; and invoked xenophobic and eugenicist rhetoric, such as warning that immigrants are "poisoning the blood of our country." *Id.* Moreover, in contrast to the out-of-circuit and vacated *Ramos* decision on which Defendants rely heavily, in this case there is no need to make any speculative leaps about whether this longstanding animus infected Defendant Noem's decision-making.  In the days immediately following her vacatur of the Venezuela extension, she went on "Fox and Friends" to once again fuel racial stereotypes

---

585 U.S. at 705. Even in this deferential context, the Constitution forbids policies motivated by "a bare [] desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973). That is precisely the case here, as Defendants lack a "facially legitimate and bona fide" reason for their actions independent of unconstitutional motives. *Hawaii*, 585 U.S. at 704. For example, the Venezuela Termination asserts "notable" improvements in Venezuela without citing any, contradicting the Department of State's own reports. *See* ECF No. 1-4 ("Venezuela Termination"). Similarly, the Haiti Vacatur references "significant development" in Haiti, yet provides no supporting sources. *See* ECF No. 1-3 ("Venezuela Vacatur") at 5; Lawrence Dec. ¶ 13; *Brief for Commonwealth of Mass. et al. as Amicus Curiae*, ECF No. 33 ("States Amicus Brief") at 8 & 9, *HAU et al., v. Trump et al.*, No. 25-cv-10498 (D. Mass. 2025).

equating Latino immigrants with criminals and linking those sentiments directly to the TPS

Vacatur: "They were going to extend this protection to people that are in temporary protected

status, which meant they were going to be able to stay here and violate our laws another 18 months

and we stopped that…. The people of this country want these dirtbags out." Albert Dec., Ex. 23,

ECF No. 11-23. Defendants' attempt to dismiss these statements as remote, "taken out of context,"

or unrelated to TPS determinations is therefore baseless. *See* Defs. Br. at 25.[20] Moreover, neither

Defendant has disavowed or distanced themselves from these racist remarks. *See Saget*, 375 F.

Supp. 3d at 368 (quoting *New York v. United States Dep't of Com.*, 351 F. Supp. 3d 502, 668

(S.D.N.Y. 2019) (the court may look beyond the administrative record as the intentional

discrimination inquiry "contemplates a wide-ranging and penetrating inquiry capable of

uncovering hidden forms of discrimination").[21]

"The specific sequence of events leading up [to] the challenged decision" and "[d]epartures

from the normal procedural sequence" *Arlington Heights*, 429 U.S. at 266–68 (citations and

internal quotation marks omitted) are equally problematic for Defendants. Defendants do not

---

[20] Defendants' assertion that the statements concern nationality, not race, *see* Defs. Br. at 25, is disingenuous at best given the overlap between discrimination based on alienage, national origin, and race. *See* e.g., *Espinoza v. Farah Manufacturing Co., Inc.*, 414 U.S. 86, 92 n.5, 95 (1973) (refusing to hire people of "Spanish-speaking background," or insisting on an "Anglo Saxon background" as a condition of employment constitutes discrimination based on a protected class); 29 C.F.R. § 1606.1 ("EEOC's guidelines on discrimination define "discrimination based on national origin" broadly, to include acts of discrimination undertaken "because an individual has the physical (such as race), cultural or linguistic characteristics of a national origin group."); *see also* Fleurissaint Dec. ¶16; Velasquez Dec. ¶ 16 ("in light of the President's inflammatory remarks referring to Venezuelans as "criminals" and "animals"… the Venezuelan community feel[s] stigmatized, excluded, and alienated in the country they now call home").

[21] Defendant Noem echoed these racist sentiments by citing Defendant Trump's first-day Executive Orders as justification for the 2025 Venezuela Vacatur, which falsely asserts that "[m]illions of illegal aliens" have been allowed to settle in the United States "in violation of longstanding Federal laws." Venezuela Termination at 5. *See also Saget*, 375 F. Supp. 3d at 359-60 (echoing the influence of the "America First" political agenda, which courts previously cited when enjoining TPS terminations under the first Trump administration).

dispute the highly irregular nature of their actions: that in the more than three decades of TPS' existence, DHS has never before vacated a TPS designation. The extreme speed at which the unprecedented reversals occurred—even though the TPS statute requires meaningful engagement with other government agencies in the decision-making process and typically takes months— provides further evidence that the stated reasons for the action are pretextual. Far from showing "[t]he Secretary's efficiency," Defs. Br. at 26, they evince a result that was pre-ordained and not based on reasoned decision-making. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 227 (4th Cir. 2015) (procedural irregularities, including rushed decision making, truncated debate, and timing of enactment are evidence of discriminatory intent); *Centro Presente*, 332 F. Supp. 3d at 415 (same). Taken together, these factors confirm that Defendants' actions were, at least in part, driven by discriminatory intent based on race or national origin.

## III.   THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS' FAVOR AND THE PUBLIC INTEREST WOULD BE SERVED BY A STAY.

Without a stay, Plaintiffs and other TPS holders across the country will become immediately subject to forcible removal as soon as next week. *See* Pls. Br. at 1.  Thousands of parents like Marlene Doe will be forced to make the unbearable choice between returning their citizen-children to the life-threatening conditions of their countries of origin or leaving them behind in the United States, possibly never to see them again. No parent should ever be subjected to such a cruel and impossible decision. *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (identifying "separated families" as an irreparable harm); States Amicus Brief at 7 ("approximately 141,000 U.S. citizen children and 196,000 U.S. citizen adults lived with a Haitian or Venezuelan TPS holder" all of whom would be at risk of family separation).  Homes, jobs, and livelihoods will be lost. *See* States Amicus Brief at 12-15.

18

Defendants dismiss this harm by highlighting the "temporary nature" of TPS, arguing that "there is never a guarantee of indefinite TPS." Defs. Opp. at 27.  But this is wrong on several grounds.  First, it ignores the value of time: that every day of TPS protection means safety from life-threatening conditions in violent and unstable home countries, and the ability to live and work in the United States.  The U.S. Government formally told Venezuelan TPS beneficiaries that they were protected until October 2, 2026, and told Haitian beneficiaries they were protected until February 3, 2026; now shortening that time by up to 18 months constitutes a significant harm.  Moreover, many TPS holders are seeking to adjust their immigration status, such as through asylum proceedings.  Cutting short their TPS protection will cut many of those avenues off.

The devastation caused by the mass deportations of TPS holders would not only disrupt families but also cripple businesses and communities that depend on TPS holders as employees and business owners. *See* Sydney Dec. ¶¶ 10-11; Marlene Dec. ¶ 12; *see also Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 571 (N.D. Cal. 2020) (enjoining restrictions on certain nonimmigrant work visas, recognizing the substantial harm to "hundreds of thousands of American businesses across various industries and economic sectors"); States Amicus Brief at 13 ("TPS eligible Venezuelans and Haitians contribute $15.9 billion annually to the U.S. economy"). As 19 States recognized in their *amicus* brief: "Far from being a burden … Haitian and Venezuelan TPS holders are a resounding benefit. They are valued employees and residents of the Amici States …Stripping these individuals of legal status would harm our residents, our economies, and our public health and safety." States Amicus Brief at 2, 12-19.

On the other side of the balance, Defendants present no evidence.  They rely only on the argument that Defendant Noem suffers harm if a policy decision she has made cannot proceed. Defs. Br. at 28.  But "[t]here is generally no public interest in the perpetuation of unlawful agency

action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

## IV.  THE APPROPRIATE RELIEF IS A UNIVERSAL STAY UNDER 5 U.S.C. § 705.

Finally, Defendants' arguments against a universal stay ignore both the language of the APA and decades of precedent interpreting the law.  The APA specifically provides that a reviewing court "shall…hold unlawful and set aside agency action" that it finds to be not in accordance with the law. 5 U.S.C. §706(1); (2).  When those conditions are met, "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (when agency action is found unlawful, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Such a result is not only consistent with longstanding APA practice but is of particular importance in immigration matters, where nationwide consistency is of paramount importance.[22]

### CONCLUSION

For all of these reasons, the Court should exercise its authority under 5 U.S.C. § 705 to stay the effective date of the TPS Vacaturs and Venezuela Termination pending conclusion of this review proceeding.


Dated:  March 27, 2025                    Respectfully submitted,

                                          */s/ Oren Sellstrom*
                                          Oren Sellstrom (BBO #569045)
                                          Mirian Albert (BBO #710093)

---

[22] *See* U.S. Const., art. 1, § 8, Clause 4 (granting Congress power "[t]o establish an uniform Rule of Naturalization"); *see also* Lawrence Dec. ¶ 2 (noting geographic dispersion of members throughout the country).

Victoria Miranda (BBO #695913)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
malbert@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
vmiranda@lawyersforcivilrights.org

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2025, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

 /s/*Mirian Albert*
Mirian Albert (BBO #710093)