YAAKOV M. ROTH
Acting Assistant Attorney General
SARAH L. VUONG
Assistant Director
WILLIAM H. WEILAND
Senior Litigation Counsel
ANNA L. DICHTER
LAUREN BRYANT
JEFFREY HARTMAN
CATHERINE ROSS
AMANDA SAYLOR
ERIC SNYDERMAN
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-1263
Facsimile: (202) 305-7000
E-mail: sarah.l.vuong@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HAITIAN-AMERICANS UNITED, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.,*<br><br>Defendants. | Case No. 1:25-cv-10498 |

## DEFENDANTS'MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION…...................................................................................................1

STATEMENT OF FACTS …....................................................................................2

    I. Statutory Background…….................................................................................3

    II. Factual Background…….................................................................................4

        A. Venezuela…...........................................................................................4

        B. Haiti...........................................................................................................6

STANDARD OF REVIEW........................................................................................7

ARGUMENT…..........................................................................................................7

    I. THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' ENTIRE ACTION ….7

        A. The TPS Statute Bars Plaintiffs' Claims…...........................................7

        B. The APA Precludes Review of the Venezuela Determinations ..........................9

        C. Plaintiffs' Haiti Claims Are Not Justiciable......................................................10

        D. Section 1252(f)(1) Precludes Plaintiffs' Requested Relief................................11

    II. THE SECRETARY'S DETERMINATIONS DID NOT VIOLATE THE APA..............13

        A. The Secretary's Vacaturs Were Not Contrary to Law.........................................13

        B. The Venezuela Vacatur and Termination and the Haiti Partial Vacatur Were Not Arbitrary and Capricious..................................................................................16

            1. Venezuela Vacatur....................................................................................16

            2. Venezuela Termination..............................................................................17

            3. Haiti Partial Vacatur..................................................................................19

        C. Plaintiffs' Constitutional Claims Fail as a Matter of Law..................................21

        D. The Declaratory Judgment Act is Not a Basis For A Claim................................27

CONCLUSION……...................................................................................…………...28

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*,

422 U.S. 289 (1975)..................................................................................................12

*Albertson v. FCC*,

182 F.2d 397 (D.C. Cir. 1950).................................................................................14

*Ali v. Fed. Bureau of Prisons*,

552 U.S. 214 (2008)....................................................................................................8

*American Bioscience, Inc. v. Thompson*,

269 F.3d 1077 (D.C. Cir. 2001)................................................................................7

*Arizona v. United States*,

567 U.S. 387 (2012)..................................................................................................21

*Bell Atl. Corp. v. Twombly*,

550 U.S. 544 (2007)....................................................................................................7

*Biden v. Texas*,

597 U.S. 785 (2022)..................................................................................................12

*Boateng v. InterAmerican Univ.*,

210 F.3d 56 (1st Cir. 2000)........................................................................................7

*Brito v. Garland*,

22 F.4th 240 (1st Cir. 2021)....................................................................................13

*Cal. Tow Truck Ass'n v. City & County of San Francisco*,

807 F.3d 1008 (9th Cir. 2015)...................................................................................8

*California v. Grace Brethren Church*,

457 U.S. 393 (1982)..................................................................................................13

*Chao v. Russell P. Le Frois Builder, Inc.*,

291 F.3d 219 (2d Cir. 2002).....................................................................................14

*China Unicom (Ams.) Ops. Ltd. v. FCC*,

124 F.4th 1128 (9th Cir. 2024)................................................................................13

*Colonial Penn Grp., Inc. v. Colonial Deposit Co.*,

834 F.2d 229 (1st Cir. 1987)....................................................................................27

*Dan's City Used Cars, Inc. v. Pelkey*,
  569 U.S. 251 (2013)......................................................................................8

*Daylily Farms, Inc. v. Chao*,
  357 F. Supp. 2d 356 (D. Mass. 2005)......................................................27

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)..............................................................................18, 19

*Direct Mktg. Ass'n v. Borhl*,
  575 U.S. 1 (2015).................................................................................12, 20

*FDA v. Wages and White Lion Invs.*,
  145 S. Ct. 898 (2025)..................................................................................21

*Fiallo v. Bell*,
  430 U.S. 787 (1977)....................................................................................23

*Galvez v. Jaddou*,
  52 F.4th 821 (9th Cir. 2022)......................................................................11

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022)...............................................................................12, 13

*Gulluni v. Levy*,
  85 F.4th 76 (1st Cir. 2023).........................................................................16

*Gun South, Inc. v. Brady*,
  877 F.2d 858 (11th Cir. 1989)...................................................................14

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952)...............................................................................15, 22

*Huffington v. T.C. Group, LLC*,
  637 F.3d 18 (1st Cir. 2011)….....................................................................8

*In re Colonial Mortgage Bankers Corp.*,
  324 F.3d 12 (1st Cir. 2003).........................................................................4

*Ivy Sports Medicine, LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014)....................................................................14

*Jafarzadeh v. Duke*,
  270 F. Supp. 3d 296 (D.D.C. 2017)..........................................................16

*Johansen v. United States,*
  506 F.3d 65 (1st Cir. 2007)................................................................................7

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972)..........................................................................................22

*Lamar, Archer & Cofrin, LLP v. Appling,*
  584 U.S. 709 (2018)............................................................................................8

*Last Best Beef, LLC v. Dudas,*
  506 F.3d 333 (4th Cir. 2007)...........................................................................14

*Lincoln v. Vigil,*
  508 U.S. 182 (1993)..........................................................................................10

*Macktal v. Chao,*
  286 F.3d 822 (5th Cir. 2002)...........................................................................14

*Marsh v. Oregon Natural Res. Council,*
  490 U.S. 360 (1989)..........................................................................................16

*Mathews v. Diaz,*
  426 U.S. 67 (1976)............................................................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)............................................................................................21

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010).......................................................................13

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982)..........................................................................................26

*Patel v. Garland,*
  596 U.S. 328 (2022).........................................................................................8, 9

*Poursina v. USCIS,*
  936 F.3d 868 (9th Cir. 2019)......................................................................15, 18

*Ramos v. Nielsen,*
  975 F.3d 872 (9th Cir. 2020)..................................................................8, 14, 26

*Ramos v. Wolf,*
  59 F.4th 1010 (9th Cir. 2023)............................................................................8

*Reddy v. Foster,*
 845 F.3d 493 (1st Cir. 2017)...................................................................10

*Regents of Univ. of Cal.,*
 591 U.S. 1 (2020)................................................................. 23, 24, 26

*Sanchez v. Mayorkas,*
 593 U.S. 409 (2021)...............................................................................3

*Staub v. Proctor Hospital,*
 562 U.S. 411 (2011)..............................................................................26

*Texas v. United States,*
 523 U.S. 296 (1998)........................................................................10, 11

*Trump v. Hawaii,*
 585 U.S. 667 (2018)...................................................................... *passim*

*Trump v. New York,*
 592 U.S. 125 (2020)..............................................................................11

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,*
 508 U.S. 439 (1993)..............................................................................11

*United States v. Carroll,*
 105 F.3d 740 (1st Cir. 1997)..................................................................11

*United States v. Nixon,*
 418 U.S. 683 (1974)............................................................................. 26

*United States v. Texas,*
 599 U.S. 670 (2023)..............................................................................12

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
 429 U.S. 252 (1977)...................................................................2, 23, 26

*Webster v. Doe,*
 486 U.S. 592 (1988)..............................................................................10

*Youngstown Sheet and Tube Co. v. Sawyer,*
 343 U.S. 579 (1952) .............................................................................15

*Zhu v. Gonzales,*
 411 F.3d 292 (D.C. Cir. 2005)...............................................................10

**STATUTES**

**Immigration and Nationality Act of 1952:**

1 U.S.C. § 204(a)................................................................................................11

5 U.S.C. § 553......................................................................................................21

5 U.S.C. § 701(a)(1)...............................................................................................1

5 U.S.C. § 701(a)(2).........................................................................................2, 10

5 U.S.C. § 706(2)................................................................................................11

6 U.S.C. § 202(1)-(5)............................................................................................15

6 U.S.C. §§ 552(d)..................................................................................................3

8 U.S.C. § 1103(a)(1)...........................................................................................15

8 U.S.C. § 1252(a)(5)..............................................................................................9

8 U.S.C. § 1252(f)(1)....................................................................................2, 11, 13

8 U.S.C. § 1254a.....................................................................................12, 13, 20

8 U.S.C. § 1254a(a)..............................................................................................3, 4

8 U.S.C. § 1254a(b)(1)(C).............................................................................*passim*

8 U.S.C. § 1254a(b)(3)...............................................................................5, 7, 8, 17

8 U.S.C. § 1254a(b)(5)(A)...............................................................................1, 7, 9

8 U.S.C. § 1254a(c)(2)(A).....................................................................................17

8 U.S.C. §§ 1103(a)..............................................................................................13

28 U.S.C. § 2201...................................................................................................27

**The Immigration Act of 1990:**

Pub. L. No. 101-649, 104 Stat. 4978............................................................... 3

**Illegal Immigration Reform and Immigration Responsibility Act of 1996:**

Pub. L. No. 104-208, 110 Stat. 3009-546.........................................................................11

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(1).....................................................................................2, 27

Fed. R. Civ. P. 12(b)(6).....................................................................................2, 27

Fed. R. Evid. 201(b).............................................................................................4

## FEDERAL REGISTER

75 Fed. Reg. 3,746 (Jan. 21, 2010)...........................................................................6

76 Fed. Reg. 29,000 (May 19, 2011)..........................................................................6

77 Fed. Reg. 59,943 (Oct. 1, 2012)............................................................................6

79 Fed. Reg. 11,808 (Mar. 3, 2014)...........................................................................6

80 Fed. Reg. 51,582 (Aug. 25, 2015)..........................................................................6

82 Fed. Reg. 23,830 (May 24, 2017)..........................................................................6

83 Fed. Reg. 2, 648 (Jan. 18, 2018)...........................................................................6

86 Fed. Reg. 13, 574 (Mar. 9, 2021)..........................................................................4

86 Fed. Reg. 41, 863 (Aug. 3, 2021)..........................................................................6

87 Fed. Reg. 55,024 (Sept. 8, 2022)...........................................................................4

88 Fed. Reg. 5,022 (Jan. 26, 2023)............................................................................6

88 Fed. Reg. 40,282 (June 21, 2023).....................................................................14, 16

88 Fed. Reg. 68, 130 (Oct. 3, 2023)...........................................................................4

89 Fed. Reg. 54484 (Jul. 1, 2024).........................................................................19, 20

90 Fed. Reg. 5,961 (Jan. 17, 2025)............................................................................4

90 Fed. Reg. 9,040 (Feb. 5, 2025).........................................................................5

90 Fed. Reg. 8,805 (Feb. 3, 2025).........................................................................4

90 Fed. Reg. 10, 511 (Feb. 24, 2025)...............................................................*passim*

90 Fed. Reg. 19,217 (May 6, 2025)........................................................................26

## MISCELLANEOUS

H.R. Rep. N. 101-245 (1989)...............................................................................7

Exec. Order No. 14157...........................................................................................25

Exec. Order No. 14159...........................................................................................21

**INTRODUCTION**

Secretary of Homeland Security Kristi Noem vacated her predecessor's extension of Venezuela's Temporary Protected Status ("TPS") designation and, thereafter, terminated the designation. She later partially vacated Haiti's TPS designation, shortening the existing extension from 18 months to 12 months. TPS is a humanitarian program that affords temporary relief from removal to certain aliens who are in the United States when their country of nationality experiences armed conflict, a natural disaster, or other extraordinary and temporary conditions and who are thus temporarily unable to return home safely. The TPS statute vests the Secretary with broad discretion over TPS designations. In Secretary Noem's assessment, her predecessor failed to evaluate the key statutory question: whether permitting Venezuelan and Haitian nationals to remain temporarily in the United States is "contrary to the national interest." 8 U.S.C. § 1254a(b)(1)(C).

Plaintiffs are three national nonprofit organizations—Haitian Americans United, Inc. (HAU), Venezuela Association of Massachusetts (VAM), UndocuBlack Network Inc. (UBN)— and four individual TPS beneficiaries. Plaintiffs bring claims under the Administrative Procedure Act (APA), alleging that Secretary Noem's determinations were an arbitrary and capricious action in excess of her statutory authority under 8 U.S.C. § 1254a(b)(3)(A)-(B). Plaintiffs also claim that the Secretary's determinations were motivated by discriminatory animus toward Venezuelans and Haitians in violation of the Equal Protection component of the Fifth Amendment Due Process Clause. Secretary Noem and the Department of Homeland Security ("DHS") (collectively, "Defendants") respectfully move to dismiss Plaintiffs' Complaint in its entirety. *See* ECF No. 1 ("Compl.").

As a threshold matter, this Court lacks jurisdiction over all of Plaintiffs' claims, for four independent reasons. *First*, Congress has explicitly barred judicial review of TPS determinations. *See* 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state [for TPS].""); 5 U.S.C. § 701(a)(1) (precluding review under the APA "to the extent" that other "statutes preclude judicial review"). The Secretary's vacatur and termination and partial vacatur—like the

1

previous Secretary's extension of TPS for Venezuela—are not subject to judicial review. *Second*, the APA precludes judicial review where, as here, agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). *Third*, because Haiti remains designated for TPS, and the Secretary has not yet decided whether to terminate that designation at the end of the current extension, Plaintiffs' claims regarding Haiti are not ripe and Plaintiffs lack standing to bring them. *Fourth*, another provision bars any court other than the Supreme Court from granting Plaintiffs the relief they seek—any order that "enjoin[s] or restrain[s]" the Secretary from exercising her authority under the TPS statute and enforcing immigration law how she deems appropriate. 8 U.S.C. § 1252(f)(1). Thus, the Court should dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

Even if the Court had jurisdiction, Plaintiffs fail to state a claim on the merits. The Secretary's actions were not contrary to law, because she has inherent authority to reconsider and correct past actions. Nor were Secretary Noem's determinations arbitrary and capricious. They were based on the determination that her predecessor's extensions contained flaws warranting reconsideration. Plaintiffs' equal protection claim is equally unavailing because they fail to plausibly allege that the Secretary was motivated by discriminatory animus. Secretary Noem's determinations are facially legitimate and not motivated by racially discriminatory intent. That is true under the correct standard—the deferential review applicable to such claims in the immigration context, *see Trump v. Hawaii*, 585 U.S. 667 (2018)—and, in the alternative, under the standard sometimes applied in other contexts, *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). The Court should dismiss this action with prejudice, under Federal Rule 12(b)(1) or 12(b)(6).

## STATEMENT OF FACTS

### I.    Statutory Background

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that

temporarily prevent the aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to handle adequately the return of its nationals. Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the Secretary of Homeland Security,[1] "after consultation with appropriate agencies of the Government," to designate countries for "Temporary [P]rotected [S]tatus," if she finds:

> (C)  … there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1)(C).

When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be removed from the United States and are authorized to work for the duration of the country's TPS designation, so long as they remain in valid temporary protected status. 8 U.S.C. § 1254a(a), (c); *see Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations and extensions of TPS designations may not exceed eighteen months, but the Secretary has discretion over how long a designation or extension lasts.  *Id*. § 1254a(b)(2), (3)(C). The Secretary must consult with appropriate agencies and review each designation before it ends to determine whether the conditions for the country's designation continue to be met.  *Id.* § 1254a(b)(3)(A).  If the Secretary finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal Register of the determination and the basis for the termination.  *Id.* § 1254a(b)(3)(B). If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)."  *Id.* § 1254a(b)(3)(C).

---

[1] Although the statute continues to refer to the Attorney General, the TPS authority now lies with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002.  *See* 6 U.S.C. §§ 552(d), 557 (providing that statutory references to the Attorney General in the INA generally are deemed to refer to the Secretary or DHS).

Finally, the statute makes the Secretary's TPS determinations unreviewable. "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).

## II.    Factual Background

### A.    Venezuela

On March 9, 2021, former Secretary of Homeland Security Alejandro Mayorkas designated Venezuela for TPS based on extraordinary and temporary conditions that prevented nationals of Venezuela from safely returning (the 2021 Venezuela Designation).[2,3] The former Secretary extended Venezuela's TPS designation twice.[4] On October 3, 2023, in addition to extending the 2021 Designation through September 2025, the former Secretary redesignated Venezuela for TPS, effective from October 3, 2023, through April 2, 2025 (the 2023 Venezuela Designation).[5] This notice provided procedures for initial applicants registering for TPS under the 2023 Designation, and it also allowed Venezuelan nationals who had previously registered for TPS under the 2021 Designation to re-register for TPS and apply to renew their employment authorization documentation with U.S. Citizenship and Immigration Services (USCIS). *Id.* On January 10, 2025, former Secretary Mayorkas issued a notice extending the 2023 Designation for 18 months, allowing a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through October 2, 2026 (the

---

[2] Pursuant to Fed. R. Evid. 201(b), the Court should take judicial notice of the Federal Register Notices cited throughout the brief. *See In re Colonial Mortgage Bankers Corp.,* 324 F.3d 12, 20 (1st Cir. 2003) (holding that "a court may take judicial notice of matters of public record").

[3] *See Designation of Venezuela for [TPS] and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed. Reg. 13574 (Mar. 9, 2021).

[4] *See Extension of the Designation of Venez. for [TPS]*, 87 Fed. Reg. 55,024 (Sept. 8, 2022); *see also Extension and Redesignation of Venez. For [TPS]*, 88 Fed. Reg. 68,130 (Oct. 3, 2023).

[5] *2023 Venez. Designation*, 88 Fed. Reg. 68,130.

2025 Venezuela Extension).[6]

On January 28, 2025, Secretary Noem vacated the 2025 Extension and restored the status quo that preceded that decision (the 2025 Venezuela Vacatur).[7] She explained that the 2025 Extension "did not acknowledge the novelty of its approach" or "explain how it is consistent with the TPS statute." *Id*. at 8,807; *see* 8 U.S.C. § 1254a(b)(3). The Secretary determined that the "lack of clarity" warranted a vacatur to "untangle the confusion and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *Id*.

After reviewing the Venezuelan country conditions and consulting with the appropriate U.S. Government agencies, on February 1, 2025, Secretary Noem determined that Venezuela no longer continued to meet the conditions for the 2023 Designation and that it was "contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States."[8] Accordingly, Secretary Noem terminated the 2023 Designation, effective April 7, 2025 (the 2025 Venezuela Termination). *Id*. In making this determination, the Secretary highlighted the "notable improvements in several areas, such as the economy, public health, and crime," that allow for Venezuelan nationals to be "safely returned to their home country." *Id*. at 9042. The Secretary determined, however, that even assuming extraordinary and temporary conditions remained, the Secretary explained that that the termination of the 2023 Designation is necessary because it is contrary to the national interest to permit the Venezuelan nationals to remain temporarily in the United States. *Id*. The national interest is "an expansive standard that may encompass an array of broad considerations" which "calls upon the Secretary's expertise and discretionary judgment." *Id*. Secretary Noem explained that the significant population of TPS holders has resulted in "associated difficulties in local communities where local resources have been inadequate to meet the demands cause by increased numbers," and further underscored that, across the United States,

---

[6] *Extension of the 2023 Designation of Venez. for [TPS]*, 90 Fed. Reg. 5,961 (Jan. 17, 2025).

[7] *See Vacatur of 2025 [TPS] Decision for Venezuela*, 90 Fed. Reg. at 8,805 (Feb. 3, 2025).

[8] *See Termination of the October 3, 2023 Designation of Venezuela for [TPS]*, 90 Fed. Reg. 9,040 (Feb. 5, 2025).

"city shelters, police stations and aid services are at maximum capacity." *Id.* In considering the national interest, she found that this population includes members of Tren de Aragua (TdA), a transnational criminal organization recently determined to "pos[e] threats to the United States." *Id.* at 9,042-43. Secretary Noem also observed that "U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration." *Id.* at 9,043. "[C]ontinuing to permit Venezuelans nationals to remain temporarily in the United States" was one such policy. *Id.*

**B.    Haiti**

On January 21, 2010, former Secretary Janet Napolitano designated Haiti for TPS for a period of 18 months due to the "conditions in Haiti following the [7.0 magnitude] earthquake" that struck Haiti in January 2010.[9] Various Secretaries extended and redesignated TPS for Haiti through 2018.[10] On January 18, 2018, then-Acting Secretary Elaine Duke terminated the designation, finding that "the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met."[11] On August 3, 2021, former Secretary Alejandro Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions.[12] Thereafter, he extended the TPS designation and redesignated Haiti for TPS for 18 months, ending on August 3, 2024. On July 1, 2024, former Secretary Mayorkas again extended the Haiti

---

[9] *Designation of Haiti for [TPS]*, 75 Fed. Reg. 3,476, 3,477 (Jan. 21, 2010).

[10] *Extension and Redesignation of Haiti for [TPS]*,76 Fed. Reg. 29,000 (May 19, 2011); *Extension of the Designation of Haiti for [TPS]*, 77 Fed. Reg. 59,943 (Oct. 1, 2012); *Extension of the Designation of Haiti for [TPS]*, 79 Fed. Reg. 11,808 (Mar. 3, 2014); *Extension of the Designation of Haiti for [TPS]*, 80 Fed. Reg. 51,582 (Aug. 25, 2015); *Extension of the Designation of Haiti for [TPS]*, 82 Fed. Reg. 23,830 (May 24, 2017).

[11] *Termination of Designation of Haiti for [TPS]*, 83 Fed. Reg. 2,648 (Jan. 18, 2018).

[12] *Designation of Haiti for [TPS]*, 86 Fed. Reg. 41,863 (Aug. 3, 2021).

designation and redesignated Haiti for TPS for 18 months, ending on February 3, 2026 (the 2024 Haiti Extension).[13]

On February 24, 2025, Secretary Noem partially vacated the 2024 Haiti Extension (the 2025 Haiti Partial Vacatur).[14] In so doing, the Secretary shortened the existing designation period from 18 months to 12 months. In rolling back the 18-month extension, Secretary Noem explained that the extension "failed to evaluate" whether permitting Haitian nationals to remain temporarily is "contrary to the national interest of the United States." *See id.* at 10,511-12; 8 U.S.C. § 1254a(b)(1)(C). Secretary Noem also noted that "there is no discussion in the [2024 Haiti Extension] of why the 18-month period was selected in lieu of a 6 or 12 month period." *Id.* at 10,513. She further relied on indications from the Department of State and DHS of "significant developments" that "might result in improvement in conditions," including U.N. involvement to "support the Haitian National Police in capacity building, combatting gang violence and provid[ing] security for critical infrastructure." *Id.* at 10,513-14. The Secretary considered the putative reliance interests of those impacted by the 2025 Haiti Partial Vacatur but found that they were outweighed by the overriding interests and concerns articulated in the notice. *Id.*

### STANDARDS OF REVIEW

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) must be granted if the complaint fails to allege facts sufficient to establish subject matter jurisdiction. *See Johansen v. United States,* 506 F.3d 65, 68 (1st Cir. 2007).

A court should dismiss for failure to state a claim under Rule 12(b)(6) when a complaint fails to plead enough facts to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). When considering a motion made pursuant to Rule 12(b)(6), "a court may look beyond the complaint to matters of public record without having to convert the motion to one for summary judgment." *Boateng v. InterAmerican Univ.*, 210 F.3d

---

[13] *Extension & Redesignation of Haiti for [TPS]*, 88 Fed. Reg. 5,022 (Jan. 26, 2023).

[14] *See Partial Vacatur of 2024 [TPS] Decision for Haiti*, 90 Fed. Reg. 10,511 (Feb. 24, 2025).

56, 60 (1st Cir. 2000). When a district court reviews agency action under the APA, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotations omitted). Accordingly, the case on review is a question of law and the Court's review is limited as to whether the agency acted in an arbitrary and capricious manner. *Id.*

## ARGUMENT

**I.    This Court Lacks Jurisdiction over Plaintiffs' Entire Action**

### A.  The TPS Statute Bars Plaintiffs' Claims

The TPS statute provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS relief. 8 U.S.C. § 1254a(b)(5)(A). This provision bars all of Plaintiffs' claims in this Court, whether statutory or constitutional, each of which challenges Secretary Noem's vacatur and termination. *Id.*; *see also* H.R. Rep. No. 101-245, at 14 (1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review."). The statute's broad terms confirm its broad sweep. The word "any" carries an expansive meaning. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("of whatever kind"). And the phrase "with respect to" similarly "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018); s*ee also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (the similar phrase "related to" means "having a connection with or reference to . . . whether directly or indirectly"); *Cal. Tow Truck Ass'n v. City & County of San Francisco,* 807 F.3d 1008, 1021 (9th Cir. 2015) ("with respect to" "is generally understood to be synonymous with the phrase 'relating to'" or "'related to'"); *Huffington v. T.C. Group, LLC*, 637 F.3d 18, 22 (1st Cir. 2011) (same); *Webster's New Collegiate Dictionary* 1004 (9th ed. 1990) (defining "respect" as "a relation to or concern with something usually specified"). Indeed, the Supreme Court held that materially similar jurisdiction stripping language in the INA precludes a whole category of judicial review. *Patel v. Garland*, 596 U.S. 328, 337-40 (2022) (statute barring

review of "any judgment regarding the granting of relief" covers "any authoritative decision" on the matter).

Section 1254a plainly precludes judicial review of the Secretary's 2025 Venezuela Termination because it is a "determination with respect to the termination" of the 2023 TPS designations for Venezuela. *See* 2025 *Venezuela Termination*, 90 Fed. Reg. 9,040. A decision to terminate a TPS designation is at the core of the jurisdictional statute's broad sweep. Because the Secretary's determination to terminate the 2023 Venezuela Designation was clearly a determination "with respect to" the TPS extension or termination, this Court lacks jurisdiction to review it. *See Ramos*, 975 F.3d 872, 889 (9th Cir. 2020) (this bar "preclude[s] direct review of the Secretary's country-specific TPS determinations"), *vacated*, 59 F.4th 1010, 1011 (9th Cir. 2023).

The Secretary's 2025 Venezuela Vacatur and 2025 Haiti Partial Vacatur likewise fall within § 1254a(b)(5)(A)'s bar. A determination to fully or partially vacate an extension of a designation is again undoubtedly a determination "with respect to" the "extension of a designation." 8 U.S.C. § 1254a(b)(5)(A); *see Merriam-Webster's Dictionary* (2025), Determination ("the act of deciding definitely and firmly"); *The American Heritage Dictionary* (2022), Determination ("The act of making or arriving at a decision[;] The decision reached[;] The settling of a question by an authoritative decision or pronouncement"); *Black's Law Dictionary* 450 (defining determination as "[t]o settle or decide by choice of alternatives or possibilities"); *Webster's New Collegiate Dictionary* 346 ("the act of deciding definitively and firmly"); *Webster's Encyclopedic Unabridged Dictionary* 393 ("the act of coming to a decision or of fixing or settling a purpose"). Those determinations are therefore not subject to any judicial review—full stop. *See Patel*, 596 U.S. at 338 (acknowledging importance of broadening terms "any" and "regarding" in similar jurisdiction-stripping provision).

The application of § 1254a(b)(5)(A)'s bar on judicial review is not complicated. Plaintiffs challenge the Secretary's 2025 Venezuela Termination and Vacatur and 2025 Haiti Partial Vacatur determinations. But each was a determination with respect to "termination or extension of a [TPS]

designation." 8 U.S.C. § 1254a(b)(5)(A). This Court thus lacks jurisdiction to review them, and this case should end now.

Plaintiffs may seek to circumvent this jurisdictional bar by arguing that their challenge is merely a collateral challenge to the Secretary's processes or legal authority, but that argument fails. The bar on judicial review of "any determination" "with respect to" a TPS designation, extension, or termination covers any sort of challenge to those decisions. 8 U.S.C. § 1254a(b)(5)(A); *see Patel*, 596 U.S. at 338-39 (similar jurisdictional bar did not "restrict itself to certain kinds of decisions," but instead covered both subsidiary determinations and the ultimate, "last-in-time judgment" on the matter); 8 U.S.C. § 1252(a)(5) (defining "judicial review" for INA purposes broadly).

Accordingly, judicial review is foreclosed by § 1254a(b)(5)(A) and this Court should dismiss this case for lack of jurisdiction.

**B. The APA Precludes Review of the Venezuela Determinations**

The APA also precludes review where the agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). While "rare," this section of the APA is used "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). A determination as to what constitutes the national interest is one of these rare circumstances. *See Hawaii*, 585 U.S. at 684-86 (explaining that where the President has statutory discretion to determine if an alien's entry "would be detrimental to the interests of the United States," federal courts should not inquire "into the persuasiveness of the President's justifications"). The determination of "national interest" is one that calls upon the Secretary's "expertise and judgment" and is not a manageable legal standard. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *see also Webster v. Doe*, 486 U.S. 592, 600 (1988). Because there is no manageable standard by which this Court can judge the Secretary's finding that permitting TPS holders from Venezuela is contrary to the national interest, this Court lacks jurisdiction to review any determination based upon that finding. *See 2025 Venezuela Vacatur*; *2025 Venezuela Termination*.

### C. Plaintiffs' Haiti Claims Are Not Justiciable.

Independently, the claims related to the Haiti Partial Vacatur are not ripe for review, and no plaintiff has standing to challenge the Haiti Partial Vacatur. To invoke federal court jurisdiction, the case must be "ripe"—not dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Here, the plaintiffs pressing Haiti-related claims are HAU and UBN (alleging associational standing on behalf of its Haitian members) and two individual Haitian plaintiffs. Neither organization or the individual Haitian plaintiffs has a ripe claim, or standing, with respect to their Haiti claims.

Haiti TPS holders have not suffered an injury in fact from the 2025 Haiti Partial Vacatur. That decision does not deprive them of any rights or change their present status. Haiti TPS holders will lose TPS only if Secretary Noem decides to terminate Haiti's TPS designation, in a separate, future decision. Plaintiffs accordingly lack standing to challenge the 2025 Haiti Partial Vacatur.

Nor, of course, can Plaintiffs challenge a hypothetical future decision terminating Haiti's TPS designation. An allegation that the "decision was preordained," Compl. ¶ 115, is not enough. *See Texas v. United States*, 523 U.S. at 300; *Trump v. New York*, 592 U.S. 125, 131 (2020) ("Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time") (quotations omitted). Any challenge to a future termination of Haiti's TPS designation must challenge that termination—but no termination has occurred at present.

### D. Section 1252(f)(1) Precludes Plaintiffs' Requested Relief

By seeking to have the Secretary's determinations "be immediately enjoined and set aside" under 5 U.S.C. § 706(2), Compl. ¶¶ 9, Plaintiffs also seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) bars district courts and courts of appeals from entering an order that "enjoin[s] or restrain[s]" the operation of the statutory provisions § 1252(f)(1) covers. Section 1254a is one of those covered provisions. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), div. C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-

11

546. Although Section 1254a appears in Part V of the U.S. Code, the U.S. Code is inconsistent with the INA, wherein the TPS provisions in Section 244 appear in Chapter 4. *Id*. When there is a conflict, the INA prevails. *See Galvez v. Jaddou*, 52 F.4th 821, 830-31 (9th Cir. 2022); *see also U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("Though the United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112...."); *United States v. Carroll*, 105 F.3d 740, 744 (1st Cir. 1997) ("Conflicts between the text of a statute as it appears in the Statutes at Large, on one hand, and in usually reliable but unofficial sources such as the United States Code Annotated, on the other hand, are rare, but … the rendition of the law contained in the Statutes at Large controls."). INA § 244 lies within chapter 4 of title II of the INA, as amended, so it is one of the statutes to which § 1252(f)(1) applies.

Regardless of how Plaintiffs frame the relief sought, an order that would have the effect of enjoining or restraining DHS's implementation of the TPS provisions in § 1254a, is jurisdictionally barred under § 1252(f)(1). *See Biden v. Texas*, 597 U.S. 785, 797 (2022) (§ 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions.") (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)) (emphasis added); *see* Black's Law Dictionary (12th ed. 2024) (An injunction is "[a] court order commanding or preventing an action"). To "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Aleman Gonzalez*, 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). An order setting aside the Secretary's vacatur and termination decisions would be an order "restraining" federal officials. *Id*. at 550.

It does not matter for purposes of Section 1252(f)(1) whether Plaintiffs request an order setting aside the Secretary's determinations or an injunction, or both. *See* Compl., Prayer for Relief (B). Like an injunction, an order to "set aside" the vacatur and termination determinations "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Borhl*, 575 U.S. 1, 13 (2015), by

prohibiting officials from relying on the agency's determinations—the practical equivalent of an injunction compelling Defendants to stop enforcing the termination and vacatur decisions, determinations pursuant to 8 U.S.C. § 1254a. *See United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring) (questioning the validity of the district court's finding that § 1252(f)(1) does not bar vacatur orders and that § 706(2) authorizes courts to issue them). The Supreme Court has repeatedly given a broad interpretation to terms such as "injunction" in other statutes. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s] in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 307 (1975). The Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id.* at 308 n.11 (quotation omitted). Here, too, setting aside the Secretary's determinations qualifies as an injunction barred by § 1252(f)(1) because it would coerce and restrain the agency's operation of covered statutes.  Thus, to the extent Plaintiffs continue to ask this Court to "set aside" the vacatur order of February 3, 2025, termination order of February 5, 2025, and partial vacatur order of February 24, 2025, from taking effect or being put into effect," this type of order would necessarily constitute an order "restraining" federal officials and is therefore equally prohibited by 8 U.S.C. § 1252(f)(1). FAC, Prayer for Relief (B); *see Aleman Gonzelez*, 596 U.S. at 544.

Finally, it remains the government's view that § 1252(f)(1) also bars declaratory relief. *See Aleman Gonzelez*, 596 U.S. at 551 n.2; *cf. California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (Tax Injunction Act barred declaratory relief as well as injunctive relief); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010). The government recognizes, however, that the First Circuit has held otherwise. *Brito v. Garland*, 22 F.4th 240, 250 (1st Cir. 2021) ("declaratory relief remains available under Section 1252(f)(1)").

13

II.    **THE SECRETARY'S DETERMINATIONS DID NOT VIOLATE THE APA**

Even if the Court finds it has jurisdiction, the Court should dismiss Plaintiffs' three APA

claims because the Secretary's determinations were lawful and consistent with 8 U.S.C. § 1254a.

A.    **The Secretary's Vacaturs Were Not Contrary to Law**

The Secretary has inherent authority 8 U.S.C. §§ 1103(a) and 1254a to reconsider past

actions. Plaintiffs, however, contend that the 2025 Venezuela Vacatur "constitutes arbitrary and

capricious acts that are an abuse of discretion." Compl. ¶ 145. Statutory authorization to make a

decision "must be understood as carrying with it an implied incidental authority" to revoke that

decision, *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024), especially

because the TPS statute gives the Secretary discretion over both the length of a TPS designation

and the timing of periodic review. 8 U.S.C. § 1254a(b)(3)(A)-(C).

First, Plaintiffs allege that "[t]he [TPS] statute provides no authority to rescind a

determination to designate or extend once it has already been granted." Compl. ¶ 155. Not so.

Courts have long recognized that an administrative agency has inherent or statutorily implicit

authority to reconsider and change a decision within a reasonable period if Congress has not

foreclosed this authority by requiring other procedures. *See Albertson v. FCC*, 182 F.2d 397, 399

(D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide."); *Chao v. Russell

P. Le Frois Builder, Inc.*, 291 F.3d 219, 229 n.9 (2d Cir. 2002) (agency's power to reconsider

"applies regardless of whether the applicable statute and agency regulations expressly provide for

such review, but not where there is contrary legislative intent or other affirmative evidence")

(emphasis in original) (quotations omitted); *see also Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d

81, 86 (D.C. Cir. 2014) (collecting cases and explaining that "administrative agencies are assumed

to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely

fashion."); *The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (federal agencies

have broad authority to reconsider their prior decisions, particularly when the prior decision

contained an error); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (holding agency acted

lawfully by exercising inherent authority to reconsider decisions) (collecting cases); *Gun South,*

14

*Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) ("[T]he Supreme Court and other courts have recognized an implied authority in other agencies to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration."). And the Secretary has asserted and exercised this authority previously. *See Reconsideration and Recission of Termination of the Designation of El Salvador for [TPS]; Extension of the [TPS] Designation for El Salvador*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023) (Secretary Mayorkas exercising "inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination" to vacate his predecessor's termination of El Salvador's TPS designation).

Here, Congress gave the Secretary "undoubtedly broad" authority to "make TPS determinations" and ensure the continued designation of a country complies with the law. *Ramos*, 975 F.3d at 890 (finding statutory constraints "on the Secretary's discretion, [are] in favor of limiting unwarranted designations or extensions…") (cleaned up). Section 1254a requires the Secretary to review conditions within foreign states designated for TPS periodically, but any subsequent action turns on the Secretary's findings about whether the conditions for such designation continue to exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). The statute also requires the Secretary to determine whether "permitting aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C); *cf. Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing Hawaii, 585 U.S. at 684-86)). Secretary Noem took the steps provided for by the TPS statute and, while Plaintiffs may disagree with her decision, they cannot adequately allege that she has "no statutory authority" to rescind and reconsider a prior TPS determination. Compl. ¶¶ 4, 155-156.

Flexibility to reconsider decisions makes especially good sense in the TPS context. The Secretary's TPS authority inevitably requires her to make sensitive assessments affecting United

States foreign policy. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). When the Executive Branch acts in the field of foreign policy "pursuant to an express or implied authorization of Congress, [its] authority is at its maximum, for it includes all that [it] possesses in [its] own right plus all that Congress can delegate." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (cleaned up).

Employing Plaintiffs' analysis that Section 1254a bars such reconsideration would mean that no Secretary of Homeland Security could ever vacate a designation or extension of a designation, no matter the type of national security threat posed, the weight of the foreign policy or border security interest hindered, or the seriousness of the error or legal defect in a prior determination. Section 1254a does not mandate such an unworkable and potentially detrimental limitation of the Secretary's ability to fulfill her border security, national security, and foreign policy responsibilities by exercising her broad authority to administer and enforce the immigration laws, *see, e.g.*, 6 U.S.C. § 202(1)-(5), 8 U.S.C. § 1103(a)(1), (a)(3), and to do so consistent with the President's Executive Orders. For these articulated reasons, Secretary Noem exercised her inherent authority under Section 1254a in revisiting and reconsidering prior TPS determinations. If agencies hold any inherent power to reconsider past actions, as the law says they do, these were, as Secretary Mayorkas previously recognized, quintessential exercises of that power. *See 2023 El Salvador Reconsideration*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023).

Accordingly, the Secretary possessed authority to vacate prior TPS determinations and did not violate the APA. Plaintiffs' Third Claim should be dismissed.[15]

_____

[15] Plaintiffs also allege that the Secretary's 2025 Venezuela Vacatur and the 2025 Haiti Partial Vacatur were ultra vires in that they were not authorized by Section 1254a. Compl. ¶ 156. Because Plaintiffs assert the same claim— the TPS statute "provides no authority to rescind a determination to designate or extend once it has already been granted" (*Cf.* Compl. ¶ 155 with ¶ 95 and ¶ 112)—as both a violation of the INA and as a substantive violation of the APA, Plaintiffs cannot obtain relief "through the Court's inherent power to review ultra vires agency

**B.  The Venezuela and Vacatur and Termination and the Haiti Partial Vacatur Were Not Arbitrary and Capricious**

1.  <u>Venezuela Vacatur</u>

The other bases that Plaintiffs invoke do not establish that the Venezuela Vacatur was arbitrary and capricious. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (Under the arbitrary and capricious standard, a reviewing court must determine whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment). "[A] court 'is not to substitute its judgment for that of the agency' but rather determine 'whether there has been a clear error of judgment.'" *Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023) (internal citation omitted). Plaintiffs first allege that the Secretary did not identify any error in her predecessor's determination that Venezuela continues to meet the criteria for TPS designation. Compl. ¶ 96. But Secretary Noem provided her reasons for the Venezuela Vacatur. She had reasoned concerns that the 2025 Venezuela Extension consolidated the two overlapping populations and prevented her from making "informed determinations regarding the TPS designation and clear guidance." *2025 Venezuela Vacatur*, 90 Fed. Reg. 8,807.  It was not arbitrary or capricious for the Secretary to invoke the vacatur to "untangle the confusion" of the 2025 Extension and "restore the status quo" preceding that determination. *Id*. Plaintiffs also assert that the 2025 Venezuela Vacatur decision assumes TPS holders are present in the United States illegally is patently incorrect and cannot be arbitrary or capricious. *See* Compl. ¶ 97. TPS is a status that permits recipients, including aliens who have entered the country illegally, to continue to remain in the United States lawfully on a temporary basis. *See* 8 U.S.C. § 1254a(a)(1), (c)(2)(A). Recognizing that feature of the statute cannot support vacating the Secretary's decision.

---

actions." *See Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311-12 (D.D.C. 2017) (dismissing ultra vires claim since the same claim could be asserted through the APA).

Accordingly, the Secretary's 2025 Venezuela Vacatur did not violate the APA and Plaintiffs' First Claim should be dismissed.[16]

2. <u>Venezuela Termination</u>

Plaintiffs' allegations that the 2025 Venezuela Termination was unlawful also fail. Compl. ¶ 162. To support this conclusion, Plaintiffs assert that Secretary Noem's reliance on national interest factors "mark[s] a stark departure from past agency practices without explanation." Compl. ¶ 108. But this argument ignores the statutory language providing that if the Secretary determines during her periodic review that the country no longer continues to meet the conditions for designation, termination is warranted. 8 U.S.C. § 1254a(b)(3)(B). And one of the conditions for designation under § 1254a(b)(1)(C) is a finding by the Secretary that "permitting the aliens to remain temporarily in the United States is [not] contrary to the national interest." If the Secretary determines otherwise with respect to the national interest, as she did with respect to the 2023 Venezuela Designation, then the designation must be terminated. Adhering to the plain text of the TPS statute, which requires consideration of the basis for the designation, cannot be arbitrary or capricious.

Here, Secretary Noem carefully reviewed Venezuela's 2023 TPS designation and, after consulting with the appropriate Government agencies, determined that Venezuela no longer continues to meet the conditions for 2023 designation. *See 2025 Venezuela Termination*, 90 Fed. Reg. at 9,042. And Plaintiffs' allegation that "[t]here have not been notable improvements in Venezuela that allow for Venezuelan TPS holders to safely return," Compl. ¶ 105, fails because Secretary Noem determined that "even assuming relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination…is 'required' because it is contrary to national interest…." *2025 Venezuela Termination*, 90 Fed. Reg. 9,042. The Secretary explained that the "'[n]ational interest' is an expansive standard that may encompass an array of broad

---

[16] Defendants address Plaintiffs' assertion that the three determinations violated the Equal Protection Clause in Section III.

considerations, including foreign policy, public safety, national security, migration factors, immigration policy, and economic considerations." *Id.* (cleaned up); *see id.* n.5 (citing cases). In her termination notice, Secretary Noem appropriately considered these factors and provided her reasons for terminating the 2023 Designation, including valid concerns for the safety of the U.S. communities, impact that the TPS designation has had on local community resources, and adverse impacts on border security and foreign relations. *Id.* at 9,042-43. Secretary Noem's reasoned determination was unquestionably a lawful exercise of her authority to determine whether "permitting aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C); *see Poursina*, 936 F.3d at 874. Plaintiffs' claims that Secretary Noem's stated reasons are "pretext," and that termination was a "foregone conclusion based on improper political considerations and racial bias," Compl. ¶ 103, are also wholly without merit.

Plaintiffs also assert that the 2025 Venezuela Termination was "preordained" and "heavily influenced by the White House's …political agenda." Compl. ¶ 108. But "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Commerce v. New York*, 588 U.S. 752, 78 (2019). As the Supreme Court has explained, "a court may not set aside an agency's policymaking decision solely because it may have been influenced by political considerations or prompted by Administrative priorities …. Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest groups, foreign relations, and national security concerns (among others). *Id*. at 782.

As Plaintiffs have not shown that the 2025 Termination was arbitrary and capricious, Plaintiffs' Fourth Claim should also be dismissed.

### 3.  Haiti Partial Vacatur

Plaintiffs' claim that the Secretary's 2025 Haiti Partial Vacatur was "an arbitrary and capricious" action that is an "abuse of discretion" should also be dismissed for failure to state a

claim. Compl. ¶ 152. First, contrary to Plaintiffs' assertions that the TPS statute "does not outline a national interest analysis that must be conducted when making a determination," Compl. ¶ 114, as previously stated, § 1254a(b)(1)(C) explicitly provides that the Secretary may designate a foreign state for TPS unless she finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest. *Id*. Consistent with this statutory authority, Secretary Noem carefully reviewed the decision of former Secretary Mayorkas to extend (for the second time) the 2021 designation of Haiti for TPS for 18 months and redesignate Haiti for TPS until February 3, 2026. *2025 Haiti Partial Vacatur*, 90 Fed. Reg. 10,513-15. In revisiting this determination, Secretary Noem reasonably found that the former Secretary "failed to evaluate whether 'permitting Haitian nationals to remain temporarily in the United States' is not 'contrary to the national interest of the United States'" and cited the lack of support in the record concerning the former Secretary's national interest finding. *Id*. at 10,511-13. Indeed, the only reference to the national interest element in the 2024 Extension is a conclusory statement that "the Secretary has determined that … it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily." *2024 Haiti Extension*, 89 Fed. Reg. at 54,487-92. Additionally, Secretary Noem reasonably noted that the former Secretary's decision to extend the TPS designation for Haiti did not include a discussion of "why the 18-month period was selected in lieu of a 6- or 12-month period." *2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,513-15. Partially vacating the 2024 Extension on these grounds is not arbitrary and capricious simply because Plaintiffs disagree with the outcome.  Nor can Plaintiffs adequately allege that the 2025 Haiti Partial Vacatur "lacks any legal basis," Compl. ¶ 115, as Secretary Noem's consideration of this issue is entirely consistent with Congress's objective of providing temporary relief (subject to mandatory periodic review) to nationals of designated countries until, depending on the designation category at issue, they can safely return home, the country can adequately handle their return, or it is no longer in the national interest to permit them to remain in the United States temporarily. *See* 8 U.S.C. § 1254a.

Further, Secretary Noem determined that some of the sources the former Secretary relied on indicated that "significant developments" that "might result in improvement in conditions" took place in 2024, and they were not discussed when assessing the length of the extension. *See 2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,511-13; *see also 2024 Haiti Extension*, 89 Fed. Reg. 54,491. These include a United Nations-backed Multinational Security Support Mission deployed to Haiti in 2024 to support the Haitian National Police in "capacity building, combatting gang violence, and provide security for critical infrastructure." *See* 2025 Haiti Partial Vacatur, 90 Fed. Reg. at 10,513-14. Thus, it was entirely reasonable for Secretary Noem to partially vacate the 2024 Haiti Extension under these circumstances.

Plaintiffs' claim that Secretary Noem's decision is contrary to the TPS statute, which "requires the Secretary to consult with the appropriate agencies of government to determine whether the foreign nation meets one of the classifications under the statute before making a designation, extension, or termination." Compl. ¶ 114. That claim fails because the partial vacatur merely had the effect of rolling back the extension—not terminating it—from 18 months to 12 months. *Id*. at 10,515. Secretary Noem explained that the partial vacatur would allow for a clearer and more fulsome review of the country conditions in Haiti, whether Haitians could return to Haiti safely, and whether it is contrary to the U.S. national interest to continue to permit Haitian nationals to remain in the United States under the TPS program. *Id*. at 10,514. This reasoning demonstrates Secretary Noem's intention to make a new determination in accordance with the requirements laid out in the TPS statute. *Id.* The partial vacatur simply allowed for her to do so.

The Secretary's 2025 Haiti Partial Vacatur was firmly and appropriately rooted in foreign policy and national interest considerations. *See* 8 U.S.C. § 1254a(b)(1)(C); *Arizona v. United States*, 567 U.S. 387, 409 (2012) (holding the federal government must speak "with one voice" in determining "whether it is appropriate to allow a foreign national to continue living in the United States"); *cf.* U.S. Secretary of State, Determination: Foreign Affairs Functions of the United States, 90 Fed. Reg. 12,200 (Mar. 14, 2025) ("[A]ll efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services,

data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States under the Administrative Procedure Act, 5 U.S.C. 553, 554."). Thus, Plaintiffs' allegation that the decision was "improperly influenced by a political agenda to terminate TPS for Haiti" falls flat. Compl. ¶ 115. The Secretary's action was consistent with her continuing obligation to safeguard the border and national security of the United States and to administer and enforce the immigration laws. *See* 8 U.S.C. § 1254a(b)(1)(C); Exec. Order No. 14159, Protecting the American People Against Invasion, § 16(b), 90 Fed. Reg. 8443 (Jan. 20, 2025). Furthermore, the Secretary "considered the relevant evidence and factors and "articulated a satisfactory explanation for [her] action including whether there is a rational connection between the facts found and the choice made." *FDA v. Wages and White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Plaintiffs have failed to show that the Secretary's Haiti Partial Vacatur was arbitrary and capricious, and their Second Claim should be dismissed.

### C.  Plaintiffs' Constitutional Claims Fail as a Matter of Law

Even if the Court finds that it has jurisdiction to consider Plaintiffs' constitutional claims, Secretary Noem's decision to (1) vacate the 2025 Venezuela Extension and terminate the 2023 Venezuela Designation; and (2) partially vacate the 2024 Haiti Extension and roll back the deadline to review Haiti's TPS designation did not violate the Due Process Clause of the Fifth Amendment. Accordingly, this Court should dismiss Plaintiffs' Fifth Claim for failure to state a claim.

Plaintiffs' assertion that the 2025 Venezuela Vacatur and Termination and the 2025 Haiti Partial Vacatur "intended to discriminate against both groups on the basis of race, ethnicity, and/or national origin" is baseless. Compl. ¶ 167. The Supreme Court has been clear that where, as here, a decision is based on immigration policy, courts cannot look behind facially legitimate actions to hunt for illicit purposes. *See Hawaii*, 585 U.S. at 703-04. Indeed, decisions by the political branches about which classes of aliens to exclude or expel will generally be upheld against constitutional challenges so long they satisfy deferential rational-basis review. *Id*. at 704-05; *see*

*also Fiallo v. Bell*, 430 U.S.787, 792 (1977) (The Supreme Court "the power to expel or exclude aliens [i]s a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control"); *Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (a "narrow standard of review" applies to "decisions made by Congress or the President in the area of immigration and naturalization"); *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and bona fide" reason for its action); *Harisiades*, 342 U.S. at 588- 89. Under the standard set forth in *Hawaii*, if "there is persuasive evidence that the [decision] has a legitimate grounding in national security concerns," courts "must accept that independent justification." *Id*. at 706. The holdings in *Hawaii*, *Mandel*, and *Fiallo* support the application of rational basis review in this case, and the challenged government actions readily pass the test.

In deciding to vacate the 2025 Venezuela Extension and terminate the 2023 Venezuela Designation, the Secretary consulted with appropriate governmental agencies, including the Department of State, and found that continuing Venezuela's TPS designation was contrary to the national interest in light of certain factors—such as gang activity and public safety concerns, adverse impact on U.S. communities, foreign policy interests, immigration and border policies, and the potential magnet effect of TPS on illegal immigration of Venezuelans—all of which are rational and related to the Government's legitimate interests in immigration, national security, and foreign policy. *2025 Venezuela Termination*, 90 Fed. Reg. at 9,040, 9042-43. With respect to the Haiti Partial Vacatur, Secretary Noem explained that the six-month rollback of the extension and redesignation date afforded her the opportunity to assess "whether permitting a class of aliens to remain temporarily in the United States is contrary to the national interest," in accordance with 8 U.S.C. § 1254a(b)(1)(C). *2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,513. These determinations were facially legitimate. Ultimately, TPS decisions involve sensitive, country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *Hawaii*, 585 U.S. at 702,

– precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. *See id*.; *see also Fiallo*, 430 U.S. at 799. For these reasons, the Secretary's TPS determinations readily pass Hawaii's deferential rational basis standard. *See Hawaii*, 585 U.S. at 684 (considering determination "that entry of the covered aliens would be determinantal to the national interest"). Because the Secretary's determinations are firmly anchored in the TPS statute and its objectives, including taking into account the national interest, Plaintiffs fail to state a claim under the Equal Protection Clause of the Constitution. *Hawaii*, 585 U.S. at 704-05.

The Court should not apply a stricter test. The Court in *Hawaii* made clear that courts are "highly constrained" in this context; any "rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [the Court's] inquiry into matters of entry and national security is highly constrained." *Id*. at 704. But even under the standard set forth in *Vill. of Arlington Heights v. Metro. Housing Dev. Corp*., 429 U.S. 252 (1977), Plaintiffs' Equal Protection Claim would still fail. Under that test, Plaintiffs must prove that a racially "discriminatory purpose [was] a motivating factor in the [government's] decision"—something that they cannot do through statements taken out of context and without direct links to the Secretary's determinations. *Id*. at 266; *see DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (explaining that disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus").

Here, Plaintiffs allege that the Secretary's decisions "were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin." Compl. ¶ 116. The determinations, however, lack any plausible discriminatory purpose, not least because Secretary Noem left the TPS designation in place for those Venezuelans who are covered under the 2021 Designation, and hasn't terminated the Haiti designation at all. On top of that, the Secretary provided reasoned explanations for her determinations. For example, her determination to terminate the 2023 Venezuela Designation explained that it was based, among other factors, on the Secretary's concerns with the "sheer numbers" of "inadmissible or illegal aliens" that had

entered the United States due to the prior administration's border policies, *2025 Venezuela Vacatur*, 90 Fed. Reg. at 9,042; the "magnet effect" of a TPS extension, which had been a "pull factor[] driving Venezuelan nationals to the United States" at a time when the Secretary was concerned about members of Tren de Aragua who were "[a]mong the[] Venezuelan nationals who have crossed into the United States," *id.* at 9,042-9,043; the burdening of "city shelters, police stations, and aid services" that had reached "maximum capacity" due to the influx of immigration, *id.* at 9043; and the President's policy of promoting the national interest, including U.S. foreign policy interests, by discouraging "illegal and destabilizing migration," *id.*

Similarly, in vacating the Haitian TPS Extension, Secretary Noem stated that she was taking action because there was no discussion in the Federal Register Notice or the administrative record explaining why the former Secretary chose to extend the Haiti TPS designation for 18 months instead of a "6- or 12- month period," nor was there "any justification of permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain temporarily in the United States is not contrary to the U.S. national interest." *2025 Haiti Vacatur*, 90 Fed. Reg. 10,513.  The Secretary also faulted the reliance on evidence that that was several years old to determine that the extraordinary and temporary conditions in Haiti continued, and a failure to factor into the determination some evidence of improving conditions. *Id.* at 10,513-10,514. "Abbreviating the period from 18 to 12 months" will allow for the Secretary to take "a fresh review of country conditions in Haiti and of whether such conditions remain both 'extraordinary' and 'temporary,' whether Haitian may return in safety, and whether it is contrary to the U.S. national interest to continue to permit the Haitian nationals to remain temporarily in the United States." *Id.* at 10,514.

Plaintiffs, however, do not focus on these stated justifications, instead cherry-picking statements, social media posts, and media appearances from the Secretary to suggest discriminatory motives for the TPS determinations. Compl. ¶¶ 120, 130-132. But none of these allegations reflect animus based on race or national origin. Plaintiffs take Secretary Noem's statements grossly out of context and mischaracterize them as supposedly portraying all

25

Venezuelan TPS beneficiaries as engaging in criminal activity or belonging to gangs, when the Secretary never said any such thing. For example, Plaintiffs misleadingly allege that "referring specifically to Venezuelan migrants, Secretary Noem stated: 'The people of this country want these dirtbags out.'" Compl. ¶ 130. This gross mischaracterization of a snippet of her interview appears deliberate, as during the interview the Secretary actually explained that she had been in New York City to help arrest a ringleader of Tren de Aragua and it was these violent gang members that the people wanted removed from their communities. Compl. ¶ 130 n.#109. Yet Plaintiffs urge this Court to draw the mistaken conclusion that the Secretary's statement referred to all Venezuelans as "dirt bags," when her statement plainly refers to members of Tren de Aragua—a group that the President designated a foreign terrorist organization. *See Designating Cartels and Other Foreign Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, Exec. Order No. 14157, 90 Fed. Reg. 8,439 (Jan. 29, 2025); *see also* 90 Fed. Reg. 10,030 (Feb. 20, 2025) (State Department designation).

Additionally, without any comments about Haiti from Secretary Noem that can be taken out of context, Plaintiffs chose to cite campaign statements made by President Trump, as well as wholly unrelated events during President Trump's first term several years ago – underscoring the paucity of evidence of an invidious discriminatory purpose here. Compl. ¶¶ 116-119, 121-129, 132-133. Reyling entirely upon this "cats paw theory," Plaintiffs fail to show how such statements or prior conduct can be extended to the determinations at issue here. Further, most of the statements—similar to those challenged and rejected in *Hawaii*—were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents of the Univ. of Cal*., 591 U.S. at 35 (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); *Hawaii*, 585 U.S. at 35 ("The Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving "sensitive and weighty interests of national security and foreign affairs."). Even so, these selective quotations from well into the past ignore the first Trump administration's handling of other TPS-related decisions. For example, during the first

administration, the administration extended TPS designations for four other "non-white, non-European" countries. *Ramos*, 975 F.3d at 898; *see id*. at 880 (describing the extension of TPS designations of Somalia, South Sudan, Syria, and Yemen). Also, during the first administration, the President deferred removal of certain Venezuelans—an action that is inexplicable under Plaintiffs' assumption that the President has consistently harbored discriminatory animus, and that Secretary Noem must therefore share it. *See* 86 Fed. Reg. at 6,845. Moreover, the fact that the Secretary recently allowed for a six-month extension of TPS as to South Sudan further undermines Plaintiffs' assertion claims that the Secretary's actions are based on racial animus towards non-white immigrants. Compl. ¶¶ 6, 7, 127; *see [TPS]: Extension of the Designation of South Sudan*, 90 Fed. Reg. 19,217 (May 6, 2025).

Even so, President Trump's prior statements could not show animus by the Secretary regardless. *See, e.g.*, *Staub v. Proctor Hospital*, 562 U.S. 411, 418 (2011); *Ramos*, 975 F.3d at 897. ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations). Such an approach would invite judicial second guessing of an agency official's actions based on mere allegations that a different government official harbored some discriminatory motive. Such second-guessing would in turn open the door to impermissible intrusion on privileged Executive Branch deliberations, *see United States v. Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749-750 (1982).

Put simply, none of the evidence outlined in the Complaint is sufficient to state a claim that the Secretary's TPS determinations were motivated by racial animus. President Trump and Secretary Noem seek to reduce illegal immigration and crime, policy goals that are reflected in their public statements and that Americans elected President Trump to prioritize. Allowing Plaintiffs' claims to move forward would leave virtually any immigration policy adopted by this Administration susceptible to an Equal Protection challenge. Even if the *Arlington Heights* test were applied, Plaintiffs would still fail to state an Equal Protection claim under the Fifth

Amendment because the Secretary's determinations were consistent the TPS statute, including its emphasis on the temporariness of the protection afforded and its assignment of responsibility for determining whether, in the Secretary's informed judgment, continuing to permit the TPS recipients to remain temporarily in the United States is contrary to the national interest. *See* 8 U.S.C. § 1254a(b)(1)(C).

### D.  The Declaratory Judgment Act is Not A Basis for a Claim.

Finally, Plaintiffs' Declaratory Judgment Act "claim," Compl. ¶ 175, does not create a freestanding cause of action, as that statute, 28 U.S.C. § 2201, merely defines the scope of relief available to a plaintiff with a cognizable claim; it does not establish a standalone cause of action. *See Daylily Farms, Inc. v. Chao*, 357 F. Supp. 2d 356, 359 (D. Mass. 2005) ("The Declaratory Judgment Act provides a procedure for resolving certain kinds of controversies, but it is not a source of substantive rights in itself." (citing *Colonial Penn Grp., Inc. v. Colonial Deposit Co.*, 834 F.2d 229, 232 (1st Cir. 1987))). Since Plaintiffs have not plausibly alleged a cognizable claim, they are entitled to no remedy whatsoever, and the Court should dismiss the Declaratory Judgment Act claim with Plaintiffs' substantive claims.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety for lack of subject matter jurisdiction and for failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6).

Dated: May 6, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General

SARAH L. VUONG
Assistant Director

WILLIAM H. WEILAND
Senior Litigation Counsel

LAUREN BRYANT
ERIC SNYDERMAN
ANNA L. DICHTER
JEFFREY HARTMAN
AMANDA SAYLOR
Trial Attorneys

s/ *Catherine Ross*
CATHERINE ROSS
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044

*Counsel for Defendants*