**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HAITIAN-AMERICANS UNITED INC.; VENEZUELAN ASSOCIATION OF MASSACHUSETTS; UNDOCUBLACK NETWORK, INC.; SYDNEY DOE; MARLENE DOE; GUSTAVO DOE; and NATALIA DOE, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, <br><br> Defendants. | Civil Action No. 25-cv-10498-RGS |

<u>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

# Table of Contents

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 2

    I.     TPS Statutory Scheme .......................................................................... 2

    II.    TPS Designation Prior To The Second Trump Administration............................ 4

    III.   The Challenged Conduct.................................................................... 5

    IV.   Related Case: Procedural Posture. .......................................................... 6

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT ................................................................................................................... 8

    I.     THIS COURT HAS JURISDICTION OVER PLAINTIFFS' SUIT..................... 8

      A.  8 U.S.C. § 1254a(b)(5)(A) Does Not Preclude This Court's Review.................... 8

      B.  The APA Does Not Preclude Judicial Review. ................................................... 11

      C.  8 U.S.C. §1252(f)(1) Does Not Preclude Judicial Review. ................................ 12

      D.  Plaintiffs' Haiti-Related Claims Are Justiciable and Properly Before This Court. ................................................................................ 17

    II.    PLAINTIFFS HAVE SUFFICIENLTY ALLEGED VIOLATIONS OF THE APA. ................................................................................ 18

    III.   Plaintiffs Have Sufficiently Stated An Equal Protection Claim. .......................... 24

      A.  *Arlington Heights* is the Controlling Standard of Review. ................................... 24

      B.  Racial Animus Was A Motivating Factor In The Challenged Actions. ............... 25

    IV.   PLAINTIFFS HAVE CAUSES OF ACTION UNDER THE CONSTITUTION AND THE APA, THEREFORE THEY CAN SEEK DECLARATIORY RELIEF. ................................................................ 30

    CONCLUSION................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)............................................................ 15, 17

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ............................................................................... 11

*Ali v. Ashcroft*, 346 F.3d 873 (9th Cir. 2003) .......................................................................... 13

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3rd Cir. 1996)........................................ 27

*American Baptist Churches v Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991)......................... 11

*American Meat Institute v. U.S. Dep't of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014)................. 14

*American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984) ................................................ 21

*ANA Int'l, Inc. v. Way*, 393 F.3d 886 (9th Cir. 2004). .............................................................. 16

*Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) ................................ 14

*Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016)............................. 27

*Bankamerica Corp. v. United States*, 462 U.S. 122 (1983)....................................................... 22

*Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260 (E.D.N.Y. 2018) ................................................. 29

*Biden v. Nebraska*, 600 U.S. 477 (2023) .................................................................................. 23

*Biden v. Texas*, 597 U.S. 785 (2022). ....................................................................................... 15

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)............................................ 16

*Brito v Garland*, 22 F.4th 240 (1st Cir. 2021) ......................................................................... 17

*Brito v. Barr*, 22 F.4th 240 (1st Cir. 2021) .............................................................................. 13

*Casa de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018)...................... 9, 11, 24, 28

*Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393 (D. Mass. 2018)
................................................................................................................................. passim

*Chehazeh v. Att'y Gen. of U.S.*, 666 F.3d 118 (3d Cir. 2012)..................................................... 11

*Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880 (D.C. Cir. 2021)....... 16

*Colonial Penn Grp., Inc. v. Colonial Deposit Co.*, 834 F.2d 229 (1st Cir. 1987) ....................... 30

*Daylily Farms, Inc. v. Chao*, 357 F. Supp. 2d 356 (D. Mass. 2005) ......................................... 30

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ............... 16, 25

*Dig. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767 (2018) ............................................................. 10

*Espinoza v. Farah Manufacturing Co., Inc.*, 414 U.S. 86 (1973)............................................... 28

*FDA v. Brown & Williamson*, 529 U.S. 120 (2000) .................................................................. 21

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023) ................................................ 15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) ..................... 10, 23

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ................................................ 13, 14

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) ................................................ 13

*Guimaraes v. SuperValu, Inc.,* 674 F.3d 962 (8th Cir.2012) ................................................ 27

*Gun Owners Action League, Inc. v. Swift*, 284 F.3d 198 (1st Cir. 2002) ................................................ 18

*Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013) ................................................ 7

*Immigrant Assistance Project of AFL CIO v. I.N.S.*, 306 F.3d 842 (9th Cir. 2002) ..................... 9

*INS v. St. Cyr*, 533 U.S. 289 (2001) ................................................ 16

*Ivy Sports Medicine v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014) ................................................ 20, 21

*Jennings v. Rodriguez,* 583 U.S. 281 (2018). ................................................ 13

*Johnson v. Robison*, 415 U.S. 361 (1974) ................................................ 12, 16

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ................................................ 10

*Kidd v. Mayorkas*, 734 F. Supp. 3d 967 (C.D. Cal. 2024) ................................................ 15

*Landon v. Plasencia*, 459 U.S. 21 (1982)*;* ................................................ 25

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ................................................ 19

*Macktal v. Chao*, 286 F.3d 822 (5th Cir. 2002) ................................................ 22

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ................................................ 18

*Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34 (1st Cir. 2013) ................................................ 8

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................ 10

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) ................................................ 9, 10

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ................................................ 30

*Monsanto Co. v. Geertson Seed Farms, Inc.*, 561 U.S. 139 (2010) ................................................ 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................... 23

*Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99 (1st Cir. 2015) ................................................ 25

*Muniz-Rivera v. United States*, 326 F.3d 8 (1st Cir. 2003) ................................................ 7

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ................................................ 29

*NAACP v. United States Dep't of Homeland Sec.,* 364 F. Supp. 3d 568 (D. Md. 2019) ............. 24

*Nat'l TPS All. v. Noem*, No. 25-2120, 2025 WL 1142444 (9th Cir. Apr. 18, 2025) ..................... 7

*Nat'l TPS All. v. Noem*, No. 25-CV-01766, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025) .. 6, 8, 26

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) ................................................................................................................................. 19

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................................. 16, 17

*Noem v. Nat. TPS All.*, No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025) ......................... 7

*NRDC v. Regan*, 67 F.4th 397 (D.C. Cir. 2023) ................................................................. 20, 21

*O'Brien v. Wilmington Tr. Nat'l Ass'n as Tr. to CitiBank, N.A.*, 506 F. Supp. 3d 82 (D. Mass. 2020) ..................................................................................................................................... 30

*Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1 (1st Cir. 2011)............................................. 8

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)................................................................. 16

*Ramos v. Louisiana*, 590 U.S. 83 (2020) .................................................................................... 7

*Ramos v. Mayorkas*, 2023 WL4363667 ...................................................................................... 3

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018) ............................................ 12, 24, 29

*Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018) ...................................................... 3, 4

*Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) .......................................................................... 3, 8

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ......................... 15

*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43 (1993) ............................................................... 15

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012) ...................................... 14

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) ............................................................... 13

*Sackett v. E.P.A.*, 566 U.S. 120 (2012) ................................................................................... 10

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................... 3, 9

*Sierra Club v. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) ........................................... 23

*St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) ........................................................ 28

*Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) (same) ................................................ 15

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022)................................................................. 15

*Thai v. Ashcroft*, 366 F.3d 790 (9th Cir. 2004)........................................................................ 26

*The Last Best Beef  v. Dudas*, 506 F.3d 333 (4th Cir. 2007). ................................................. 22

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) .............................................................. 25

*United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985).............................................. 22

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)................................................................... 19

*Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ............................................................................................................................................... 24

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ............................................. 21

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................ 11, 12, 16

*Weinberger v. Salfi*, 422 U.S. 749 (1975) ........................................................ 12

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018).................................... 11

## STATUTES

28 U.S.C. § 1342 ........................................................................ 15

28 U.S.C. § 2201 ........................................................................ 30

28 U.S.C. §1341 ........................................................................ 15

5 U.S.C. § 559 ......................................................................... 16

5 U.S.C.§ 701 ......................................................................... 11

5 U.S.C. § 706 ..................................................................... 14, 19

8 U.S.C. § 1182(f) ..................................................................... 12

8 U.S.C. § 1252 ................................................................... 10, 15

8 U.S.C. §1254a ................................................................... passim

8 U.S.C. §1160 ......................................................................... 9

## RULES

Rule 12(b)(6) ......................................................................... 7

## REGULATIONS

76 Fed. Reg. 29000 ................................................................... 4

77 Fed. Reg. 59943 ................................................................... 4

79 Fed. Reg. 11808 ................................................................... 4

80 Fed. Reg. 51582 ................................................................... 4

82 Fed. Reg. 23830 ................................................................... 4

83 Fed. Reg. 2648 .................................................................... 4

86 Fed. Reg. 13574 ................................................................... 4

86 Fed. Reg. 41863 ................................................................... 4

87 Fed. Reg. 55024 ................................................................... 4

88 Fed. Reg. 68130 ................................................................... 4

88 Fed. Reg. 5022 .................................................................... 4

88 Fed. Reg. 86665 ................................................................... 4

89 Fed. Reg. 54484 ............................................................... 1, 4, 5

90 Fed. Reg. 5961 ................................................................ 1, 4, 5

90 Fed. Reg. 9497 .................................................................... 1

90 Fed. Reg. 10511 ............................................................................................... passim

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 1 ................................................................................................ 19

Plaintiffs Haitian Americans United, Inc. ("HAU"), Venezuelan Association of Massachusetts ("VAM"), UndocuBlack Network Inc. ("UBN"), and four individual recipients of Temporary Protected Status ("TPS") respectfully submit this Memorandum in Opposition to the Defendants' Motion to Dismiss. ECF No. 42. For the reasons described below, the Defendants' motion lacks merit and should be rejected in its entirety.

## INTRODUCTION

This case challenges the unlawful, unprecedented, and discriminatory actions taken by Defendants DHS and its Secretary, Defendant Kristi Noem, to dismantle life-saving protections for Haitian and Venezuelan nationals living lawfully in the United States under TPS. Within days of her confirmation, Defendant Noem took radical steps to reverse prior TPS extensions—the 2025 Venezuela Extension[1] and the 2024 Haiti Extension[2]—issuing "vacaturs" that are not authorized by statute and not supported by any historical precedent in the 35-year history of the TPS program. She subsequently terminated TPS for Venezuela's 2023 designation.

The challenged conduct did not occur in a vacuum; it was the product of a rushed and procedurally irregular process carried out under the shadow of explicitly racist and xenophobic rhetoric and an "America First" agenda. Defendant Noem's so-called "vacaturs" of existing TPS designations were not only *ultra vires*, they were infected by discriminatory animus. As a result, the rug has been pulled out from under hundreds of thousands of Haitian and Venezuelan TPS holders. While they have been targeted for sudden and severe loss of protection, the Trump Administration has chosen instead to extend refugee status and protections to white South Africans.[3]

---

[1] Extension of the 2023 Designation of Venezuela for TPS, 90 Fed. Reg. 5961 (Jan. 17, 2025).
[2] Extension and Redesignation of Haiti for TPS, 89 Fed. Reg. 54484 (July 1, 2024).
[3] Compl. ¶ 7 (citing Addressing Egregious Actions of the Republic of South Africa, Executive Order, 90 Fed. Reg. 9497 (February 12, 2025).

Defendants now ask this Court to shield these actions from judicial scrutiny by invoking jurisdictional bars that do not apply. Neither the TPS statute, the Administrative Procedure Act ("APA"), nor any provision of the Immigration and Nationality Act ("INA") forecloses review of these constitutional and statutory violations. Courts have repeatedly rejected the very arguments Defendants advance here, and rightly so. The APA explicitly empowers courts to "set aside" unlawful agency action, such as that alleged here. And the Constitution does not yield to expedience—particularly where racial bias and executive overreach intersect. Plaintiffs' pleadings have catalogued an array of unprecedented agency action, including the *ultra vires* "vacaturs" and scores of racially hostile statements made by Defendant Noem and Defendant Trump, all of which is clawing back TPS protections for thousands of families across the country.

This case is not about second-guessing the Administration's policy preferences. It is about ensuring that the federal government follows the law, respects statutory and constitutional limits, and does not strip legal protections from vulnerable immigrant communities in ways that infected by bias. Plaintiffs have sufficiently pled their legal claims. Therefore, Defendants' motion to dismiss should be denied in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    TPS Statutory Scheme

Before the enactment of TPS, the Executive Branch relied on a discretionary policy known as Extended Voluntary Departure ("EVD") to allow certain groups of otherwise deportable individuals to remain in the United States. This policy was implemented on a case-by-case basis by the Attorney General without clear statutory guidelines. Recognizing these deficiencies, Congress established TPS as part of the Immigration Act of 1990. 8 U.S.C. § 1254a. TPS now provides a structured process for designating countries whose nationals face unsafe conditions. It authorizes the DHS Secretary to extend TPS to foreign nationals who cannot return to their country

of origin because of war, civil unrest or a natural disaster. *Id.* TPS recipients who meet eligibility criteria, including having no serious criminal record, receive protection from removal and work authorization, enabling them to sustain their livelihoods while conditions in their home countries remain unsafe. *Id.* §1254a(c)(2)(B).

The DHS Secretary may designate a country for TPS—after consulting with appropriate government agencies—if one of the following conditions is met: (1) an ongoing armed conflict poses a serious threat to returning nationals; (2) a natural disaster, such as an earthquake or epidemic, has temporarily disrupted living conditions, making it unsafe for nationals to return and prompting an official request for TPS; or (3) extraordinary and temporary conditions prevent safe return unless doing so is against U.S. interests. *Id.* §1254a(b)(1)(A)-(C).

Once a country is designated, TPS takes effect upon publication in the Federal Register and lasts between six to eighteen months. *Id.* §1254a(b)(2). Each designation has a fixed end-point: it "shall remain in effect until the effective date of the termination of the designation." *Id.* At least 60 days before a designation expires, DHS must review country conditions, consult with other agencies, and determine whether TPS should be extended or terminated. *Id*. In practice, this process includes a multi-step review, incorporating a Country Conditions Memo from USCIS, a Decision Memo with USCIS's recommendation, and input from the State Department and other agencies.[4]

If the DHS Secretary determines that conditions no longer justify TPS, she must publish a termination notice in the Federal Register. *Id.* §1254a(b)(3). The termination cannot take effect

---

[4] *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted*, 59 F.4th 1010 (2023), *appeal dismissed sub nom. Ramos v. Mayorkas*, 2023 WL4363667; *Saget v. Trump*, 375 F. Supp. 3d 280, 298-300 (E.D.N.Y. 2019).

sooner than 60 days after publication, nor before the end of the most recent extension granted. *Id*. (termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension…."). If the Secretary does not find grounds for termination, the designation is extended for at least six months, with the option for 12- or 18-month extensions at the Secretary's discretion. *Id*.

## II.    TPS Designation Prior To The Second Trump Administration.

Both Haiti and Venezuela have experienced prolonged periods of instability that have necessitated TPS designations. These designations have been extended and re-designated multiple times due to ongoing humanitarian crises, political repression, and economic collapse in both countries.[5]

Haiti received its initial TPS designation on January 21, 2010, following a catastrophic earthquake that devastated Port-au-Prince, leaving over a million homeless. 75 Fed. Reg. 3476 (Jan. 21, 2010). The designation was subsequently extended due to persistent instability, including political turmoil, natural disasters, and health crises like the cholera outbreak. In 2018, during the first Trump Administration, the DHS Secretary attempted to terminate Haiti's TPS; however, the termination was enjoined.[6] On August 3, 2021, former DHS Secretary Mayorkas re-designated Haiti for TPS due to escalating violence, political instability following President Moïse's assassination, and worsening humanitarian conditions. 86 Fed. Reg. 41863 (Aug. 3, 2021). The most recent extension on July 1, 2024 ensured protection through February 3, 2026,

---

[5] Designations and Extensions of Haiti for TPS, 75 Fed. Reg. 3476 (Jan. 21, 2010); 76 Fed. Reg. 29000 (May 19, 2011); 77 Fed. Reg. 59943 (Oct. 1, 2012); 79 Fed. Reg. 11808 (Mar. 3, 2014); 80 Fed. Reg. 51582 (Aug. 25, 2015); 82 Fed. Reg. 23830 (May 24, 2017); 83 Fed. Reg. 2648 (Jan. 18, 2018); 86 Fed. Reg. 41863 (Aug. 3, 2021); 88 Fed. Reg. 5022 (Jan. 26, 2023); 88 Fed. Reg. 86665 (Dec. 14, 2023); 89 Fed. Reg. 54484 (July 01, 2024). Designations and Extensions of Venezuela for TPS, 86 Fed. Reg. 13574 (Mar. 9, 2021); 87 Fed. Reg. 55024 (Sep. 8, 2022); 88 Fed. Reg. 68130 (Oct. 3, 2023); 90 Fed. Reg. 5961 (Jan. 17, 2025).

[6] *Ramos v. Nielsen*, *supra* n.4.

acknowledging Haiti's ongoing crisis. 89 Fed. Reg. 54484 ("The 18-month designation of Haiti for TPS … will remain in effect for 18 months, ending on February 3, 2026. The extension allows existing TPS beneficiaries to retain TPS through February 3, 2026, if they otherwise continue to meet the eligibility requirements for TPS.").

Secretary Mayorkas first designated Venezuela for TPS on March 9, 2021. 6 Fed. Reg. 13574 (Mar. 9, 2021). The designation was based on overwhelming evidence of economic collapse, political repression, and human rights violations under Nicolás Maduro's regime. Arbitrary arrests, extrajudicial killings, food shortages, and a crumbling healthcare system left millions in dire conditions. *Id.* Recognizing the persistent instability, DHS extended TPS in September 2022 and again in October 2023, allowing additional Venezuelans to apply. *Supra* n.5. By 2025, the crisis showed no signs of abating. On January 17, 2025, Secretary Mayorkas extended protections through October 2, 2026, reaffirming that Venezuela's severe conditions made safe return impossible. 90 Fed. Reg. 5961 ("The 18-month extension of Venezuela's … will remain in effect for 18 months, ending on October 2, 2026. The extension allows existing TPS beneficiaries to retain TPS through October 2, 2026, if they otherwise continue to meet the eligibility requirements for TPS.").

### III.    The Challenged Conduct.

Thus, when Defendant Trump assumed the presidency on January 20, 2025, Venezuela's TPS designation extended through October 2, 2026, and Haiti's TPS designation extended through February 3, 2026. On January 25, 2025, Defendant Noem was sworn in as Secretary of the DHS. Three days later, Defendant Noem announced the reversal of the Venezuela TPS extension, publicly characterizing it as a way to prevent Venezuelan TPS holders from "violating our laws for another 18 months." *See* Compl. ¶ 94. On February 3, 2025, she published notice in the Federal

Register of what she termed a "vacatur" of the Venezuela TPS extension—though the TPS statute contains no provision for such an action. 90 Fed. Reg. 8805 (Feb. 3, 2025) ("Venezuela Vacatur"). Nonetheless, Defendant Noem claimed "inherent authority" under the INA to vacate TPS determinations. No Secretary in the TPS statute's 35-year history had ever before "vacated" an already-granted extension.

This paved the way to end the TPS designation for Venezuela altogether. On February 5, 2025, DHS announced the termination of Venezuela's 2023 TPS designation in the Federal Register, with an end date of April 7, 2025. 90 Fed. Reg. 9040 (Feb. 5, 2025) ("Venezuela Termination"). This accelerated termination date depended on the vacatur, because a TPS termination cannot occur before the end date of the last-granted extension (which prior to the vacatur was October 2, 2026). Despite acknowledging ongoing issues in Venezuela, the Secretary claimed that improvements in conditions made it possible for Venezuelan nationals to safely return.

In parallel, on February 20, 2025, Secretary Noem announced a partial vacatur of Haiti's most recent TPS extension, cutting the designation period short by six months. 90 Fed. Reg. 10511 (Feb. 24, 2025) ("Haiti Vacatur"). This decision, made swiftly after Defendant Noem's confirmation, mirrored her reasoning for the Venezuela termination, citing "national interest" factors and questioning the thoroughness of Secretary Mayorkas' extension analysis, but citing no statutory provision granting her authority to vacate. *Id.*

### IV.    Related Case: Procedural Posture.

On March 31, 2025, in a case filed in the U.S District Court of the Northern District of California challenging the Venezuela Vacatur and Termination, the court granted the plaintiffs' motion to postpone DHS' actions relating to the Venezuela Vacatur and Termination. *See Nat'l TPS All. v. Noem*, No. 25-CV-01766, 2025 WL 957677, at *47 (N.D. Cal. Mar. 31, 2025). On

April 4,2025, the Ninth Circuit Court of Appeals denied a stay petition from the Government. *See Nat'l TPS All. v. Noem*, No. 25-2120, 2025 WL 1142444, at *1 (9th Cir. Apr. 18, 2025). On May 19, 2025, the U.S. Supreme Court granted the Government's stay application. *See Noem v. Nat. TPS All.*, No. 24A1059, --- S.Ct. ----, 2025 WL 1427560, at *1 (U.S. May 19, 2025). In a one-page order that did not state a grounds for the decision, the Court granted the Government's stay application. The Court also stated that "order is without prejudice to any challenge to Secretary Noem's February 3, 2025 vacatur notice insofar as it purports to invalidate EADs, Forms I-797, Notices of Action, and Forms I-94 issued with October 2, 2026 expiration dates." *Id.*[7]

## STANDARD OF REVIEW

Granting a Rule 12(b)(1) motion at the pleading stage is "appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003). When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 40 (1st Cir. 2014). The complaint should be read as a whole, "not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013). The allegations "need [] only enough detail to provide a defendant with 'fair notice of what the ... claim is and the grounds upon which it rests.'" *Manning v. Bos. Med. Ctr. Corp.*,

---

[7] Because the Supreme Court's stay ruling was not decided on the merits and contains no reasoning or analysis, it does not resolve any of the questions in this motion to dismiss. As numerous courts have recognized, such summary or procedural dispositions carry limited—if any—precedential value and are not binding authority on legal questions not decided. *See, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83, 104–05 (2020) (noting that a U.S. Supreme Court decision's precedential force lies in its reasoning, and that unexplained rulings may resolve the dispute before the Court but should not be read as abandoning previously established doctrine).

725 F.3d 34, 43 (1st Cir. 2013) (quoting *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir. 2011)).

## ARGUMENT

### I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' SUIT.

#### A.  8 U.S.C. § 1254a(b)(5)(A) Does Not Preclude This Court's Review.

Defendants begin by recycling a jurisdictional argument that failed when Defendant Trump attempted similar terminations during his first Administration—starting with a misreading of the TPS statute itself: 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of any determination of the [Secretary] with respect to designation, or termination or extension of a designation, of a foreign state under this subsection.").  But this argument is a nonstarter. Defendants have already conceded that "whether the Secretary had such authority is purely a matter of statutory construction (*i.e.,* of the TPS statute) and is not a "determination" with respect to a TPS designation, termination, or extension." *Nat'l TPS All*, 2025 WL 957677, at *15.[8] In short, Defendants cannot now shield their statutory overreach behind a jurisdictional bar they previously disavowed.  Even if the Court were to entertain this argument, nothing in that provision can credibly be read to bar judicial review of Plaintiffs' claims.

Courts have held that the jurisdictional bar is limited to "inquiring into the underlying considerations and reasoning employed by the Secretary in reaching her country-specific TPS determinations." *Id.* (citing *Ramos*, 975 F.3d at 891).  These cases follow Supreme Court holdings that Section 1254a(b)(5)(A) does not preclude judicial review of agency action that is collateral to

---

[8] Defendants' claim is apparently only that—if the Court finds the Secretary is authorized to vacate extensions—the jurisdiction-stripping provision bars "the other claims asserted by Plaintiffs (*i.e.,* whether the vacatur[s] w[ere] arbitrary and capricious and/or whether the vacatur[s] or termination was unconstitutionally motivated)." *Nat'l TPS All.*, 2025 WL 957677 at *15. As explained below, even as to those limited questions Defendants are incorrect. *See infra* at 19-24.

determinations themselves.  In *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491 (1991), the Court upheld a class action challenge to the manner in which a special agricultural worker amnesty program was being implemented, in the face of a jurisdiction-stripping provision that barred actions seeking "judicial review of a determination respecting an application for adjustment of status…."  *Id.* at 491 (citing 8 U.S.C. §1160(e)(1)). The Court held that this language does not reach "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.*; *see also Cath. Soc. Servs., Inc*., 509 U.S. at  63–64 (district court may properly exercise jurisdiction over challenge to regulations concerning legalization of undocumented immigrants, despite jurisdiction-stripping statute that precludes review of "determination[s] respecting an application for adjustment of status"); *Immigrant Assistance Project of AFL CIO v. I.N.S.*, 306 F.3d 842, 862–63 (9th Cir. 2002).  Numerous courts have reached this same conclusion in TPS challenges specifically.[9]

As these cases make clear, plaintiffs do not challenge a "determination" where the relief they seek does not impinge on the substantive outcome of the ultimate agency decision.  Here, Plaintiffs do not dispute that DHS Secretaries may terminate TPS protections, but they must follow the statutory process for doing so. As with Defendant's other jurisdiction-stripping argument, *see infra*, the contrast to other jurisdiction-stripping laws is instructive.  Where Congress has intended

---

[9] *See*, *e.g*., *Saget,* 375 F. Supp. 3d at 330-333 ("The construction of the TPS statute does not evince an intent to bar all judicial review"); *Centro Presente v. United States Dep't of Homeland Sec*., 332 F. Supp. 3d 393, 405–09 (D. Mass. 2018) (no jurisdiction-stripping where plaintiffs bring "challenges to Defendants' process of adjudication rather than the content of any particular adjudication" and "there would be no meaningful opportunity for review of Plaintiffs' constitutional and statutory claims in removal proceedings"); *Casa de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 317-20 (D. Md. 2018) (finding jurisdiction where "the text does not use the unambiguous and comprehensive language used in statutes courts have interpreted as broadly precluding judicial review" and "the alternative methods of review of Plaintiffs' claims offered by the Department do not constitute meaningful review.").

to preclude review of all claims, it has done so explicitly.  *See, e.g.*, 8 U.S.C. § 1252(b)(9) (precluding "[j]udicial review of all questions of law and fact, *including interpretation and application of constitutional and statutory provisions . . .*") (emphasis added).  "Where Congress includes particular language in one section of a statute but omits it in another," courts presume the omission is intentional.  *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (internal quotations omitted); *accord Dig. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161-62 (2018).[10]

Moreover, in these circumstances, there is no meaningful alternative avenue for review, further undercutting Defendants' arguments.  *See McNary*, 498 U.S. at 496-97. To raise the claims that Plaintiffs raise here in the removal context, individual TPS holders would have to remain in this country (in violation of the law) and either be arrested and placed in removal proceedings or turn themselves in to the Government and request removal proceedings.  The law does not require plaintiffs to undertake such burdens to enforce the law and to "bet the farm . . . by taking the violative action" before bringing a legal challenge."  *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490-91 (2010) (explaining that there was no "meaningful avenue of relief" if plaintiff were required to incur a sanction in order to test a law's validity) (internal citation omitted).  Indeed, in *McNary*, the Supreme Court allowed undocumented immigrants to raise a due-process challenge to immigration proceedings in district court, rather than pursue eventual review in a court of appeals after removal, in part because most of the immigrants could "ensure themselves review in courts of appeals only if they voluntarily surrender[ed] themselves for deportation," a "price . . . tantamount to a complete denial of judicial review for most undocumented aliens."  498 U.S. at 496-97; *see also Mathews v. Eldridge*, 424 U.S. 319, 331 (1976) (declining to require actual denial

---

[10] *See also Sackett v. E.P.A.*, 566 U.S. 120, 128 (2012) ("[t]he APA ... creates a presumption favoring judicial review of administrative action"); *Webster*, 486 U.S. at 603 ("where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.").

of benefits to bring due process challenge in part because recipient "raised at least a colorable claim" that full post-deprivation relief could not be obtained); *American Baptist Churches v Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (certifying class action brought by Salvadorans and Guatemalans challenging the federal government's discriminatory adjudication of asylum claims).  Where, as here, "'by reason of the nature of the right asserted, [it] cannot be raised efficaciously within the administrative proceedings delineated by the INA,'" those proceedings are not a meaningful forum to bring that claim.  *Chehazeh v. Att'y Gen. of U.S.*, 666 F.3d 118, 133 n.19 (3d Cir. 2012) (quoting *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007)); *Centro Presente,* 332 F. Supp. 3d at 406.  Defendants' attempt to avoid judicial review is, therefore, unavailing.

### B.  The APA Does Not Preclude Judicial Review.

Defendants next turn to the APA to argue—without merit—that it precludes judicial review. *See* MTD Brf. at 10 (citing 5 U.S.C.§ 701(a)(2)). But Section 701(a)(2) applies only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply." *Webster*, 486 U.S. at 599. The presumption of reviewability can only be rebutted under the APA if a law explicitly forecloses review or where agency action is committed to "agency discretion by law." 5 U.S.C. §701(a)(2). Because the challenged conduct—unauthorized vacaturs that were infected by improper bias— falls outside the APA's narrow exceptions, the presumption of reviewability remains intact. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) ("legal lapses and violations occur, and especially so when they have no consequence. That is why this Court has so long applied a strong presumption favoring judicial review of administrative action.").

Courts have consistently adjudicated similar collateral challenges to TPS-related decisions—particularly at the motion to dismiss stage. *See, e.g.*, *Centro Presente*, 332 F. Supp. 3d at 416; *Casa de Maryland*, 355 F. Supp. 3d at 327-28; *Ramos v. Nielsen*, 321 F. Supp. 3d 1083,

11

1108-09 (N.D. Cal. 2018). With respect to Plaintiffs' constitutional claims, longstanding Supreme Court precedent makes clear that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Johnson v. Robison*, 415 U.S. 361, 373-374 (1974). *See also Weinberger v. Salfi*, 422 U.S. 749, 762 (1975); *Webster*, 486 U.S. at 603. Congress has not done so here, and Defendants offer no authority suggesting otherwise.[11]

### C.  8 U.S.C. §1252(f)(1) Does Not Preclude Judicial Review.

Contrary to Defendants' assertions, 8 U.S.C. §1252(f)(1) does not bar this Court from granting Plaintiffs the relief they seek.  MTD Brf. 11-13. That provision states that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter" except in individual removal hearings. *Id.* Defendants contend that this statute bars certain relief requested by Plaintiffs: namely, that the Court set aside the Vacaturs and Venezuela Termination.  Defendants are wrong for several reasons.

First, Plaintiffs are not seeking to "enjoin or restrain the operations" of the TPS statute—but rather to have the Government *follow* the provisions of the law.  The TPS statute sets forth an orderly process for initiating, extending, and terminating a TPS designation. *See supra* at pp. 2-4; Compl. ¶¶ 55-61 There is no statutory process for vacating a decision that has already been made—in the TPS statute or anywhere else. Therefore, what Plaintiffs challenge is agency action outside the bounds of the law.

In considering the jurisdictional statute that Defendants now cite, the Supreme Court has specifically noted this distinction between enjoining the operation of a law and challenging agency

---

[11] Defendants' reliance on *Trump v. Hawaii*, 585 U.S. 667, 684–86 (2018), is misplaced. *See* MTD Brf. at 10. That case involved the Executive's authority under 8 U.S.C. § 1182(f) to restrict the entry of foreign nationals based on national security concerns—an entirely distinct context from the TPS framework at issue here. Moreover, the Court in *Trump* did not address judicial review under the APA, rendering its reasoning inapplicable to the present issue.

action that operates *outside* the law.  In *Jennings v. Rodriguez*, the Court reviewed a Ninth Circuit decision concerning the availability of periodic bond hearings for immigrants in detention. 583 U.S. 281, 313 (2018). While reversing on statutory interpretation grounds and remanding for consideration of constitutional claims, the Court cited approvingly to the Ninth Circuit's holding that Section 1252(f)(1) does not apply where a plaintiff challenges conduct as unauthorized by statute:

> The Court of Appeals held that [8 U.S.C. 1252(f)(1)] did not affect its jurisdiction over respondents' statutory claims because those claims did not "seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct ... not authorized by the statutes."… This reasoning does not seem to apply to an order granting relief on constitutional grounds, and therefore the Court of Appeals should consider on remand whether it may issue classwide injunctive relief based on respondents' constitutional claims.

*Id.* (emphasis omitted);[12] *see also Brito v. Barr*, 22 F.4th 240, 249 (1st Cir. 2021) (noting that the Supreme Court "seemed to accept this distinction" between enjoining operation of a statute and challenging *ultra vires* agency action); *Grace v. Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020) (holding that §1252(f)(1) "refers only to 'the operation of the provisions'—*i.e.*, the statutory provisions themselves, and thus places no restriction on the district court's authority to enjoin *agency action* found to be unlawful."). Indeed, if Section 1252(f)(1) reached as far as Defendants now contend— to claims that an agency has acted outside its delegated powers—the Supreme Court in *Jennings* would have disposed of the Ninth Circuit's ruling on those grounds, rather than reaching the merits. *See also Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (Section 1252(f)(1) prohibits

---

[12] The Ninth Circuit put it this way in the ruling under review: "[Section] 1252(f)(1) limits the district court's authority to enjoin the INS from carrying out legitimate removal orders. Where, however, a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of part IV of subchapter II, and § 1252(f)(1) therefore is not implicated." *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010) (quoting *Ali v. Ashcroft*, 346 F.3d 873, 886 (9th Cir. 2003)).

injunctions ordering federal officials to take or refrain from action to carry out "specified statutory provisions.").

Second, even if Section 1252(f)(1) reached challenges to *ultra vires* action—which it does not—it still would not limit the power of this Court to "hold unlawful and set aside agency action" under the APA. 5 U.S.C. §706(2). Contrary to Defendants' arguments, the Supreme Court has specifically distinguished vacating agency action from an injunction, describing vacatur as a "less drastic remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Among other differences, the Court has noted that an injunction operates as a direct command to an agency official to act or refrain from acting. *See, e.g., Aleman Gonzales*, 596 U.S. at 550 ("§ 1252(f)(1)generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions.…"). By contrast, "setting aside" agency action under the APA simply removes an agency's authority to act but is not a direct order that runs against agency officials. *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1222 (D.C. Cir. 2012), *overruled on other grounds by American Meat Institute v. U.S. Dep't of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014).[13]

Indeed, because the two remedies are distinct, courts have noted that an injunction is often "anomalous" when a court sets aside agency action under the APA. *R.J. Reynolds*, 696 F.3d at 1222; *see also Monsanto*, 561 U.S. at 165-66 (upholding vacatur of agency rule, but reversing grants of injunctive relief). While the Supreme Court has never ruled on this issue in the context of Section 1252(f)(1), its precedents draw a clear distinction between injunctions and the "less

---

[13] *Cf. Armstrong v. Exec. Office of the President, Office of Admin.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (an order that declares that agency action violates the APA is not punishable by contempt because it is not an injunction directed at any federal official).

drastic remedy" of setting aside agency action.[14]  And every court to consider the issue has rejected

the argument Defendants raise here. *See Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir.

2022) (holding Section 1252(f)(1) does not apply to vacatur); *Kidd v. Mayorkas*, 734 F. Supp. 3d

967, 987 (C.D. Cal. 2024) (same); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D.

Fla. 2023) (same); *Texas v. Biden*, 646 F. Supp. 3d 753, 768-69 (N.D. Tex. 2022) (same).

There are numerous other indicators that an order setting aside illegal agency action under

the APA is not limited by Section 1252(f)(1).  Where Congress desires to strip jurisdiction more

broadly, it uses broader language.  *See*, *e.g.*, 8 U.S.C. § 1252(e) (barring not just "enjoining or

restrain[ing]" as in §1252(f)(1), but "declaratory, injunctive, or other equitable relief," as well as

class certification); 28 U.S.C. §§ 1341, 1342(in Tax Injunction and Johnson Acts, providing that

districts courts may not "enjoin, suspend, or restrain" the assessment or collection of state taxes or

rate-making orders). By contrast, as the Supreme Court has held, "[b]y its plain terms, and even

by its title, [§ 1252(f)] is nothing more or less than a limit on injunctive relief." *Reno v. American-*

*Arab Anti-Discrimination Committee*, 525 U.S. 471, 481 (1999).[15]

This inquiry as to the scope of Section 1252(f) also operates against the backdrop of the

longstanding presumption in favor of APA review. *See Abbott Laboratories v. Gardner*, 387 U.S.

136, 140 (1967); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 63–64 (1993) ("[T]here is a 'well-

settled presumption favoring interpretations of statutes that allow judicial review of administrative

action,' and we will accordingly find an intent to preclude such review only if presented with 'clear

and convincing evidence.'") (citations omitted); *Dep't of Homeland Sec. v. Regents of the Univ. of*

---

[14] In a recent case, the Court requested briefing from the parties on whether Section 1252(f)(1) extends to relief under Section 706 of the APA, but ultimately "express[ed] no views" on the question.  *Biden v. Texas*, 597 U.S. 785, 801 n.4 (2022).
[15] Section 1252(f)'s title is "Limit on injunctive relief," in contrast, *e.g.*, to the broader title of Section 1252(e)(1): "Limitations on relief."

*California*, 591 U.S. 1, 16 (2020). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).[16] The APA is designed to reach broadly, and explicitly states that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly." 5 U.S.C. § 559; *see also Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880, 889 (D.C. Cir. 2021) ("[Federal Election Campaign Act] cannot alter the APA's limitation on judicial review unless it does so expressly.").

Interpreting Section 1252(f)(1) to preclude judicial review of Plaintiffs' *constitutional* claims would be particularly problematic, since that "would, of course, raise serious questions concerning the constitutionality" of the statute. *Johnson*, 415 U.S. at 366. Thus, the Supreme Court instructs courts "to avoid [that] 'serious constitutional question'" by accepting any fairly possible construction that permits review. *Webster*, 486 U.S. at 603 (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)); *see also INS v. St. Cyr*, 533 U.S. 289, 314 (2001).

<u>Third</u>, an order to "set aside" unlawful agency action, which is what Plaintiffs request, is even further removed from an injunction against a governmental official to stop the operation of provisions of the TPS statute. The Supreme Court has made clear that the two remedies—a stay and an injunction—are distinct and "have typically been understood to serve different purposes." *Nken v. Holder*, 556 U.S. 418, 428-29 (2009). Whereas an injunction "is a means by which a court

---

[16] "Even where the ultimate result [of a statute] is to limit judicial review, ... as a matter of the interpretive enterprise itself, the narrower construction of a jurisdiction-stripping provision is favored over the broader one." *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004).

tells someone what to do or not to do," a stay simply suspends on a temporary basis the source of authority to act.[17]

     Fourth, as Defendants concede, the First Circuit has held that §1252(f)(1) does not bar declaratory relief. *See* MTD Brf. at 13 (citing *Brito v Garland*, 22 F.4th 240, 250 (1st Cir. 2021) ("declaratory relief remains available under Section 1252(f)(1)")).

### D. Plaintiffs' Haiti-Related Claims Are Justiciable and Properly Before This Court.

     Defendants' assertion that Plaintiffs' Haiti-related claims are unripe because Haiti's designation has not yet been terminated ignores what the Complaint actually challenges, which is the "vacatur" of the Haiti extension. Compl. ¶¶ 109-115. That action in and of itself—which strips Haitian TPS holders of nearly six months of protected status—is more than enough to make this challenge ripe for review. The fact that the vacatur, if allowed to stand, also advances the date on which Haiti's designation may be terminated altogether is yet another concrete harm that makes the matter is ripe for review.

     Ripeness requires a two-fold inquiry of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs*., 387 U.S. 149. The first prong looks to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* at 148. Here, there is no "abstract disagreement" the Haiti Vacatur has immediate and tangible consequences and harms. It strips away hundreds of thousands of Haitian TPS holders of nearly six months of vital protections that they expected and counted on. *See* Compl. ¶ 13 (citing case of an HAU member's youngest daughter—who suffers from Kartagener syndrome, a rare pulmonary disease—who will lose

---

[17] *Nken*, 556 U.S. at 430 ("Whether such a stay might technically be called an injunction is beside the point: that is not the label by which it is generally known. The sun may be a star, but 'starry sky' does not refer to a bright summer day.").

access to critical treatment in Haiti—putting her life at serious risk). "Ripeness does not require that" Plaintiffs wait to be deported to seek judicial review. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003).

The Haiti Vacatur affects Plaintiffs' ability to plan their lives, maintain employment, and make critical decisions about housing, education, and family unity. *See* Compl. ¶ 14 (citing example of HAU member Jean Doe, who is fearful of being separated from her 15-month-old baby and cannot "fathom taking her [U.S. citizen] child to Haiti due to the extreme insecurity and violence there."). The First Circuit does not require plaintiffs to wait for the axe to fall before they can challenge the machinery being assembled to drop it. *See Mangual*, 317 F.3d at 60 ("If [the chilling] effect emanates from a credible threat of prosecution, as it does here, [the plaintiff] need not either describe a plan to break the law or wait for a prosecution under it."); *Gun Owners Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002) ("the doctrine of ripeness ... asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review.").

Not only does the vacatur take away nearly six months of TPS protection from Haitian TPS holders, it also advances the date by which Defendant Noem can decide to terminate Haiti's TPS designation altogether. 8 U.S.C. 1254a(b)(3)(B). That means that Haitian TPS holders are a mere three months away and counting from losing crucial protections that ensure their ability to work, their access to healthcare, and safety from life-threatening conditions in their home countries. This simply compounds the harms that flow from the challenged vacatur and confirms the matter is ripe for review.

## II. PLAINTIFFS HAVE SUFFICIENLTY ALLEGED VIOLATIONS OF THE APA.

Under the APA, a reviewing court "shall…hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; …(B) contrary to constitutional right, power, privilege, or immunity; … [or] (C) in excess of statutory jurisdiction, authority, or limitations…." 5 U.S.C. § 706. As the Supreme Court has recently explained:

> Congress in 1946 enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices. It was the culmination of a comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers.

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quotations and internal citations omitted); *see also id*. at 392 ("agency interpretations of statutes…are *not* entitled to deference.") (emphasis in original).

Plaintiffs have sufficiently alleged their APA claims because Defendant Noem has no authority to "vacate" TPS extensions that have already been granted. And once the original date of Venezuela's most recent extension is restored to October 2, 2026, the Venezuela Termination is automatically improper because it terminates Venezuela's designation prior to the end of that extension period.

As the Supreme Court has repeatedly emphasized, "[a]dministrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). Legislative power lies with Congress, *see* U.S. Const. art. I, § 1, and it is "[a] "core administrative-law principle … that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Here, Congress has legislated explicitly about how TPS extensions and terminations must occur—and has included no process for "vacaturs." As described *supra* at 3-4, Congress set forth in the TPS statute an orderly process for designating, extending, and terminating TPS protections. The process is clear and defined, with dates by which decisions must be made, formal notice

published in the Federal Register, and work authorizations that run concurrently with the designation—all of which allow TPS beneficiaries to order their lives. This framework also provides time and a process for the DHS Secretary to periodically review TPS designations to determine whether to extend or terminate them. Underpinning the entire scheme is the certainty that comes from a designation period of a fixed duration: a designation "*shall remain in effect* until the effective date of the termination of the designation…." 8 U.S.C. §1254a(b)(2)(B). ) (emphasis supplied).

Nowhere in this detailed statutory scheme is there any provision that allows the DHS Secretary to revoke an extension that has already been granted—*i.e.*, to remove protections that have been officially afforded to TPS recipients. In the TPS Vacatur notices, Defendant Noem concedes that Congress has not explicitly granted her the power to do so. She does not cite to any statutory provision for this supposed authority, because there is none. She claims instead that she has "inherent (that is, statutorily implicit) authority" to vacate prior extensions.[18]

But the cases that she cites for the proposition that agencies have "statutorily implicit" authority to reconsider their decisions support Plaintiffs' position here. For example, in *Ivy Sports Medicine v. Burwell*, the Court *rejected* the FDA's claim of inherent authority to re-classify a medical device, after public allegations of undue political pressure in the classification process arose. 767 F.3d 81, 89 (D.C. Cir. 2014). Then-Judge Kavanaugh reviewed the detailed statutory scheme that Congress had set forth to reclassify such devices and held that "FDA may not short-

---

[18] *See* 90 Fed. Reg. at 8806; 90 Fed. Reg. at 10514. As the Secretary's phrasing appears to recognize, agencies do not in fact have *any* "inherent" power. Any grant of power to an agency must come from Congress—or it does not exist at all. *NRDC v. Regan*, 67 F.4th 397 (D.C. Cir. 2023) ("While we have often referred to agencies' inherent authority, the term "inherent" is misleading because it is axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress.") (citations and internal quotations omitted).

circuit that process through what it calls its inherent authority[.]" *Id*. at 87. The FDA may have wanted "to take action more promptly" and avoid the "procedural hoops" created by the statutory framework, but "inherent reconsideration authority does not apply in cases where Congress has spoken." *Id*. at 86-87. Permitting the FDA to rescind the classification "would render the [statutory reclassification process] a dead letter" as it would permit the FDA to "reclassify a device without complying with the procedural requirements" that Congress had set forth. *Id*. at 87.

So here, there is a carefully prescribed statutory process for deciding—and publicly announcing—TPS extensions and terminations.  Congress has specifically spoken: a designation "shall remain in effect until the effective date of the termination of the designation…." 8 U.S.C. §1254a(b)(2)(B). It would be unreasonable to presume that Defendant Noem can nonetheless short-circuit those procedures by revoking an extension that has already been granted. As the Supreme Court has repeatedly cautioned, enabling legislation "is generally not an open book to which the agency may add pages and change the plot line." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (cleaned up). It would make no sense to think that Congress would explicitly set forth a precise statutory scheme, only to then impliedly give the Secretary authority to ignore it at any time. *NRDC*, 67 F.4th at 404 ("Congress did not create a process for EPA to withdraw a regulatory determination because it seemingly did not want EPA to have power to do so.").[19]

Further, immense uncertainty would arise from implying a free-ranging agency power to revoke prior determinations: "Like the sword suspended by a hair above the courtier Damocles, the Administration's claimed revocation authority would pose an ever-present threat…fostering great uncertainty."  *American Methyl Corp. v. EPA*, 749 F.2d 826, 840 (D.C. Cir. 1984).

---

[19] *See also FDA v. Brown & Williamson*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted").

Particularly in the context of the TPS statute, where human lives are at stake, this type of uncertainty is untenable—and is precisely what the law was enacted to avoid. *See supra* at 3; *United States v. Riverside Bayview Homes*, 474 U.S. 121, 132-33 (1985) (underlying purpose of law is relevant to discerning limits on agency power).[20]

The other cases cited by Defendant Noem are also readily distinguishable. In *Macktal v. Chao*, the Fifth Circuit held that the Administrative Review Board of the Labor Department could reconsider its earlier decision awarding an employee attorneys' fees, but it emphasized that this was not the case where a statutory scheme otherwise provided a mechanism for review. 286 F.3d 822, 826 (5th Cir. 2002). Similarly, *The Last Best Beef v. Dudas* focused on instances where federal agencies can correct themselves if they "take erroneous or unlawful action…." 506 F.3d 333, 340 (4th Cir. 2007). But here, Defendant Noem did not claim any "error" in Secretary Mayorkas' extensions for Venezuela or Haiti. She cited only his "novel approach" to consolidating the two Venezuela designations, and what she considered his "inadequately developed" explanation for it. 90 Fed. Reg. 8807.[21]

The fact that DHS has never before in the 35-year history of the TPS statute rescinded a TPS extension bolsters the conclusion that DHS has no such authority. *See Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) (lack of assertion of power is significant in determining

---

[20] This purpose in fact permeates the statutory scheme. *See*, *e.g.*, 8 U.S.C. 1254a(a)(1)(A) (assuring that a TPS holder will not be removable "during the period in which such status is in effect"); 1254a(a)(2) (assuring work authorization which "shall be effective throughout the period the alien is in [TPS] under this section"); 1254a(d) (documentation of protected status given to individual TPS holder "shall be valid during the initial period of designation of the foreign state (or part thereof) involved and any extension of such period."); 1254a(d) (ensuring "orderly renewal of documentation" and "orderly transition" in the case of a termination).

[21] As explained below, there is substantial evidence that it was not Secretary Mayorkas' approach to consolidating designations that motivated Defendant Noem's actions, but rather improper political influence and bias. *See infra* at 24-29; Compl. at ¶¶ 116-133.

whether power was actually conferred); *Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (same).[22] The Venezuela Termination, which purports to terminate Venezuela's TPS protection by April 7, 2025, is similarly unlawful: once the illegal Venezuela Vacatur is set aside, then the Termination stands in direct conflict with the requirements of the TPS statute. Absent the Vacatur, Venezuela's TPS designation extends to October 2, 2026. And by law, the Secretary may not terminate TPS protection until that period expires. 8 U.S.C. 1254a(b)(3)(B) (any termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension…."). Her Venezuela Termination, however, purports to terminate TPS protection for Venezuela by April 7, 2025.

Finally, even if Defendant Noem had the authority to undertake the challenged conduct— which she does not—Plaintiffs have sufficiently alleged that the challenged conduct is arbitrary and capricious, or otherwise not in accordance with law. *See* Compl. ¶¶ 96-115; 5 U.S.C. § 706(2). An agency acts arbitrarily and capriciously when it fails to "examine the relevant data" or "articulate a satisfactory explanation" showing a rational link between facts and decision. *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, a policy change demands a "reasoned analysis." *State Farm*, 463 U.S. at 57.

Here, Plaintiffs allege multiple defects that render the challenged conduct arbitrary and capricious under the APA. First, the actions lack any rational connection to the evidentiary record

---

[22] The Vacatur Notices cite to Secretary Mayorkas' recission of a decision to terminate TPS for El Salvador and other countries. *See* 90 Fed. Reg. 10511-10513. However, that action was taken to resolve years of litigation, *see supra* n.4, and was not challenged in court. In any event, given the hundreds of designations, extensions, and terminations that DHS has acted upon over the years, Defendant Noem's actions here indisputably lack precedent. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (finding "lack of historical precedent" where parties cite "only a handful of isolated" examples).

and represent an abrupt, unexplained departure from decades of consistent TPS policy. In particular, Plaintiffs allege that the decision-making process was so rushed that meaningful consultation with other government agencies—as required by the TPS statute—was effectively impossible. *See* Compl. ¶¶ 94, 110. Second, Secretary Noem's stated justifications contradict the U.S. government's own contemporaneous findings—including State Department reports documenting continued violence, repression, and humanitarian crisis in Venezuela. *See* Compl. ¶¶ 102–107. Third, the decision is pretextual and politically driven, closely aligned with first-day anti-immigrant Executive Orders and racially charged rhetoric, rather than any objective evaluation of country conditions. *Id.* at ¶¶ 108, 115. *See also Centro Presente*, 332 F. Supp. 3d at 416-417 (plausibly alleging "arbitrary and capricious" government action as it relates to TPS); *CASA de Maryland*, 355 F. Supp. 3d at 327 (same).

Taken together, these allegations more than satisfy the pleading standard for Plaintiffs' APA claims at this stage.

### III.    Plaintiffs Have Sufficiently Stated An Equal Protection Claim.

#### A.    *Arlington Heights* is the Controlling Standard of Review.

Contrary to Defendants' argument, courts have repeatedly addressed the appropriate standard for evaluating Equal Protection claims alleging racial discrimination in TPS cases and have consistently applied the heightened standard set forth in *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). *See also Centro Presente*, 332 F. Supp. 3d at 409–13; *CASA de Maryland., Inc. v. Trump,* 355 F. Supp. 3d 307, 322-23 (D. Md. 2018); *NAACP v. United States Dep't of Homeland Sec.,* 364 F. Supp. 3d 568, 576 (D. Md. 2019); *Ramos*, 321 F. Supp. 3d at 1124-1125. Defendants' argument that the standard in *Trump v. Hawaii* should apply instead is misplaced.

*Hawaii* is inapposite because it concerned a very different factual context: regulation of foreign nationals seeking to enter the country in the face of national security concerns. By contrast, TPS beneficiaries have long-established ties to the United States and are entitled to a "higher level of due process than foreign nationals seeking admission to the country." *Centro Presente*, 332 F. Supp. 3d at 411 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982))*; see also DHS v. Regents*, 591 U.S. at 34 (plurality) (applying *Arlington Heights* standard to case challenging recission of Deferred Action for Childhood Arrivals (DACA)). Further, the Executive Order in *Hawaii* was issued pursuant to a statute that "exudes deference to the President in every clause," 585 U.S. at 684, whereas the TPS statute sets forth a clear process and criteria to be followed. Compl. ¶¶55-61. Therefore, Defendants' argument that the Court should apply the rational basis standard under *Hawaii* is contrary to the weight of authority and should be rejected. *See* MTD Br. at 24-25.[23]

### B.  Racial Animus Was A Motivating Factor In The Challenged Conduct.

For their Equal Protection claim to withstand Defendants' motion to dismiss, Plaintiffs need only plausibly allege that discriminatory purpose was one "motivating factor" for the challenged action. *Arlington Heights*, 429 U.S. at 265–66. This analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Relevant factors include contemporaneous statements of decision-makers, the historical

---

[23] Plaintiffs would prevail even under rational basis review because the challenged conduct is "not rationally related to a legitimate government purpose." *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107 (1st Cir. 2015). The Court may consider extrinsic evidence in this assessment. *See Hawaii*, 585 U.S. at 705. Even in this deferential context, the Constitution forbids policies motivated by "a bare [] desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973). That is precisely the case here, as Defendants lack a "facially legitimate and bona fide" reason for their actions independent of unconstitutional motives. *Hawaii*, 585 U.S. at 704. For example, the Venezuela Termination asserts "notable" improvements in Venezuela without citing any, contradicting the Department of State's own reports. *See* 90 Fed. Reg. at 9042. Similarly, the Haiti Vacatur references "significant development" in Haiti, yet provides no supporting sources. *See* 90 Fed. Reg. at 10513-10514.

background of the decision, the sequence of events leading up to it, departures from normal processes, and the disparate impact of the decision. *Id.* at 266-68.

Defendants claim that Defendant Noem's statements do not demonstrate racial animus by asserting that these statements were "reasoned explanations for [the challenged conduct]," specifically connected to national security concerns. MTD Brf. at 24-25. This, however, ignores the fact that the Venezuela Vacatur does not cite national security concerns. *See Nat'l TPS All.*, 2025 WL957677 at *38. Even if it had, similar to the Haiti Vacatur and the Venezuela Termination, the "government does not get a free pass … simply because it makes an *ipse dixit* assertion that there is a national security interest." *Id.* Defendants failed to offer—nor could they–concrete evidence to support the basis of their national security concerns. *Id.*[24] Therefore, this Court should not grant these arguments any credence, particularly on a motion to dismiss.

Next, Defendants argue that the racist statements made by Defendant Noem and Defendant Trump were "taken out of context" and selectively quoted. *See* MTD Brf. at 24. This claim is, at best, disingenuous and, at worst, intellectually dishonest. The record of discriminatory animus is not limited to a few isolated remarks—it is extensive and well-documented. Plaintiffs have identified a pattern of racially charged statements by both Defendant Noem and Defendant Trump, rooted in harmful stereotypes, and made repeatedly over a sustained period—including in the critical months preceding Defendant Noem's decisions. *See* Compl. at ¶¶ 116-133.

---

[24] As one example, among others, Defendants cite to gang violence, but "the danger of criminal conduct by an alien is [not] automatically a matter of national security." *Thai v. Ashcroft*, 366 F.3d 790, 796 (9th Cir. 2004). Defendants also point to Defendant Trump's Executive Order identifying the Venezuelan gang, Tren de Aragua("TdA"), as a terrorist organization, MTD Brf. at 25, but offer no evidence to "tie TPS holders to TdA or even to establish that TdA has a substantial presence in the United States." *Nat'l. TPS All.*, 2025 WL957677 at *38.

As numerous courts have held, "[t]here are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination." *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1083 (3rd Cir. 1996). Racist tropes, code words, stereotypes: all are "relevant for what they reveal—the intent of the speaker." *Id*.; *see also Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 505-06 (9th Cir. 2016) ("use of 'code words' may demonstrate discriminatory intent"); *Guimaraes v. SuperValu, Inc.,* 674 F.3d 962, 974 (8th Cir.2012) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications."). Plaintiffs' allegations, taken as true, more than plausibly support an inference of discriminatory motive.

For example, Defendants Trump and Noem have promoted racist tropes, such as the false claim that Haitians eat pets, Compl. ¶¶ 6, 125; equated Black and Latino immigrants with criminals, including labeling Venezuelans as "gangs," "thugs," and "criminals," Compl. ¶¶ 117-121, 123, 126, 128, 129; and invoked xenophobic and eugenicist rhetoric, such as warning that immigrants are "poisoning the blood of our country." *Id.* Moreover, in this case there is no need to make any speculative leaps about whether this longstanding animus infected Defendant Noem's decision-making. For example, in the days immediately following her vacatur of the Venezuela extension, she went on "Fox and Friends" to once again fuel racial stereotypes equating Latino immigrants with criminals and linking those sentiments directly to the TPS Vacatur: "They were going to extend this protection to people that are in temporary protected status, which meant they were going to be able to stay here and violate our laws another 18 months and we stopped that….

The people of this country wants these dirtbags out." Compl. ¶130. [25] Moreover, neither Defendant has disavowed or distanced themselves from these racist remarks. *See Saget*, 375 F. Supp. 3d at 368 (It is the "Court's responsibility to "smoke out" unconstitutional government conduct under the [*Arlington Heights*] doctrine.") (internal citations omitted).[26]

Defendant Trump's racist statements are also relevant and crucial in this matter, despite Defendants' protests. MTD Brf. at 26-27. Under the *Arlington Heights* standard, which the Court should apply here, Plaintiffs have sufficiently presented direct and circumstantial evidence of not only statements from Defendant Noem, the primary decisionmaker of the challenged conduct, but also evidence of Defendant Trump's intent and actions bearing a direct nexus to the actions of Defendant Noem. 429 U.S. at 266; *see also Centro Presente*, 332 F. Supp. 3d at 415 (finding President Trump's statements relevant); *Casa de Maryland*, 355 F. Supp. 3d at 325-326 (same). This is more than sufficient to move past the pleading stage.

Defendants' reliance on the vacated *Ramos* decision is unconvincing and is not controlling. MTD Brf. at 26. Here, numerous statements by Defendant Trump relate directly to TPS policy,

---

[25] Defendants' assertion that the statements concern nationality, not race, *see* MTD. Br. at 22, is disingenuous at best given the overlap between discrimination based on alienage, national origin, and race. *See* e.g., *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination based on 'place or nation of ... origin,' is not a bright one"); *Espinoza v. Farah Manufacturing Co., Inc.*, 414 U.S. 86, 92 n.5, 95 (1973) (refusing to hire people of "Spanish-speaking background," or insisting on an "Anglo Saxon background" as a condition of employment constitutes discrimination based on a protected class); *see also* Fleurissaint Dec. ¶16; Velasquez Dec. ¶ 16 ("in light of the President's inflammatory remarks referring to Venezuelans as "criminals" and "animals"… the Venezuelan community feel[s] stigmatized, excluded, and alienated in the country they now call home").
[26] Defendant Noem echoed these racist sentiments by citing Defendant Trump's first-day Executive Orders as justification for the Venezuela Vacatur, which falsely asserts that "[m]illions of illegal aliens" have been allowed to settle in the United States "in violation of longstanding Federal laws." Venezuela Termination at 5. *See also Saget*, 375 F. Supp. 3d at 359-60 (echoing the influence of the "America First" political agenda, which courts previously cited when enjoining TPS terminations under the first Trump administration).

Compl. ¶132, and even if some statements did not explicitly reference TPS, they remain highly relevant. As the *Centro Presente* court held, liability for racial discrimination can be found where "a biased individual manipulates a non-biased decision-maker into taking discriminatory action." 332 F. Supp. 3d at 414 (citing *Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260, 279 (E.D.N.Y. 2018)). As such, the court refused to dismiss the complaint where it alleged that the White House pressured DHS leadership to terminate TPS designations for political reasons, including advancing then-President Trump's broader anti-immigration agenda. *Id.*

Similarly, here, the discriminatory remarks from both Defendants were consistently about immigration, were repeated over time, and occurred in the months leading up to Defendant Noem's decisions—unlike in *Ramos*, where the challenged statements lacked this temporal and contextual connection. 321 F. Supp. 3d at 1131-1132. Additionally, in this case, Defendant Noem cites directly to several of Defendant Trump's Executive Orders in her TPS determination—a clear showing that Defendant Trump influenced TPS policy, specifically the challenged conduct. *See* Compl. ¶ 97; 90 Fed. Reg at 8807; 90 Fed. Reg. 9042-9043; 90 Fed. Reg. at 1053.

The remaining *Arlington Heights* factors are also satisfied here. The unprecedented and procedurally irregular sequence of events—including the first-ever vacatur of a TPS designation in the statute's history, rushed decision-making immediately following Secretary Noem's confirmation, and failure to engage in the statutorily expected interagency consultation—strongly suggest discriminatory pretext. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 227 (4th Cir. 2016); *Centro Presente*, 332 F. Supp. 3d at 415. These procedural departures, along with the disproportionate impact on Black and Latino TPS holders from Venezuela and Haiti—particularly when compared to the more favorable treatment of predominantly white and European countries—further support an inference of discriminatory intent.

Given this overwhelming evidence, Plaintiffs have sufficiently stated that the challenged conduct was due, in part, by discriminatory intent, namely racial and ethnic animus

## IV.    PLAINTIFFS HAVE CAUSES OF ACTION UNDER THE CONSTITUTION AND THE APA, THEREFORE THEY CAN SEEK DECLARATIORY RELIEF.

Defendants' last argument misunderstands the role of the Declaratory Judgment Act, 28 U.S.C. § 2201, in this case. MTD Brf. at 28 ("[s]ince Plaintiffs have not plausibly alleged a cognizable claim, they are entitled to no remedy whatsoever…."). Plaintiffs do not assert the Act as a freestanding cause of action, nor is that necessary. Rather, Plaintiffs seek declaratory relief as a remedy for the legally cognizable claims they have pled—namely, violations of the APA and the Constitution. As courts have repeatedly held, the Declaratory Judgment Act provides a vehicle for relief where an underlying legal claim exists, as it does here.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007); *O'Brien v. Wilmington Tr. Nat'l Ass'n as Tr. to CitiBank, N.A.*, 506 F. Supp. 3d 82, 93 (D. Mass. 2020).[27]

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motions to Dismiss in full.

---

[27] Defendants' reliance on *Daylily Farms, Inc. v. Chao*, 357 F. Supp. 2d 356, 359 (D. Mass. 2005), and *Colonial Penn Grp., Inc. v. Colonial Deposit Co*., 834 F.2d 229, 232 (1st Cir. 1987), is misplaced. Those cases stand only for the uncontroversial proposition that the Act does not create rights in and of itself. As explained above, however, all of Plaintiffs' claims are cognizable and properly pled. In such a case, a Declaratory Judgment Act claim is proper, and declaratory judgment is an available remedy. *See Centro Presente*, 332 F. Supp. 3d at 418.

Dated:  May 27, 2025                                Respectfully submitted,

                                                    */s/ Oren Sellstrom*_____
                                                    Oren Sellstrom (BBO #569045)
                                                    Mirian Albert (BBO #710093)
                                                    Iván Espinoza-Madrigal (BBO # 708080)
                                                    Victoria Miranda (BBO #695913)
                                                    Lawyers for Civil Rights
                                                    61 Batterymarch Street, 5th Floor
                                                    Boston, MA 02110
                                                    malbert@lawyersforcivilrights.org
                                                    osellstrom@lawyersforcivilrights.org
                                                    iespinoza@lawyersforcivilrights.org
                                                    vmiranda@lawyersforcivilrights.org

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2025, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.


           /s/*Mirian Albert*       
          Mirian Albert (BBO #710093)