BRETT SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Deputy Assistant Attorney General
Civil Division
WILLIAM H. WEILAND
Acting Assistant Director
ANNA L. DICHTER
Senior Litigation Counsel
ERIC SNYDERMAN
LAUREN BRYANT
CATHERINE ROSS
SHELBY WADE
AMANDA SAYLOR
DANIEL CAPPELLITTI
JEFFREY HARTMAN
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HAITIAN-AMERICANS UNITED, *et al.,* | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-10498 |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.,* | |
| Defendants. | |

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION…..............................................................................................1

STATEMENT OF FACTS ...................................................................................3

    I. Statutory Background…..............................................................................3

    II. Factual Background…...............................................................................4

        A. Venezuela…...................................................................................4

        B. Haiti...............................................................................................7

STANDARDS OF REVIEW.................................................................................9

ARGUMENT…...................................................................................................10

    I. THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' ENTIRE ACTION. .10

        A. The TPS Statute Bars Plaintiffs' Claims…...................................10

        B. The APA Precludes Review of the Determinations ........................14

        C. Section 1252(f)(1) Precludes Plaintiffs' Requested Relief.................15

    II. THE SECRETARY'S DETERMINATIONS DID NOT VIOLATE THE APA...........17

        A. The Vacatur Orders Were Not Contrary to Law…........................17

        B. The Termination Determinations Were Not Arbitrary and Capricious...............21

        C. Plaintiffs' Constitutional Claims Fail as a Matter of Law.................24

        D. The Declaratory Judgment Act is Not a Basis For A Claim.................28

CONCLUSION…………………………………………………………..………...28

# TABLE OF AUTHORITIES

## CASES

*Albertson v. FCC*,

 182 F.2d 397 (D.C. Cir. 1950) ................................................................. 18

*Am. Bioscience, Inc. v. Thompson*,

 269 F.3d 1077 (D.C. Cir. 2001) .............................................................. 10

*Arizona v. United States*,

 567 U.S. 387 (2012) ................................................................................. 24

*Associated Fisheries of Me. v. Daley*,

 127 F.3d 104 (1st Cir. 1997) ................................................................... 10

*Bell Atl. Corp. v. Twombly*,

 550 U.S. 544 (2007) ................................................................................. 10

*Bennett v. Murphy*,

 166 F. Supp. 3d 128 (D. Mass. 2016) .................................................... 10

*Biden v. Texas*,

 597 U.S. 785 (2022) ................................................................................. 16

*Boateng v. InterAmerican Univ.*,

 210 F.3d 56 (1st Cir. 2000) ..................................................................... 10

*Brito v. Garland*,

 22 F.4th 240 (1st Cir. 2021) .................................................................... 17

*California Trout v. Schaefer*,

 58 F.3d 469 (9th Cir. 1995) ..................................................................... 20

*California v. Grace Brethren Church*,

 457 U.S. 383 (1982)(f) ........................................................................ 16-17

*CASA de Maryland, Inc. v. Trump*,

 971 F.3d 220 (4th Cir. 2020) ..................................................................... 1

*Celotex Corp. v. Catrett,*

    477 U.S. 317 (1986) ................................................................................. 10

*Chao v. Russell P. Le Frois Builder, Inc.,*

    291 F.3d 219 (2d Cir. 2002) ...................................................................... 18

*Daylily Farms, Inc. v. Chao,*

    357 F. Supp. 2d 356 (D. Mass. 2005) .................................................. 28-29

*Dep't of Commerce v. New York,*

    588 U.S. 752 (2019) ............................................................................ 23, 24

*DHS v. Regents of Univ. of Cal.,*

    591 U.S. 1 (2020) ................................................................................ 26, 27

*Egbert v. Boule,*

    596 U.S. 482 (2022) ................................................................................. 11

*FCC v. Prometheus Radio Project,*

    592 U.S. 414 (2021) ................................................................................. 20

*Fiallo v. Bell,*

    430 U.S. 787 (1977) ...................................................................... 12, 25, 26

*Galvan v. Press,*

    347 U.S. 522 (1954) ................................................................................. 25

*Galvez v. Jaddou,*

    52 F.4th 821 (9th Cir. 2022) ..................................................................... 15

*Garland v. Aleman Gonzalez,*

    596 U.S. 543 & n.5 (2022) .............................................................. 11, 16, 17

*Garside v. Osco Drug, Inc.,*

    895 F.2d 46 (1st Cir. 1990) ...................................................................... 10

*Grace Brethren Church,*

    457 U.S. ................................................................................................... 17

*Gun South, Inc. v. Brady,*

877 F.2d 858 (11th Cir. 1989) ............................................................... 18

*Haitian Evangelical Clergy Ass'n v. Trump*,

   --- F. Supp. 3d. ---, 2025 .................................................................... 9

*Harisiades v. Shaughnessy*,

   342 U.S. 580 (1952) .................................................................. 19, 25

*Holder v. Humanitarian L. Project*,

   561 U.S. 1 (2010) ...................................................................... 14-15

*Hollingsworth v. Perry*,

   558 U.S. 183 (2010) (per curiam) ............................................................ 1

*Hotel & Rest. Emps. Union, Loc. 25 v. Smith*,

   846 F.2d 1499 (D.C. Cir. 1988) (per curiam) ...................................... 12

*Housatonic River Initiative v. U.S. EPA*,

   75 F.4th 248 (1st Cir. 2023) ................................................................ 10

*In re Colonial Mortgage Bankers Corp.*,

   324 F.3d 12 (1st Cir. 2003) .................................................................... 4

*Ivy Sports Medicine, LLC v. Burwell*,

   767 F.3d 81 (D.C. Cir. 2014) ............................................................... 17

*Johansen v. United States*,

   506 F.3d 65 (1st Cir. 2007) ................................................................. 10

*Kleindienst v. Mandel*,

   408 U.S. 753 (1972) ............................................................................ 25

*Lincoln v. Vigil*,

   508 U.S. 182 (1993) ............................................................................ 14

*Macktal v. Chao*,

   286 F.3d 822 (5th Cir. 2002) .............................................................. 18

*Marsh v. Oregon Natural Res. Council*,

   490 U.S. 360 (1989) ............................................................................ 20

*National TPS Alliance v. Noem*,

    773 F. Supp. 3d 807 (N.D. Cal. 2025) ............................................................... 1, 6

*National TPS Alliance v. Noem*,

    2025 WL 2487771 at *13 (9th Cir, 2025) ............................................................... 17

*Newdow v. Roberts*,

    603 F.3d 1002 (D.C. Cir. 2010) ............................................................................... 17

*Nixon v. Fitzgerald*,

    457 U.S. 731 (1982) .................................................................................................. 28

*Noem v. National TPS Alliance, No. 24A1059*,

    2025 WL 1427560 (9th Cir. 2025) ........................................................................ 1, 7

*Ops. Ltd. v. FCC*,

    124 F.4th 1128 (9th Cir. 2024) ................................................................................ 17

*Nat'l TPS All. v. Noem, No. 25-cv-01766-EMC*,

    2025 WL 1547628 (N.D. Cal. May 30, 2025) ......................................................... 7

*Patel v. Garland*,

    596 U.S. 328 (2022) ........................................................................................... 12, 13

*Poursina v. USCIS*,

    936 F.3d 868 (9th Cir. 2019) ....................................................................... 14, 19, 23

*Ramos v. Wolf*,

    975 F.3d 872 (9th Cir. 2020) ................................................................... 13, 18-19, 27

*Reno v. Am.-Arab Anti-Discrim. Comm.*,

    525 U.S. 471 (1999) .................................................................................................. 11

*Sanchez v. Mayorkas*,

    593 U.S. 409 (2021) ............................................................................................... 3, 4

*Sheldon v. Sill*,

    49 U.S. (8 How.) 441 (1850) ................................................................................... 11

*Sistema Universitario Ana G. Mendez v. Riley*,

234 F.3d 772 (1st Cir.2000) ................................................................................. 24

*Staub v. Proctor Hosp.*,

562 U.S. 411 (2011) ........................................................................................... 27

*The Last Best Beef, LLC v. Dudas*,

506 F.3d 333 (4th Cir. 2007) ............................................................................. 18

*the Legislature or the Executive." Mathews v. Diaz*

Legislature or the Executive." Mathews v. Diaz, 426 U.S. 67 (1976) ................... 25

*Trump v. Hawaii*,

585 U.S. 667 (2018) .............................................................. 2, 14, 25, 26, 27

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,

508 U.S. 439 (1993) ........................................................................................... 15

*United States v. Carroll*,

105 F.3d 740 (1st Cir. 1997) ............................................................................. 15

*United States v. Nixon*,

418 U.S. 683 (1974) ........................................................................................... 28

*United States v. Tohono O'odham Nation*,

563 U.S. 307 (2011) ........................................................................................... 12

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,

429 U.S. 525 (1977) ........................................................................................... 26

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252 (1977) ............................................................................................. 2

*Webster v. Doe*,

486 U.S. 592 (1988) ........................................................................................... 14

*Youngstown Sheet and Tube Co. v. Sawyer*,

343 U.S. 579 (1952) ........................................................................................... 19

*Zhu v. Gonzales*,

411 F.3d 292 (D.C. Cir. 2005) ........................................................................... 14

## STATUTES

5 U.S.C. § 701 ................................................................................................... 2, 14

5 U.S.C. § 705 ....................................................................................................... 6

5 U.S.C. § 706 ................................................................................................... 9, 15

6 U.S.C. § 202 ...................................................................................................... 20

6 U.S.C. § 552 ........................................................................................................ 3

6 U.S.C. § 557 ........................................................................................................ 3

8 U.S.C. § 1254a ................................................................................................... 13

8 U.S.C. § 1252 .............................................................................................. *passim*

8 U.S.C. § 1254a ........................................................................................... *passim*

8 U.S.C. §§ 1103 .................................................................................................. 17

28 U.S.C. § 2201 .................................................................................................. 28

## OTHER AUTHORITIES

Pub. L. No. 104-208, 110 Stat. 3009-546 ........................................................... 15

## U.S. CONSTITUTION

U.S. Const. art. III, § 1, cl. 1 ............................................................................. 11

## FEDERAL RULES OF CIVIL PROCEDURE

Federal Rule 12(b) ..................................................................................... 3, 10, 29

Fed. R. Civ. P. 56 ................................................................................................ 10

## FEDERAL RULE OF EVIDENCE

Fed. R. Evid. 201 .................................................................................................. 4

## FEDERAL REGISTER

58 Fed. Reg. 7582 (Feb. 8, 1993) ......................................................................... 4

62 Fed. Reg. 33442 (Jun. 19, 1997) ............................................................................. 4

69 Fed. Reg. 40642 (Jul. 6, 2004) ............................................................................... 4

75 Fed. Reg. 3,476 (Jan. 21, 2010) ............................................................................. 7

76 Fed. Reg. 29,000 (May 19, 2011) .......................................................................... 7

77 Fed. Reg. 59,943 (Oct. 1, 2012) ............................................................................ 7

79 Fed. Reg. 11,808 (Mar. 3, 2014) ........................................................................... 7

80 Fed. Reg. 51,582 (Aug. 25, 2015) ......................................................................... 7

82 Fed. Reg. 23,830 (May 24, 2017) .......................................................................... 7

82 Fed. Reg. 47228 (Oct. 11, 2017) ........................................................................... 4

83 Fed. Reg. 2,648 (Jan. 18, 2018) ............................................................................ 8

86 Fed. Reg. 13,574 (Mar. 9, 2021) .................................................................... 4, 28

86 Fed. Reg. 41,863 (Aug. 3, 2021) ........................................................................... 8

87 Fed. Reg. 55,024 (Sept. 8, 2022) .......................................................................... 5

88 Fed. Reg. 5,022 (Jan. 26, 2023) ............................................................................ 8

88 Fed. Reg. 40,282 (June 21, 2023) .................................................................. 18, 20

88 Fed. Reg. 68,130 (Oct. 3, 2023) ............................................................................ 5

88 Fed. Reg. 40294 (June 21, 2023) ......................................................................... 18

89 Fed. Reg. 20,682 (Mar. 25, 2024) ....................................................................... 23

90 Fed. Reg. 5,961 (Jan. 17, 2025) ............................................................................ 5

90 Fed. Reg. 8,439 (Jan. 29, 2025) .......................................................................... 27

90 Fed. Reg. 8,805 (Feb. 3, 2025) ............................................................................ 20

90 Fed. Reg. 9,040 (Feb. 5, 2025) ..................................................................... *passim*

90 Fed. Reg. 10,030 (Feb. 20, 2025) ....................................................................... 27

90 Fed. Reg. 10,511 (Feb. 24, 2025) .................................................................... 8,21

90 Fed. Reg. 12,200 (Mar. 14, 2025) ...................................................................... 24

90 Fed. Reg. 28,700 (Jul. 1, 2025) ............................................................................ 8

90 Fed. Reg. 28,760 (Jul. 1, 2025) .................................................................... *passim*

90 Fed. Reg. 8443 (Jan. 20, 2025) ............................................................................... 24

90 Fed. Reg. at 8,805 (Feb. 3, 2025) ............................................................................. 5

# INTRODUCTION

Defendants, Kristi Noem, in her official capacity as Secretary of Homeland Security, U.S. Department of Homeland Security, and United States of America (collectively, Defendants), submit this memorandum in support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (FAC), ECF No. 57, and in opposition to Plaintiffs' Motion for Partial Summary Judgement. ECF No. 61.

This spring, the Supreme Court granted the government's application for a stay of a district court order in a nearly identical lawsuit, *Noem v. National TPS Alliance*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025), which underscores the strength of the government's position in this case. With just one noted dissent, the Supreme Court ruled that the government is likely to succeed in challenging a district court order accepting the same legal theories advanced by Plaintiffs in this case. *See National TPS Alliance v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025); *see also Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) (in order to "obtain a stay pending the filing and disposition of a petition for writ of certiorari, an applicant must show," among other things, "a fair prospect that a majority of the Court will vote to reverse the judgment below"); *cf. CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 230 (4th Cir. 2020) ("[E]very maxim of prudence suggests that we should decline to take the aggressive step of ruling that the plaintiffs here are in fact likely to succeed on the merits right upon the heels of the Supreme Court's stay order necessarily concluding that they were unlikely to do so."). By the same measure, the Plaintiffs in this case are not entitled to partial summary judgment and the Court should instead dismiss their First Amended Complaint in its entirety.

Exercising her clear and unreviewable statutory authority, Secretary of Homeland Security Kristi Noem vacated her predecessor's extension of Venezuela's Temporary Protected Status (TPS) designation and, thereafter, terminated the designation. Additionally, she partially vacated Haiti's TPS designation, shortening the existing designation period from 18 months to 12 months. Subsequently, after determining that Haiti no longer met the conditions for TPS, she terminated that designation. Notwithstanding the Secretary's clear authority and Congress's

1

decision to commit her determinations to her discretion alone, Plaintiffs bring claims under the Administrative Procedure Act (APA), alleging that Secretary Noem's TPS determinations were arbitrary and capricious under 8 U.S.C. § 1254a(b)(3)(A)-(B). Plaintiffs also claim that the determinations were motivated by discriminatory animus towards Venezuelans and Haitians in violation of the Equal Protection guarantee of the Fifth Amendment Due Process Clause. Dismissal of this action in its entirety is appropriate because this Court lacks jurisdiction over all of Plaintiffs' claims. First, the TPS statute broadly prohibits judicial review of "any determination of the Secretary with respect to" designations, terminations, or extensions of TPS designations. 8 U.S.C. § 1254a(b)(5)(A). The Secretary's vacatur and termination determinations—like the previous Secretary's extension of the TPS designation for Venezuela—are not subject to judicial review. Second, Plaintiffs' claims are inconsistent with the principle that the APA does not allow for review of agency action that is committed to agency discretion by law. 5 U.S.C. § 701(a)(2). Third, Plaintiffs' claims are foreclosed by another section of the INA—section 1252(f)(1)— which bars district courts from "enjoin[ing] or restrain[ing]" the operation of certain provisions of the INA.

Even if the Court had jurisdiction, Plaintiffs fail to state a claim on the merits. Secretary Noem's determinations were not arbitrary and capricious. They were based on the determination that her predecessor's extensions contained flaws warranting reconsideration, as well as evidence of improvements in both countries' conditions that would allow for the safe return of its nationals, thereby mooting existing TPS eligibility under 8 U.S.C. § 1254a(b)(1)(C). Plaintiffs' equal protection and due process claims are equally unavailing because they fail to plausibly allege that the Secretary was motivated by discriminatory animus. Secretary Noem's determinations are facially legitimate and not motivated by racially discriminatory intent. That is true under the correct standard—the deferential review applicable to such claims in the immigration context, *see Trump v. Hawaii*, 585 U.S. 667 (2018)—and under the standard proposed by Plaintiffs and sometimes applied in other contexts, *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). The Court should dismiss Plaintiffs' First

Amended Complaint with prejudice pursuant to Federal Rule 12(b)(1) or 12(b)(6), or in the alternative, deny Plaintiffs' motion for partial summary judgment.

**STATEMENT OF FACTS**

**I.      Statutory Background**

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent the aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to handle adequately the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the Secretary of Homeland Security,[1] "after consultation with appropriate agencies of the Government," to designate countries for "Temporary [P]rotected [S]tatus," if she finds:

> (C)  … there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1)(C).

When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be removed from the United States and are authorized to work for the duration of the country's TPS designation, so long as they remain in valid temporary protected status. 8 U.S.C. § 1254a(a), (c); *see Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations and extensions of TPS designations may not exceed eighteen months, but the Secretary has discretion

---

[1] Although the statute continues to refer to the Attorney General, the TPS authority now lies with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002. *See* 6 U.S.C. §§ 552(d), 557 (providing that statutory references to the Attorney General in the INA generally are deemed to refer to DHS).

over how long a designation or extension lasts. *Id*. § 1254a(b)(2), (3)(C). The Secretary must consult with appropriate agencies and review each designation before it ends to determine whether the conditions for the country's designation continue to be met. *Id.* § 1254a(b)(3)(A).

If the Secretary finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal Register of the determination and the basis for the termination. *Id.* § 1254a(b)(3)(B). If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C). Virtually every President in the decades since TPS was created has terminated at least one TPS designation. *See, e.g.*, *Termination of Designation of Rwanda under [TPS]*, 62 Fed. Reg. 33442 (Jun. 19, 1997) (Clinton Administration); *Termination of Designation of Lebanon under [TPS] program*, 58 Fed. Reg. 7582 (Feb. 8, 1993) (Clinton Administration); *Termination of the Designation of Montserrat under [TPS],* 69 Fed. Reg. 40642 (July 6. 2004) (Bush Administration); *Termination of the Designation of Sudan for [TPS]*, 82 Fed. Reg. 47228 (Oct. 11, 2017) (Obama Administration).

Finally, the statute makes the Secretary's TPS determinations unreviewable. "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

## I.    Factual Background

### A.    Venezuela

On March 9, 2021, former Secretary of Homeland Security Alejandro Mayorkas designated Venezuela for TPS based on extraordinary and temporary conditions that prevented

nationals of Venezuela from safely returning (the 2021 Venezuela Designation).[2,3] The former Secretary extended Venezuela's TPS designation twice.[4] On October 3, 2023, in addition to extending the 2021 Designation through September 2025, the former Secretary redesignated Venezuela for TPS, effective from October 3, 2023, through April 2, 2025 (the 2023 Venezuela Designation).[5] This notice provided procedures for initial applicants registering for TPS under the 2023 Designation, and it also allowed Venezuelan nationals who had previously registered for TPS under the 2021 Designation to re-register for TPS and apply to renew their employment authorization documentation with U.S. Citizenship and Immigration Services (USCIS). *Id.* On January 10, 2025, former Secretary Mayorkas issued a notice extending the 2023 Designation for 18 months, allowing for a novel consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through October 2, 2026 (the 2025 Venezuela Extension).[6]

On January 28, 2025, Secretary Noem vacated the 2025 Extension and restored the status quo that preceded that decision (the 2025 Venezuela Vacatur).[7] She explained that the 2025 Extension "did not acknowledge the novelty of its approach" or "explain how it is consistent with the TPS statute." *Id.* at 8,807; *see* 8 U.S.C. § 1254a(b)(3). The Secretary determined that the "lack of clarity" warranted a vacatur to "untangle the confusion and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *Id.*

---

[2] Pursuant to Fed. R. Evid. 201(b), the Court should take judicial notice of the Federal Register Notices cited throughout the brief. *See In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003) (holding that "a court may take judicial notice of matters of public record").

[3] *See Designation of Venezuela for [TPS] and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed. Reg. 13,574 (Mar. 9, 2021).

[4] *See Extension of the Designation of Venez. for [TPS]*, 87 Fed. Reg. 55,024 (Sept. 8, 2022); *see also Extension and Redesignation of Venez. For [TPS]*, 88 Fed. Reg. 68,130 (Oct. 3, 2023).

[5] *2023 Venez. Designation*, 88 Fed. Reg. 68,130.

[6] *Extension of the 2023 Designation of Venez. for [TPS]*, 90 Fed. Reg. 5,961 (Jan. 17, 2025).

[7] *See Vacatur of 2025 [TPS] Decision for Venezuela*, 90 Fed. Reg. at 8,805 (Feb. 3, 2025).

After reviewing the Venezuelan country conditions and consulting with the appropriate U.S. Government agencies, on February 1, 2025, Secretary Noem determined that Venezuela no longer continued to meet the conditions for the 2023 Designation, concluding that it was "contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States."[8] Accordingly, Secretary Noem terminated the 2023 Designation, effective April 7, 2025 (the 2025 Venezuela Termination). *Id*. In making this determination, the Secretary highlighted the "notable improvements in several areas, such as the economy, public health, and crime," that allow for Venezuelan nationals to be "safely returned to their home country." *Id*. at 9042. The Secretary determined, however, that even assuming extraordinary and temporary conditions remained, the termination of the 2023 Designation is necessary because it is contrary to the national interest to permit the Venezuelan nationals to remain temporarily in the United States. *Id*. The national interest is "an expansive standard that may encompass an array of broad considerations" which "calls upon the Secretary's expertise and discretionary judgment." *Id*. Secretary Noem explained that the significant population of TPS holders has resulted in "associated difficulties in local communities where local resources have been inadequate to meet the demands cause by increased numbers," and further underscored that, across the United States, "city shelters, police stations and aid services are at maximum capacity." *Id*. In considering the national interest, she found that this population includes members of Tren de Aragua (TdA), a transnational criminal organization recently determined to "pos[e] threats to the United States." *Id*. at 9,042-43. Secretary Noem also observed that "U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration." *Id*. at 9,043. "[C]ontinuing to permit Venezuelans nationals to remain temporarily in the United States" was one such policy. *Id*.

---

[8] *See Termination of the October 3, 2023 Designation of Venezuela for [TPS]*, 90 Fed. Reg. 9,040 (Feb. 5, 2025).

On March 31, 2025, the Northern District of California granted Plaintiffs' motion to postpone the agency action, postponing the effective date of Secretary Noem's Vacatur and Termination decisions under 5 U.S.C. § 705. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025). On April 1, 2025, Defendants appealed that order to the Ninth Circuit and sought a stay while the order was under appellate review, which the 9th Circuit denied. Defendants appealed the denial of the stay to the Supreme Court who, on May 19, 2025, stayed the district court's postponement order pending disposition of any petition for certiorari regarding that order. *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1427560 (S. Ct. May 19, 2025). In doing so, the Supreme Court stated that "[t]his order is without prejudice to any challenge to Secretary Noem's February 3, 2025 vacatur notice insofar as it purports to invalidate EADs [employment authorization documents], Forms I-797, Notices of Action, and Forms I-94 issued with October 2, 2026 expiration dates. *See* 8 U.S.C. § 1254a(d)(3)." *Id.* On May 30, 2025, the Northern District of California ordered that "to preserve the status and rights of th[ese] TPS holders," the effective date of the portion of the Secretary's vacatur decision purporting to invalidate those documents is postponed pending resolution of this case on the merits." Order Granting in Part and Denying in Part Plaintiffs' Motion to Preserve, *Nat'l TPS All. v. Noem*, No. 25-cv-01766-EMC, 2025 WL 1547628, at *7 (N.D. Cal. May 30, 2025), ECF No. 144. On August 29, 2025, the Ninth Circuit affirmed the district court's postponement order. *See Noem v. Nat'l TPS All*, No. 25-2120, Dkt. 98.1 (9th Cir. 2025).

### B.    Haiti

On January 21, 2010, former Secretary Janet Napolitano designated Haiti for TPS for a period of 18 months due to the "conditions in Haiti following the [7.0 magnitude] earthquake" that struck Haiti in January 2010.[9] Various Secretaries extended and redesignated TPS for Haiti until 2018.[10] On January 18, 2018, then-Acting Secretary Elaine Duke terminated the designation,

---

[9] *Designation of Haiti for [TPS]*, 75 Fed. Reg. 3,476, 3,477 (Jan. 21, 2010).

[10] *Extension and Redesignation of Haiti for [TPS]*,76 Fed. Reg. 29,000 (May 19, 2011); *Extension of the Designation of Haiti for [TPS]*, 77 Fed. Reg. 59,943 (Oct. 1, 2012); *Extension of the*

finding that "the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met."[11] On August 3, 2021, former Secretary Alejandro Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions.[12] Thereafter, he extended and redesignated TPS for Haiti for 18 months, ending on August 3, 2024. On July 1, 2024, former Secretary Mayorkas again extended and redesignated TPS for Haiti for 18 months, ending on February 3, 2026 (the 2024 Haiti Extension).[13]

On February 24, 2025, Secretary Noem partially vacated the 2024 Haiti Extension (the 2025 Haiti Partial Vacatur).[14] In so doing, the Secretary shortened the existing designation period from 18 months to 12 months. In rolling back the 18-month extension, Secretary Noem explained that the extension "failed to evaluate" whether permitting Haitian nationals to remain temporarily is "contrary to the national interest of the United States." *See id*. at 10,511-12; 8 U.S.C. § 1254a(b)(1)(C). Secretary Noem also noted that "there is no discussion in the [2024 Haiti Extension] of why the 18-month period was selected in lieu of a 6 or 12 month period." *Id*. at 10,513. She further relied on indications from the Department of State and DHS of "significant developments" that "might result in improvement in conditions," including U.N. involvement to "support the Haitian National Police in capacity building, combatting gang violence and provid[ing] security for critical infrastructure." *Id*. at 10,513-14. The Secretary considered the putative reliance interests of those impacted by the 2025 Haiti Partial Vacatur but found that they were outweighed by the overriding interests and concerns articulated in the notice. *Id*.

---

*Designation of Haiti for [TPS]*, 79 Fed. Reg. 11,808 (Mar. 3, 2014); *Extension of the Designation of Haiti for [TPS]*, 80 Fed. Reg. 51,582 (Aug. 25, 2015); *Extension of the Designation of Haiti for [TPS]*, 82 Fed. Reg. 23,830 (May 24, 2017).

[11] *Termination of Designation of Haiti for [TPS]*, 83 Fed. Reg. 2,648 (Jan. 18, 2018).

[12] *Designation of Haiti for [TPS]*, 86 Fed. Reg. 41,863 (Aug. 3, 2021).

[13] *Extension & Redesignation of Haiti for [TPS]*, 88 Fed. Reg. 5,022 (Jan. 26, 2023).

[14] *See Partial Vacatur of 2024 [TPS] Decision for Haiti*, 90 Fed. Reg. 10,511 (Feb. 24, 2025).

After reviewing the Haiti country conditions and consulting with the appropriate U.S. Government agencies, Secretary Noem determined that Haiti no longer continued to meet the conditions for the 2024 Designation and that it was "contrary to the national interest to permit the [covered] Haitian nationals to remain temporarily in the United States." [15] *2025 Haiti Termination*, 90 Fed. Reg. 28,762. Accordingly, Secretary Noem terminated the 2024 Designation effective September 2, 2025. *Id*. In making this determination, she explained that national interest is "an expansive standard that may encompass an array of broad considerations" which "calls upon the Secretary's expertise and discretionary judgment." *Id*. Secretary Noem cited recent reports highlighting a "pattern of large-scale irregular migration" from Haitian nationals that is "unsustainable" and inconsistent with U.S. national interests. *Id*. at 28,763. She further emphasized that "limited access to critical information," particularly in a "high-volume border environment" has hindered the ability of U.S. officials to reliably screen foreign nationals arriving in the United States. *Id*. at 28,762. The Secretary explained that this "inability to access reliable law enforcement or security information from the alien's country of origin" combined with the "serious threat posed by Haitian gangs" directly impacts U.S. national security interests, particularly in the context of "uncontrolled migration." *Id*. at 28,763. In considering U.S. public safety, Secretary Noem pointed to a recent report from the U.S. Department of State, which designated organizations such as the Viv Ansanm coalition and Gran Grif as Foreign Terrorist Organizations and Specially Designated Global Terrorists. *Id*. She noted that members of these organizations "have already been identified among those who have entered the United States" and, in some instances, "have been apprehended by law enforcement for committing serious and violent crimes." *Id*. Secretary Noem observed that the "U.S. must prioritize its national interests," which includes assessing factors such as "foreign policy, public safety, national security, migration factors, immigration policy, and

---

[15] *Termination of Designation of Haiti for [TPS]*, 90 Fed. Reg. 28,700 (July 1, 2025).

economic considerations." *Id*. Weighing these factors, the Secretary determined that "continuing TPS for Haiti is not in the national interest." *Id*.

On July 28, 2025, the Eastern District of New York set aside Secretary Noem's partial vacatur under 5 U.S.C. § 706. As a result, the 2024 TPS extension, which extended TPS for Haiti until February 3, 2026, remains in effect. *See Haitian Evangelical Clergy Ass'n v. Trump*, --- F. Supp. 3d. ---, 2025 WL 1808743 at *11 (E.D.N.Y. July 1, 2025).

## STANDARDS OF REVIEW

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) must be granted if the complaint fails to allege facts sufficient to establish subject matter jurisdiction. *See Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007). A court should dismiss for failure to state a claim under Rule 12(b)(6) when a complaint fails to plead enough facts to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). When considering a motion made pursuant to Rule 12(b)(6), "a court may look beyond the complaint to matters of public record without having to convert the motion to one for summary judgment." *Boateng v. InterAmerican Univ.*, 210 F.3d 56, 60 (1st Cir. 2000). When a district court reviews agency action under the APA, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotations omitted). Accordingly, the case on review is a question of law and the Court's review is limited as to whether the agency acted in an arbitrary and capricious manner. *Id*.

Summary judgment is warranted if "there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). When a party challenges an agency action under the APA, the usual summary judgment standard does not apply. *See Bennett v. Murphy*, 166 F. Supp. 3d 128, 139 (D. Mass. 2016) (quoting *Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015)). Instead, in deciding whether an agency action was arbitrary and capricious, the reviewing court is limited to the existing administrative record. *Housatonic River Initiative v. U.S. EPA*, 75 F.4th

10

248, 278 (1st Cir. 2023). When a district court reviews an agency's adjudication, "judicial review, even at the summary judgment stage, is narrow" because "the APA standard affords great deference to agency decisionmaking" and "the Secretary's action is presumed valid." *Associated Fisheries of Me. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

## ARGUMENT

**II.    This Court Lacks Jurisdiction over Plaintiff's Entire Action.**

### A.    The TPS Statute Bars Plaintiff's Claims

In the immigration context, Congress has enacted many limits on courts' authority to intervene in Executive Branch decision-making. *See, e.g.*, *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 486 (1999) (observing that "*many* provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation," and collecting limits in that statute on judicial review). These limits reflect Congress's authority to determine which cases lower courts may and may not hear and when to make the lower courts available to aggrieved parties. *See* U.S. Const. art. III, § 1, cl. 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers."); *see, e.g.*, *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (recognizing that "Congress," not the courts, has the authority and ability, to weigh the pros and cons of remedial schemes, including "economic and governmental concerns," "administrative costs," and the "impact on governmental operations systemwide"). These limitations operate, by Congress's design, to channel or foreclose even meritorious claims; indeed, that is precisely when they have teeth. *See, e.g.*, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554 & n.5 (2022) (explaining that it would be "unusual" for such a bar to foreclose review or relief only when a claim "already independently fails on the merits").

The TPS statute provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a

foreign state" for TPS relief. 8 U.S.C. § 1254a(b)(5)(A). This provision bars all of Plaintiffs' claims in this Court, whether statutory or constitutional, each of which challenges Secretary Noem's vacaturs and terminations. *Id*.; *see also* H.R. Rep. No. 101-245, at 14 (1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review."). The statute's terms confirm its broad sweep.

First, Congress prefaced "determination" with the term "any." 8 U.S.C. 1254a(b)(5)(A). As the Supreme Court explained "the word 'any' has an expansive meaning." *Patel v. Garland*, 596 U.S. 328, 338 (2022) (cleaned up). The provision thus captures determinations "of whatever kind." *Id*. Second, the phrase "with respect to" has "a broadening effect," as it "ensur[es] that the scope of [the] provision covers not only its subject but also matters relating to that subject." *Id*. at 339. When Congress has stripped a court of jurisdiction "in respect to" certain claims, the Supreme Court has construed that as a "broad prohibition." *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011). The TPS statute thus plainly commits to the Secretary's unreviewable authority and all determinations relating to any TPS termination. *Id*.

Reinforcing this interpretation, "the Government's political departments [are] largely immune from judicial control" in the immigration context, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), particularly when making the sort of sensitive foreign policy judgments at issue here. The Executive Branch had long exercised inherent authority to afford temporary immigration status based on its assessment of conditions in foreign states, even before there was any "specific statutory authority" for such relief. *See Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (per curiam). That authority included the discretion "not to extend [protected] status" to a particular class of aliens, and the D.C. Circuit had recognized that such decisions were "unreviewable" by courts. *Id*. Congress legislated against that backdrop when it enacted the TPS program and codified in Section 1254a(b)(5)(A) the understanding that "[t]here is no judicial review" of such determinations. 8 U.S.C. § 1254a(b)(5)(A).

Plaintiffs' APA claims fall squarely within § 1254a(b)(5)(A)'s prohibition on judicial review. They are challenging, and seeking to vacate, the Secretary's "determination[s] … with

respect to the … extension or termination … of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). Courts lack the authority to review or set aside those determinations. Section 1254a plainly precludes judicial review of the Secretary's 2025 Venezuela Termination and the 2025 Haiti Termination because they are both "determination(s) with respect to the termination" of TPS designations. *See 2025 Venezuela Termination*, 90 Fed. Reg. 9,040; *2025 Haiti Termination*, 90 Fed. Reg. 28,760. A decision to terminate a TPS designation is at the core of the jurisdictional statute's broad sweep. Because the Secretary's decisions to terminate the 2023 Venezuela Designation and the 2024 Haiti Designation were clearly a determination "with respect to" the TPS extension or termination, this Court lacks jurisdiction to review it. *See Ramos*, 975 F.3d 872, 889 (9th Cir. 2020) (this bar "preclude[s] direct review of the Secretary's country-specific TPS determinations"), *vacated*, 59 F.4th 1010, 1011 (9th Cir. 2023).

The Secretary's 2025 Venezuela Vacatur and 2025 Haiti Partial Vacatur likewise fall within § 1254a(b)(5)(A)'s bar. A determination to fully or partially vacate an extension of a designation is undoubtedly a determination "with respect to" the "extension of a designation." 8 U.S.C. § 1254a(b)(5)(A); *see Merriam-Webster's Dictionary* (2025), Determination ("the act of deciding definitely and firmly"); *The American Heritage Dictionary* (2022), Determination ("The act of making or arriving at a decision[;] The decision reached[;] The settling of a question by an authoritative decision or pronouncement"); Black's Law Dictionary 450 (defining determination as "[t]o settle or decide by choice of alternatives or possibilities."); Webster's New Collegiate Dictionary 346 ("the act of deciding definitively and firmly"); Webster's Encyclopedic Unabridged Dictionary 393 ("the act of coming to a decision or of fixing or settling a purpose"). Those determinations are therefore not subject to any judicial review—full stop. *See Patel*, 596 U.S. at 338 (acknowledging importance of broadening terms "any" and "regarding" in similar jurisdiction-stripping provision).

Plaintiffs seek to circumvent this statutory bar by arguing that their challenge is merely a collateral challenge to the Secretary's processes or legal authority, but that argument fails. ECF No. 61 at 18. The bar on judicial review of "any determination" "with respect to" a TPS

designation, extension, or termination covers any sort of challenge to those decisions. 8 U.S.C. § 1254a(b)(5)(A); *see Patel*, 596 U.S. at 338-39 (similar jurisdictional bar did not "restrict itself to certain kinds of decisions," but instead covered both subsidiary determinations and the ultimate, "last-in-time judgment" on the matter); 8 U.S.C. § 1252(a)(5) (defining "judicial review" for INA purposes broadly).

The application of § 1254a(b)(5)(A)'s bar on judicial review is not complicated. Plaintiffs challenge the Secretary's 2025 Venezuela Vacatur and Termination and the 2025 Haiti Partial Vacatur and Termination determinations. But each was a determination with respect to "termination or extension of a [TPS] designation." 8 U.S.C. § 1254a(b)(5)(A). This Court thus lacks jurisdiction to review them, and this case should end now.

### B.    The APA Precludes Review of the Determinations

The APA also precludes review where the agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). While "rare," this section of the APA applies "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). A determination of the national interest is one of these rare circumstances. *See Hawaii*, 585 U.S. at 684-86 (explaining that where the President has statutory discretion to determine if an alien's entry "would be detrimental to the interests of the United States," federal courts should not inquire "into the persuasiveness of the President's justifications"). The determination of "national interest" is one that calls upon the Secretary's "expertise and judgment" and lacks a manageable legal standard. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *see also Webster v. Doe*, 486 U.S. 592, 600 (1988); *Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) ("[T]he 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts.") (citing *Trump v. Hawaii*, 585 U.S. 667, 685-86 (2018)). Indeed, the Secretary is not required to explain her national-interest finding "with sufficient detail to enable judicial review" at all, underscoring that this finding is not susceptible to APA review.

*Hawaii*, 585 U.S. at 685-86; *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 34-35 (2010) (rejecting as "dangerous" an argument that national security and foreign policy concerns must be publicly stated with "'detail,' 'specific facts', and 'specific evidence,'" and recognizing that "[i]n this context, conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government."). Because there is no manageable standard by which this Court can judge the Secretary's finding that permitting TPS holders from Venezuela or Haiti is contrary to the national interest, this Court also lacks jurisdiction to review any determination based upon that finding. *See* 2025 Venezuela Vacatur; 2025 Venezuela Termination; 2025 Haiti Partial Vacatur; 2025 Haiti Termination.

### C.    Section 1252(f)(1) Precludes Plaintiff's Requested Relief

By seeking to have the Secretary's determinations "be immediately enjoined and set aside" under 5 U.S.C. § 706(2), Plaintiffs also seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1). FAC ¶ 9; ECF No. 61 at 13, 17, 22-26. Section 1252(f)(1) bars district courts and courts of appeals from entering an order that "enjoin[s] or restrain[s]" the operation of the statutory provisions § 1252(f)(1) covers. Section 1254a is one of those covered provisions. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), div. C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-546. Although Section 1254a appears in Part V of the U.S. Code, the U.S. Code is inconsistent with the INA, wherein the TPS provisions in Section 244 appear in Chapter 4. *Id.* When there is a conflict, the INA prevails. *See Galvez v. Jaddou*, 52 F.4th 821, 830-31 (9th Cir. 2022); *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("Though the United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112...."); *United States v. Carroll*, 105 F.3d 740, 744 (1st Cir. 1997) ("Conflicts between the text of a statute as it appears in the Statutes at Large, on one hand, and in usually reliable but unofficial sources such as the United States Code Annotated, on the other hand, are rare, but … the rendition of the law contained in the Statutes at Large controls."). INA

§ 244 lies within chapter 4 of title II of the INA, as amended, so it is one of the statutes to which § 1252(f)(1) applies.

Regardless of how Plaintiffs frame the relief sought, an order that would have the effect of enjoining or restraining DHS's implementation of the TPS provisions in § 1254a is jurisdictionally barred under § 1252(f)(1). *See Biden v. Texas*, 597 U.S. 785, 797 (2022) (§ 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions.") (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)) (emphasis added); *see* Black's Law Dictionary (12th ed. 2024) (An injunction is "[a] court order commanding or preventing an action"). To "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Aleman Gonzalez*, 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). An order setting aside the Secretary's vacatur and termination decisions would be an order "restraining" federal officials. *Id*. at 550.

Section 1252(f)(1) thus plainly bars classwide injunctive relief (which would impermissibly "enjoin" the operation of a covered provision) and classwide declaratory relief or relief under the APA (which would impermissibly "restrain" the covered provision's operation). *See California v. Grace Brethren Church*, 457 U.S. 383, 408 (1982) (holding that a similarly phrased provision barred declaratory. An order to "set aside" the vacatur and termination determinations "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Borhl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency's determinations—the practical equivalent of an injunction compelling Defendants to stop enforcing the termination and vacatur decisions, determinations pursuant to 8 U.S.C. § 1254a. *See United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring) (questioning the validity of the district court's finding that § 1252(f)(1) does not bar vacatur orders and that § 706(2) authorizes courts to issue them). Setting aside the Secretary's determinations is barred by § 1252(f)(1) because it would coerce and restrain the agency's operation of covered statutes. Thus, to the extent Plaintiffs seek an order

"setting aside, under the Administrative Procedure Act, the 2025 Haiti Vacatur, the 2025 Venezuela Vacatur, the 2025 Venezuela Termination and the 2025 Haiti Termination," this type of order would necessarily constitute an order "restraining" federal officials and is therefore equally prohibited by 8 U.S.C. § 1252(f)(1). FAC Prayer for Relief (B); ECF 61 at 26; *see Aleman Gonzalez*, 596 U.S. at 544.

Finally, it remains the government's view that § 1252(f)(1) also bars declaratory relief. *See Aleman Gonzalez*, 596 U.S. at 551 n.2; cf. *Grace Brethren Church*, 457 U.S. at 408 (similarly phrased Tax Injunction Act barred declaratory relief as well as injunctive relief); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010). The government recognizes, however, that the First Circuit has held otherwise, and preserves its argument that the First Circuit's precedent is erroneous. *Brito v. Garland*, 22 F.4th 240, 250 (1st Cir. 2021) ("declaratory relief remains available under Section 1252(f)(1)").

## III.    The Secretary's Determinations Did Not Violate the APA

### A.    The Vacatur Orders Were Not Contrary to Law

Even if Plaintiffs' claims were reviewable, they lack merit. The Secretary has inherent authority under 8 U.S.C. §§ 1103(a) and 1254a to reconsider past actions. Plaintiffs, however, contend that the 2025 Venezuela Vacatur and 2025 Haiti Partial Vacatur were unlawful under the APA. FAC ¶¶ 155, 161, 165; ECF No. 61 at 13. Statutory authorization to make a decision "must be understood as carrying with it an implied incidental authority" to revoke that decision, *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024),[16] especially because the TPS statute gives the Secretary discretion over both the length of a TPS designation and the timing of periodic review. 8 U.S.C. § 1254a(b)(3)(A)-(C); *see also Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (collecting cases and explaining that "administrative

---

[16] Defendants acknowledge the recent opinion from the Ninth Circuit, which analyzes the statutory limitations on inherent authority. *See National TPS Alliance v. Noem*, 25-2120, 2025 WL 2487771 at *13 (9th Cir, 2025). However, Defendants maintain their position that the Secretary's determinations were consistent with her statutory authority because they were based on a finding that her predecessor's decisions contained flaws warranting reconsideration.

agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion").

Plaintiffs argue that the TPS statute provides no authority to rescind a TPS designation or extension. FAC ¶ 164; ECF No. 61 at 13. This is not so. Courts have long recognized that an administrative agency has inherent or statutorily implicit authority to reconsider and change a decision within a reasonable period if Congress has not foreclosed this authority by requiring other procedures. *See Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide."); *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 229 n.9 (2d Cir. 2002) (agency's power to reconsider "applies regardless of whether the applicable statute and agency regulations expressly provide for such review, but not where there is contrary legislative intent or other affirmative evidence") (emphasis in original) (quotations omitted); *see also The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (federal agencies have broad authority to reconsider their prior decisions, particularly when the prior decision contained an error); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (holding agency acted lawfully by exercising inherent authority to reconsider decisions) (collecting cases); *Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) ("[T]he Supreme Court and other courts have recognized an implied authority in other agencies to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration."). And the Secretary has asserted and exercised this authority previously. *See Reconsideration and Recission of Termination of the Designation of El Salvador for [TPS]; Extension of the [TPS] Designation for El Salvador*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023) (Secretary Mayorkas exercising "inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination" to vacate his predecessor's termination of El Salvador's TPS designation); *Reconsideration and Recission of Termination of the Designation of Nicaragua for [TPS]; Extension of [TPS] Designation for Nicaragua*, 88 Fed. Reg. 40294 (June 21, 2023) (same).

18

Here, Congress gave the Secretary "undoubtedly broad" authority to "make TPS determinations" and to ensure the continued designation of a country complies with the law. *Ramos*, 975 F.3d at 890 (finding statutory constraints "on the Secretary's discretion, [are] in favor of limiting unwarranted designations or extensions…") (cleaned up). Section 1254a requires the Secretary to review conditions within foreign states designated for TPS periodically, but any subsequent action turns on the Secretary's findings about whether the conditions for such designation continue to exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). The statute also requires the Secretary to determine whether "permitting aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C); *cf. Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Hawaii*, 585 U.S. at 684-86)). Secretary Noem took the steps provided by the TPS statute and, while Plaintiffs may disagree with her decision, they cannot adequately allege that she has "no statutory authority" to rescind and reconsider a prior TPS determination. FAC ¶¶ 4, 164-165; ECF No. 61 at 13-14.

Flexibility to reconsider decisions makes especially good sense in the TPS context. The Secretary's TPS authority inevitably requires her to make sensitive assessments affecting United States foreign policy. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations [and] the war power."). When the Executive Branch acts in the field of foreign policy "pursuant to an express or implied authorization of Congress, [its] authority is at its maximum, for it includes all that [it] possesses in [its] own right plus all that Congress can delegate." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (cleaned up).

Employing Plaintiffs' analysis that Section 1254a bars such reconsideration would mean that no Secretary of Homeland Security could ever vacate a designation or extension of a

19

designation, no matter the type of national security threat posed or the seriousness of the error or legal defect in a prior determination. Section 1254a does not mandate such an unworkable and potentially detrimental limitation of the Secretary's ability to fulfill her border security, national security, and foreign policy responsibilities by exercising her broad authority to administer and enforce the immigration laws, *see, e.g.*, 6 U.S.C. § 202(1)-(5), 8 U.S.C. § 1103(a)(1), (a)(3), and to do so consistent with the President's Executive Orders. And reconsideration authority is particularly essential and sensible in the TPS context, where Congress has sharply limited the availability of judicial review, even for erroneous designations. *Id.* § 1254a(b)(5)(A). For these articulated reasons, Secretary Noem exercised her inherent authority under Section 1254a in revisiting and reconsidering prior TPS determinations. If agencies hold *any* inherent power to reconsider past actions, as the law says they do and as Secretary Mayorkas previously recognized, this was a quintessential exercise of that power. *See 2023 El Salvador Reconsideration*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023).

The other bases that Plaintiffs invoke also fail to show that the vacaturs were arbitrary and capricious as a matter of law. See *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (under the arbitrary and capricious standard, a reviewing court must determine whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment); *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (emphasizing deferential standard, *viz.*, whether "the agency has acted within a zone of reasonableness"). The court should overturn an agency's decision only if the agency committed a "clear error of judgment." *California Trout v. Schaefer*, 58 F.3d 469, 473 (9th Cir. 1995). Plaintiffs' assertion that the Secretary did not identify any error in her predecessor's determination that Venezuela continues to meet the criteria for TPS designation is flatly incorrect. FAC ¶ 95. Secretary Noem provided her reasons for the Venezuela Vacatur—namely, she raised concerns that the 2025 Venezuela Extension consolidated the two overlapping populations and prevented her from making "informed determinations regarding the TPS designation and clear guidance." 2025 Venezuela Vacatur, 90 Fed. Reg. 8,807. In this context, it was not arbitrary or

capricious for the Secretary to invoke the vacatur to "untangle the confusion" of the 2025 Extension and "restore the status quo" preceding that determination. *Id.*

Plaintiffs' allegation that the 2025 Haiti Partial Vacatur "lacks any legal basis" is also itself baseless. FAC ¶ 114. Secretary Noem carefully reviewed the decision of former Secretary Mayorkas to extend (for the second time) the 2021 designation of Haiti for TPS for 18 months and redesignate Haiti for TPS until February 3, 2026. *2025 Haiti Partial Vacatur*, 90 Fed. Reg. 10,513-15. In revisiting this determination, Secretary Noem reasonably found that the former Secretary "failed to evaluate whether 'permitting Haitian nationals to remain temporarily in the United States' is not 'contrary to the national interest of the United States'" and cited the lack of support in the record concerning the former Secretary's national interest finding. *Id.* at 10,511-13. Additionally, Secretary Noem reasonably noted that the former Secretary's decision to extend the TPS designation for Haiti did not include a discussion of "why the 18-month period was selected in lieu of a 6- or 12-month period." *2025 Haiti Partial Vacatur*, 90 Fed. Reg. at 10,513-15. Partially vacating the 2024 Extension on these grounds is not arbitrary and capricious simply because Plaintiffs disagree with the outcome—and second-guessing her reasoning about a specific country's TPS designation falls at the indisputable core of the statutory bar on judicial review of the Secretary's determinations with respect to TPS extensions. 8 U.S.C. § 1254a(b)(5)(A). Moreover, Secretary Noem's consideration of this issues is entirely consistent with Congress's objective of providing temporary relief (subject to mandatory periodic review) to nationals of designated countries until, depending on the designation category at issue, they can safely return home, the country can adequately handle their return, or it is no longer in the national interest to permit them to remain in the United States temporarily. *See* 8 U.S.C. § 1254a.

Plaintiffs further assert that, because the vacaturs are unlawful and must be set aside, the Secretary did not have the authority to terminate TPS for Venezuela and Haiti until their pre-

vacatur end dates. ECF 61 at 17. Since Plaintiffs have failed to demonstrate that the vacaturs were unlawful, this argument also fails.[17]

**B.    The Termination Determinations Were Not Arbitrary and Capricious**

Plaintiffs also fail to demonstrate that  the 2025 Venezuela and Haiti Terminations  were unlawful as a matter of law. FAC ¶¶ 171, 177.  Plaintiffs first allege that Secretary Noem's assessments in her determinations contradict the reports from the Department of State. FAC ¶¶ 104, 120. Putting aside the fact that this argument urges a quintessential re-weighing of the evidence underlying the Secretary's determinations with respect to two specific countries' TPS designations, which is plainly barred by § 1254a(b)(5)(A), Plaintiffs are simply wrong. Contrary to Plaintiffs' assertion, the termination notices reflect that Secretary  Noem appropriately considered the country conditions for Venezuela and Haiti, consulted with the relevant government agencies, and determined that Venezuela and Haiti no longer continue to meet the conditions for designation. *See 2025 Venezuela Termination*, 90 Fed. Reg. at 9,042; *2025 Haiti Termination*, 90 Fed. Reg. at 28,760.

Here, Secretary Noem reviewed Venezuela's designation and, based on the U.S. Department of State's assessment, noted "improvements in several areas such as the economy, public health and crime that allow for [Venezuelan] nationals to be safely returned to their home country," but determined that "even assuming relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination…is 'required' because it is contrary to national interest…." *2025 Venezuela Termination*, 90 Fed. Reg. at 9,042; *supra* I.A. Similarly, the Secretary reviewed Haiti's 2024 TPS designation and, based on a joint assessment conducted by the U.S. Department of State, the Secretary of Homeland Security, and the Director of National Intelligence, found that Haiti's lack of "functioning central authority capable of maintaining or sharing critical information" has hindered the ability of U.S. officials to "access reliable law

---

[17] While the FAC includes claims that the Venezuela and Haiti Terminations were arbitrary and capricious, FAC ¶¶ 171, 177, Plaintiffs do not make this argument in their papers and have therefore forfeited any such argument on summary judgment.

enforcement or security information from the alien's country of origin." *2025 Haiti Termination*, 90 Fed. Reg. at 28,763; *supra* I.B. As articulated in her termination notices, Secretary Noem appropriately considered country conditions, based on information provided by the appropriate government agencies, evaluated the national interest factors and provided her reasons for terminating Venezuela's and Haiti's TPS designations. *2025 Venezuela Termination*, 90 Fed. Reg. at 9,042; *2025 Haiti Termination*, 90 Fed. Reg. at 28,760. The Secretary's reasoned determinations were unquestionably a lawful exercise of her authority to determine whether "permitting aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C); *Poursina*, 936 F.3d at 874.

Plaintiffs also assert that Secretary Noem's reliance on national interest factors "mark[s] a stark departure from past agency practices." FAC ¶ 107. However, this argument ignores the statutory language providing that if the Secretary determines during her periodic review that the country no longer continues to meet the conditions for designation, termination is warranted. 8 U.S.C. § 1254a(b)(3)(B). And one of the conditions for designation under § 1254a(b)(1)(C) is a finding by the Secretary that "permitting the aliens to remain temporarily in the United States is [not] contrary to the national interest."[18] If the Secretary determines otherwise with respect to the national interest, as she did with the 2023 Venezuela Designation and the 2024 Haiti Designation, then the designation must be terminated. Adhering to the plain text of the TPS statute, which requires consideration of the basis for the designation, cannot be arbitrary or capricious.

Moreover, Plaintiffs' claim that the terminations were based on "improper political considerations" is meritless. FAC ¶¶ 107, 123. "It is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred

---

[18] *See, e.g.*, *Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status*, 89 Fed. Reg. 20,682, 20,865-86 (Mar. 25, 2024) (extending TPS designation after determining that "it is not contrary to the national interest of the United States to permit TPS beneficiaries from Burma to remain in the United States temporarily"); *Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension*, 63 FR 15437, 15438 (Mar. 31, 1998) (terminating Liberia TPS designation after "consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States").

policy." *Dep't of Commerce v. New York*, 588 U.S. 752, 78 (2019). As the Supreme Court has explained, "a court may not set aside an agency's policymaking decision solely because it may have been influenced by political considerations or prompted by Administrative priorities …. Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations interest groups, foreign relations, and national security concerns (among others). *Id*. at 782. And, here, the terminations were firmly and appropriately rooted in foreign policy and national interest considerations. *See* 8 U.S.C. § 1254a(b)(1)(C); *Arizona v. United States*, 567 U.S. 387, 409 (2012) (holding the federal government must speak "with one voice" in determining "whether it is appropriate to allow a foreign national to continue living in the United States"); *cf.* U.S. Secretary of State, Determination: Foreign Affairs Functions of the United States, 90 Fed. Reg. 12,200 (Mar. 14, 2025) ("[A]ll efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States under the Administrative Procedure Act, 5 U.S.C. 553, 554."). Thus, Plaintiffs' allegations fail to rise to the level of plausibility required for their claims to proceed. The Secretary's actions were consistent with her continuing obligation to safeguard the border and national security of the United States and to administer and enforce the immigration laws. *See* 8 U.S.C. § 1254a(b)(1)(C); Exec. Order No. 14159, Protecting the American People Against Invasion, § 16(b), 90 Fed. Reg. 8443 (Jan. 20, 2025).

It is clear that the Secretary "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for" her action "including whether there is a rational connection between the facts found and the choice made." *Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 777 (1st Cir.2000) (citation and alterations omitted). Plaintiffs have accordingly failed to show that the Secretary's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* Based on the foregoing, this Court should dismiss this case or alternatively, deny Plaintiffs' motion for partial summary judgment and grant judgment in favor of Defendants.

IV.        **Plaintiffs' Constitutional Claims Fail as a Matter of Law**

Plaintiffs' assertions that the Secretary's determinations "intended to discriminate against both groups on the basis of race, ethnicity, and/or national origin" are baseless. FAC ¶ 182. The Supreme Court has been clear that where, as here, a decision is based on immigration policy, courts cannot look behind facially legitimate actions to hunt for illicit purposes. *See Hawaii*, 585 U.S. at 703-04. The deferential, "highly constrained" review of *Trump v. Hawaii* applies here, and the Secretary's decisions easily passes muster under it. *See id*. at 704 ("Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [the Court's] inquiry into matters of entry and national security is highly constrained").

The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Because decisions in these matters implicate "relations with foreign powers" and involve "classifications … defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government"). Decisions by the political branches about which classes of aliens to exclude or expel will generally be upheld against constitutional challenges so long they satisfy deferential rational-basis review. *Hawaii*, 585 U.S. at 704-05; *see also Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a " facially legitimate and bona fide" reason for its action); *Mathews*, 426 U.S. at 82 (a "narrow standard of review" applies to "decisions made by Congress or the President in the area of immigration and naturalization"); *Shaughnessy*, 342 U.S. at 588-89.

The holdings in *Hawaii*, *Mandel*, and *Fiallo* support the application of rational basis review in this case. In addition to reviewing country conditions and consulting with appropriate government agencies, the Secretary appropriately considered "whether permitting a class of aliens to remain temporarily in the United States is contrary to the national interest," in accordance with 8 U.S.C. § 1254a(b)(1)(C); *See 2025 Venezuela Termination*, 90 Fed. Reg. at 9,040, 9,042-43; *2025 Haiti Termination*, 90 Fed. Reg. at 28,763. TPS decisions, such as the determinations at issue, involve sensitive, country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *Hawaii*, 585 U.S. at 702—precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. *See id.*; *see also Fiallo*, 430 U.S. at 799.

Plaintiffs' equal protection claim would fail even under the standard set forth in *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 525 (1977). Plaintiffs cannot show that a "racially discriminatory purpose was a motivating factor in the [government's] decision," through statements taken out of context and without direct links to the Secretary's determinations. *Id.* at 266; *see DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (explaining that disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus").

Here, the determinations lack any plausible discriminatory purpose, as Secretary Noem provided reasoned explanations for her determinations. Rather than focusing on these stated, facially sufficient and neutral justifications, however, Plaintiffs instead cherry-pick statements, social media posts, and media appearances from the Secretary to suggest discriminatory motives for the TPS determinations. FAC ¶¶ 128, 131-141. But none of these allegations reflect animus based on race or national origin. Plaintiffs take Secretary Noem's statements grossly out of context and mischaracterize them as supposedly portraying all Venezuelan TPS beneficiaries as engaging in criminal activity or belonging to gangs, when the Secretary has said no such thing. For example, Plaintiffs misleadingly allege that "referring specifically to Venezuelan migrants,

Secretary Noem stated: 'The people of this country want these dirtbags out.'" FAC ¶ 138. This gross mischaracterization of a snippet of her interview appears deliberate, as during the interview the Secretary actually explained that she had been in New York City to help arrest a ringleader of Tren de Aragua and it was these violent gang members that the people wanted removed from their communities.   FAC ¶ 138 n.114. Yet Plaintiffs urge this Court to draw the mistaken conclusion that the Secretary's statement referred to all Venezuelans as "dirt bags," when her statement plainly refers to members of Tren de Aragua—a group that the President designated a foreign terrorist organization. *See Designating Cartels and Other Foreign Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, Exec. Order No. 14157, 90 Fed. Reg. 8,439 (Jan. 29, 2025); *see also* 90 Fed. Reg. 10,030 (Feb. 20, 2025) (State Department designation).

Additionally, without any comments about Haiti from Secretary Noem that can be taken out of context, Plaintiffs chose to cite campaign statements made by President Trump, as well as wholly unrelated events during President Trump's first term several years ago – underscoring the paucity of evidence of an invidious discriminatory purpose here. FAC ¶¶ 124-127, 129-137, 141. Reyling entirely upon this "cat's paw" theory, Plaintiffs fail to show how such statements or prior conduct can be extended to the determinations at issue here. Further, most of the statements— similar to those challenged and rejected in *Hawaii*—were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents of the Univ. of Cal.*, 591 U.S. at 35 (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); *Hawaii*, 585 U.S. at 35 ("The Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving "sensitive and weighty interests of national security and foreign affairs."). Even so, these selective quotations from well into the past ignore the first Trump administration's handling of other TPS-related decisions. For example, the first Trump administration extended TPS designations for four other "non-white, non-European" countries. *Ramos*, 975 F.3d at 898; *see id*. at 880 (describing the extension of TPS designations of Somalia, South Sudan, Syria, and Yemen). Also during the first

Trump administration, the President deferred removal of certain Venezuelans—an action that is inexplicable under Plaintiffs' assumption that the President has consistently harbored discriminatory animus, and that Secretary Noem must therefore share it. *See* 86 Fed. Reg. at 6,845.

Even so, President Trump's prior statements could not show animus by the Secretary regardless. *See, e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011); *Ramos*, 975 F.3d at 897. ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations). Such an approach would invite judicial second guessing of an agency official's actions based on mere allegations that a different government official harbored some discriminatory motive. Such second-guessing would in turn open the door to impermissible intrusion on privileged Executive Branch deliberations, *see United States v. Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982).

Put simply, none of the evidence outlined in the Amended Complaint is sufficient to state a claim that the Secretary's TPS determinations were motivated by racial animus. President Trump and Secretary Noem seek to reduce illegal immigration and crime, policy goals that are reflected in their public statements and that Americans elected President Trump to prioritize. Allowing Plaintiffs' claims to move forward would leave virtually any immigration policy adopted by this Administration susceptible to an Equal Protection challenge. Even if the *Arlington Heights* test were applied, Plaintiffs would still fail to state an Equal Protection claim under the Fifth Amendment because the Secretary's determinations were consistent the TPS statute, including its emphasis on the temporariness of the protection afforded and its assignment of responsibility for determining whether, in the Secretary's informed judgment, continuing to permit the TPS recipients to remain temporarily in the United States is contrary to the national interest. *See* 8 U.S.C. § 1254a(b)(1)(C). Accordingly, Plaintiffs have failed to plausibly allege an equal protection violation and these claims should be dismissed for failure to state a claim.

V.        **The Declaratory Judgment Act Does Not Provide Plaintiffs a Basis for Relief**

Finally, Plaintiffs' Declaratory Judgment Act "claim," FAC ¶¶ 188-191, does not create a freestanding cause of action, as that statute merely defines the scope of relief available to a plaintiff with a cognizable claim; it does not establish a standalone cause of action. 28 U.S.C. § 2201; *see Daylily Farms, Inc. v. Chao*, 357 F. Supp. 2d 356, 359 (D. Mass. 2005) ("The Declaratory Judgment Act provides a procedure for resolving certain kinds of controversies, but it is not a source of substantive rights in itself." (citing *Colonial Penn Grp., Inc. v. Colonial Deposit Co*., 834 F.2d 229, 232 (1st Cir. 1987))). Since Plaintiffs have not plausibly alleged a cognizable claim, they are entitled to no remedy whatsoever, and the Court should dismiss the Declaratory Judgment Act claim with Plaintiffs' substantive claims.

## CONCLUSION

Plaintiffs' First Amended Complaint should be dismissed in its entirety for lack of subject-matter jurisdiction and for failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6). Alternatively, Plaintiffs' Motion for Partial Summary Judgment should be denied and judgment entered in favor of Defendants.

Dated: September 5, 2025

Respectfully Submitted,
BRETT SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

WILLIAM H. WEILAND
Acting Assistant Director

ANNA L. DICHTER
Senior Litigation Counsel

LAUREN BRYANT
ERIC SNYDERMAN
DANIEL CAPPELLITTI
AMANDA SAYLOR
SHELBY WADE
JEFFREY HARTMAN
Trial Attorneys

/s/ *Catherine Ross*_____
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
(202)- 305-7082
Catherine.ross@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I, Catherine A. Ross, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: September 5, 2025                                                    By: */s/Catherine Ross*
                                                                                            Catherine A. Ross
                                                                                             Trial Attorney