## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HAITIAN-AMERICANS UNITED INC.; VENEZUELAN ASSOCIATION OF MASSACHUSETTS; UNDOCUBLACK NETWORK, INC.; SYDNEY DOE; MARLENE DOE; GUSTAVO DOE; and NATALIA DOE,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security,<br><br>Defendants. | Civil Action No. 25-cv-10498-RGS |

## PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

# Table of Contents

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................ 2

STANDARDS OF REVIEW ................................................................................... 7

ARGUMENT .......................................................................................................... 7

    I.     THIS COURT HAS JURISDICTION OVER PLAINTIFFS' SUIT ............... 7

    A.    The TPS Statute Does Not Bar a Challenge to Agency Action That is in Excess of the Secretary's Authority and that is a Collateral Challenge. ................................................................................................ 7

    B.    The APA Does Not Preclude Judicial Review. ............................................. 11

    C.    8 U.S.C. §1252(f)(1) Does Not Preclude Judicial Review. ........................... 12

    II.    THE CHALLENGED CONDUCT VIOLATES THE APA AS A MATTER OF LAW, MAKING PARTIAL SUMMARY JUDGMENT APPROPRIATE. ................................................................................... 15

    III.   PLAINTIFFS' AMENDED COMPLAINT SUFFICIENTLY STATES ALL OTHER CLAIMS. ................................................................... 18

    A.    The Amended Complaint Adequately Alleges That The Challenged Conduct Was Arbitrary and Capricious Under the APA. ............................... 18

    B.    Plaintiffs Have Sufficiently Stated An Equal Protection Claim. .................... 21

    IV.   PLAINTIFFS HAVE CAUSES OF ACTION UNDER THE CONSTITUTION AND THE APA, THEREFORE THEY CAN SEEK DECLARATIORY RELIEF. ......................................................... 27

CONCLUSION ...................................................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)..................................................... 13

*Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133 (1958)................................. 19

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3rd Cir. 1996)......................... 23

*ANA Int'l, Inc. v. Way*, 393 F.3d 886 (9th Cir. 2004). ................................................ 13

*Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016)............... 23

*Bankamerica Corp. v. United States*, 462 U.S. 122 (1983) ........................................... 17

*Barclays Bank PLC v. Poynter*, 710 F.3d 16 (1st Cir. 2013)........................................... 6

*Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260 (E.D.N.Y. 2018) ................................... 26

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...................................................................... 17

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)............................... 14

*Brito v Garland*, 22 F.4th 240 (1st Cir. 2021) ............................................................ 14

*Casa de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018)....................... 9, 11, 21, 25

*Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880 (D.C. Cir. 2021)....... 14

*Colonial Penn Grp., Inc. v. Colonial Deposit Co.*, 834 F.2d 229 (1st Cir. 1987) ........................ 27

*Coteau Props. Co. v. Dep't of Interior*, 53 F.3d 1466 (8th Cir. 1995)........................................ 19

*Daylily Farms, Inc. v. Chao*, 357 F. Supp. 2d 356 (D. Mass. 2005) .......................................... 27

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ............... 13, 22

*FDA v. Brown & Williamson*, 529 U.S. 120 (2000) .............................................................. 15, 20

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023) .............................................. 12

*Guimaraes v. SuperValu, Inc.*, 674 F.3d 962 (8th Cir.2012)..................................................... 24

*Haitian Evangelical Clergy Ass'n v. Trump*, 2025 WL 1808743 (E.D.N.Y. July 1, 2025)... passim

*Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013)......................................................... 7

*INS v. St. Cyr*, 533 U.S. 289 (2001).......................................................................................... 14

*Int'l Paper Co. v. FERC*, 737 F.2d 1159 (D.C. Cir. 1984) .......................................................... 19

*Johnson v. Robison*, 415 U.S. 361(1974).............................................................................. 11, 14

*Kidd v. Mayorkas*, 734 F. Supp. 3d 967 (C.D. Cal. 2024).......................................................... 12

*Landon v. Plasencia*, 459 U.S. 21 (1982) ................................................................................. 21

*Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480 (2015) ................................................................ 10

*Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34 (1st Cir. 2013) ...................................................... 7

*McAllister v. United States*, 3 Cl. Ct. 394, 402 (1983) ................................................................ 19

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ........................................................ 27

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .................................................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................... 18

*Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99 (1st Cir. 2015) ........................................... 22

*Muniz-Rivera v. United States*, 326 F.3d 8 (1st Cir. 2003) ........................................................... 7

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109
      (2022) ........................................................................................................................................ 16

*NAACP v. United States Dep't of Homeland Sec.*, 364 F. Supp. 3d 568 (D. Md. 2019) ............. 21

*Nat'l TPS All. v. Noem*, 2025 WL 2487771 (9th Cir. Aug. 29, 2025) ................................... passim

*Nat'l TPS All. v. Noem*, 2025 WL 2578045 (N.D. Cal. Sept. 5, 2025) ................................. passim

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ....................................... 26

*Noem v. Nat. TPS All.*, No. 24A1059, --- S.Ct. ----, 2025 WL 1427560 (U.S. May 19, 2025) ...... 2

*O'Brien v. Wilmington Tr. Nat'l Ass'n as Tr. to CitiBank, N.A.*, 506 F. Supp. 3d 82 (D. Mass.
      2020) ........................................................................................................................................ 27

*Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1 (1st Cir. 2011) .............................................. 7

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) ................................................................... 13

*Poursina v. United States Citizenship & Immigr. Servs.*, 936 F.3d 868 (9th Cir. 2019) ............. 16

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018) ............................................. 11, 21, 26

*Ramos v. Wolf*, 975 F.3d 872, 891 (9th Cir. 2020) ..................................................................... 16

*Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023) ........................................................................... 16

*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43 (1993) ................................................................... 13

*Saget v. Trump*, 375 F. Supp. 3d 290 (E.D.N.Y. 2019) ........................................................... 9, 25

*Sierra Club v. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) ............................................ 18

*Solar v. Pension Benefit Guar. Corp.*, 504 F.Supp. 1116 (S.D.N.Y. 1981) ................................ 19

*Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) ............................................................. 12

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) ................................................................. 12

*Thai v. Ashcroft*, 366 F.3d 790 (9th Cir. 2004) .......................................................................... 23

*Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2025 WL 1773631 (2025) .............................................. 12

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ................................................. 22

*Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) .. 21

*Webster v. Doe*, 486 U.S. 592, 603 (1988) ........................................................ 11, 14

*Weinberger v. Salfi*, 422 U.S. 749 (1975) ............................................................. 11

## STATUTES

28 U.S.C. § 2201 ....................................................................................... 27

5 U.S.C. § 559 ......................................................................................... 14

5 U.S.C.§ 701 .......................................................................................... 10

8 U.S.C. § 1153(b)(2)(B)(i) ............................................................................. 16

8 U.S.C. § 1182(f) ..................................................................................... 11

8 U.S.C. § 1252(f) ................................................................................. passim

8 U.S.C. § 1254a .................................................................................. passim

## RULES

Rule 12(b)(6) ........................................................................................ 7, 17

## REGULATIONS

90 Fed. Reg. 10511 .................................................................................. 4, 20

90 Fed. Reg. 28760 ..................................................................................... 4

90 Fed. Reg. 5961 ...................................................................................... 3

Plaintiffs Haitian Americans United, Inc. ("HAU"), Venezuelan Association of Massachusetts ("VAM"), UndocuBlack Network Inc. ("UBN"), and four individual recipients of Temporary Protected Status ("TPS") respectfully submit this Reply in support of their Motion for Partial Summary Judgment, ECF No. 60, and Memorandum in Opposition to the Defendants' Motion to Dismiss. ECF No. 72 ("MTD"). For the reasons described below, the Court should grant Plaintiffs' motion and reject Defendants' motion in its entirety.

## INTRODUCTION

Defendants seek to insulate unlawful agency action from judicial review by recasting this case in the broadest possible terms, as if it were simply about immigration or foreign policy. But Plaintiffs' partial summary judgment motion is not about second-guessing Defendant U.S. Department of Homeland Security's ("DHS") and Noem's discretionary judgments on immigration. Rather, the motion centers on whether the Secretary exceeded the authority Congress gave her when she purported to "vacate" lawfully granted Temporary Protected Status ("TPS") extensions for Venezuela and Haiti—a power that appears nowhere in the statute and that no Secretary has ever before utilized in the 35-year history of the TPS program.

As Defendants acknowledge, court decisions against them on this issue are mounting. Federal district courts in both the Northern District of California and the Eastern District of New York have issued final rulings on the merits that the Secretary has no such authority. S*ee Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464, 2025 WL 1808743, at *9 (E.D.N.Y. July 1, 2025) ("*HECA*"); *Nat'l TPS All. v. Noem*, No. 25-CV-01766, 2025 WL 2578045, at *41 (N.D. Cal. Sept. 5, 2025). In addition, the Ninth Circuit Court of Appeals has affirmed the district court's earlier preliminary ruling on the same issue. *See Nat'l TPS All. v. Noem*, No. 25-2120, 2025 WL 2487771, at *20 (9th Cir. Aug. 29, 2025). For the same reasons that Plaintiffs outlined in their opening brief, ECF No. 61, at 18-26 ("Plfs. Brf."), these courts have rejected the jurisdictional

arguments Defendants recycle here, making plain that Section 1254a(b)(5)(A) bars challenges to substantive TPS determinations—not collateral challenges to unlawful procedures or actions taken in excess of statutory authority. Likewise, the Administrative Procedure Act's ("APA") presumption of reviewability applies with full force, and nothing in Section 1252(f)(1) forecloses this Court's authority to set aside unlawful agency action. This Court should join those well-reasoned decisions and grant Plaintiffs' partial summary judgment motion.

For all of the same reasons why partial summary judgment on the issue of Defendant Noem's lack of "vacatur" power is appropriate, Defendants' motion to dismiss on that issue must fail. The remainder of Defendant's motion to dismiss is equally lacking. Plaintiffs' pleadings have catalogued an array of unprecedented agency action, including not only *ultra vires* "vacaturs" but scores of racially hostile statements made by Defendant Noem and Defendant Trump, all of which more than sufficiently allege that the challenged conduct is both arbitrary and capricious under the APA and in violation of Equal Protection.

Accordingly, Plaintiffs are entitled to partial summary judgment, and Defendants' motion to dismiss should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

**Facts Relevant To Plaintiffs' Motion For Partial Summary Judgment.** Plaintiffs have set forth the facts relevant to their partial summary judgment motion in their affirmative motion and accompanying declarations. Plfs. Brf. at 3-12. Defendants do not dispute any of the relevant facts, namely that: a) the TPS statute establishes an orderly and clearly defined process for designating, extending, and terminating TPS protections, requiring the DHS Secretary to make periodic, time-bound reviews and guaranteeing certainty through fixed-duration designations that "shall remain in effect until the effective date of the termination of the designation." 8 U.S.C. §1254a(b)(2)(B)(emphasis added); b) Defendant Noem instead "vacated" TPS extensions that had

previously been granted for Haiti and Venezuela; and c) Plaintiffs are grievously harmed by this conduct. Plfs. Brf. at 3-12.

**Amended Complaint Allegations Relevant To Defendants' Motion To Dismiss.** In addition to opposing Plaintiffs' partial summary judgment motion, Defendants have also moved to dismiss the entirety of Plaintiffs' Amended Complaint. ECF No. 57 ("FAC"). The Amended Complaint alleges the following facts outlining how Defendants' decisions to vacate and terminate TPS for Haiti and Venezuela were procedurally irregular, pretextual, and infected by discriminatory animus:

Within just three days after her confirmation as DHS Secretary, Defendant Noem purported to reverse the 2025 Venezuela Extension,[1] announcing this reversal publicly on "Fox and Friends" the next day, claiming it stopped Venezuelan TPS holders from staying here and "violat[ing] our laws for another 18 months." FAC ¶93. Days later, on February 3, 2025, DHS published notice of what Noem called a "vacatur" of the extension, despite the statute containing no such mechanism.[2] The notice conceded this but claimed she had "inherent authority" to "vacate or amend the determination." FAC ¶¶ 94–95. This was the first attempt to void a TPS extension in the history of the TPS statute. *Id.* ¶ 98. Two days later, DHS terminated Venezuela's 2023 designation, again citing the supposed deadline created by the "vacatur." *Id.* ¶99.[3] The notice acknowledged that Venezuela still suffered "extraordinary" and "temporary" conditions but insisted termination was required because continued protection was "contrary to the national interest." *Id.* ¶¶100–101. The stated rational contradicted the U.S. State Department's reports documenting ongoing violence,

---

[1] Extension of the 2023 Designation of Venezuela for TPS, 90 Fed. Reg. 5961 (Jan. 17, 2025).
[2] Vacatur of 2025 TPS Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025).
[3] Termination of the October 3, 2023 Designation of Venezuela for TPS, 90 Fed. Reg. 9040 (Feb. 5, 2025).

repression, and humanitarian collapse in Venezuela. *Id.* ¶¶102–106. For instance, a 2024 State Department Travel Advisory reported "[v]iolent crimes, such as homicide, armed robbery, kidnapping, and carjacking, are common in Venezuela" and security forces engaged in violent crackdowns. *Id.* ¶104.

The Amended Complaint alleges similar irregularities in the treatment of Haiti's TPS designation. On February 20, 2025, Defendant Noem likewise issued a "vacatur" of Haiti's most recent extension. *Id.* ¶108.[4] Similar to the Venezuela Termination, Defendant Noem introduced, among other reasons, a lengthy list of factors to determine whether a TPS designation is "contrary to national interest" and faulted Secretary Mayorkas for purportedly not giving these factors sufficient attention. *Id.* ¶113. As the Amended Complaint alleges in detail, these actions were taken with extraordinary haste and without meaningful review of country conditions, demonstrating they were not reasoned determinations but rather predetermined political decisions. *Id.* ¶¶109–114.

On July 1, 2025, DHS announced the termination of Haiti's designation, cutting protections months earlier than the valid extension previously guaranteed. *Id.* ¶115.[5] Under the "Reasons for the Secretary's Termination of the TPS Designation for Haiti," Defendant Noem stated that the "termination of TPS for Haiti is required because it is contrary to the national interest to permit Haitian nationals [] to remain temporarily in the United States." *Id.* ¶116. Similar to the Venezuela Termination, Defendant Noem's assessment of Haiti directly contradicted the U.S. Department of State's reports, which currently place Haiti in the "Level 4, Do Not Travel" category due to risk of kidnapping, crime, terrorist activity, civil unrest, and limited health care. *Id.* ¶ 120.

---

[4] Partial Vacatur of 2024 TPS Decision for Haiti, 90 Fed. Reg. 10511 (February 24, 2025).
[5] Termination of the Designation of Haiti for TPS, 90 Fed. Reg. 28760 (July 1, 2025).

Plaintiffs further allege that these irregularities cannot be separated from the discriminatory animus that motivated Defendants' actions. As the Amended Complaint catalogues, Defendant Trump has a long history of disparaging statements about immigrants of color, including claiming that Haitian immigrants "all have AIDS," referring to TPS countries as "shithole countries," and characterizing Mexicans as "rapists." *Id.* ¶125. More recently, he directed specific vitriol at Venezuelans, describing them as "criminals," "animals," and "thugs" dumped into the United States from prisons. *Id.* ¶¶ 136–137. He declared at various campaign rallies and interviews that immigrants were "poisoning the blood of our country." *Id.* at ¶126. And then doubled down on his statement by stating on Truth Social, in all caps:

> "ILLEGAL IMMIGRATION IS POISONING THE BLOOD OF OUR NATION. THEYR'RE COMING FROM PRISIONS, FROM MENTAL INSTITUTIONS—FROM ALL OVER THE WORLD. WITHOUT BORDERS & FAIR ELECTIONS, YOU DON'T HAVE A COUNTRY. MAKE AMERICA GREAT AGAIN!"

*Id.* ¶127. Defendant Trump recklessly spread misinformation about Haitian immigrants in Springfield, Ohio, erroneously stating that Haitians eat cats and dogs. *Id.* ¶ 133. Defendant Noem echoed this rhetoric, calling Venezuelan TPS holders "dirtbags" and insisting they were "illegal" notwithstanding their lawful TPS protections. *Id.* ¶¶ 128, 138–140. By contrast, Defendant Trump has praised white immigrants from countries like Denmark and Switzerland and told a predominantly white crowd that they have "good genes." *Id.* ¶¶132,135.

The Amended Complaint outlines the severe consequences for Plaintiffs as a result of the challenged actions: TPS holders will face imminent removal without sufficient time to prepare, resulting in the loss of jobs, health benefits, housing, and the ability to safeguard property and family relationships. *Id.* ¶ 145-147. Beyond these tangible harms, Plaintiffs allege dignitary injury: that Defendants' actions stigmatize immigrants of color, fuel harassment and violence, and deny

them the dignity and respect guaranteed under the Constitution and federal law. *Id.* ¶¶ 143–144, 148-150.

The Amended Complaint asserts that these actions are arbitrary and capricious under the APA and violate the Equal Protection guarantee of the Fifth Amendment. FAC ¶¶ 151–182. Plaintiffs also seek a declaration that Defendants violated the U.S. Constitution and other laws. *Id.* ¶¶188-191.

**Related Case Developments: *National TPS Alliance v. Noem.*** On March 31, 2025, in the Northern District of California case challenging the Venezuela and Haiti Vacaturs and Venezuela Termination, the district court granted the plaintiffs' motion to postpone DHS' actions relating to the Venezuela Vacatur and Termination. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 866-868 (N.D. Cal. 2025), *aff'd*, No. 25-2120, 2025 WL 2487771 (9th Cir. Aug. 29, 2025).

Since the time that Plaintiffs filed their Motion for Partial Summary Judgment in this matter, the Ninth Circuit Court of Appeals has affirmed the district court's order postponing the vacatur and termination of Venezuelan TPS. *See Nat'l TPS All.*, 2025 WL 2487771, at *3. In addition, on September 5, 2025, the Northern District court entered final relief in plaintiffs' favor, granting the plaintiffs' motion for partial summary judgment and denying the governments' cross-motion for summary judgment and motion to dismiss. The court found "that the Secretary's actions in vacating the orders of the prior administration and terminating TPS exceeded the Secretary's statutory authority and was arbitrary and capricious and thus must be set aside under the [APA]." *Nat'l TPS All.*, 2025 WL 2578045, at *1. On September 17, 2025, the Ninth Circuit denied the defendants' motion for a stay of this order pending final appeal. *Nat'l TPS All. v. Noem*, --- F.4th ---, 2025 WL 2661556 (9th Cir. Sept 17, 2025).

## STANDARDS OF REVIEW

For Plaintiffs' affirmative motion, partial summary judgment is appropriately granted where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Plfs. Brf. at 12; *Barclays Bank PLC v. Poynter*, 710 F.3d 16, 19 (1st Cir. 2013).

As for Defendants' Motion to Dismiss, granting a Rule 12(b)(1) motion at the pleading stage is "appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003). When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 40 (1st Cir. 2014). The complaint should be read as a whole, "not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013). The allegations "need [] only enough detail to provide a defendant with 'fair notice of what the ... claim is and the grounds upon which it rests.'" *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) (quoting *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir. 2011)).

## ARGUMENT[6]

### I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' SUIT.

#### A.    The TPS Statute Does Not Bar a Challenge to Agency Action That is in Excess of the Secretary's Authority and that is a Collateral Challenge.

---

[6] In the introduction to their Motion To Dismiss, Defendants claim that the Supreme Court's May 19, 2025 grant of the government's stay application in the *National TPS Alliance* case supports their position here, though they do not develop this argument in the body of their brief. Defs. Brf. at 1 (citing *Noem v. Nat'l TPS All.*, No. 24A1059, --- S.Ct. ---, 2025 WL 1427560, at *1 (May 19, 2025)). As the Ninth Circuit has recently explained, however, that argument "ignores the text of the Supreme Court's order," *Nat'l TPS All. v. Noem*, 2025 WL 2661556 at *2, and is particularly

As outlined in Plaintiffs' opening brief, while the TPS statute bars judicial review of "determinations" made under the statute—*i.e.*, designations, extensions, and terminations—it does not foreclose judicial review of *ultra vires* conduct, nor does it bar collateral challenges that do not impinge on the ultimate substantive outcome of any determination.  Pls. Brf. at 18-21.

In attempting to overcome these arguments, Defendants overbroadly reframe this case in the "immigration context," but that characterization is imprecise. *See* Defs. Brf. at 11. By recasting the issue in the broadest possible terms, Defendants seek to insulate their conduct from judicial review under the guise of the Executive Branch's authority over immigration. But this authority is not unbridled. Defendants' arguments—detached from reality and precedent—have been squarely rejected by multiple courts. *See HECA*, 2025 WL 1808743, at *9 ("Because Secretary Noem does not have statutory or inherent authority to partially vacate a country's TPS designation, her partial vacatur must be set aside as unlawful under the APA."); *Nat'l TPS All.*, 773 F. Supp. 3d at 852. ("Secretary Noem lacked the inherent authority to vacate … And if Secretary Noem lacked the authority to vacate the extension, she necessarily did not have the authority to terminate the 2023 Designation thereafter..."). Each time, the judiciary has unequivocally ruled that Section 1254a(b)(5)(A) does not bar judicial review of the conduct challenged here. *Id.*

Courts, including most recently the Ninth Circuit, have focused on two main reasons why the government's arguments fail. First, jurisdiction-stripping statutes such as Section 1254a(b)(5)(A) do not preclude judicial review where the question relates to agency action taken in *excess* of statutory authority. *See Nat'l TPS All.*, 2025 WL 2487771, at *10. In such

---

unavailing because it arose at a preliminary stage of the proceedings. *Id.* at *3 ("interim orders are not conclusive as to the merits") (citing *Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2653-54 (2025)). "[T]he unreasoned stay order . . . provides no analysis to inform our view of the equities in this posture and on this record." *Id.*

circumstances, there is a "particularly strong" presumption of reviewability. *Id.* Indeed, the Ninth Circuit described Defendants' argument as "an extreme position," because a contrary interpretation would produce absurd results, such as barring review of a Secretary's decision to extend a TPS designation for thirty years. *Id.* at *10 n. 7. In other words, courts can "review the Secretary's interpretations of her authority under the TPS statute." *Id.*[7]

Second, even if the Secretary acted within her delegated authority—which she did not— her actions are still reviewable because Plaintiffs raise a collateral, not a substantive challenge. Section 1254a(b)(5)(A) prohibits challenges to substantive TPS determinations only (*i.e.*, designations, extensions, and terminations), not challenges to procedurally deficient conduct. As numerous courts have held, the jurisdictional bar is limited to "inquiring into the underlying considerations and reasoning employed by the Secretary in reaching her country-specific TPS determinations." *Nat'l TPS All.*, 2025 WL 2578045, at *16.[8] Contrary to Defendants' assertions, Plaintiffs do not challenge a "determination" where the relief they seek does not impinge on the substantive outcome of the ultimate agency decision. Here, Plaintiffs do not dispute that DHS

---

[7] "The legislative history of the TPS statute confirms our understanding that Congress intended to constrain the authority of the Executive, not to render all aspects of the TPS program unreviewable." *Id.* at *10.

[8] *See also HECA*, 2025 WL 1808743 at *5 ("it is clear from context that the judicial review provision in the TPS statute refers to an individual designation, termination, or extension of a designation with respect to a particular country, not to Defendants' determination practices or adoption of general policies or practices employed in making such determinations.") (citing *Saget*, 375 F. Supp. 3d at 330-333); *Nat'l TPS All*, 773 F. Supp. 3d at 831; *Centro Presente*, 332 F. Supp. 3d at 405–09 (no jurisdiction-stripping where plaintiffs bring "challenges to Defendants' process of adjudication rather than the content of any particular adjudication" and "there would be no meaningful opportunity for review of Plaintiffs' constitutional and statutory claims in removal proceedings"); *Casa de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 317-20 (D. Md. 2018) (finding jurisdiction where "the text does not use the unambiguous and comprehensive language used in statutes courts have interpreted as broadly precluding judicial review" and "the alternative methods of review of Plaintiffs' claims offered by the Department do not constitute meaningful review.").

Secretaries may terminate TPS protections, but they must follow the statutory process for doing so. *See HECA*, 2025 WL 1808743, at *6 ("However, at least on this motion, plaintiffs are not challenging the 'underlying rationale' of the partial vacatur; they are challenging Secretary Noem's authority to partially vacate Haiti's TPS designation.").

Defendants' reliance on various dictionary entries does nothing to change the analysis, particularly with respect to the vacaturs. *See* Defs. Brf. at 12-14. The TPS statute itself makes clear that "determine" and "determination" mean the Secretary's substantive decision, made during periodic review, about whether a particular country qualifies for TPS under the statutory criteria. *See Nat'l TPS All.*, 2025 WL 2578045, at *17.  For example, in the case of termination, the statute provides: "If the [Secretary] *determines* under subparagraph (A) that a foreign state. . . no longer continues to meet the conditions for designation under paragraph (1), the [Secretary] shall terminate the designation by publishing notice in the Federal Register of the *determination* under this subparagraph. . . " 8 U.S.C. § 1254a(b)(3)(B) (emphasis added). Similarly, for an extension: "If the [Secretary] does not *determine* under subparagraph (A) that a foreign state. . . no longer meets the conditions for designation …the period of designation of the foreign state is extended for an additional period of 6 months. . ." *Id*. § 1254a(b)(3)(C) (emphasis added).

Thus, in statutory context, "determine" and "determination" refers to an individual designation, termination, or extension for a particular country—not to "determination practices or adoption of general policies or practices employed in making such determinations." *HECA*, 2025 WL 1808743, at *5. Here, Plaintiffs challenge the latter: Defendant Noem's improper use of vacaturs (as relevant to Plaintiffs' affirmative motion) and Defendants' arbitrary, capricious, and discriminatory manner of proceeding (as relevant to the Defendants' motion to dismiss). Because

none of this challenged conduct is a "determination," the TPS statute's jurisdictional bar does not apply.

### B. The APA Does Not Preclude Judicial Review.

Defendants next turn to the APA to argue that it precludes judicial review. *See* Defs. Brf. at 14 (citing 5 U.S.C.§ 701(a)(2)). This argument also falls flat. "Congress rarely intends to prevent courts from enforcing its directives to federal agencies. For that reason, [c]ourt[s] appl[y] a strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) (internal citations and quotation marks omitted). The agency "bears a heavy burden in attempting to show that Congress prohibit[ed] all judicial review of the agency's compliance with a legislative mandate." *Id.* (internal quotation marks omitted). Because nothing in the TPS statute indicates that it prohibits review of a Secretary's conclusion as to the extent of her power under the TPS statute, the APA presumption of reviewability applies in full force. *See Nat'l TPS All.*, 2025 WL 2487771, at *10.

Courts have consistently adjudicated similar collateral challenges to TPS-related decisions—both at the motion to dismiss stage, s*ee, e.g.*, *Centro Presente*, 332 F. Supp. 3d at 416; *Casa de Maryland*, 355 F. Supp. 3d at 327-28; *Ramos*, 321 F. Supp. 3d at 1108-09, and the summary judgment stage. *See HECA*, 2025 WL 1808743, at *5-7; *Nat'l TPS All.*, 2025 WL 2578045 at *21. With respect to Plaintiffs' constitutional claims, longstanding Supreme Court precedent makes clear that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Johnson v. Robison*, 415 U.S. 361, 373-374 (1974). *See*

*also Weinberger v. Salfi*, 422 U.S. 749, 762 (1975); *Webster v. Doe*, 486 U.S. 592, 603 (1988).

Congress has not done so here, and Defendants offer no authority suggesting otherwise.[9]

### C.  8 U.S.C. §1252(f)(1) Does Not Preclude Judicial Review.

Similarly, Defendants' position that 8 U.S.C. §1252(f)(1) bars this Court from granting

relief is wrong. Defs. Brf. 15-17. Defendants contend that this statute, which states that "no court

(other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the

operation of the provisions of Part IV of this subchapter," means that this Court cannot grant

certain relief requested by Plaintiffs: namely, that the Court set aside the vacaturs and the

subsequent terminations that flow from them. However, as explained in Plaintiffs' opening brief,

this provision is not relevant to the current challenge, which seeks to prevent *ultra vires* agency

action that is outside the scope of the TPS statute. Pls. Brf. at 22-24. Defendants do not address

this point at all in their Opposition.

Moreover, even if Section 1252(f)(1) did reach *ultra vires* action—which it does not—it

does not bar the relief that Plaintiffs seek: vacatur of the Venezuela and Haiti Vacaturs and

Terminations. Vacating agency action is not the same as an injunction, as numerous courts have

held. "[N]o court has adopted the construction of § 1252(f)(1) advanced by the government.

Rather, all courts that have addressed the issue have rejected the government's construction of the

statute." *HECA,* 2025 WL 1808743, at *6 (quoting *Nat'l TPS All.*, 773 F.Supp.3d at 826) (internal

quotation marks omitted). *See also Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022)

(holding Section 1252(f)(1) does not apply to vacatur); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967,

---

[9] Defendants' reliance on *Trump v. Hawaii*, 585 U.S. 667, 684–86 (2018), is misplaced. *See* Defs. Brf. at 14. That case involved the Executive's authority under 8 U.S.C. § 1182(f) to restrict the entry of foreign nationals based on national security concerns—an entirely distinct context from the TPS framework at issue here. Moreover, the Court in *Trump* did not address judicial review under the APA, rendering its reasoning inapplicable to the present issue.

987 (C.D. Cal. 2024) (same); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D. Fla. 2023) (same); *Texas v. Biden*, 646 F. Supp. 3d 753, 768-69 (N.D. Tex. 2022) (same).

Notably, Defendants fail to address the recent rulings on related cases addressing this specific issue. *See Nat'l TPS All.*, 2025 WL 2487771, at *11; *HECA*, 2025 WL 1808743 at *10. Instead, they continue asserting the same arguments, hoping for a different result. But as numerous courts have now ruled, Section 1252(f)(1) does not bar challenges that assert the agency acted outside of its statutory authority—as Plaintiffs do here.  *See Nat'l TPS All.*, 2025 WL 2487771, at *11 ("section 1252(f)(1)'s bar on injunctive relief for claims does not affect challenges to actions that fall outside of a statutory grant of authority").

Moreover, courts, including the Supreme Court, have drawn a clear distinction between a vacatur (an order under the APA) and an injunction, describing a vacatur as a "less drastic remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 848 n.10 (2025) (noting that vacaturs under the APA present a "distinct question" from universal injunctions); *id*. at 869 (Kavanaugh, J., concurring) ("To be sure, in the wake of the Court's decision . . . in cases under the Administrative Procedure Act, plaintiffs may [still] ask a court to [] 'set aside' a new agency rule."). The Northern District Court emphasized these differences, explaining that an order under the APA "re-establish[es] the status quo absent the unlawful agency action," whereas an injunction can be broader in scope—injunctions may bind parties and nonparties, expose parties and nonparties to contempt sanctions, can even prohibit lawful conduct, or can evolve with time. *See Nat'l TPS All.*, 2025 WL 2487771, at *18; *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) ("§ 1252(f)(1) expressly identifies injunctive relief but makes no mention of stays nor other forms of relief under the APA.

Congress knows, however, how to limit relief under the APA in other statutory schemes such as the Magnuson-Stevens Act and the Clean Air Act.").

This inquiry as to the scope of Section 1252(f) also operates against the backdrop of the longstanding presumption in favor of APA review. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 63–64 (1993) ("[T]here is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence.") (citations omitted); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).[10] The APA is designed to reach broadly, and explicitly states that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly." 5 U.S.C. § 559; *see also Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880, 889 (D.C. Cir. 2021) ("[Federal Election Campaign Act] cannot alter the APA's limitation on judicial review unless it does so expressly.").

Interpreting Section 1252(f)(1) to preclude judicial review of Plaintiffs' *constitutional* claims would be particularly problematic, since that "would, of course, raise serious questions concerning the constitutionality" of the statute. *Johnson*, 415 U.S. at 366. Thus, the Supreme Court instructs courts "to avoid [that] 'serious constitutional question'" by accepting any fairly possible construction that permits review. *Webster*, 486 U.S. at 603 (quoting *Bowen v. Mich. Acad.*

---

[10] "Even where the ultimate result [of a statute] is to limit judicial review, ... as a matter of the interpretive enterprise itself, the narrower construction of a jurisdiction-stripping provision is favored over the broader one." *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004).

*of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)); *see also INS v. St. Cyr*, 533 U.S. 289, 314 (2001). Again, Defendants do not address this issue at all in their Opposition.

Finally, as Defendants concede, the First Circuit has held that §1252(f)(1) does not bar declaratory relief. *See* Defs. Brf. at 17 (citing *Brito v Garland*, 22 F.4th 240, 250 (1st Cir. 2021) ("declaratory relief remains available under Section 1252(f)(1)")).

## II.    THE CHALLENGED CONDUCT VIOLATES THE APA AS A MATTER OF LAW, MAKING PARTIAL SUMMARY JUDGMENT APPROPRIATE.

On the merits of Plaintiffs' partial summary judgment motion, Defendants recycle the same arguments that have proven unavailing in numerous other cases, citing the same authorities to claim that Defendant Noem's authority to issue vacaturs is somehow "implicit" in the statute.[11] *See* Defs. Brf. at 17, n. 16 ("Defendants acknowledge the recent opinion from the Ninth Circuit . . . . However, Defendants maintain their position that the Secretary's determinations were consistent with her statutory authority. . .). Their refusal to grapple with the wealth of precedent underscores the weakness of their position. There simply is no legal authority, explicitly or implicitly, to vacate an already lawfully granted TPS extension. *See* 8 U.S.C. §1254a(b)(2); *Nat'l TPS All.,* 2025 WL 2487771, at *13 ("The [TPS] statute does not permit the Secretary to terminate a designation midstream, but that is exactly what the Secretary purports to do here. . . Thus, if the Secretary

---

[11] Plaintiffs have outlined in their previous briefing why the cases cited by Defendants are inapposite. *See* Plfs. Brf. at 14-17. *See also HECA*, 2025 WL 1808743, at *8 (E.D.N.Y. July 1, 2025) ("The cases the Government itself cites demonstrate that there is inherent authority to reconsider a decision, but only where there is no "contrary legislative intent or other affirmative evidence. . . The [TPS] statute provides specific instructions for how to reconsider a TPS designation, and it provides a timeline for doing so… The legislative provision of a specific procedure for reconsideration of a TPS designation precludes Secretary Noem from reconsidering a TPS designation pursuant to other procedures (or no procedures at all), including by partial vacatur."); *FDA v. Brown & Williamson*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted").

wished to end TPS status for Venezuelans, she is statutorily required to follow the procedures for termination that Congress enacted.") (internal quotation marks omitted).

Defendants unpersuasively attempt to circumvent Congress' intent by hiding behind the mantle of "foreign policy," which they claim gives Defendants' *carte blanche* to ignore the statutory procedure set forth in the TPS statute. *See* Defs. Brf. at 19-20. To support this claim, they rely on a selectively quoted passage from *Ramos*, asserting that the Secretary "undoubtedly" has broad authority to "make TPS determinations." Defs. Brf. at 19. However, *Ramos* makes clear that while the Secretary's discretion is broad, it is "not without check" and remains constrained by "certain limited statutory criteria." *Ramos v. Wolf*, 975 F.3d 872, 891 (9th Cir. 2020), *reh'g en banc granted*, *opinion vacated*, 59 F.4th 1010 (9th Cir. 2023). This is because as the Supreme Court has consistently ruled, "[a]dministrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022).

Defendants also claim that "[f]lexibility to reconsider decisions makes especially good sense in the TPS context." Defs. Brf. at 19. But Congress deliberately structured TPS designations, extensions and terminations to limit the Attorney General's discretion, replacing the *ad hoc* EVD process that had been almost entirely discretionary. Plfs. Brf. 3-4; *Ramos*, 975 F. 3d at 879. Congress' intent to narrow that discretion stands in sharp contrast to the national-interest waiver in *Poursina v. United States Citizenship & Immigr. Servs.*, which is statutorily defined as "entirely discretionary." 936 F.3d 868, 872 (9th Cir. 2019). Despite this fundamental difference, Defendants cite repeatedly to *Poursina* in an attempt to import the "national interest standard" into the TPS context. Defs. Brf. at 14, 19-20. However, TPS determinations are categorically distinct from the

Immigration and Nationality Act's "national interest waivers," and should not be conflated. 8

U.S.C. § 1153(b)(2)(B)(i).[12]

The fact that DHS has never before in the 35-year history of the TPS statute rescinded a

TPS extension—which Defendants do not dispute—bolsters the conclusion that DHS has no such

authority. *See Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) (lack of assertion of

power is significant in determining whether power was actually conferred); *Biden v. Nebraska*,

600 U.S. 477, 501 (2023) (same).[13]

For all of these reasons, Plaintiffs are entitled to partial summary judgment. The facts are

undisputed, and as a matter of law, Defendant Noem had no authority to issue the Venezuela and

---

[12] While the DHS Secretary may consider whether granting a permanent employment-based visa would substantially benefit the national economy or welfare of the United States, *id.,* this analysis is limited to the issuance of permanent visas. TPS, by contrast, is temporary, subject to periodic review, 8 U.S.C. § 1254a, and is not conditioned on whether TPS holders disrupt the U.S. workforce. In fact, the opposite is true as TPS holders have greatly benefitted our economy and helped sustain local economies. *See* FAC ¶146 ("TPS beneficiaries fill critical gaps in the economy, including in the healthcare sector and other sectors where their labor and expertise are needed."); Velasquez Dec. at ¶13 (a Venezuelan TPS holder has created a thriving restaurant in Somerville, MA, that not only anchors the community but also employs a team made up mostly of other TPS holders); Fleurissaint Dec. ¶10 ("TPS holders are essential workers in Massachusetts' healthcare industry. Immigrants, especially Haitians, make up 40% of frontline staff—including nurses, home health aides, and essential hospital workers who cared for the public during the pandemic and to present day."). Moreover, *Poursina* discusses "national security" in the context of national interest waivers as a "core exercise of discretion," akin to the Executive Branch's authority over immigrant entry. 936 F.3d at 873-876; *Trump v. Hawaii*, 585 U.S. 667 (2018). This is unlike TPS determinations, which are governed by a detailed statutory framework that regulates the Secretary's initial designation and subsequent extensions or terminations and applies to immigrants who have been vetted and are already present in the U.S. 8 U.S.C. § 1254a.

[13] The Vacatur Notices cite to Secretary Mayorkas' recission of a decision to *terminate* TPS for El Salvador and other countries. *See* 90 Fed. Reg. 10511-10513. However, that action was taken to resolve years of litigation, *See Ramos v. Nielsen,* 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf,* 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (2023)*,appeal dismissed sub nom. Ramos v. Mayorkas,* 2023 WL4363667*; Saget v. Trump,* 375 F. Supp. 3d 280, 298-300 (E.D.N.Y. 2019), and was not challenged in court. In any event, as the Ninth Circuit stated: "a prior violation of statutory authority does not excuse subsequent violations, nor does it affect the Congressionally-enacted scope of agency authority." *Nat'l TPS All.,* 2025 WL 2487771, at *14.

Haiti Vacaturs. Accordingly, they must be vacated and set aside. Moreover, once the illegal Vacaturs are set aside, then the Terminations stand in direct conflict with the requirements of the TPS statute. Absent the Vacaturs, Haiti's and Venezuela's TPS designations extend to February 3, 2026, and October 2, 2026, respectively. And by law, the Secretary may not terminate TPS protection until those periods expire. 8 U.S.C. §1254a(b)(3)(B) (any termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension . . . ."). The Terminations must therefore be set aside and vacated as well.

### III.    PLAINTIFFS' AMENDED COMPLAINT SUFFICIENTLY STATES ALL OTHER CLAIMS.

The jurisdictional arguments that Defendants raise in their Motion To Dismiss under Fed. R. Civ. Proc. 12(b)(1) are the same as those raised in opposition to Plaintiffs' Motion For Partial Summary Judgment—and should be rejected for the same reason. Defendants' Motion To Dismiss under Fed. R. Civ. Proc. 12(b)(6) further argues that the remainder of Plaintiffs' Amended Complaint should be dismissed as well, for failure to state a claim. In addition to asserting that Defendants' conduct is *ultra vires* because Defendant Noem has no authority to vacate previously-granted extensions, Plaintiffs' Amended Complaint also asserts that Defendants' conduct is arbitrary and capricious under the APA and violates the Equal Protection guarantee of the Fifth Amendment. For the reasons explained below, those claims are all adequately alleged, making dismissal inappropriate.

### A.  The Amended Complaint Adequately Alleges That The Challenged Conduct Was Arbitrary and Capricious Under the APA.

Even if Defendant Noem had the authority to undertake the challenged conduct—which she does not—Plaintiffs have also alleged that the challenged conduct is arbitrary and capricious,

or otherwise not in accordance with law. *See* FAC ¶¶ 95-123. An agency acts arbitrarily and capriciously when it fails to "examine the relevant data" or "articulate a satisfactory explanation" showing a rational link between facts and decision. *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, a policy change demands a "reasoned analysis." *State Farm*, 463 U.S. at 57.

Here, Plaintiffs have more than adequately alleged that Defendant Noem's actions lack any rational connection to the evidentiary record and represent an abrupt, unexplained departure from decades of consistent TPS policy. Defendant Noem attempts to justify her actions, for example, by claiming that the Venezuela Vacatur is lawful because Secretary Mayorkas consolidated the separate Venezuela designations. *See* 90 Fed. Reg. at 8807. But this does not constitute clerical or legal error or fraud. The TPS statute explicitly grants the Secretary broad discretion over the registration process. *See* 8 U.S.C. §1254a(c)(1)(A)(iv). Courts routinely reject such unsubstantiated claims as pretext for unlawful policy shifts. *See, e.g., Int'l Paper Co. v. FERC*, 737 F.2d 1159, 1164-66 (D.C. Cir. 1984) (describing the clerical-error doctrine as one of "limited character," and rejecting a claim by the Federal Energy Regulatory Commission ("FERC") of alleged error on the grounds that the agency did not fully explain how the error occurred, and because the parties had little knowledge that a mistake had been made); *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958) ("Of course, the power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies.").

As alleged in the Amended Complaint, Defendants' actions are not about correcting mistakes or fraud—they are a transparent attempt to reverse Secretary Mayorkas' lawful TPS

determinations and impose a policy change that exceeds their authority. *See, e.g., Coteau Props. Co. v. Dep't of Interior*, 53 F.3d 1466, 1469-70 (8th Cir. 1995) (disallowing reconsideration made soon after a change in presidential administration); *Solar v. Pension Benefit Guar. Corp.*, 504 F.Supp. 1116, 1123 (S.D.N.Y. 1981) (disallowing reconsideration made soon after a change in agency personnel); *McAllister v. United States*, 3 Cl. Ct. 394, 402 (1983) (rejecting reconsideration where "the sole basis for the reversal of the [initial] determination... was that the agency decided to change its official mind").[14]

Further, Defendants hinge their argument on the provision that the Secretary must "determine whether the conditions for … designation under this subsection continue to be met." *See* Defs. Brf. at 19 (citing 8 U.S.C. §1254a(b)(3)(A)). But this is not a free-floating license to make the determination at any time; to the contrary, it is a part of the provision for "Periodic review," in which Congress specified exactly when such determinations must be made. *Id*. Defendants attempt to avoid this conclusion by cloaking themselves in "national security" and "foreign policy" interests, but this is unavailing for numerous reasons.  First, it is a *post hoc* rationalization that is nowhere to be found in the Vacaturs themselves, which focus instead on bureaucratic "confusion" purportedly caused by overlapping designations.[15]  Moreover, this argument overlooks that the TPS statute specifically allows consideration of the national interest— but that it is to be analyzed at the regular and defined intervals set forth by law.[16]  And even if the

---

[14] The Biden Administration's practice of combining registration processes had been done before with other TPS designations. *Nat'l TPS All.*, 2025 WL 2578045, at *27 (noting that Sudan and Haiti have similarly streamlined filing processes).

[15] *See* 90 Fed. Reg. 8805 (Feb. 3, 2025); 90 Fed. Reg. 10511 (Feb. 24, 2025).

[16] Defendants frequently stray from the actual language used by Congress ("national interest"), variously re-phrasing it as "national security" or "foreign policy" interest and citing cases in those contexts instead.  *See* Defs. Br. at 18-19.  They also overlook provisions of the TPS statute that allow DHS to deny or revoke status at any time from any *individuals* found not to meet TPS eligibility standards such as through criminal activity, *see* 8 U.S.C. § 1254a(c)(2).

asserted basis for the Vacaturs was more than supposed bureaucratic confusion, "[r]egardless of how serious the problem an administrative agency seeks to address, … it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tabacco Corp.*, 529 U.S. 120, 125 (2000).

Moreover, Defendants decision-making process was so rushed that meaningful consultation with other government agencies—as required by the TPS statute—was effectively impossible. In the Northern District Court case, discovery further substantiated these very types of claims, underscoring why dismissal at the pleading stage would be improper here. *See Nat'l TPS All.*, 2025 WL 2578045, at *30 ("the Court finds that the Secretary violated the TPS statute because she effectively made the decision to terminate before consultation with any government agency.").[17]

## B.  Plaintiffs Have Sufficiently Stated An Equal Protection Claim.

### 1.  *Arlington Heights* is the Controlling Standard of Review.

The Amended Complaint similarly alleges sufficient facts to state an Equal Protection claim. It cites extensive evidence demonstrating that racial bias improperly infected the decision-making process, making dismissal at this preliminary stage inappropriate.

Contrary to Defendants' argument, courts have repeatedly addressed the appropriate standard for evaluating Equal Protection claims alleging racial discrimination in TPS cases and have consistently applied the heightened standard set forth in *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). *See also Centro Presente*, 332 F. Supp. 3d at 409–13; *CASA de Maryland., Inc. v. Trump,* 355 F. Supp. 3d 307, 322-23 (D. Md.

---

[17] For example, discovery revealed that the decision-making process for the Venezuela Vacatur and Termination was within a span of a couple of days. *See Nat'l TPS All.*, 2025 WL 2578045, at *29-34. DHS had drafted the termination before even having the vacatur finished. *Id.* A similar timeline existed for the Haiti Vacatur. *Id.*

2018); *NAACP v. United States Dep't of Homeland Sec.,* 364 F. Supp. 3d 568, 576 (D. Md. 2019); *Ramos*, 321 F. Supp. 3d at 1124-1125.[18]

    *Hawaii* is inapposite because it concerned a very different factual context: regulation of foreign nationals seeking to enter the country in the face of national security concerns. By contrast, TPS beneficiaries have long-established ties to the United States and are entitled to a "higher level of due process than foreign nationals seeking admission to the country." *Centro Presente*, 332 F. Supp. 3d at 411 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)); *Nat'l TPS All.*, 2025 WL 2578045, at *35; *see also DHS v. Regents*, 591 U.S. at 34 (plurality) (applying *Arlington Heights* standard to case challenging recission of Deferred Action for Childhood Arrivals (DACA)). Further, the Executive Order in *Hawaii* was issued pursuant to a statute that "exudes deference to the President in every clause," 585 U.S. at 684, whereas the TPS statute sets forth a clear process and criteria to be followed. *Supra* pp. 3-4. Therefore, Defendants' argument that the Court should apply the rational basis standard under *Hawaii* is contrary to the weight of authority and should be rejected. *See* Defs. Brf. at 26.[19]

### *2.* <u>Plaintiffs Have Sufficiently Alleged That Racial Animus Was A Motivating Factor In The Challenged Conduct.</u>

---

[18] Defendants' argument that the standard in *Trump v. Hawaii* should apply was recently rejected in a related TPS case. *See Nat'l TPS All.*, 2025 WL 2578045, at *35 (rejecting government's motion for summary judgment on Equal Protection grounds).

[19] Plaintiffs would prevail even under rational basis review because the challenged conduct is "not rationally related to a legitimate government purpose." *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107 (1st Cir. 2015). The Court may consider extrinsic evidence in this assessment. *See Hawaii*, 585 U.S. at 705. Even in this deferential context, the Constitution forbids policies motivated by "a bare [] desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973). That is precisely the case here, as Defendants lack a "facially legitimate and bona fide" reason for their actions independent of unconstitutional motives. *Hawaii*, 585 U.S. at 704. For example, the Venezuela Termination asserts "notable" improvements in Venezuela without citing any, contradicting the Department of State's own reports. *See* 90 Fed. Reg. at 9042. Similarly, the Haiti Vacatur references "significant development" in Haiti yet provides no supporting sources. *See* 90 Fed. Reg. at 10513-10514.

For their Equal Protection claim to withstand Defendants' motion to dismiss, Plaintiffs need only plausibly allege that discriminatory purpose was one "motivating factor" for the challenged action. *Arlington Heights*, 429 U.S. at 265–66. This analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Relevant factors include contemporaneous statements of decision-makers, the historical background of the decision, the sequence of events leading up to it, departures from normal processes, and the disparate impact of the decision. *Id.* at 266-68.

Defendants claim that Defendant Noem's statements do not demonstrate racial animus by asserting that these statements were "reasoned explanations for [the challenged conduct]," specifically connected to national security concerns. Defs. Brf. at 26-28. This, however, ignores the fact that the Venezuela Vacatur does not cite national security concerns. *See Nat'l TPS All.*, 2025 WL957677 at *38. Even if it had, similar to the Haiti Vacatur and the Venezuela Termination, the "government does not get a free pass … simply because it makes an *ipse dixit* assertion that there is a national security interest." *Id.* Defendants failed to offer—nor could they—concrete evidence to support the basis of their national security concerns. *Id.*[20] Therefore, this Court should not grant these arguments any credence, particularly on a motion to dismiss.

Next, Defendants argue that the discriminatory statements made by Defendant Noem and Defendant Trump were "taken out of context" and selectively quoted. *See* Defs. Brf. at 26. This claim is, at best, disingenuous and, at worst, intellectually dishonest. The record of discriminatory

---

[20] As one example, among others, Defendants cite to gang violence, but "the danger of criminal conduct by an alien is [not] automatically a matter of national security." *Thai v. Ashcroft*, 366 F.3d 790, 796 (9th Cir. 2004). Defendants also point to Defendant Trump's Executive Order identifying the Venezuelan gang, Tren de Aragua("TdA"), as a terrorist organization, Defs. Brf. at 27, but offer no evidence to "tie TPS holders to TdA or even to establish that TdA has a substantial presence in the United States." *Nat'l. TPS All.*, 2025 WL957677 at *38.

animis is not limited to a few isolated remarks—it is extensive and well-documented. Plaintiffs have identified a pattern of racially charged statements by both Defendant Noem and Defendant Trump, rooted in harmful stereotypes, and made repeatedly over a sustained period—including in the critical months preceding Defendant Noem's decisions. *See* FAC at ¶¶ 124-142.

As numerous courts have held, "[t]here are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination." *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1083 (3rd Cir. 1996). Racist tropes, code words, stereotypes: all are "relevant for what they reveal—the intent of the speaker." *Id.*; *see also Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 505-06 (9th Cir. 2016) ("use of 'code words' may demonstrate discriminatory intent"); *Guimaraes v. SuperValu, Inc.,* 674 F.3d 962, 974 (8th Cir.2012) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications.").  Plaintiffs' allegations, taken as true, more than plausibly support an inference of discriminatory motive.

For example, the Amended Complaint alleges that Defendants Trump and Noem have promoted racist tropes, such as the false claim that Haitians eat pets, FAC ¶ 133; equated Black and Latinx immigrants with criminals, including labeling Venezuelans as "gangs," "thugs," and "criminals," FAC ¶¶ 125, 128-131, 134, 136, 137; and invoked xenophobic and eugenicist rhetoric, such as warning that immigrants are "poisoning the blood of our country." *Id.* ¶¶ 126 & 127. In this case there is no need to make any speculative leaps about whether this longstanding animus infected Defendant Noem's decision-making. For example, just days after vacating the Venezuela extension, she went on "Fox and Friends" and stoked racial stereotypes by equating Latinx immigrants with criminals. She explicitly linked those sentiments directly to the TPS Vacatur,

claiming Venezuelan TPS holders were breaking the law by "stay[ing] here and violat[ing] our laws for another 18 months. And [Defendants] stopped that…. The people of this country want these dirtbags out." FAC ¶¶ 93, 138. *See Nat'l TPS All.*, 2025 WL 2578045, at *35 ("Secretary Noem's generalization of the alleged acts of a few (for which there is little or no evidence) to the entire population of Venezuelan TPS holders who have lower rates of criminality and higher rates of college education and workforce participation than the general population is a classic form of racism.").

The Northern District court, in denying the government's motion for summary judgment and examining similar statements by Defendant Noem, explained that "a reasonable jury could still infer racial animus from the Secretary's statement because she was choosing to strip legal status from all Venezuelan TPS holders—numbering in the hundreds of thousands—based off her assessment of a limited number of individuals, and with no proof that any alleged gang member was a TPS holder." *Id.* Moreover, neither Defendant has disavowed or distanced themselves from these racially charged remarks. *See Saget*, 375 F. Supp. 3d at 368 (It is the "Court's responsibility to 'smoke out' unconstitutional government conduct under the [*Arlington Heights*] doctrine.") (internal citations omitted).[21]

Defendant Trump's discriminatory statements are also relevant and crucial in this matter, despite Defendants' protests. Defs. Brf. at 27-28. Under the *Arlington Heights* standard, which the Court should apply here, Plaintiffs have sufficiently presented direct and circumstantial evidence

---

[21]Defendant Noem echoed these biased sentiments by citing Defendant Trump's first-day Executive Orders as justification for the Venezuela Vacatur, which falsely asserts that "[m]illions of illegal aliens" have been allowed to settle in the United States "in violation of longstanding Federal laws." 90 Fed. Reg. 9040. *See also Saget*, 375 F. Supp. 3d at 359-60 (echoing the influence of the "America First" political agenda, which courts previously cited when enjoining TPS terminations under the first Trump administration).

of not only statements from Defendant Noem, the primary decisionmaker of the challenged conduct, but also evidence of Defendant Trump's intent and actions bearing a direct nexus to the actions of Defendant Noem. 429 U.S. at 266; *see also Centro Presente*, 332 F. Supp. 3d at 415 (finding President Trump's statements relevant); *Casa de Maryland*, 355 F. Supp. 3d at 325-326 (same). This is more than sufficient to move past the pleading stage.

Defendants' reliance on the vacated *Ramos* decision is unconvincing and is not controlling. Defs Brf. at 28. Here, numerous statements by Defendant Trump relate directly to TPS policy, FAC ¶¶ 140-141, and even where some statements did not explicitly reference TPS, they remain highly probative. As the *Centro Presente* court held, liability for racial discrimination can be found where "a biased individual manipulates a non-biased decision-maker into taking discriminatory action." 332 F. Supp. 3d at 414 (citing *Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260, 279 (E.D.N.Y. 2018)). As such, the court refused to dismiss the complaint where it alleged that the White House pressured DHS leadership to terminate TPS designations for political reasons, including advancing then-President Trump's broader anti-immigration agenda. *Id.*

Similarly, here, the discriminatory remarks from both Defendants were consistently about immigrants of color, were repeated over time, and occurred in the months leading up to Defendant Noem's decisions—much more so than in *Ramos*, where the challenged statements lacked this same temporal and contextual connection. 321 F. Supp. 3d at 1131-1132. Additionally, in this case, Defendant Noem cites directly to several of Defendant Trump's Executive Orders in her TPS determination—a clear showing that Defendant Trump influenced TPS policy, specifically the challenged conduct. *See* FAC ¶ 99; *see also* 90 Fed. Reg at 8807; 90 Fed. Reg. 9042-9043; 90 Fed. Reg. at 1053.

The remaining *Arlington Heights* factors are also satisfied here. The unprecedented and procedurally irregular sequence of events—including the first-ever vacatur of a TPS designation in the statute's history, rushed decision-making immediately following Secretary Noem's confirmation, and failure to engage in the statutorily expected interagency consultation—strongly suggest discriminatory pretext. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 227 (4th Cir. 2016); *Centro Presente*, 332 F. Supp. 3d at 415. These procedural departures, along with the disproportionate impact on Black and Latinx TPS holders from Venezuela and Haiti—particularly when compared to the more favorable treatment of predominantly white and European countries—further support an inference of discriminatory intent.

Given this overwhelming evidence, Plaintiffs have more than sufficiently stated a claim that the challenged conduct was motivated in part by discriminatory intent.

## IV.    PLAINTIFFS HAVE CAUSES OF ACTION UNDER THE CONSTITUTION AND THE APA, THEREFORE THEY CAN SEEK DECLARATIORY RELIEF.

Defendants' last argument misunderstands the role of the Declaratory Judgment Act, 28 U.S.C. § 2201, in this case. Defs. Brf. at 29 ("[s]ince Plaintiffs have not plausibly alleged a cognizable claim, they are entitled to no remedy whatsoever…."). Plaintiffs do not assert the Act as a freestanding cause of action, nor is that necessary. Rather, Plaintiffs seek declaratory relief as a remedy for the legally cognizable claims they have pled—namely, violations of the APA and the Constitution. As courts have repeatedly held, the Declaratory Judgment Act provides a vehicle for relief where an underlying legal claim exists, as it does here. *See MedImmune, Inc. v. Genentech,*

*Inc.*, 549 U.S. 118, 126–27 (2007); *O'Brien v. Wilmington Tr. Nat'l Ass'n as Tr. to CitiBank, N.A.*, 506 F. Supp. 3d 82, 93 (D. Mass. 2020).[22]

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment and deny Defendants' Motions to Dismiss in its entirety.

Dated:  September 19, 2025                    Respectfully submitted,

                                             */s/ Mirian Albert*
                                             Mirian Albert (BBO #710093)
                                             Oren Sellstrom (BBO #569045)
                                             Iván Espinoza-Madrigal (BBO # 708080)
                                             Victoria Miranda (BBO #695913)
                                             Lawyers for Civil Rights
                                             61 Batterymarch Street, 5th Floor
                                             Boston, MA 02110
                                             malbert@lawyersforcivilrights.org
                                             osellstrom@lawyersforcivilrights.org
                                             iespinoza@lawyersforcivilrights.org
                                             vmiranda@lawyersforcivilrights.org

---

[22] Defendants' reliance on *Daylily Farms, Inc. v. Chao*, 357 F. Supp. 2d 356, 359 (D. Mass. 2005), and *Colonial Penn Grp., Inc. v. Colonial Deposit Co*., 834 F.2d 229, 232 (1st Cir. 1987), is misplaced. Those cases stand only for the uncontroversial proposition that the Act does not create rights in and of itself. As explained above, however, all of Plaintiffs' claims are cognizable and properly pled. In such a case, a Declaratory Judgment Act claim is proper, and declaratory judgment is an available remedy. *See Centro Presente*, 332 F. Supp. 3d at 418.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2025, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.


 /s/*Mirian Albert*
Mirian Albert (BBO #710093)