# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CASA, INC.,

      Plaintiff,

      v.

KRISTI NOEM,
*in her official capacity as*
*Secretary of Homeland Security*, and
U.S. DEPARTMENT OF
HOMELAND SECURITY,

      Defendants.

Civil Action No. 25-1484-TDC

## MEMORANDUM OPINION

Plaintiff CASA, Inc. ("CASA") has filed suit against Defendants Secretary of Homeland Security Kristi Noem and the United States Department of Homeland Security (collectively, "DHS") challenging DHS's terminations of temporary protected status ("TPS") for approximately 11,700 nationals of Afghanistan and 5,200 nationals of Cameroon residing in the United States. The two terminations were published in notices entitled "Termination of the Designation of Afghanistan for Temporary Protected Status," 90 Fed. Reg. 20309 (May 13, 2025) ("the Afghanistan Notice"), and "Termination of the Designation of Cameroon for Temporary Protected Status," 90 Fed. Reg. 23697 (June 4, 2025) ("the Cameroon Notice"). On behalf of its members from Afghanistan and Cameroon, CASA challenges these terminations under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

DHS has filed a Motion to Dismiss Counts 5 and 8, and CASA has filed a Motion to Complete the Administrative Record and for Extra-Record Discovery. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, DHS's Motion will be DENIED, and CASA's Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In the presently operative Amended Complaint and Supplement (collectively, "the Complaint"), CASA asserts eight causes of action. In Counts 1 and 6, CASA asserts that DHS's termination of the TPS designations for Afghanistan and Cameroon, respectively, violated the APA because Secretary Noem did not comply with a statutory requirement to publish notices of the terminations in the Federal Register at least 60 days before the designations were set to expire. In Counts 3 and 4, CASA seeks a declaratory judgment, pursuant to the Declaratory Judgment Act, that because of the failure to meet those deadlines, the TPS designations for Afghanistan and Cameroon, respectively, are automatically extended by at least six months pursuant to 8 U.S.C. § 1254a(b)(3)(C).

In Counts 2 and 7, CASA asserts that the terminations of the Afghanistan and Cameroon TPS designations, respectively, violated the APA because they were arbitrary and capricious and not in accordance with law, on the grounds that they were part of a preordained decision by the President to reduce the number of non-white immigrants in the United States. In Counts 5 and 8, CASA alleges that the Afghanistan and Cameroon terminations, respectively, violated the equal protection component of the Due Process Clause of the Fifth Amendment to the Constitution, because they were motivated in part by discrimination against non-white immigrants based on race, ethnicity, or national origin.

2

On July 10, 2025, the Court denied CASA's Motion for Partial Summary Judgment or a Stay of Agency Action, ECF No. 42, in which CASA sought summary judgment on the merits of Counts 1, 2, 3, 4, 6, and 7 (the "statutory claims") or, in the alternative, a stay of the effective dates of the TPS terminations pending resolution of this case. *CASA, Inc. v. Noem* ("*CASA I*"), 792 F. Supp. 3d 576, 582 (D. Md. 2025). In the same ruling, the Court also denied DHS's Cross Motion for Summary Judgment and Motion to Dismiss, ECF No. 53, in which DHS sought summary judgment on the merits of the statutory claims and argued that two provisions in the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1254a(b)(5)(A) and 1252(f)(1), bar consideration of CASA's claims. *CASA I*, 792 F. Supp. 3d at 588–96. At the time, CASA sought no other relief as to Counts 5 and 8 (the "equal protection claims"). The legal background, relevant facts, and early procedural history of this case are set forth in the Court's Memorandum Opinion resolving those motions, which is incorporated by reference here. *Id.* at 582–87.

DHS has since filed a Partial Answer to the statutory claims and a Motion to Dismiss the equal protection claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For its part, CASA has filed a Motion to Complete the Administrative Record and for Extra-Record Discovery, in which it seeks to add several documents to the administrative records leading to the issuance of the Afghanistan Notice and the Cameroon Notice for purposes of its APA claims and also seeks additional discovery outside the administrative records.

## DISCUSSION

### I.    DHS's Motion to Dismiss the Equal Protection Claims

In Counts 5 and 8, CASA asserts that DHS's terminations of the TPS designations for Afghanistan and Cameroon violated the equal protection component of the Due Process Clause of the Fifth Amendment because race discrimination against non-white immigrants was a motivating

3

factor for those decisions. In denying DHS's procedural arguments for dismissal of these claims in its Cross Motion for Summary Judgment and Motion to Dismiss, the Court held that CASA's equal protection claims could proceed if construed to "challenge . . . a general policy or practice of terminating TPS designations based on racial animus." *CASA I*, 792 F. Supp. 3d at 593. The Court therefore construes Counts 5 and 8 in this way for purposes of the present Motion to Dismiss.

To defeat a Rule 12(b)(6) motion, the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). When considering a Rule 12(b)(6) motion, a court may consider the complaint and its attachments, as well as documents attached to the motion that are integral to and explicitly relied upon in the complaint and that are of unchallenged authenticity. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015). Here, the Court finds that the Afghanistan Notice and the Cameroon Notice, which are specifically referenced in the Complaint, are integral to the Complaint and may be considered in resolving the Motion.

### A.    Legal Standard

The Court must first identify the applicable legal standard governing CASA's equal protection claims. CASA asserts that the Court should analyze these claims using the framework established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.* ("*Arlington Heights*"), 429 U.S. 252 (1977), under which a government action violates the

4

constitutional right to equal protection of the law if race discrimination was "a motivating factor" in the decision. *Id.* at 265–66. In contrast, DHS argues that pursuant to *Trump v. Hawaii*, 585 U.S. 667 (2018), the Could should apply rational basis review, under which the government action must be upheld as constitutional if it "can reasonably be understood to result from a justification independent of unconstitutional grounds," such as race discrimination. *Id.* at 704–05.

In *Arlington Heights*, the United States Supreme Court considered a facially neutral municipal zoning decision that was challenged as racially discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment. *Arlington Heights*, 429 U.S. at 254. The Court stated that "because legislators and administrators are properly concerned with balancing numerous competing considerations," courts should generally "refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality." *Id.* at 265. However, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Id.* at 265–66. The Court instructed that in considering whether discriminatory intent motivated a facially neutral government decision, courts should engage in a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and then proceeded to identify a series of factors that courts may consider in assessing whether discriminatory intent was a motivating factor in a government decision. *Id.* at 266–68. Courts have since applied the *Arlington Heights* framework to assess whether facially neutral government policies or actions violate the equal protection rights provided by the Fifth and Fourteenth Amendments based on race discrimination. *See, e.g.*, *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016). In such cases, an equal protection violation may be established if race discrimination was "a motivating factor," even if it was not the "sole" or even a "primary" motive for the action. *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–66). If a

5

plaintiff demonstrates that race discrimination was a motivating factor, the burden shifts to the government defendant to demonstrate that the policy or action would have been adopted even "without this factor." *Id.* at 221 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

DHS argues that *Arlington Heights* does not apply to the present case because the TPS terminations involve issues of immigration and national security and are thus governed by *Hawaii*. In that case, the plaintiffs asserted a violation of the Establishment Clause of the First Amendment to the Constitution arising from Presidential Proclamation No. 9645, which prohibited entry into the United States by foreign nationals from several countries, most of which were predominantly Muslim, on the grounds that it "singl[ed] out Muslims for disfavored treatment" and was primarily motivated by "religious animus." *Hawaii*, 585 U.S. at 699. After finding that the proclamation was "facially neutral toward religion," the Supreme Court declined to "probe the sincerity of the stated justifications for the policy." *Id.* at 702, 704–05. Rather, the Court invoked the principle set forth in *Fiallo v. Bell*, 430 U.S. 787 (1977), that "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii*, 585 U.S. at 702 (quoting *Fiallo*, 430 U.S. at 792). The Court also invoked the standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), under which, based on the principle that "foreign nationals seeking admission have no constitutional right to entry," an Executive Branch decision to deny entry to the United States to a foreign national seeking admission will be upheld in the face of a constitutional challenge if the government can provide a "'facially legitimate and bona fide' reason for its action." *Hawaii*, 585 U.S. at 703 (quoting *Mandel*, 408 U.S. at 769). As to the proclamation, the Court, after noting that its "inquiry into matters of entry and national security is highly constrained," allowed that its review could potentially extend beyond the *Mandel* standard to "look behind" the stated

6

justifications "to the extent of applying rational basis review," under which a government policy is upheld so long as it is "plausibly related to the Government's stated objective" and "can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 704–05.

Upon consideration of these competing legal standards, the Court finds that *Hawaii* does not apply to this case. To the extent that the highly deferential standard of *Hawaii* may be applicable outside of an Establishment Clause challenge, it would apply to the specific context of government policies or actions addressing entry or admission of foreign nationals to the United States, in large part because "foreign nationals seeking admission have no constitutional right to entry." *See id.* at 703 (stating that "the admission and exclusion of foreign nationals is . . . largely immune from judicial control"); *id.* at 705 n.5 (stating that rational basis review "applies to any constitutional claim concerning the entry of foreign nationals"). Indeed, the precedents relied upon by the Supreme Court in *Hawaii* specifically addressed government policies or actions relating to entry or admission by foreign nationals. *See Fiallo*, 430 U.S. at 798–800 (upholding against an equal protection challenge based on sex discrimination a statute granting preferential treatment to mothers of illegitimate children over fathers of illegitimate children in the context of the admission of foreign family members to the United States); *Mandel*, 408 U.S. at 769–70 (upholding the denial of a visa to a foreign journalist against a First Amendment challenge).

*Hawaii* continues the longstanding distinction in equal protection jurisprudence between the treatment of foreign nationals seeking entry into the United States, who generally lack constitutional rights, and foreign nationals already present in the United States, who are subject to certain constitutional protections. The Supreme Court has recognized that "once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the

7

Constitution to all people within our borders." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596
n.5 (1953). Such rights include the rights to due process and equal protection of the law under the
Fifth and Fourteenth Amendments. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (holding
that "illegal aliens . . . may claim the benefit of the Fourteenth Amendment's guarantee of equal
protection"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 373 (1886) (holding that the administration
of an ordinance discriminated against Chinese nationals in the United States in violation of their
rights to equal protection of the law); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (stating that
"once an alien enters the country, the legal circumstance changes," and that the Fifth Amendment's
Due Process Clause "applies to all 'persons' within the United States, including aliens, whether
their presence here is lawful, unlawful, temporary, or permanent").

Consistent with this distinction, in a post-*Hawaii* decision, a majority of the Justices of the
Supreme Court applied the *Arlington Heights* standard to a claim that DHS's rescission of the
Deferred Action for Childhood Arrivals ("DACA") program, which allowed certain
undocumented immigrants who entered the United States as children to receive forbearance from
removal for a designated time period, was motivated by discriminatory animus and thus violated
the equal protection component of the Fifth Amendment. *Dep't of Homeland Security v. Regents
of the Univ. of California* ("*Regents*"), 140 S. Ct. 1891, 1901, 1915 (2020) (plurality opinion); *id.*
at 1918 (Sotomayor, J., concurring in part, concurring in the judgment in part, and dissenting in
part). Similarly, the United States Court of Appeals for the Fourth Circuit, while not deciding the
specific question of the applicable legal standard, analyzed under the *Arlington Heights* framework
an equal protection challenge brought by noncitizens located in the United States to the federal
statute criminalizing illegal reentry after deportation and upheld the law based on the conclusion

8

that race discrimination was not a motivating factor in its enactment. *United States v. Sanchez-Garcia*, 98 F.4th 90, 97–98, 102 (4th Cir. 2024).

Here, unlike the individuals excluded by the travel ban in *Hawaii* who were seeking entry to the United States, the TPS beneficiaries affected by DHS's terminations are, by definition, present in the United States in accordance with the law. *See* 8 U.S.C. § 1254a(c) (stating that an individual's eligibility for TPS requires continuous physical presence in the United States since the most recent effective date of designation). Indeed, where both Afghanistan and Cameroon were redesignated for TPS in 2023, *see* Afghanistan Notice, 90 Fed. Reg. at 20309; Cameroon Notice, 90 Fed. Reg. at 23697, all of CASA's members from Afghanistan and Cameroon who have TPS have lived in the United States since at least that year. They are therefore similarly situated to those challenging the DACA rescission in *Regents* in that they are already present in the United States as they assert an equal protection challenge, based on an allegedly discriminatory motivation, to the termination of a program that protects them from deportation. *See Regents*, 140 S. Ct. at 1901, 1903.

Finally, although the Supreme Court in *Hawaii* noted that its application of a highly deferential standard to decisions relating to the entry of foreign nationals "has particular force in admission and immigration cases that overlap with the area of national security," *Hawaii*, 585 U.S. at 704, the TPS terminations at issue here do not implicate the same kind of national security interests. On its face, the proclamation in *Hawaii* was issued to enhance "Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats," *id.* at 677 (quoting Proclamation No. 9645), and it identified countries subject to the ban in part by weighing "various indicators of national security risk, including whether the foreign state is a known or potential terrorist safe haven," *id.* at 678. In contrast, the TPS statute states that designations must

9

be based on factual findings relating to conditions in the foreign state, including the occurrence of a natural disaster in such a foreign state, the presence of an armed conflict in such a state that prevents its nationals residing in the United States from returning safely, or the presence of a temporary and extraordinary condition that prevents such safe return and for which the TPS designation is not contrary to the national interest. *See* 8 U.S.C. § 1254a(b)(1). The Afghanistan Notice and the Cameroon Notice discussed these considerations, including by relying on factual findings relating to foreign nationals' ability to return safely to these nations, with only passing, non-specific references to national security.

For these reasons, *Hawaii* does not apply, and the Court will apply the *Arlington Heights* standard. Numerous courts have reached the same conclusion and applied the *Arlington Heights* framework in reviewing equal protection challenges to TPS terminations. *See, e.g.*, *NAACP v. U.S. Dep't of Homeland Security*, 364 F. Supp. 3d 568, 576 (D. Md. 2019); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 322–25 (D. Md. 2018); *Centro Presente v. U.S. Dep't of Homeland Security*, 332 F. Supp. 3d 393, 410–12 (D. Mass. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 301–04 (E.D.N.Y. 2018); *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 858 (N.D. Cal. 2025); *Nat'l TPS All. v. Noem*, ___ F. Supp. 3d ___, No. 25-5687, 2025 WL 2233985, at \*15 (N.D. Cal. July 31, 2025).

### B.    Equal Protection Claims

Under the *Arlington Heights* framework, CASA must plead facts that permit the Court to draw a reasonable inference that "invidious discriminatory purpose was a motivating factor" in the TPS terminations. *Arlington Heights*, 429 U.S. at 266. Among the categories of direct and circumstantial evidence that courts may consider in making this assessment are: (1) any disparate impact of the policy on one race over another; (2) the "historical background of the decision . . .

particularly if it reveals a series of official actions taken for invidious purposes"; (3) the "specific sequence of events leading up to the challenged decision"; (4) "[d]epartures from the normal procedural sequence"; (5) departures from the substantive factors usually considered in making the decision; and (6) "contemporary statements by members of the decisionmaking body." *Id.* at 266–68.

At this early stage, the Court finds that CASA has adequately pleaded facts in several of these categories of direct and circumstantial evidence that, when read as a whole and in the light most favorable to CASA, permit a reasonable inference of a policy or practice of race discrimination in TPS determinations. First, CASA, in alleging a broader discriminatory effort to reduce the number of non-white immigrants in the United States, has pleaded facts that arguably demonstrate, at a minimum, a disparate impact of the policy on non-white populations. *Id.* at 266. CASA points to TPS terminations and other decisions by the Trump Administration relating to immigration or immigrants that almost exclusively have an adverse impact on individuals from predominantly non-white nations. These include the February 2025 vacating of recent extensions of TPS designations for Haiti and Venezuela; the March 2025 termination of parole programs for nationals of Cuba, Haiti, Nicaragua, and Venezuela; and the revocation of over 1,600 student visas by May 2025, which most affects students from "India, China, South Korea, Saudi Arabia, Nigeria, Nepal, Bangladesh, [Colombia], Mexico, and Iran." Am. Compl. ¶¶ 70–72, ECF No. 41. Significantly, in the same time frame, President Trump has directed Secretary Noem to "prioritize" the admission and resettlement of white Afrikaners from South Africa because they are allegedly "victims of unjust racial discrimination." *Id.* ¶ 73. CASA also alleges that President Trump is creating a "gold card" visa program that will be accessible only to multimillionaires, who are disproportionately white. *Id.* ¶ 75.

11

Second, CASA has pointed to multiple examples of "contemporary statements" by decisionmakers that can be "highly relevant" to the question of discriminatory intent. *Arlington Heights*, 429 U.S. at 268. CASA has alleged that President Trump made racially discriminatory statements about non-white immigrants during the 2024 presidential campaign and in the first months of his second presidential term. For example, President Trump stated in late 2023 that immigrants are "poisoning the blood of our country" when they come from South America or "from Africa, from Asia, from all over the world." Am. Compl. ¶¶ 94–95. In June 2024, he stated that "very bad people" had come to the United States from "Congo and Africa," "from Asia," "from the Middle East," and "from South America." *Id.* ¶ 87. In September 2024, President Trump stated that "nests of bad people" from Venezuelan jails were "taking over cities" in the United States, *id.* ¶ 88, and he falsely claimed that Haitian immigrants were eating residents' dogs and cats in Springfield, Ohio. In February 2025, President Trump stated that South American, African, and Asian countries had allowed "every single prisoner" from their countries to be sent to the United States. *Id.* ¶ 90. In contrast, President Trump has stated that he wants more immigrants from "nice" countries like Denmark, Norway, and Switzerland. *Id.* ¶ 99. CASA has also referenced statements by Secretary Noem at her confirmation hearing in January 2025, when she stated that the extension of TPS for Venezuela is "alarming when you look at what we've seen in different states including Colorado with gangs doing damage and harming individuals and the people that live there." *Id.* ¶ 103.

DHS, citing a vacated opinion, *Ramos v. Wolf*, 975 F.3d 872, 897–99 (9th Cir. 2020), *vacated on reh'g en banc*, 59 F.4th 1010 (9th Cir. 2023), argues that these statements are irrelevant because CASA has presented no evidence tying them specifically to the Afghanistan and Cameroon TPS terminations. However, the claimed equal protection violation is the alleged

12

general policy or practice of terminating TPS designations to reduce the number of non-white immigrants in the country, which manifested itself in the Afghanistan and Cameroon TPS terminations. Thus, the statements disparaging various groups of non-white immigrants while complimenting white ones are probative of general discriminatory intent toward non-white immigrants, and President Trump's statements about immigrants from Africa, Asia, and the Middle East are particularly relevant because Cameroon and Afghanistan are in those regions. Where Secretary Noem expressly invoked President Trump's executive order directing immigration policy as a key factor underlying her TPS terminations, President Trump's statements are relevant to the motivation for these decisions. *See* Afghanistan Notice, 90 Fed. Reg. at 20311; Cameroon Notice, 90 Fed. Reg. at 23698. Based on this linkage, as well as the fact that the identified statements draw contrasts between treatment of white and non-white immigrants and include at least one directly related to a TPS determination, they are more compelling than the statements about Latinos in *Regents* that were considered too "remote in time and made in unrelated contexts" to be probative on the motivation for the DACA rescission. *See Regents*, 140 S. Ct. at 1916 (plurality opinion). Thus, while by no means sufficient on their own to demonstrate a discriminatory motivation, these statements are properly considered as part of the Court's analysis. *Arlington Heights*, 429 U.S. at 268.

Third, CASA has pleaded facts relating to the "historical background of the decision" and the "specific sequence of events leading up to the challenged decision" that demonstrate "[d]epartures from the normal procedural sequence" of TPS determinations. *Id.* at 267. As alleged in the Complaint, "TPS review typically begins with career specialists preparing an objective country conditions report, a process spanning months." Am. Compl. ¶ 77. Because of the lengthy review process, the first Trump Administration did not terminate Sudan's TPS designation until

13

almost nine months into the term, and it took even longer for several other TPS termination decisions. Here, where the Afghanistan TPS designation was set to expire on May 20, 2025, Afghanistan Notice, 90 Fed. Reg. at 20309, and a termination decision must be made no less than 60 days before that date, 8 U.S.C. § 1254a(b)(3), Secretary Noem necessarily made the decision no later than March 21, 2025, or only two months into the second Trump Administration. Similarly, where the Cameroon TPS designation was set to expire on June 7, 2025, Cameroon Notice, 90 Fed. Reg. at 23697, that termination decision was necessarily made by April 8, 2025. CASA thus plausibly alleges that Secretary Noem "could not have engaged in the typical review process within the shortened timeframe of at most three months." Am. Compl. ¶ 80.

Fourth and finally, CASA has pleaded facts that could demonstrate a departure from substantive "factors usually considered important by the decisionmaker." *Arlington Heights*, 429 U.S. at 267. Under the TPS statute, Secretary Noem may terminate a TPS designation only if she determines that a foreign state "no longer continues to meet the conditions for designation," which consist of (1) ongoing armed conflict within the foreign state that would endanger the safety of that country's nationals if they were required to return; (2) disruptive natural disasters, where the foreign state is temporarily unable to handle its returning nationals and has requested a designation; or (3) other "extraordinary and temporary conditions in the foreign state . . . unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest." 8 U.S.C. § 1254a(b)(1), (3)(B). In both the Afghanistan and Cameroon Notices, Secretary Noem relied in part on a separate factor, President Trump's directive in Executive Order 14,159 to Secretary Noem to "rescind policies that led to increased or continued presence of illegal aliens in the United States." Afghanistan Notice, 90 Fed. Reg. at 20311; Cameroon Notice, 90 Fed. Reg. at 23698. Even to the extent that this factor could relate to the appropriate consideration

14

of the "national interest," 8 U.S.C. § 1254a(b)(1)(C), because TPS holders have lawful status in the United States and are not in fact "illegal aliens," and because the Afghanistan and Cameroon Notices do not explain how the TPS terminations actually advance any such interest by decreasing the presence of illegal aliens in the United States, Secretary Noem relied on a substantive factor that does not appear to be aligned with any statutorily identified consideration.

Where the Court must consider CASA's factual allegations to be true and to view them in the light most favorable to CASA, the Complaint, particularly its assertions showing that the TPS determinations have disproportionately impacted non-white TPS holders, that by comparison a predominantly white population from South Africa has received highly favorable treatment in relation to whether they are permitted to reside in the United States, that decisionmakers have made statements that arguably demonstrate discriminatory animus, and that the process and substance of the TPS determinations deviated from past decisions, alleges sufficient facts to support a reasonable inference that the Afghanistan and Cameroon TPS terminations were authorized as part of a general policy or practice of making TPS determinations motivated by race discrimination.    Other courts faced with similar claims of race discrimination in TPS determinations, upon application of the *Arlington Heights* framework, have denied motions to dismiss under comparable facts. *See, e.g.*, *NAACP*, 364 F. Supp. 3d at 575–78 (applying *Arlington Heights* and denying a motion to dismiss an equal protection challenge to the TPS termination for Haiti where the plaintiffs offered evidence of President Trump's racial animus and its influence on the decisionmaking process); *CASA de Maryland*, 355 F. Supp. 3d at 325–26 (same for the TPS termination for El Salvador).

Accordingly, DHS's Motion to Dismiss Counts 5 and 8 will be denied.

15

## II.    CASA's Motion to Complete the Administrative Record

In its Motion to Complete the Administrative Record, CASA argues that the administrative records for the Afghanistan and Cameroon TPS terminations are "demonstrably incomplete." CASA Mot. at 5, ECF No. 104.  It seeks to have both administrative records enlarged by including the following documents that it alleges are missing from them:  unredacted versions of Secretary Noem's decisional memoranda for the Afghanistan and Cameroon TPS terminations; rejected decisional memoranda; non-concurrence memoranda; records of clearance and approval; State Department country conditions reports; DHS Office of Intelligence and Analysis ("I&A") assessments; and input from a number of sources, including Department of Defense ("DOD") combatant commands, United States embassies, foreign government officials, Members of Congress, and non-governmental organizations ("NGOs").  CASA also seeks the addition to the Cameroon administrative record of Secretary of State Marco Rubio's letter providing a written recommendation on the Cameroon TPS designation.

In its memorandum in opposition to the Motion, DHS states that certain of these documents are already included in the administrative records.  For example, DHS has submitted Secretary Noem's decisional memoranda as part of the administrative records, but it has redacted nearly all of the content based on the assertion in a privilege log that the content is protected by the deliberative process privilege.  As to the State Department country conditions reports, DHS states that they are already included in the administrative records, and that there is "no factual basis" for the existence of more recent versions of those reports.  DHS Opp'n at 11, ECF No. 105.  DHS further states that the administrative records already include "documents reflecting information considered by [NGOs]."  *Id.* at 12 n.2.

16

DHS has also filed two declarations from DHS officials attesting that many of the categories of requested documents do not exist. The first declaration, from the Acting Deputy Under Secretary of Analysis, states that I&A did not provide assessments for Secretary Noem's terminations of TPS for Afghanistan and Cameroon. The second declaration, from a United States Citizenship and Immigration Services ("USCIS") official, states that (1) there were no rejected decisional memoranda in that no proposed decisional memoranda recommending the extension of either TPS designation were sent to Secretary Noem; (2) there were no non-concurrence memoranda relating to either TPS termination; (3) DOD did not provide input as to these two TPS terminations; (4) input from United States embassies was subsumed into the State Department country conditions reports in the administrative records; (5) USCIS did not receive any letters from NGOs relating to the Afghanistan termination; and (6) USCIS did not receive letters from foreign governments relating to either TPS termination. CASA has provided no specific basis upon which the Court should question these representations.

DHS submitted five documents requested by CASA as exhibits but maintains that they should not be included in the two administrative records. These documents are: the records of clearance and approval for the Afghanistan and Cameroon TPS terminations, a letter from five United States Senators recommending the extension of the Afghanistan TPS designation, a letter from 34 Members of Congress recommending the extension of the Cameroon TPS designation, and Secretary Rubio's written recommendation to terminate the Cameroon TPS designation.

Although DHS's representations are qualified in certain ways that do not entirely foreclose the existence of certain requested documents, CASA now agrees that the dispute relating to the completion of the administrative records has narrowed to two questions: first, whether and to what extent the two decisional memoranda may be redacted; and second, whether the five documents

17

that DHS attached as exhibits and any more recent State Department country conditions reports, if they exist, must be included in the administrative records.

### A.    Legal Standards

#### 1.    APA Administrative Record

As relevant here, the APA provides that a final agency action will be "set aside" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

When adjudicating an APA claim, a court must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Thus, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *see Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995) ("Judicial review of administrative action is generally confined to the administrative record."). The administrative record includes all materials that were "before the Secretary" or other applicable deciding official at the time that official made the relevant decision. *Citizens to Preserve Overton Park, Inc. v. Volpe* ("*Overton Park*"), 401 U.S. 402, 420 (1971). It includes all materials "directly or *indirectly* considered by agency decision-makers." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted); *see Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993). Documents considered by the agency include all materials that "might have influenced the agency's decision," not just those on which the agency actually relied in making its final decision. *Nat'l Courier Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys.*, 516 F.2d 1229, 1241 (D.C. Cir. 1975); *Bethlehem Steel Corp. v. EPA*, 638 F.2d 994, 1000 (7th Cir. 1980); *Stainback v. Sec'y of the Navy*, 520 F. Supp. 2d 181, 186 (D.D.C. 2007). Such materials can include documents containing evidence contrary to the

18

agency's final position. *See Thompson*, 885 F.2d at 555; *Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 46 (D.D.C. 2015).

The agency "may not unilaterally determine what constitutes the administrative record." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47 (quoting *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005)). However, as part of the "presumption of regularity" traditionally afforded to government officials carrying out their duties, "when an agency certifies that the administrative record it has provided to the court is complete, courts generally presume it to be so absent clear evidence to the contrary." *Mestanek v. Jaddou*, 93 F.4th 164, 172 (4th Cir. 2024).

Even so, courts have recognized several situations in which it is appropriate to order the supplementation of the administrative record with material that "should have been properly a part of the administrative record but was excluded by the agency." *Otsuka Pharm. Co., Ltd. v. Burwell*, No. GJH-15-852, 2015 WL 1579127, at *3 (D. Md. Apr. 8, 2015) (unpublished) (quoting *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 5 n.4 (D.D.C. 2009)). Generally, such supplementation is warranted only "if the agency deliberately or negligently excluded documents that may have been adverse to its decision," "if background information was needed to determine whether the agency considered all the relevant factors," and "if the agency failed to explain administrative action so as to frustrate judicial review." *City of Dania Beach v. Fed. Aviation Admin.*, 628 F.3d 581, 590 (D.C. Cir. 2010); *Otsuka Pharm. Co.*, 2015 WL 1579127, at *3 (quoting *City of Dania Beach*, 628 F.3d at 590). The challenger bears the burden to identify the allegedly excluded material with "sufficient specificity" and may not "merely proffer[] broad categories of documents and data that are likely to exist." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47 (quoting *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 17 (D.D.C. 2013)).

19

## 2.    Deliberative Process Privilege

The deliberative process privilege "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). The privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism." *Coastal States Gas Corp. v. Dep't of Energy* ("*Coastal States*"), 617 F.2d 854, 866 (D.C. Cir. 1980). To be subject to the deliberative process privilege, a document must meet two requirements: (1) it must be predecisional; and (2) it must be deliberative. *Sierra Club*, 141 S. Ct. at 785–86.

To be predecisional, a document must have been "generated before the agency's final decision on the matter." *Id.* at 786. Predecisional documents are "'prepared in order to assist an agency decisionmaker in arriving at [a] decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)). To be deliberative, the document must have been "prepared to help the agency formulate its position." *Sierra Club*, 141 S. Ct. at 786. It must reflect "the give-and-take of the consultative process" used by the agency. *Coastal States*, 617 F.2d at 866. "[R]ecommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" are generally considered deliberative. *Id.*

Even if these two requirements are met, the privilege may be lost if the government agency expressly chooses "to adopt or incorporate by reference" protected material into a document that

20

constitutes final agency action. *NLRB v. Sears, Roebuck & Co.* ("*Sears*"), 421 U.S. 132, 161 (1975); *see Coastal States*, 617 F.2d at 866 ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."). "[D]ocuments that embody a final decision" are not protected by the privilege, because "once a decision has been made, the deliberations are done." *Sierra Club*, 141 S. Ct. at 785.

The deliberative process privilege is a qualified privilege, and a "litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Fed. Trade Comm'n v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984); *see Cipollone v. Liggett Grp. Inc.*, 812 F.2d 1400, 1987 WL 36515, at \*2 (4th Cir. 1987) (unpublished).

There can be tension between the deliberative process privilege and judicial review in the APA context, because the APA requires courts to review agencies' decisionmaking processes based on the "whole record" before the agency. 5 U.S.C. § 706. If they were considered by the agency during the decisionmaking process, deliberative materials would appear to fall within the definition of the administrative record. *See Overton Park*, 401 U.S. at 420; *Nat'l Courier Ass'n*, 516 F.2d at 1241; *Thompson*, 885 F.2d at 555. Some federal courts, however, consider such deliberative materials to fall outside the administrative record. *See Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024); *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (stating that deliberative materials are "not part of the administrative record to begin with" and need not be logged as withheld from that record). In *Blue Mountains Biodiversity Project*, the court nevertheless noted that "whether materials are in fact deliberative is subject to

21

judicial review" and may warrant the submission of a privilege log "to aid in that analysis." *Blue Mountains Biodiversity Project*, 99 F.4th at 445.

Within the Fourth Circuit, district courts are split on whether a document withheld as deliberative is categorically excluded from the administrative record or whether its inclusion depends on a case-specific evaluation of the document's relevance to the court's review of the agency action. *Compare Tafas v. Dudas*, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008) (categorical exclusion) *with Clinch Coal. v. U.S. Forest Serv.*, 597 F. Supp. 3d 916, 922–25 (W.D. Va. 2022) (case-specific approach). In *Clinch Coalition*, the court rejected a categorical rule that deliberative materials are not part of the administrative record even if they were actually considered as part of the decisionmaking process, because such an approach would lead to the "strange result" that the documents "are relevant for purposes of developing [the] final rule but irrelevant for purposes of the court's review of that final rule." *Clinch Coal.*, 597 F. Supp. 3d at 923. Rather, the court concluded that a deliberative document actually relied upon could be part of the administrative record, but an agency could withhold some or all of it pursuant to the deliberative process privilege, subject to a determination by the court of both its relevance to the decisionmaking process and the applicability of the privilege. *See id.* at 923–24.

The Court generally agrees that a categorical exclusion of deliberative materials from the administrative record is difficult to square with the traditional definition of the administrative record, which includes all materials "directly or indirectly considered" by the agency decisionmakers, including "evidence contrary to the agency's position" and not merely "those on which the agency relied in its final decision." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 46–47. Nevertheless, the Court need not decide whether such materials should be treated as categorically outside the administrative record because regardless of this issue, the Court must determine

22

whether the decisional memoranda are, in whole or in part, protected by the deliberative process privilege and will exclude them from consideration only if they are, in fact, protected by that privilege. *See Blue Mountains Biodiversity Project*, 99 F.4th at 445.

### B.    Decisional Memoranda

With these standards in mind, the Court first addresses whether and to what extent the full contents of the two decisional memoranda should be added to the administrative records. The decisional memoranda at issue embody the final decisions of Secretary Noem and were undisputedly considered by Secretary Noem in making her decisions, such that they fall within the definition of the administrative record. DHS has, in fact, included the redacted versions in the administrative records. The question to be decided is whether the redacted contents are protected by the deliberative process privilege and were therefore properly withheld by the Government.

As submitted to the Court, the decisional memoranda, one for Afghanistan and one for Cameroon, are each entirely redacted except for the date; the name of the sender, identified as Kika M. Scott, the Senior Official Performing the Duties of the Director of USCIS; the subject, identified as "Temporary Protected Status" for either Afghanistan or Cameroon; a header marking it as "Pre-Decisional/Deliberative"; and Secretary Noem's signature and the date of signing under a brief statement of the decision made. *See* Joint Record ("J.R.") 131–41, ECF No. 59 (Afghanistan Administrative Record); Cameroon Admin. Record ("CAR") 4–11, ECF No. 70. The two unredacted sentences in the Afghanistan decisional memorandum identifying the decisions made read "Terminate Afghanistan's designation on the basis of no longer meeting the extraordinary and temporary conditions statutory standard" and "Terminate Afghanistan's designation on the basis of improved conditions as it relates to ongoing conflict." J.R. 140–41. The unredacted statement of the decision made in the Cameroon decisional memorandum consists

of the header "Secretary's Decision" and the statement "3. Terminate: Terminate Cameroon's designation." CAR 11. DHS contends that the several pages of redacted material in each memorandum consist of predecisional recommendations to Secretary Noem, and that while her signature "reflects her final decision to terminate TPS for each country," the contents of the decisional memoranda are privileged because they do not "embody" the agency's final decisions, which are instead memorialized in the Federal Register notices. DHS Opp'n at 8–9.

The Supreme Court has stated that the deliberative process privilege does not apply to "documents that embody a final decision, because once a decision has been made, the deliberations are done." *Sierra Club*, 141 S. Ct. at 785. A document embodies a final decision if "it communicates a policy on which the agency has settled," "the agency treats the document as its final view on the matter," and it has "real operative effect." *Id.* at 786. A document that provides a "tentative position" and "leaves agency decisionmakers free to change their minds does not reflect the agency's final decision." *Id.* (citations omitted). In *Sierra Club*, the Court held that draft biological opinions by the U.S. Fish and Wildlife Service which never resulted in a final opinion were protected by the privilege, even though they were that agency's last word on the subject, because they "reflect[ed] a preliminary view—not a final decision" and carried no "real operative effect" in the form of "direct and appreciable legal consequences" flowing from their creation. *Id.* at 786–87.

Here, the decisional memoranda, once signed by Secretary Noem, unambiguously reflected DHS's final decisions to terminate TPS for Afghanistan and Cameroon from which legal consequences flowed. Specifically, the signed decisional memoranda fulfilled the statutory requirement that the Secretary "determine" no later than 60 days prior to the country's TPS expiration date whether the conditions for TPS continued to be met. 8 U.S.C. § 1254a(b)(3)(A).

24

This Court previously accepted DHS's arguments that Secretary Noem satisfied this deadline by signing the decisional memoranda within the required time period, and that the publication of a notice of termination in the Federal Register is a separate requirement that follows such a final determination. *See CASA I*, 792 F. Supp. 3d at 602–03. Thus, the signed decisional memoranda reflected DHS's "final view on the matter" and had "real operative effect" in that they effected compliance with the statutory requirement for a determination on termination to occur in advance of the statutory deadline. *Sierra Club*, 141 S. Ct. at 786. Indeed, where DHS specifically argued that the decisional memoranda, rather than the Federal Register notices, represented the final decisions on TPS terminations and thus satisfied this statutory requirement, and the Court relied on this representation in denying CASA's Motion for Partial Summary Judgment on the claim that DHS failed to comply with that statutory deadline, DHS's claim to the contrary now is arguably barred by judicial estoppel. *See Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (stating that judicial estoppel is "designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment" and applies when "the party to be estopped . . . has taken a later position that is clearly inconsistent with [its] earlier one" that was adopted by the court, and would "derive an unfair advantage . . . if not estopped" (citations omitted)). The Court therefore finds that the decisional memoranda are, in fact, "documents that embody a final decision" not protected by the deliberative process privilege. *Sierra Club*, 141 S. Ct. at 785.

DHS further argues that even if the decisional memoranda reflect final decisions, the entirety of the content of each decisional memorandum, other than the brief statement of the termination decision and accompanying signature block, remains subject to the deliberative process privilege because the body of the document contains "pre-decision recommendations"

25

received by Secretary Noem. DHS Opp'n at 9. The Court finds DHS's position to be overbroad.
First, regardless of whether certain predecisional recommendations are subject to redaction, any
"purely factual material" that is not so intertwined with deliberative material such that it is
severable is not protected by the privilege and may not be redacted. *Empower Oversight
Whistleblowers & Rsch. v. NIH*, 122 F.4th 92, 105 (4th Cir. 2024).

Second, when an agency decisionmaker approves a decisional document that provides
analysis of the issue and the reasons for the final decision, the contents of the document are not
subject to the deliberative process privilege if they provide the basis or explanation for the decision.
*See Sears*, 421 U.S. at 155, 160; *Nat'l Courier Ass'n*, 516 F.2d at 1242 (finding that intra-agency
deliberative memoranda are protected by the deliberative process privilege except for "parts of
such memoranda that are purely factual in nature" or have been "adopted by the agency as the
basis of its decision"); *see also Bolden v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201, 207 (D.C.
Cir. 1988) (stating that the court correctly considered an agency's decisional memorandum that
provided the reasons for its decision). In *Sears*, the Supreme Court considered whether "Advice
Memoranda" and "Appeals Memoranda" prepared by the General Counsel of the National Labor
Relations Board ("NLRB") to inform an NLRB Regional Director of a final determination that an
unfair labor practices complaint would not be authorized were exempt from disclosure under the
fifth exemption ("Exemption Five") of the Freedom of Information Act, 5 U.S.C. § 552(b)(5).
*Sears*, 421 U.S. at 139–42. Exemption Five, which protects from disclosure "inter-agency or intra-
agency memorand[a] or letters that would not be available by law to a party other than an agency
in litigation with the agency," has been found to "incorporate[] . . . the deliberative process
privilege." *Sierra Club*, 141 S. Ct. at 785. In *Sears*, the Court held that Advice and Appeals
Memoranda determining that no complaint would be filed, which provide an "explanation to the

Regional Director" of the General Counsel's decision, are not protected from disclosure because they are "final . . . disposition[s]" and therefore disclosure "would not intrude on predecisional processes." *Sears*, 421 U.S. at 155. The Court further held that separate documents that are expressly adopted or incorporated by reference into non-privileged Advice or Appeals Memoranda are also not protected from disclosure, even if they would have been protected before they were incorporated, in part because it is unlikely that the knowledge that "advice, *if adopted*, will become public" will deter agency staff "from freely advising a decisionmaker," as such staff "will generally be encouraged rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency." *Id.* at 161.

Here, the decisional memoranda, like the Advice and Appeals Memoranda in *Sears*, represent final decisions by Secretary Noem and likely contain either operative facts or the specific bases or explanations for her decisions that, based on her signatures, were adopted by the decisionmaker and therefore are no longer predecisional in nature. *See id.* at 155; *Coastal States*, 617 F.2d at 866 ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue."). To the extent that the decisional memoranda may have discrete sections that provide predecisional, deliberative information that recommended a different decision or provided analysis not properly deemed to have been adopted by the Secretary, such information could be subject to redaction.

Because some or all of the contents of the decisional memoranda may not be subject to the deliberative process privilege, the Court finds that they must be submitted for *in camera* review. *See Nat'l Courier Ass'n*, 516 F.2d at 1242 (conducting *in camera* review of documents to determine if redactions were proper or if certain material should be disclosed as providing "the basis of [the agency's] decision" or "facts not otherwise in the record"). Indeed, courts regularly

27

review internal agency materials claimed to be subject to the deliberative process privilege in order to determine whether or not they should be part of the administrative records in APA cases, including in other cases challenging TPS actions. *See, e.g.*, *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Security*, No. ELH-16-1015, 2017 WL 3189446, at \*15 (D. Md. July 27, 2017); *Desert Survivors v. U.S. Dep't of the Interior*, 231 F. Supp. 3d 368, 382–83 (N.D. Cal. 2017); *Nat'l TPS All. v. Noem*, No. 25-5687, 2025 WL 2419266, at \*4 (N.D. Cal. Aug. 21, 2025). Upon submission, the Court will determine whether the contents, in whole or in part, are subject to the deliberative process privilege and may be withheld, and whether the Government's interest in the nondisclosure of any deliberative material outweighs CASA's need for the material as evidence in this case. *See Warner Comm'cns*, 742 F.2d at 1161; *Cipollone*, 1987 WL 36515, at \*2.

### C.    Other Documents

The parties also contest whether the following documents should be included in the administrative records: (1) the records of clearance and approval for the TPS determinations; (2) two letters from Members of Congress urging TPS extensions; (3) Secretary Rubio's letter recommending the termination of Cameroon's TPS designation; and (4) more recent State Department country conditions reports.

The Court finds that the two DHS Records of Clearance and Approval should be included in the administrative records. The Afghanistan Record of Clearance and Approval lists four advisors who cleared the decision on March 20, 2021, the day before Secretary Noem made her determination in the decisional memorandum, and one who cleared it on the same day that the decision was made. The Cameroon Record of Clearance and Approval lists two advisors who cleared the decision on April 4 and 5, 2025, two and three days before Secretary Noem's

28

determination was made on April 7, 2025, and two officials, including the Deputy Secretary of Homeland Security, who did so on the same day that the decision was made. Where these documents were "before the Secretary" at the time that she made her decisions as demonstrated by her signatures on the clearance records, and she thus necessarily considered at the least the fact of her advisors' clearances in the decisionmaking process, they are appropriately deemed to be part of the administrative records. *Overton Park*, 401 U.S. at 420.

As for the two letters from Members of Congress, one letter, from five United States Senators to Secretary Noem, Secretary Rubio, and Secretary of Defense Pete Hegseth, in part recommended that DHS redesignate Afghanistan for TPS. Because it was dated February 4, 2025 and received on February 5, 2025, it was received by the agency more than six weeks before Secretary Noem's decision on March 21, 2025. The second letter, from 34 Senators and Representatives, urged President Trump to redesignate Cameroon for TPS. This letter was dated April 4, 2025 and received by DHS on April 7, 2025 at 12:45 p.m., the same day that Secretary Noem signed the decisional memorandum for Cameroon. Although CASA argues that the two letters must be included in the administrative records based on these timelines, where DHS has not acknowledged that they were directly or indirectly considered by Secretary Noem, there must be "unusual circumstances justifying" inclusion. *City of Dania Beach*, 628 F.3d at 590. Here, where the letters were from Members of Congress, with one directly addressed to Secretary Noem, they related directly to the Afghanistan and Cameroon TPS termination decisions, and they were received by DHS on or before the dates of those decisions, there is a high probability that they were actually considered, as it is difficult to conceive of an agency completely ignoring such submissions by United States Senators and Representatives. *Cf. Thompson*, 885 F.2d at 555 (concluding that "all relevant correspondence" sent to an administrative law judge "should have

been included as part of the record" forwarded to the Secretary). Under these circumstances, there is also a possibility that they were "negligently excluded" documents that "may had been adverse to [the agency's] decision." *City of Dania Beach*, 628 F.3d at 590. In light of the nature of these documents, the Court will direct DHS to submit a further declaration identifying which officials received and reviewed these documents from the time of their receipt until the Afghanistan and Cameroon TPS determinations were made, and identifying any role those officials played in the preparation of the materials for Secretary Noem or in the actual TPS termination decisions.

Secretary Rubio's letter recommending the termination of Cameroon's TPS designation was properly excluded from the administrative record because it was dated April 8, 2025, one day after Secretary Noem made her determination on the Cameroon TPS termination, and thus could not have been considered in the decisionmaking process. CASA argues that the Court should nevertheless supplement the Cameroon administrative record with this letter because it "illuminates" the fact that "Secretary Noem acted without any supporting recommendation from" the State Department. CASA Reply at 8, ECF No. 108 (quoting *Bolden*, 848 F.2d at 207). However, the primary authority cited by CASA on this point authorized the inclusion in the administrative record of a post-decisional memorandum by agency decisionmakers that reiterated reasons for the decision that the record demonstrated were considered by the agency before the decision was made, not a letter received after the decision was made that provided a viewpoint of another agency that was not otherwise contained in the record. *See Bolden*, 848 F.2d at 207. Moreover, the letter's absence from the administrative record itself illuminates the fact that Secretary Noem acted without a recommendation from the State Department, in contravention of prior practice, such that the Court does not find that its inclusion is somehow necessary to establish that point.

Finally, the Court cannot make a determination at this time as to the State Department country conditions reports. In its July 29, 2025 Order, the Court stated that DHS must either produce the documents requested by CASA, provide reasons for failing to produce them, or file a declaration from a DHS official attesting that they do not exist. CASA requested the production of more recent country conditions reports than those already present in the administrative records, because such reports are typically attached to letters from the Secretary of State, but none were attached to Secretary Rubio's letter relating to the Afghanistan TPS termination, and the Cameroon administrative record did not include a letter from Secretary Rubio. DHS did not produce more recent reports and did not file a declaration attesting that they do not exist. Instead, DHS pointed to the country conditions reports in the administrative records, which were sent to DHS in 2024, and stated that CASA has "no factual basis" for believing that more recent reports exist. DHS Opp'n at 18. If DHS's position is that more recent reports do not exist, it must file a declaration from a DHS official attesting to their nonexistence.

The Court will therefore include the two records of clearance and approval in the administrative records but will not include Secretary Rubio's letter relating to the Cameroon TPS termination. DHS will be required to submit a declaration identifying which officials considered the two letters from Members of Congress and identifying any role those officials played in the TPS termination decisions, and to produce more recent State Department country conditions reports for Afghanistan and Cameroon or file a declaration attesting that none exist.

## III.    CASA's Motion for Extra-Record Discovery

CASA's Motion also requests discovery beyond the two administrative records on its APA claims, as well as "ordinary civil discovery" on its equal protection claims. CASA Mot. at 14. In

opposing this Motion, DHS argues that the provision of the administrative records is the only appropriate discovery for all of CASA's claims.

### A.    APA Claims

As discussed above, judicial review pursuant to the APA is "generally confined to the administrative record." *Fort Sumter Tours*, 66 F.3d at 1335. In an ordinary APA case, the reviewing court "should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). For that reason, the court's inquiry ordinarily does not include discovery or a trial and instead consists of an examination of "the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). The Supreme Court has cautioned against "further judicial inquiry into 'executive motivation,'" because it "represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Id.* (quoting *Arlington Heights*, 429 U.S. at 268 n.18).

Still, consideration of extra-record evidence is appropriate in some APA cases. Such situations include those "where the record is incomplete; where additional information would provide helpful context; where supplemental information would assist the court in determining whether the agency failed to consider relevant factors; and, where the record's integrity has been impugned." *Mayor & City Council of Baltimore v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019). Extra-record discovery may be justified where "the 'bare record' does not reveal the agency's reasoning." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 226 (4th Cir. 2019) (quoting *Overton Park*, 401 U.S. at 420). In addition, while courts generally may not inquire into "the mental processes of administrative decisionmakers," a "strong showing of bad faith or improper behavior" by the agency may justify such an inquiry and related extra-record

32

discovery. *Dep't of Commerce*, 139 S. Ct. at 2573–74 (quoting *Overton Park*, 401 U.S. at 420). Such a showing may be made, for example, through "strong evidence" that the agency decisionmakers had "unalterably closed minds." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011). It may also be made through "a prima facie showing" that the agency's stated "rationale was pretextual." *Dep't of Commerce*, 139 S. Ct. at 2574 (finding that the district court's authorization of extra-record discovery on this basis, though prematurely granted, was ultimately justified).

Here, CASA argues that it is entitled to extra-record discovery on its APA claims because it has made a "strong showing" of "improper behavior" by Secretary Noem based on evidence that she terminated TPS for Afghanistan and Cameroon on a "preordained basis unrelated to statutorily mandated considerations" and had an "unalterably closed mind[.]" CASA Mot. at 14. Such evidence, CASA contends, includes the Afghanistan and Cameroon Notices' reliance on two executive orders directing action to curtail illegal immigration, the unusually short timeframe for the termination decisions, which in the case of Cameroon was made without waiting for input from the Secretary of State, apparent inconsistencies between reports in the administrative records and the ultimate termination decisions, and Secretary Noem's nearly across-the-board terminations of TPS for other countries. CASA also argues that the public statements to which it has pointed as evidence of racial animus demonstrate that "bad faith . . . infected the decisionmaking process." *Id.* at 18.

In other cases addressing APA challenges to TPS termination decisions, courts have permitted extra-record discovery where the plaintiffs had made initial showings that such decisions were preordained, made without applying the requirements of the TPS statute, or based on bad faith. *See, e.g., Nat'l TPS All.*, 2025 WL 2419266, at *2 (granting extra-record discovery because

33

the plaintiffs had made a showing that the TPS determinations "were based on a preordained determination to end the TPS program," including based on the facts that the Secretary "expressed her intention to alter the TPS program even before she took office during her confirmation hearing"); *Nat'l TPS All. v. Noem*, No. 25-1766, 2025 WL 1276229, at *2–3 (N.D. Cal. May 2, 2025) (granting extra-record discovery because the plaintiffs had "presented significant evidence" that the TPS vacatur decisions "were made in bad faith," including statements reflecting discriminatory animus and the compressed timeline for the decisions); Order at 1, *CASA de Maryland, Inc. v. Trump*, No. 18-0845 (D. Md. Feb. 8, 2019), Dkt. No. 57 (permitting extra-record discovery where the plaintiffs alleged that "an anti-Latino immigrant agenda was behind or, at a minimum, was a motivating factor in the decision" to terminate TPS for El Salvador, *see* Reply at 11, *CASA de Maryland*, No. 18-0845 (Dec. 20, 2018), Dkt. No. 49); Order at 1, *Saget v. Trump*, No. 18-1599 (E.D.N.Y. Nov. 20, 2018), Dkt. No. 77 (granting a motion for extra-record discovery in which the plaintiffs alleged that the termination of TPS for Haiti was "a pre-ordained, agenda-driven decision that was divorced from the requirements of the TPS statute," *see* Mot. at 1, *Saget*, No. 18-1599 (Nov. 19, 2018), Dkt. No. 74); Tr. at 5, 9, 15, *Centro Presente v. Trump*, No. 18-10340 (D. Mass. Oct. 10, 2018), Dkt. No. 57 (permitting extra-record discovery where plaintiffs had made a showing of "undue influence" in the form of "improper racial animus" in TPS termination decisions); *Ramos v. Nielsen*, No. 18-1554, 2018 WL 3109604, at *3 (N.D. Cal. June 25, 2018) (ordering defendants to respond to plaintiffs' interrogatory and requests for production where plaintiffs had alleged that the defendants made an "unexplained departure" from past TPS practices, *see* Tr. at 81, 99, *Ramos*, No. 18-1554 (June 28, 2018), Dkt. No. 39). Here, the Court finds that CASA has identified sufficiently similar evidence that it will permit extra-record discovery on its APA claims.

34

Moreover, the Court also finds that extra-record discovery is warranted because the administrative records alone do not "address the complete scope" of CASA's APA claims, which challenge two TPS terminations not only as discrete decisions but also as part of a general policy or practice. CASA Mot. at 19. To address this shortcoming, CASA seeks extra-record discovery on Secretary Noem's TPS determinations for other countries, DHS's implementation of Executive Orders 14,150 and 14,159, and the admission of Afrikaners from South Africa through the United States Refugee Admissions Program, all of which, CASA asserts, could reveal whether DHS implemented a general policy or practice of preordained TPS terminations to reduce the proportion of non-white immigrants in the country.

Courts have permitted extra-record discovery on APA claims challenging such a policy or practice. *See Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (stating that, in an APA challenge to DHS's "alleged pattern and practice of automatically extending H-2A visas beyond the regulatory definition of temporary employment," the court "is free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue'" (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008))); *Manker v. Spencer*, No. 18-372, 2019 WL 5846828, at *19 (D. Conn. Nov. 7, 2019); *United Farm Workers v. Noem*, No. 25-246, 2025 WL 1490131, at *6 (E.D. Cal. May 23, 2025). "Where a plaintiff challenges an agency's general course of conduct rather than a discrete adjudication, limited discovery outside of the administrative record may be necessary where the administrative record does not contain evidence of the challenged action." *Manker*, 2019 WL 5846828, at *19. In *Manker*, for example, where the plaintiffs in a class action challenged the Naval Discharge Review Board's general practice of denying discharge upgrades, the court permitted extra-record discovery beyond the administrative records of the two named plaintiffs in part based on the plaintiffs'

35

argument that evidence on whether there was such a general practice "is not generally part of an individual's administrative record." *Id.* Here, the Afghanistan and Cameroon administrative records contain at least some evidence that supports a finding that DHS was implementing a preordained policy or practice of terminating TPS designations, such as the references in the Afghanistan and Cameroon Notices to executive orders addressing illegal immigration, but this evidence is of only limited usefulness to deciding CASA's APA claims unless it is considered alongside additional evidence relating to DHS's other TPS determinations and the other related actions referenced by CASA. The Court therefore finds that the presumption against extra-record discovery in APA claims is overcome on this basis. *See Hisp. Affs. Project*, 901 F.3d at 388; *Manker*, 2019 WL 5846828, at *19.

For these reasons, CASA's Motion for Extra-Record Discovery will be granted as to the APA claims.

**B.    Equal Protection Claims**

CASA argues that it is entitled to "ordinary civil discovery" on its equal protection claims, CASA Mot. at 14, while DHS counters that CASA is not entitled to discovery here because its constitutional claims challenge agency action and are therefore limited to the administrative record. When plaintiffs assert constitutional claims alongside APA claims challenging agency actions, judicial review is not necessarily confined to the administrative record. Indeed, because of the breadth and diversity of constitutional claims available to litigants challenging agency actions, there is no uniform standard on "the propriety of allowing extra-record discovery" for such claims. *See Mayor & City Council of Baltimore*, 429 F. Supp. 3d at 138–40 (surveying relevant case law and concluding that courts should apply a flexible, case-specific approach to such discovery motions).

For example, some constitutional claims, including some equal protection claims, allege that an agency acted erroneously or without a rational basis and therefore require the reviewing court to apply substantially the same decision rules and consider substantially the same evidence as it would for APA arbitrary-and-capricious claims. *See, e.g.*, *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018) (stating that, on a First Amendment commercial speech claim alleging that the agency erroneously concluded that a company's statements were misleading, the court's "evaluation of the agency's decision is not aided by considering evidence to which the agency was not privy"); *Chiayu Chang v. USCIS*, 254 F. Supp. 3d 160, 162 (D.D.C. 2017) (stating that, for due process and equal protection claims alleging that the agency's visa denial decisions lacked a rational basis, the "information necessary" to decide the claims "will, presumably, be found in the administrative record"); *Tafas*, 530 F. Supp. 2d at 802–03 (stating that, for a claim under the Constitution's Patent Clause, in which the plaintiff could prevail only if he could show that a final rule of the U.S. Patent and Trademark Office lacked a rational basis, "the administrative record is sufficient" to determine whether "there is a rational basis for the conclusion that the Final Rules 'promote the progress of science and the useful arts'" (quoting U.S. Const. art. I, § 8, cl. 8)). Because in such cases additional discovery outside the administrative record would generally not be necessary for the adjudication of the particular constitutional challenges at issue, courts treat them as effectively channeled through the APA's judicial review provisions and limit the court's analysis to the administrative record.

In contrast, equal protection claims alleging discrimination based on suspect classifications, as CASA asserts here, require the reviewing court to apply decision rules distinct from those applicable to APA arbitrary-and-capricious claims and likely require the consideration of evidence that would not be found in an administrative record. *See, e.g.*, *Bos. All. of Gay,*

37

*Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Human Servs.*, 557 F. Supp. 3d 224, 244–45 (D. Mass. 2021) (stating that for an equal protection challenge involving "allegations of discriminatory animus toward transgender people" for which the court applied intermediate scrutiny, the court's review is "not limited to the administrative record"). Two equal protection challenges to revisions by DHS and the State Department to the "public charge" definition, under which foreign nationals are deemed inadmissible to the United States because they are likely to become dependent on public assistance, are illustrative of this point. In *Cook County v. Wolf*, 461 F. Supp. 3d 779 (N.D. Ill. 2020), the court, proceeding under the *Arlington Heights* framework, granted extra-record discovery on the equal protection claim because "evidence of racial animus (if any) will reside outside the administrative record." *Id.* at 795. In contrast, in *Mayor & City Council of Baltimore*, the court, proceeding under the *Hawaii* framework of rational basis review, denied discovery on the equal protection claim because where the public charge definition could be upheld even if there were evidence of discriminatory animus if there was a "justification independent of unconstitutional grounds," its review could fairly "be made on the basis of the administrative record." *Mayor & City Council of Baltimore*, 429 F. Supp. 3d at 143–44.

Here, CASA's equal protection claims fall into the category of claims that apply decision rules and require evidence distinct from those at issue on APA arbitrary-and-capricious claims in that they, like those of the plaintiffs in *Cook County*, will be analyzed under the *Arlington Heights* framework. In this way, they are separate and distinct from CASA's APA claims, which challenge the allegedly preordained nature of the decisions and will be advanced by, but do not necessarily require, evidence that race discrimination was a motivating factor in the decisions. Accordingly, extra-record discovery on the equal protection claims is appropriate and even necessary because courts applying the *Arlington Heights* framework must conduct a searching inquiry to uncover

38

evidence of illegitimate discriminatory motives, which is not likely to be found in the administrative record because such motives will almost certainly not be the agency's stated reason for the policy. *Cook Cnty.*, 461 F. Supp. 3d at 794 (in discussing equal protection claims based on race discrimination, noting that "[m]ost people know by now that the quiet part should not be said out loud"). Where the Court must evaluate agency action allegedly "intended to disadvantage certain races," there exists a serious "mismatch" between the Court's responsibility to consider any direct and circumstantial evidence of discriminatory intent under *Arlington Heights* and a limitation to consideration of only the administrative record. *See id.* Indeed, adhering to such a limitation when the reviewing court is required to apply *Arlington Heights* would undermine the ability to uphold this crucial area of constitutional law because it would constrain a court's ability to meet its responsibility to "smoke out" unconstitutional governmental discrimination. *See Saget v. Trump*, 375 F. Supp. 3d 280, 368 (E.D.N.Y. 2019).

For these reasons, the Court finds that its review of CASA's equal protection claims is not limited to the administrative record. Accordingly, CASA's Motion for Extra-Record Discovery will be granted as to these claims.

## CONCLUSION

For the foregoing reasons, DHS's Motion to Dismiss Counts 5 and 8 will be DENIED, and CASA's Motion to Complete the Administrative Record and for Extra-Record Discovery will be GRANTED IN PART and DENIED IN PART. CASA's Motion will be granted in that (1) DHS will be required to submit unredacted versions of the two decisional memoranda for *in camera* review; (2) the two records of clearance and approval will be added to the administrative records; (3) DHS will be required to provide declarations relating to the letters from the Members of Congress and the State Department country conditions reports; and (4) CASA will be permitted to

39

seek extra-record discovery on its APA and equal protection claims. That Motion will be otherwise

denied. A separate Order shall issue.

Date: December 8, 2025

THEODORE D. CHUANG
United States District Judge