
distributed by mail) are used as appropriate to meet the needs and preferences of various segments of the target population. The SNS solicits responses regarding issues affecting the emergency communications to determine a jurisdiction's level of communications operability, interoperability, continuity, and security. CISA ECD analyzes the data collected from this general survey to identify major gaps and themes affecting emergency communications across levels of government. This analysis informs the development of supplemental surveys and information collections tailored to specific needs across the emergency response community, as well as future iterations of the Nationwide Baseline Communications Assessment (NCBA), Biennial Progress Report (BPR), National Emergency Communications Plan (NECP), and other products and initiatives that enable ECD to carry out its statutory responsibilities at 6 U.S.C. 571(c).

Findings from the SNS provide invaluable insights that CISA ECD shares with emergency communications partners at all levels of government which assists with: (1) Statewide Communications Interoperability Plan (SCIP) development, (2) Threat and Hazard Identification Risk Analysis (THIRA) development, (3) state-level grant programs and guidance, and (4) funding and resource sharing strategy development.

CISA ECD also conducts supplemental surveys to complete statutorily mandated activities (6 U.S.C. 571(c), 572(a), and 573) and will share the data with relevant emergency communications partners. The SAFECOM supplemental surveys deploy topic-specific or targeted surveys to various emergency response disciplines at the federal, state, territorial, tribal, and local levels of government, as appropriate, as well as the private sector. The instruments solicit responses regarding targeted issues affecting specific segments of the emergency response community. CISA ECD analyzes the data collected from these supplemental surveys to identify changing requirements, mitigate risks, and help further inform the data collected from the SNS.

## Analysis

*Agency:* Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS).
*Title:* Generic Clearance: SAFECOM Nationwide Surveys Generic Clearance.
*OMB Number:* 1670–0048.
*Frequency:* Annually.
*Affected Public:* State, Local, Tribal, and Territorial Governments.
*Number of Respondents:* 7,215.
*Estimated Time Per Respondent:* 0.5 hours.
*Total Burden Hours:* 3,643 hours.
*Total Annual Burden Cost:* $179,570.66.
*Total Annual Cost to Government Cost:* $168,515.35.

**Robert J. Costello,**
*Chief Information Officer, Department of Homeland Security, Cybersecurity and Infrastructure Security Agency.*

[FR Doc. 2025–21438 Filed 11–26–25; 8:45 am]
**BILLING CODE 9111–LF–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2843–26; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB70

### Termination of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).
**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) newly announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Haiti for Temporary Protected Status. Because of interference by a federal district court judge, the designation of Haiti is set to expire on February 3, 2026. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Haiti no longer meets the conditions for the designation for Temporary Protected Status. The Secretary, therefore, is newly terminating the Temporary Protected Status designation of Haiti as required by statute. This termination is effective February 3, 2026. After February 3, 2026, nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been granted Temporary Protected Status under Haiti's designation will no longer have Temporary Protected Status. This determination to terminate the TPS designation for Haiti supersedes the determination announced in the July 1, 2025 notice, "Termination of the Designation of Haiti for Temporary Protected Status."

**DATES:** The designation of Haiti for Temporary Protected Status is terminated, effective at 11:59 p.m., local time, on February 3, 2026.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

### List of Abbreviations

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
UN—United Nations
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

### What is Temporary Protected Status?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for Temporary Protected Status (TPS) if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may grant Temporary Protected Status to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for Temporary Protected Status to determine whether the conditions for the Temporary Protected Status designation continue to be met. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for the designation, Temporary Protected Status will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for Temporary Protected Status designation, the Secretary must terminate the

designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation of a foreign state'' for Temporary Protected Status. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

Temporary Protected Status is a temporary immigration benefit granted to eligible nationals of a country designated by the Secretary for Temporary Protected Status under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the designation period, Temporary Protected Status beneficiaries are eligible to remain in the United States and may not be removed, so long as they continue to meet the requirements of Temporary Protected Status. In addition, Temporary Protected Status beneficiaries are authorized to work and obtain an Employment Authorization Document (EAD), if requested. Temporary Protected Status beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of Temporary Protected Status does not result in or lead to lawful permanent resident status or any other immigration status.

To qualify for Temporary Protected Status, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2) in accordance with the implementing regulations at 8 CFR parts 244 and 1244. When the Secretary terminates a country's designation, beneficiaries return to the same immigration status or category that they maintained before Temporary Protected Status, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for Temporary Protected Status, as long as it is still valid on the date Temporary Protected Status terminates.

### Designation of Haiti for Temporary Protected Status

Haiti was initially designated for Temporary Protected Status on January 21, 2010, based on a determination that there were extraordinary and temporary conditions in Haiti that prevented nationals of Haiti from returning in safety and that permitting such aliens to remain temporarily in the United States would not be contrary to the national interest of the United States.[1] Following the initial designation, former Secretary Napolitano extended and newly designated Haiti for Temporary Protected Status once, from July 23, 2011 through January 22, 2013, based on extraordinary and temporary conditions.[2] Thereafter, Temporary Protected Status was extended three more times based on extraordinary and temporary conditions: (1) from January 23, 2013 through July 22, 2014;[3] (2) from July 23, 2014 through January 22, 2016;[4] and (3) from January 23, 2016 through July 22, 2017.[5] Former Secretary Kelly then granted a six-month extension of Temporary Protected Status from July 23, 2017 through January 22, 2018, but made clear that a further extension appeared unwarranted based on then-current country conditions.[6] Subsequently, then-Acting Secretary Duke announced the termination of the Temporary Protected Status designation of Haiti effective July 22, 2019.[7]

Despite the law barring judicial review, the termination of Haiti's 2011 Temporary Protected Status designation was challenged in several lawsuits, and court injunctions required DHS to temporarily continue Temporary Protected Status for Haiti pending a final court order.[8] Former Secretary Mayorkas then newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021 through February 3, 2023.[9] Thereafter, Temporary Protected Status for Haiti was extended and newly designated from February 4, 2023 through August 3, 2024.[10]

In July 2024, DHS issued a notice stating that Secretary Mayorkas had once again determined to extend and newly designate Haiti for Temporary Protected Status for an 18-month period, set to expire on February 3, 2026.[11] On February 24, 2025, DHS published a **Federal Register** notice announcing the Secretary's decision to partially vacate the July 1, 2024 Temporary Protected Status decision by reducing the period of extension and new designation of Temporary Protected Status for Haiti from 18 months to 12 months with an amended end date of August 3, 2025.[12] On July 1, 2025, DHS published a **Federal Register** notice announcing the Secretary's decision to terminate the Temporary Protected Status designation for Haiti, effective September 2, 2025.[13]

Again, in spite of the statute prohibiting judicial review, on July 15, 2025, a judge in the U.S. District Court for the Eastern District of New York issued a final judgment in *Haitian Evangelical Clergy Ass'n* v. *Trump,* No. 25–cv–1464, that makes the effective date of any termination no earlier than February 3, 2026. In compliance with the U.S. District Court for the Eastern District of New York's final judgment, the current Temporary Protected Status designation period for Haiti ends February 3, 2026. In view of the district court's ruling with respect to the partial vacatur, the Secretary made a new, superseding determination under 8 U.S.C. 1254a(b)(3)(A), which is being announced in this notice.

### Secretary's Authority To Terminate the Designation of Haiti for Temporary Protected Status

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for Temporary Protected Status to determine whether the country continues to meet the conditions for the designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the Temporary Protected Status designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8

---

[1] Designation of Haiti for Temporary Protected Status, 75 FR 3476 (Jan. 21, 2010).

[2] Extension and Redesignation of Haiti for Temporary Protected Status, 76 FR 29000 (May 19, 2011).

[3] Extension of the Designation of Haiti for Temporary Protected Status, 77 FR 59943 (Oct. 1, 2012).

[4] Extension of the Designation of Haiti for Temporary Protected Status, 79 FR 11808 (Mar. 3, 2014).

[5] Extension of the Designation of Haiti for Temporary Protected Status, 80 FR 51582 (Aug. 25, 2015).

[6] Extension of the Designation of Haiti for Temporary Protected Status, 82 FR 23830 (May 24, 2017).

[7] Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (Jan. 18, 2018).

[8] On Dec. 28, 2023, the U.S. District Court for the Northern District of California dismissed *Ramos* v. *Nielsen,* No. 18–cv–01554 (N.D. Cal. Dec. 28, 2023). Related litigation in *Bhattarai* v. *Nielsen,* No. 19–cv–731 (N.D. Cal. Mar. 12, 2019) was consolidated with *Ramos* in August 2023. The court agreed with the government position that subsequent Temporary Protected Status designations rendered the pending litigation moot.

[9] Designation of Haiti for Temporary Protected Status, 86 FR 41863 (Aug. 3, 2021).

[10] Extension and Redesignation of Haiti for Temporary Protected Status, 88 FR 5022 (Jan. 26, 2023).

[11] Extension and Redesignation of Haiti for Temporary Protected Status, 89 FR 54484 (July 1, 2024).

[12] Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 FR 10511 (Feb. 24, 2025).

[13] Termination of the Designation of Haiti for Temporary Protected Status, 90 FR 28760 (July 1, 2025).

U.S.C. 1254a(b)(3)(B). The termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See id.* The Secretary may determine the appropriate effective date of the termination and expiration of any Temporary Protected Status-related documentation, such as EADs, issued or renewed after the effective date of termination. *See id.; see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be "appropriate").

## Reasons for the Secretary's Termination of the Temporary Protected Status Designation for Haiti

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed country conditions in Haiti and considered whether Haiti continues to meet the conditions for the designation under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). This review included examining: (a) whether extraordinary and temporary conditions in Haiti that prevent aliens who are Haitian nationals from returning to Haiti in safety continued to exist, and (b) if permitting Haitian nationals to remain temporarily in the United States was contrary to the national interest of the United States.

Based on the Department's review, the Secretary has determined that there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning in safety. Moreover, even if the Department found that there existed conditions that were extraordinary and temporary that prevented Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning in safety, termination of Temporary Protected Status of Haiti is still required because it is contrary to the national interest of the United States to permit Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) to remain temporarily in the United States.

Certain conditions in Haiti remain concerning. As an example of the challenges still facing the country, during his August 28, 2025 address to the United Nations (UN) Security Council, the UN Secretary-General reported that 1.3 million people—approximately 12% of Haiti's population—have been forced to flee their homes and are internally displaced due to escalating violence and gang violence that has "engulfed" Port-au-Prince "and spreads beyond."[14] At the UN Security Council briefing on Haiti on August 28, 2025, the Acting U.S. Ambassador to the UN, Dorothy Shea, commented that "the United States remains concerned about escalating levels of violence in Haiti" and "the territorial expansion of the gangs threatens to undermine gains made by both the Haitian National Police and the Multinational Security Support mission."[15] During the most recent UN Security Council briefing on Haiti on October 22, 2025, U.S. Ambassador to the UN Mike Waltz[16] likewise acknowledged that Haiti "has had a long and difficult history" and "truly stands at a crossroad."[17] Ambassador Waltz further stated: "We have gangs that are terrorizing communities, extorting families, recruiting children to commit horrors on behalf of the gang leaders. The spillover effects of this violence threaten not only Haiti but the stability of the wider Caribbean and the Western Hemisphere."[18]

The data surrounding internal relocation does indicate parts of the country are suitable to return to. There have also been some other positive developments. For example, in a recent briefing, the UN Secretary General stated that despite continuing violence in Haiti, "there are emerging signals of hope."[19] On September 30, 2025, the UN Security Council approved a resolution which authorized a new multinational Gang Suppression Force to replace the Kenyan-led security support mission. Per the UN, "under an initial 12-month mandate, the GSF [Gang Suppression Force] will work in close coordination with the Haitian National Police (HNP) and the Haitian armed forces to conduct intelligence-led operations to neutrali[z]e gangs, provide security for critical infrastructure and support humanitarian access. The 5,550-strong force will also protect vulnerable groups, support reintegration of former fighters and help strengthen Haitian institutions."[20] On October 1, 2025, Secretary Rubio issued a press statement stating "this force will address Haiti's immediate security challenges and lay the groundwork for long-term stability. . . moving forward, the GSF, with support from the UNSOH [UN Support Office in Haiti], will transition to an international burden-sharing model with the sufficient resources needed to fight the gangs."[21] Further, according to the World Bank, "modest GDP growth is projected by 2026 as investment increases from a low baseline, assuming improvements on the political and security fronts."[22]

Based on the Department's review, the Secretary has determined that while the current situation in Haiti is concerning, the United States must prioritize its national interests and permitting Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest.

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[23] Determining whether

---

[14] United Nations, "Security-General's remarks to the Security Council—on Haiti [trilingual, as delivered; scroll down for all-English and all-French]," Aug. 28, 2025, *https://www.un.org/sg/en/content/sg/statement/2025-08-28/secretary-generals-remarks-the-security-council-haiti-trilingual-delivered-scroll-down-for-all-english-and-all-french*.

[15] U.S. Mission to the UN, "Remarks at a UN Security Council Briefing on Haiti" (Aug. 28, 2025) (further highlighting humanitarian concerns such as displacement, recruitment of children in armed gangs, and food insecurity), *https://ht.usembassy.gov/remarks-at-a-un-security-council-briefing-on-haiti/*.

[16] Ambassador Waltz was officially sworn in as the U.S. Representative to the UN on September 20, 2025.

[17] U.S. Mission to the UN, "Remarks at a UN Security Council Briefing on Haiti" (Oct. 22, 2025), *https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-haiti-8/*.

[18] *Id.*

[19] United Nations, " 'The people of Haiti are in a perfect storm of suffering,' warns UN chief," Aug. 28, 2025, *https://news.un.org/en/story/2025/08/1165738*.

[20] United Nations, "UN Security Council approves new 'suppression force' for Haiti amid spiraling gang violence," Sept. 30, 2025, *https://news.un.org/en/story/2025/09/1166006*.

[21] U.S. Dep't of State, "On the Next Steps to Restoring Security in Haiti," Oct. 1, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/10/on-the-next-steps-to-restoring-security-in-haiti/; see also* U.S. Mission to the UN, "Remarks at a UN Security Council Briefing on Haiti," (Oct. 22, 2025) (remarks of Ambassador Waltz applauding the adoption of the resolution supporting the GSF), *https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-haiti-8/*.

[22] World Bank, "The World Bank in Haiti" (last updated Apr. 28, 2025), *https://www.worldbank.org/en/country/haiti/overview*.

[23] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v.

Continued

permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment.

President Trump clearly articulated policy imperatives bearing upon the national interest in his immigration and border-related executive orders and proclamations. In Proclamation 10888 "Guaranteeing the States Protection Against Invasion," President Trump emphasized that Congress has established a complex and comprehensive framework under the INA to regulate the entry and exit of aliens and goods across U.S. borders. Under normal conditions, this framework supports national sovereignty by enabling the admission of aliens whose presence serves the national interest and excluding those who may pose risks to public health, safety, or national security. However, in a high-volume border environment— particularly when the system is overwhelmed—this screening process can become ineffective. Limited access to critical information and significant processing delays hinder the ability of federal officials to reliably assess the criminal histories or national security threats posed by aliens attempting to enter the U.S. illegally. As a result, public safety and national security risks are significantly heightened in such conditions.[24]

In Executive Order (E.O.) 14161 "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats," President Trump instructed the Secretary of State, Attorney General, Secretary of Homeland Security, and Director of National Intelligence to jointly submit to the President a report that identified countries throughout the world "for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries."[25] Proclamation 10949 "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats" built upon the findings of that review. President Trump determined to fully restrict and limit the entry of nationals from Haiti following his review of the requested report. In support of this decision, President Trump outlined that "according to the [Fiscal Year 2023 Entry/Exit] Overstay Report [published on August 5, 2024], Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent."[26] In addition, "as is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States."[27]

Overstaying the terms of the nonimmigrant visa is a violation of U.S. immigration laws and presents challenges for immigration enforcement and resource allocation. Visa overstaying diverts resources from other critical enforcement priorities, such as addressing illegal border crossings. According to the Fiscal Year 2024 Department of Homeland Security Entry/Exit Overstay Report [published on July 16, 2025], Haiti had a Non-Visa Waiver Program Countries Business or Pleasure Visitors (B–1/B–2) visa overstay rate of 24.84% and a Student and Exchange Visitors (F, M, J) visa overstay rate of 22.35%.[28] These figures significantly exceed the global average overstay rates of 2.33% for B–1/B–2 visas and 3.23% for F, M, J visas—over ten times higher for business or pleasure visitors and six times higher for student and exchange visitors.[29] Haiti's visa overstay rates consistently remain very high compared to other nations, reflecting ongoing challenges in enforcing compliance with U.S. visa regulations. Elevated overstay rates present potential risks to U.S. national security and public safety, as aliens who overstay their visas may be harder to locate and monitor, increasing vulnerabilities within immigration enforcement systems. Moreover, aliens who overstay nonimmigrant visas can place an added strain on local communities by increasing demand for public resources, contributing to housing and healthcare pressures, and competing in an already limited job market.

In E.O. 14159 "Protecting the American People Against Invasion," President Trump underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[30] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[31] Among the directed actions are to ensure that the Temporary Protected Status designations are consistent with the Temporary Protected Status statute and "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[32]

Prior to FY2025, U.S. Border Patrol recorded a consistent year-over-year increase in encounters with Haitian nationals: 56,596 in FY2022, 163,781 in FY2023, and 220,798 in FY2024.[33] For several years, there has been a significant increase in the number of Haitians arriving in the United States illegally, particularly via land. According to one report, "from 2019 through 2021, Haitians were the top nationality for migrants crossing the dangerous Darien Gap between Colombia and Panama, and they have remained among the three largest groups in 2022 and 2023."[34] Another report states: "the continuation of a devastating political, environmental, social, and economic situation . . . in Haiti guarantees an unbroken chain migration, particularly to the United States and Canada; and when combined with already heavy backlogs in processing resident status changes, a large and growing flow of Haitians will

---

*Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J–,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[24] Guaranteeing the States Protection Against Invasion, 90 FR 8333 (Jan. 29, 2025).

[25] Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 8451 (Jan. 30, 2025).

[26] Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (June 10, 2025).

[27] Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (June 10, 2025).

[28] U.S. Customs and Border Protection, Entry/Exit Overstay Report, Department of Homeland Security (July 16, 2025), *https://www.dhs.gov/sites/default/files/2025-08/25_0826_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.*

[29] *Id.*

[30] Protecting the American People Against Invasion, 90 FR 8443 (Jan. 29, 2025).

[31] *Id.,* sec. 16, 90 FR 8446.

[32] *Id.,* sec. 16, 90 FR 8446.

[33] U.S. Customs and Border Protection, "U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component" (last updated: Sept. 19, 2025), available at: *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[34] Migration Policy Institute, "Haitian Immigrants in the United States" (Nov. 8, 2023), available at: *https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022.*

persist.''[35] This pattern of large-scale illegal immigration as a result of ''pull factors'' has continued for years.

The numerous new designations of Temporary Protected Status for Haiti in 2011, 2021, and 2023, opened eligibility to those who entered and continued to enter the U.S. many years after the initial 2010 designation.[36] As noted above, illegal immigration from Haiti into the U.S. continued to increase with extremely high numbers seen around the time of and following the latest new designations of Temporary Protected Status for Haiti by then Secretary Mayorkas.

Approximately 67,400 nationals of Haiti have entered the United States since June 3, 2024. Within this population, approximately 3,000 are nonimmigrants in valid status, approximately 1,000 are nonimmigrants out of status, approximately 63,000 were encountered at a border or port of entry and have no lawful immigration status, and it is estimated that 400 crossed the U.S. border without being apprehended.[37] These realities are unsustainable and inconsistent with President Trump's outlined policy priorities as well as U.S. national interests.

Beyond migration factors and immigration policy, public safety and national security are important considerations when assessing if a Temporary Protected Status designation is in line with U.S. national interests. DHS records indicate that there are Haitian nationals who are Temporary Protected Status recipients who have been the subject of administrative investigations for fraud, public safety, and national security. These issues underscore a conflict with the national interest of the United States.

As acknowledged previously in this notice, gang violence in Haiti persists as armed groups operate with impunity, enabled by a weak or effectively absent central government. The Congressional Research Service described the situation in Haiti in a recent report: ''The gangs— some of which are aligned with political elites—amassed control over territory and illicit markets amid political instability following the 2021 assassination of then-President Jovenel Moise. Since April 2024, Haiti has been governed by a Transitional Presidential Council (TPC). The TPC, tasked with governing until elections can be convened, has been plagued by allegations of corruption and infighting.''[38] As such, it has not been able to effectively crack down on gang violence. However, the revamped international efforts and multinational Gang Suppression Force aim to combat gang violence to improve conditions in Haiti. On May 2, 2025, the Secretary of State announced the State Department's designation of Viv Ansanm and Gran Grif as Foreign Terrorist Organizations and Specially Designated Global Terrorists. In his announcement, the Secretary noted ''Haitian gangs, including the Viv Ansanm coalition and Gran Grif, are the primary source of instability and violence in Haiti. They are a direct threat to U.S. national security interests in our region . . . their ultimate goal is creating a gang-controlled state where illicit trafficking and other criminal activities operate freely and terrorize Haitian citizens.''[39] In October 2025, Ambassador Waltz said in an interview ''we in the UN Security Council just took action yesterday on the gangs that have taken over Haiti, right off Florida's shores. These gangs are in coordination with all of these transnational groups. They're shipping drugs, money, weapons. They're destabilizing the entire region.''[40]

Widespread gang violence in Haiti is sustained by the country's lack of functional government authority. This breakdown in governance directly impacts U.S. national security interests, particularly in the context of uncontrolled migration. As previously outlined, when immigration flows exceed our capacity to properly vet aliens at the border, the risks are compounded by the inability to access reliable law enforcement or security information from the alien's country of origin. The joint assessment by the Secretary of State, Secretary of Homeland Security, and Director of National Intelligence has found that Haiti lacks a functioning central authority capable of maintaining or sharing such critical information, severely limiting the U.S. government's ability to screen and vet Haitians in the United States with Temporary Protected Status. And Haitian gangs—such as those designated by the State Department as Foreign Terrorist Organizations—pose a serious threat to U.S. interests. These challenges support the determination that permitting Haitian nationals to remain temporarily in the United States is contrary to the national interest.

This lack of government control has not only destabilized Haiti internally but has also had direct consequences for U.S. public safety. Haitian gang members have already been identified among those who have entered the United States and, in some cases, have been apprehended by law enforcement for committing serious and violent crimes. For example, in January 2025, U.S. Immigration and Customs Enforcement (ICE) apprehended Wisteguens Jean Quely Charles, a member of a violent Haitian street gang, who had been arrested, charged and convicted for 17 crimes between August 2022 and August 2024 including both ''possession of and possession to distribute controlled substances, distribution of controlled substances, trespassing, carrying dangerous weapon to wit brass knuckles, possession of a firearm without a permit, possession of ammunition without a permit, assault and battery with a dangerous weapon, assault and battery, and resisting arrest.''[41] This case underscores the broader risk posed by rising Haitian migration, particularly in light of multiple large-scale prison breaks in Haiti[42] and the increasing numbers of

---

[35] IOM, ''Engaging the Haitian Diaspora'' (Sept 10, 2013), available at: https://environmentalmigration.iom.int/resources/engaging-haitian-diaspora.

[36] The intent of Temporary Protected Status was to create a temporary safe haven for aliens who are already in the United States. See INA sec. 244(c)(1)(A)(i) (limiting Temporary Protected Status eligibility to aliens continuously physically present in the United States since the country's designation), (c)(5) (clarifying that a Temporary Protected Status designation does not authorize aliens to come to the United States to apply for such status). Using TPS to grant temporary status to successive waves of new arrivals from a designated country may generate a significant pull factor for illegal immigration and act in tension with the congressional design.

[37] Office of Homeland Security Statistics, estimate as of September 30, 2025.

[38] Library of Congress, Congressional Research Service, ''Haiti in Crisis: Developments Related to the Multinational Security Support Mission'' (June 3, 2025), available at: https://www.congress.gov/crs-product/IN12331#:~:text=Between%20January%20and%20March%202025,attributed%20to%20gang%2Drelated%20violence.

[39] U.S. Department of State, ''Terrorist Designations of Viv Ansanm and Gran Grif'' (May 2, 2025), available at: https://www.state.gov/releases/office-of-the-spokesperson/2025/05/terrorist-designations-of-viv-ansanm-and-gran-grif/.

[40] U.S. Mission to the UN, ''U.S. Representative to the United Nations, Ambassador Mike Waltz's Interview with Martha Maccallum on Fox News'' (Oct. 1, 2025), https://usun.usmission.gov/u-s-representative-to-the-united-nations-ambassador-mike-waltzs-interview-with-martha-maccallum-on-fox-news/.

[41] U.S. Immigration and Customs Enforcement, ''ICE ERO Boston arrests Haitian gang member with numerous convictions'' (Jan. 24, 2025), available at: https://www.ice.gov/news/releases/ice-ero-boston-arrests-haitian-gang-member-numerous-convictions.

[42] See The Guardian ''Haiti declares state of emergency after thousands of dangerous inmates escape'' (Mar. 4, 2024) (''Haiti has declared a three-day state of emergency and a night-time curfew after armed gangs stormed the country's two biggest jails, allowing more than 3,000 dangerous criminals, including murderers and kidnappers, to escape back on to the streets of the poor and violence-racked Caribbean nation.''), available at: https://www.theguardian.com/world/2024/mar/04/

Continued

encounters reported by U.S. Customs and Border Protection. The inability of the previous administration to reliably screen aliens from a country with limited law enforcement infrastructure and widespread gang activity presents a clear and growing threat to U.S. public safety.

Moreover, since the U.S. designated Viv Ansanm and Gran Grif as foreign terrorist organizations, the Department of Homeland Security, Department of Justice, and Department of State have announced arrests and indictments of aliens linked to these gangs. These actions demonstrate that these groups pose not just an overseas threat but a tangible national security and public safety risk within our borders. In addition, that these aliens were able to operate inside the United States raises serious concerns about how they entered or remained in the United States, potentially due to inadequate screening at the border or a lack of actionable intelligence from Haitian authorities on known gang affiliates. In July 2025, State announced deportation actions against U.S. lawful permanent residents who were found to be affiliated with Viv Ansanm.[43] In September 2025, ICE announced the arrest of a Haitian alien who ''engaged in a campaign of violence and gang support that contributed to Haiti's destabilization.''[44]

In E.O. 14150 ''America First Policy Directive to the Secretary of State,'' President Trump declared ''from this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' Moreover, it instructed ''as soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.''[45] As mentioned, the UN Security Council adopted a resolution to transition the Multinational Security Support mission to a Gang Suppression Force and authorized the establishment of a UN Support Office in Haiti.[46] On October 1, 2025, Secretary Rubio released a press statement commending the adoption of the resolution: ''The message from the Security Council is clear: the era of impunity for those who seek to destabilize Haiti is over. The United States remains committed to working with international stakeholders to support Haiti's path toward peace, stability, and democratic governance. We call on all nations to join us in this critical effort.''[47] Ending Temporary Protected Status for Haiti reflects a necessary and strategic vote of confidence in the new chapter Haiti is turning. The United States cannot call for bold change on the ground while signaling doubt from afar. Our immigration policy must align with our foreign policy vision of a secure, sovereign, and self-reliant Haiti and not a country that Haitian citizens continue to leave in large numbers to seek opportunities in the United States.

In summary, the current situation in Haiti is concerning. However, the United States must prioritize its national interests, which includes assessing foreign policy, public safety, national security, migration factors, immigration policy, and economic considerations. In considering these factors individually and cumulatively, the Secretary has determined that permitting Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest.

DHS estimates that there are approximately 352,959 nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who hold Temporary Protected Status under Haiti's designation.[48]

### Effective Date of Termination of the Designation

The Temporary Protected Status statute provides that the termination of a country's Temporary Protected Status designation may not be effective earlier than 60 days after the notice is published in the **Federal Register** or, if later, the expiration of the most-recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

The Temporary Protected Status statute authorizes the Secretary, at her discretion, to allow for an ''orderly transition'' period with respect to the termination and the expiration of any Temporary Protected Status-related documentation, such as EADs. The Secretary has determined, in her discretion, that the statutory minimum transition period of 60 days is sufficient and warranted here given the Secretary's finding that continuing to permit Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3).[49] Accordingly, the termination of the Haiti Temporary Protected Status designation will be effective February 3, 2026.[50]

DHS recognizes that Haiti Temporary Protected Status beneficiaries under the

---

[43] U.S. Department of State, ''Deportation Actions Against U.S. Legal Permanent Residents Affiliated with Haitian Foreign Terrorist Organization Viv Ansanm'' (July 21, 2025), *https://www.state.gov/releases/office-of-the-spokesperson/2025/07/deportation-actions-against-u-s-legal-permanent-residents-affiliated-with-haitian-foreign-terrorist-organization-viv-ansanm/*.

[44] ICE, ''ICE arrests illegal alien from Haiti connected to criminal terrorist organizations'' (Sept. 25, 2025), *https://www.ice.gov/news/releases/ice-arrests-illegal-alien-haiti-connected-criminal-terrorist-organizations*.

*haiti-mass-jailbreak-violence-port-au-prince-gangs;* Al Jazeera, ''Haiti declares curfew after 4,000 inmates escape jail amid rising violence'' (Mar. 4, 2024) (''Haiti's government has declared a state of emergency and imposed a curfew after an explosion of gang-led violence over the weekend saw thousands of prisoners escape after assaults on the country's two biggest prisons.''), available at: *https://www.aljazeera.com/news/2024/3/4/thousands-of-inmates-escape-prison-amid-deepening-haiti-violence; see also* Reuters, ''Haiti prison break leaves 12 dead as inmates go hungry'' (Aug. 16, 2024) (''A prison break in the Haitian city of Saint-Marc left 12 inmates dead on Friday, Mayor Myriam Fievre said, the third such incident in Haiti in recent months amid a protracted humanitarian crisis fueled by gang violence.''), available at: *https://www.reuters.com/world/americas/haitian-inmates-escape-prison-third-recent-jailbreak-miami-herald-says-2024-08-16/*.

[45] America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 29, 2025).

[46] United Nations, ''UN Security Council approves new 'suppression force' for Haiti amid spiraling gang violence'' Sept. 30, 2025, *https://news.un.org/en/story/2025/09/1166006*.

[47] U.S. Department of State, ''On the Next Steps to Restoring Security in Haiti'' (Oct. 1, 2025), *https://www.state.gov/releases/2025/10/on-the-next-steps-to-restoring-security-in-haiti/*.

[48] As of November 10, 2025, approximately 18,068 of these nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) are also approved as Lawful Permanent Residents. Data queried by Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality November 2025.

[49] Whether to allow for an additional ''orderly departure'' period following a Temporary Protected Status designation termination (beyond the statutory minimum of 60 days) is an ''option'' left to the Secretary's unfettered discretion. INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Although DHS has allowed such extended periods for certain Temporary Protected Status terminations, *see, e.g., Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (6-month orderly transition period), certain other Temporary Protected Status designations were terminated without allowing for such transition periods, *see, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (same). The Secretary has determined that a 60-day period is appropriate under the circumstances.

[50] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

designation continue to be employment authorized until the designation ends on February 3, 2026.[51] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain Employment Authorization Documents previously issued under the Temporary Protected Status designation of Haiti through February 3, 2026. Therefore, as proof of continued employment authorization through February 3, 2026, Temporary Protected Status beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a ''Card Expires'' date of February 3, 2026, August 3, 2025, August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017.

The Secretary has considered putative reliance interests in the Haiti Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, as frequently as every six months in some cases, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3).

## Notice of the Termination of the Temporary Protected Status Designation of Haiti

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Haiti; and (b) whether permitting the nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) to remain temporarily in the United States is contrary to the national interest of the United States. Based on my review, I have determined that Haiti no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(1)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Haiti for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on February 3, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) will be available at local USCIS office upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283.This information will be published on the USCIS website at *www.uscis.gov*.

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–21379 Filed 11–26–25; 8:45 am]
**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[A2407–014–004–065516; #O2412–014–004–047181.1; LLNM920000]**

### Notice of Proposed Reinstatement of BLM New Mexico Terminated Oil and Gas Leases: NMNM 141402

**AGENCY:** Bureau of Land Management, Interior.
**ACTION:** Notice of lease reinstatement.

**SUMMARY:** In accordance with the Mineral Leasing Act of 1920, as amended, the Bureau of Land Management (BLM) received a petition for reinstatement of terminated competitive oil and gas lease NMNM 141402 from Tascosa Energy Partners, LLC . The lessee timely filed a petition for reinstatement of the competitive oil and gas lease located in Eddy County, New Mexico. The lessee paid the required rentals accruing from the date of termination. No leases have been issued that affect these lands. The BLM proposes to reinstate the lease.

**FOR FURTHER INFORMATION CONTACT:**
Julieann Serrano, Supervisory Land Law Examiner, Branch of Adjudication, Bureau of Land Management New Mexico State Office, 301 Dinosaur Trail, Santa Fe, New Mexico 87508, (505) 954–2149, *jserrano@blm.gov*. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The lessee agrees to new lease terms for rental of $20 per acre, or fraction thereof, per year, and a royalty rate of 16.67 percent. The lessee agreed to amended stipulations. The lessee paid the required administration fee and has reimbursed the BLM for the cost of publishing this notice.

The lessee meets the requirements for reinstatement of the lease per sec. 31 (d) and (e) of the Mineral Leasing Act of 1920 (30 U.S.C. 188). The BLM is proposing to reinstate lease NMNM 141402 effective January 1, 2022, for the remainder of the primary term, subject to: the original terms and conditions of the lease; amended stipulations; increased rental of $20 per acre; and increased royalty of 16.67 percent.

(Authority: 30 U.S.C. 188 (e)(4) and 43 CFR 3108.23.)

**Joseph B. Peterson,**
*Acting Deputy State Director, Minerals.*
[FR Doc. 2025–21454 Filed 11–26–25; 8:45 am]
**BILLING CODE 4331–23–P**

---

## DEPARTMENT OF THE INTERIOR

### National Indian Gaming Commission

### Renewals of Information Collections Under the Paperwork Reduction Act

**AGENCY:** National Indian Gaming Commission.
**ACTION:** Notice of renewal of information collections; second request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), the National Indian Gaming Commission (NIGC or Commission) is providing notice to, and seeking comments from, the general public about its submission, concurrently with the publication of this notice or soon thereafter, of the following information collection renewal requests to the Office of Management and Budget (OMB) for OMB review and approval: (i) Indian gaming management contract-related submissions, as authorized by Office of Management and Budget (OMB) Control Number 3141–0004 (expires on February 28, 2026); (ii) Indian gaming fee payments-related submissions, as

---

[51] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).